Cite as: 595 U. S. ____ (2022)    1

Kavanaugh, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 21A477

_____

## LLOYD J. AUSTIN, III, SECRETARY OF DEFENSE, ET AL. *v.* U. S. NAVY SEALS 1–26, ET AL.

ON APPLICATION FOR A PARTIAL STAY

[March 25, 2022]

The application for a partial stay presented to Justice Alito and by him referred to the Court is granted. The district court's January 3, 2022 order, insofar as it precludes the Navy from considering respondents' vaccination status in making deployment, assignment, and other operational decisions, is stayed pending disposition of the appeal in the United States Court of Appeals for the Fifth Circuit and disposition of the petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court.

Justice Thomas would deny the application for a partial stay.

Justice Kavanaugh, concurring.

I concur in the Court's decision to grant the Government's application for a partial stay of the District Court's preliminary injunction for a simple overarching reason: Under Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces. In light of that bedrock constitutional principle, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy* v. *Egan*, 484

Kavanaugh, J., concurring

U. S. 518, 530 (1988). As the Court has long emphasized, moreover, the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments." *Gilligan* v. *Morgan*, 413 U. S. 1, 10 (1973). Therefore, it is "difficult to conceive of an area of governmental activity in which the courts have less competence." *Ibid.*

In this case, the District Court, while no doubt well-intentioned, in effect inserted itself into the Navy's chain of command, overriding military commanders' professional military judgments. The Court relied on the Religious Freedom Restoration Act. See 42 U. S. C. §2000bb–1(b). But even accepting that RFRA applies in this particular military context, RFRA does not justify judicial intrusion into military affairs in this case. That is because the Navy has an extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment of all Special Warfare personnel—including control over decisions about military readiness. And no less restrictive means would satisfy that interest in this context.

The Court "should indulge the widest latitude" to sustain the President's "function to command the instruments of national force, at least when turned against the outside world for the security of our society." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 645 (1952) (Jackson, J., concurring). That fundamental principle applies here. As Admiral William Lescher, Vice Chief of Naval Operations, explained: "Sending ships into combat without maximizing the crew's odds of success, such as would be the case with ship deficiencies in ordnance, radar, working weapons or the means to reliably accomplish the mission, is dereliction of duty. The same applies to ordering unvaccinated personnel into an environment in which they endanger their lives, the lives of others and compromise accomplishment of essential missions." App. to Application for Partial Stay 110a.

In sum, I see no basis in this case for employing the judicial power in a manner that military commanders believe would impair the military of the United States as it defends the American people.

Cite as: 595 U. S. ____ (2022)      1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 21A477

_____

## LLOYD J. AUSTIN, III, SECRETARY OF DEFENSE, ET AL. *v.* U. S. NAVY SEALS 1–26, ET AL.

ON APPLICATION FOR A PARTIAL STAY

[March 25, 2022]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting.

By rubberstamping the Government's request for what it calls a "partial stay," the Court does a great injustice to the 35 respondents—Navy Seals and others in the Naval Special Warfare community—who have volunteered to undertake demanding and hazardous duties to defend our country. These individuals appear to have been treated shabbily by the Navy, and the Court brushes all that aside. I would not do so, and I therefore dissent.

I

In August 2021, the Secretary of the Navy made COVID–19 vaccination mandatory and threatened severe consequences, including dishonorable discharge and confinement, for anyone who refused.[1] Later Navy directives told service members that they could apply for religious exemptions, see Electronic Case Filing in *U. S. Navy Seals 1–26* v. *Biden*, No. 4:21–cv–01236 (ND Tex., Jan. 3, 2022) (ECF), Doc. 44–1, p. 40 (Trident Order #12), but this program, as

_____

[1] See Decl. of W. Lescher in No. 4:21–cv–01236 (ND Tex.), ECF Doc. 87, p. 10 (explaining that the Navy's vaccination policy was that refusing to be vaccinated would constitute the refusal to obey "a lawful order under Article 92 of the Uniform Code of Military Justice," which is punishable by dishonorable discharge and confinement for two years).

Alito, J., dissenting

described by the District Court, was largely "theater" designed to result in the denial of almost all requests. *U. S. Navy Seals 1–26* v. *Biden*, ___ F. Supp. 3d___ (ND Tex. 2022), App. to Application for Partial Stay 31a (App.).

The exemption procedure that the Navy set up included no fewer than *50 steps,* and during the first 35 steps, none of the various officials who processed requests gave any consideration to their merit. Decl. of A. Stephens, Exh. 1, ECF Doc. 62, at 10–26. Instead, a form letter rejecting each request was prepared and sent to seven offices for review. App. 40a.[2] A package of rejection letters was then assembled, together with a memo asking the vice admiral who served as a deputy chief of naval operations to sign the rejection letters. *Ibid.* Only at step 35 was someone in this chain told to read the exemption requests, but it appears that this individual was not given an opportunity to recommend that a request be granted. See ECF Doc. 62, at 7. Instead, this person's sole task was to record pertinent information on a spreadsheet and send the package on to the vice admiral. *Id.,* at 7–8.

Given the nature of this procedure, the results it produced are not surprising. Although more than 4,000 exemption requests had been submitted by February 15, 2022, not a single one had been approved when the complaint in this case was filed. See Application for Partial Stay 9, and n. 3 (Application) (citing ECF Doc. 129, at 16, n. 2 (Feb. 23, 2022)).

Respondents are among the many recipients of form rejection letters, and according to their declarations and testimony, some of them were told outright that pressing for a

---

[2] Both the District Court and the Court of Appeals concluded based on the record that the Navy did not have a template for approving an exemption. See *U. S. Navy Seals* v. *Biden*, 27 F. 4th 336, ___ (CA5 2022) (*per curiam*), App. 6a; *id.,* at 40a. In the Reply filed in this Court, the Solicitor General claims that there was an approval template, Reply Brief 12, n. 6, but no such document been supplied to this Court.

religious exemption would end their naval careers. A respondent identified as Navy Seal 2 stated that a superior officer advised him that "'all religious accommodation requests will be denied'" because "'senior leadership . . . has no patience or tolerance for service members who refuse COVID–19 vaccination for religious reasons and want them out of the SEAL community.'" *U. S. Navy Seals* v. *Biden*, 27 F. 4th 336, ___ (CA5 2022) (*per curiam*), App. 9a. This officer allegedly added that "'even if a legal challenge is somehow successful, the senior leadership of Naval Special Warfare will remove [his] special warfare designation.'" *Ibid.* According to Navy Seal 5, he was told that "'there [would] be a blanket denial of all religious accommodation requests regarding COVID–19 vaccination.'" *Ibid.* Navy Seal 8 declared that his "'chain of command . . . made it clear that [his] request [would] not be approved and . . . provided [him] with information on how to prepare for separation from the U. S. Navy.'" *Ibid.* Navy Seal 11 stated that a command master chief told him that "'anyone not receiving the COVID–19 vaccine is an "acceptable loss" to the Naval Special Warfare (NSW) community.'" *Ibid.*

Forced to choose between violating their religious beliefs and the punishment that the Navy threatened, respondents brought this suit, claiming that the Navy's denial of their exemption requests violated the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.* See Complaint in ECF Doc. 1. The District Court found that these claims were likely to succeed, and it issued a preliminary injunction prohibiting the Navy from taking adverse actions against respondents due to their unvaccinated status. App. 56a. But the court made clear that its order did not require the Navy "to make any particular personnel assignments" and left "[a]ll strategic decisions . . . in the hands of the Navy." *Id.*, at 60a.

The Government appealed and asked the U. S. Court of

Alito, J., dissenting

Appeals for the Fifth Circuit to stay the preliminary injunction, but the Fifth Circuit refused and issued a detailed opinion. 27 F. 4th 336.

The Government then applied to this Court for what it characterizes as a "partial stay," and the Court now issues a stay that uses precisely the language that the Government proposed. As I will explain, the Court's order essentially gives the Navy *carte blanche* to warehouse respondents for the duration of the appellate process, which may take years. There is no justification for this unexplained and potentially career-ending disposition.

II

In order to obtain a stay, the Government must show, among other things, that it is likely to succeed in defeating respondents' RFRA and free exercise claims, *Hilton* v. *Braunskill*, 481 U. S. 770, 776 (1987), and it cannot make that showing.

A

Under the clear terms of RFRA, all components of the Federal Government are forbidden to burden a person's exercise of religion unless the Government can demonstrate that the burden represents the least restrictive means of furthering a compelling interest. 42 U. S. C. §2000bb–1(b); *Holt* v. *Hobbs*, 574 U. S. 352, 357 (2015). The Government does not claim that Article II imperatives absolve the Navy's chain of command from complying with RFRA, and it concedes that the statute applies to the military. Application 28 (citing *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 726–727 (2014)). Indeed, even the form disapproval letter for religious accommodation requests in the District Court record explains that RFRA applies to the Navy, and it is the Navy's position that "only those interests of the highest order can overbalance legitimate claims to the free exercise of religion." ECF Doc. 62, at 27–28.

ALITO, J., dissenting

Here, it is not disputed that compliance with the vaccination requirement would impose a substantial burden on respondents' free exercise of religion. Therefore, the two remaining questions are (1) whether the Navy's mandatory vaccination program furthers compelling interests and (2) whether the denial of respondents' exemptions represents the least restrictive means of furthering such interests.

As to the first question, I agree that the Navy has a compelling interest in preventing COVID–19 infection from impairing its ability to carry out its vital responsibilities, as well as a compelling interest in minimizing any serious health risk to Navy personnel. But the Navy's summary rejection of respondents' requests for religious exemptions was by no means the least restrictive means of furthering those interests. This is so for at least two reasons.

First, all the evidence available at this stage suggests that the Navy gave no real consideration to respondents' requests, and the Navy had no compelling need to proceed in that fashion. I cannot believe that this Court would tolerate such treatment in other contexts. Suppose, for example, that a federal agency processed employee complaints about discrimination on the basis of race, sex, or disability using a 50-step process in which rejection was presumed until the very last step, and suppose that the record showed that this procedure nearly always resulted in the denial of a claim. We would be outraged—and rightfully so. Why, then, is the Court willing to brush aside what appears to have occurred here?

Second, even if we ignore what the Navy did and accept the justification for the denials that Justice Department lawyers later provided in court, the relief that the Court now awards goes well beyond anything that can possibly be regarded as the least restrictive means of further compelling Navy interests. Focusing primarily on the Seals, the Government stresses certain characteristics of Seal missions, including small unit size, the frequent need to work

at very close quarters, and the remote and often inaccessible locations in which such missions are carried out. Due to those characteristics, the Government argues, there is a heightened danger that the COVID–19 virus will spread, as well as a special need to minimize the risk that a mission will be compromised by a sick team member who is unable to perform assigned tasks with maximum effectiveness.

In order to win at trial, it would not be enough for the Government to posit that sending an unvaccinated Seal on such a mission *might* produce such consequences. A court could not simply defer to the Navy's opinion, and mere "conjecture" or "speculation" would not be enough. See *Ramirez* v. *Collier*, 595 U. S. ___, ___–___ (2022) (slip op., at 13–15); *Fulton* v. *Philadelphia*, 593 U. S. ___, ___ (2021) (slip op., at 14). The Government would bear the burden of showing that mandatory vaccination is the least restrictive means of furthering the interest it asserts in light of the present nature of the pandemic, what is known about the spread of the virus and the effectiveness of the vaccines, prevalent practices, and the physical characteristics of Navy Seals and others in the Special Warfare community.

Whether the Government will be able to make the requisite showing remains to be seen, but for the purposes of considering interim relief that is sought in an emergency application, I am willing to accept the Navy's need to refrain from sending unvaccinated Seals on the types of missions the Government has described. But participating in such missions is not the only thing that respondents do, and the relief that the Government sought and that the Court now awards goes much further. Using the terminology selected by the Government, the Court stays the preliminary injunction with respect to decisions about "deployment," "assignment," and "other operational decisions."

The Government has not told us what these terms mean, but without any contrary guidance, we must assume that they will be interpreted in accordance with the definitions

Alito, J., dissenting

in the Department of Defense Dictionary of Military and
Associated Terms (DOD Dictionary).[3]  And as defined in
that dictionary, the terms seemingly allow the Navy to do
just about anything it wants short of punishing respondents
and drumming them out of the service.

"Deployment" is defined as "[t]he movement of forces into
and out of an operational area,"[4] and an "operational area"
seems to mean any "geographic are[a]" where the Navy
might carry out "a strategic, operational, tactical, service,
training, or administrative military mission."[5]  Thus, send-
ing a respondent somewhere for training or administrative
purposes may constitute a deployment.

The term "assignment" appears to include detailing an
individual to perform any duties on something more than a
temporary basis.[6]  And an "operational decision" apparently
can include the carrying out of any "strategic, operational,
tactical, service, training, or administrative military mis-
sion."[7]  Putting all this together, it appears that the Court's order
allows the Navy to use respondents' unvaccinated status as
a reason for directing them to perform whatever duties or
functions the Navy wants, including sitting alone in a room

———————
[3] See DOD Dictionary (Nov. 2021), https://www.jcs.mil/Portals/36/
Documents/Doctrine/pubs/dictionary.pdf.

[4] *Id.*, at 62.

[5] *Id.*, at 159.

[6] The DOD Dictionary does not define "assignment," but the term "as-
sign" is given this complex definition:

"1. To place units or personnel in an organization where such place-
ment is relatively permanent, and/or where such organization controls
and administers the units or personnel for the primary function, or
greater portion of the functions, of the unit or personnel. 2. To detail in-
dividuals to specific duties or functions where such duties or functions
are primary and/or relatively permanent." *Id.*, at 20.

[7] The specific term "operational decision" is not defined, but the defini-
tion of "operation" includes "the carrying out of a strategic, operational,
tactical, service, training, or administrative military mission." *Id.*, at
159.

pushing paper or reading manuals for the duration of the appellate process. It is squarely within the judicial power of Article III to assess whether the Government has shown that it has a compelling interest in obtaining this breadth of equitable relief pending appeal. The Government has not done so.

I would not rubberstamp the Government's proposed language. While I am not sure that the Navy is entitled to any relief at this stage, I am also wary, as was the District Court, about judicial interference with sensitive military decision making. Granting a substantial measure of deference to the Navy, I would limit the order to the selection of the Special Warfare service members who are sent on missions where there is a special need to minimize the risk that the illness of a member due to COVID–19 might jeopardize the success of the mission or the safety of the team members. This, I believe, was the aim of the District Court, and respondents themselves understand the preliminary injunction that way. See Response in Opposition 1 (stating that the injunction "does not require the Navy to deploy any of the thirty-five plaintiffs" (footnote omitted)).

### B

Respondents are also likely to prevail on their claims under the Free Exercise Clause. Under our case law, if the Federal Government or a State treats conduct engaged in for religious reasons less favorably than similar conduct engaged in for secular reasons, that treatment is unconstitutional unless the relevant jurisdiction can satisfy "strict scrutiny," which is essentially the same as the standard imposed by RFRA. See *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 878–879 (1990); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533 (1993).

That "[o]ur review of military regulations challenged on First Amendment grounds" is deferential does not "render

ALITO, J., dissenting

entirely nugatory in the military context the guarantees of the First Amendment." *Goldman* v. *Weinberger*, 475 U. S. 503, 507 (1986). "This Court has never held . . . that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." *Chappell* v. *Wallace*, 462 U. S. 296, 304 (1983).

Here, the Navy treated service members who applied for medical exemptions more favorably than those who sought religious exemptions. For one thing, requests for medical exemptions were seriously considered, and quite a few were granted, at least on a temporary basis. Application 7–8; 27 F. 4th, at ___, App. 20a ("[T]he Navy acknowledges that it has granted hundreds of medical exemptions from the COVID–19 vaccine, at least 17 of which were temporary medical exemptions for those in Naval Special Warfare"). In addition, service personnel with medical exemptions are not restricted as severely as respondents will be under the Court's order. App. 42a. Indeed, the District Court found that under Navy policy those participating in clinical trials and those with medical contraindications and allergies to vaccines remained deployable, unlike those seeking religious accommodations. *Id.,* at 50a (citing ECF Doc. 17–2, at 66). The Navy has no interest in different treatment for accommodation requests that produce otherwise identical outcomes. I would therefore specify in the Court's order that the Navy must provide equal treatment for all unvaccinated service members.

III

Today, the Court brushes aside respondents' First Amendment and RFRA rights. But yesterday, the Court handed down another decision that illustrates the strong protection for religious liberty that is provided by the framework that applies under RFRA and strict scrutiny. The decision in question, *Ramirez* v. *Collier*, involved a convicted murderer awaiting execution and his rights under

the Religious Land Use and Institutionalized Persons Act
of 2000, 14 Stat. 803, 42 U. S. C. §2000cc *et seq.*, which,
among other things, essentially requires prisons to comply
with the RFRA standard. Ramirez argued that his exercise
of religion will be burdened unless Texas allows his pastor
to lay hands on him and pray aloud while he is being exe-
cuted. Ramirez was less than punctilious and consistent in
requesting a religious accommodation, see *Ramirez*, 595
U. S., at ___–___ (slip op., at 4–5); *id.*, at ___ (THOMAS, J.,
dissenting) (slip op., at 8), but the Court's decision forgave
all that. Texas objected to Ramirez's request on the ground
that the pastor's conduct might interfere with the execu-
tion, but the Court held that the State failed to discharge
its burden to substantiate the likelihood of such harm. *Id.,*
at ___ (slip op., at 12).

The contrast between our decision in *Ramirez* yesterday
and the Court's treatment of respondents today is striking.
We properly went to some lengths to protect Ramirez's
rights because that is what the law demands. We should
do no less for respondents.