# HACKER STEPHENS LLP

HEATHER GEBELIN HACKER                                  (512) 399-3022
Partner                                        Heather@HackerStephens.com

February 13, 2023

Lyle W. Cayce, Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

**Via ECF**

Re: *U.S. Navy SEALs 1-26 v. Biden*, No. 22-10077 consolidated with 22-10534

Dear Mr. Cayce,

Pursuant to Federal Rule of Appellate Procedure 28(j), Plaintiffs-Appellees submit the attached additional authority. At oral argument on February 6, the Court asked Defendants' counsel whether Defendants contend that the entire case is moot. Defendants' counsel declined to answer that question, though Defendants were due to file a brief on that topic that day in the district court. Defendants did, in fact, file a suggestion of mootness that afternoon shortly before 4:00 p.m. Defendants' supporting brief and appendix, as well as Plaintiffs' response in opposition and appendix (filed today) is attached.

Additionally, during oral argument, the Court requested record citations for Admiral Lescher's deposition testimony. The deposition transcript and exhibits can be found at ROA.5837-6149.

Respectfully submitted.

/s/Heather Gebelin Hacker
Heather Gebelin Hacker
Counsel for Plaintiffs-Appellees

cc: All counsel of record via ECF

# Defendants' Brief in Support of Suggestion of Mootness and Appendix in Support

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| **NAVY SEALs 1-3**, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 4:21-cv-01236-O |
| **LLOYD J. AUSTIN, III** in his official capacity as United States Secretary of Defense, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' ASSERTION OF MOOTNESS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

PROCEDURAL BACKGROUND ............................................................................1

FACTUAL BACKGROUND ......................................................................................3

      A.     The DoD Mandate. ............................................................................3

      B.     The NDAA........................................................................................3

      C.     Plaintiffs ............................................................................................5

ARGUMENT................................................................................................................6

      I.      The Court Should Dismiss This Action as Moot Because the Challenged Vaccination Requirement Has Been Repealed and No Remaining Relief is Available to Plaintiffs. ........................................................................6

      II.     Plaintiffs Cannot Challenge Speculative Assignment, Deployment, and Operational Decisions....................................................................11

      III.    The Voluntary Cessation Exception Does Not Apply. ...................................13

      IV.    The Capable-of-Repetition-Yet-Evading-Review Exception Does Not Apply..........15

CONCLUSION ..........................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner,*
387 U.S. 136 (1967) ................................................................................................13

*Aetna Life Ins. Co. of Hartford v. Haworth,*
300 U.S. 227 (1937) ................................................................................................13

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) ...................................................................................................6

*Am. Bar Ass'n v. FTC,*
636 F.3d 641 (D.C. Cir. 2011) ...............................................................8, 13, 14, 17

*Amawi v. Paxton,*
956 F.3d 816 (5th Cir. 2020) .................................................................................15

*Austin v. U.S. Navy SEALs 1-26,*
142 S. Ct. 1301 (2022) .....................................................................................2, 3, 13

*Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs,*
217 F.3d 393 (5th Cir. 2000) .................................................................................16

*Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers,*
941 F.3d 1195 (9th Cir. 2019) .................................................................................7

*Brown v. Collier,*
929 F.3d 218 (5th Cir. 2019) .................................................................................13

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ..............................................................................................9, 11

*Ctr. for Individual Freedom v. Carmouche,*
449 F.3d 655 (5th Cir. 2006) ...................................................................................6

*Davila v. Gladden,*
777 F.3d 1198 (11th Cir. 2015) .............................................................................12

*Dehne v. United States,*
970 F.2d 890 (Fed. Cir. 1992) ...............................................................................12

*Empower Texans, Inc. v. Geren,*
977 F.3d 367 (5th Cir. 2020) ................................................................. 15, 16, 17, 18

*Fantasy Ranch Inc. v. City of Arlington,*
459 F.3d 546 (5th Cir. 2006) ...................................................................................7

*Fontenot v. McGraw*,
  777 F.3d 741 (5th Cir. 2015) ................................................................. 6, 10, 11

*Freedom From Religion Found., Inc. v. Abbott*,
  No. 21-50469, 2023 WL 565082 (5th Cir. Jan. 27, 2023) .............................. 7, 15

*Garcia v. United States*,
  666 F.2d 960 (5th Cir. 1982) ................................................................................ 12

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) ................................................................................................... 13

*Guedes v. ATF*,
  920 F.3d 1 (D.C. Cir. 2019) ................................................................................... 14

*Hodges v. Callaway*,
  499 F.2d 417 (5th Cir. 1974) ................................................................................. 11

*Houston Chronicle Publ'g Co. v. League City*,
  488 F.3d 613 (5th Cir. 2007) ................................................................................... 7

*J. T. v. District of Columbia*,
  983 F.3d 516 (D.C. Cir. 2020) ............................................................................... 14

*Johnson v. Mississippi*,
  586 F.2d 387 (5th Cir. 1978) ................................................................................... 7

*K.P. v. LeBlanc*,
  729 F.3d 427 (5th Cir. 2013) ................................................................................... 6

*Keister v. Bell*,
  29 F.4th 1239 (11th Cir. 2022) ................................................................................ 7

*Kingdomware Techs., Inc. v. United States*,
  579 U.S. 162 (2016) ............................................................................................... 15

*Klayman v. Obama*,
  759 F. App'x 1 (D.C. Cir. 2019) ............................................................................. 14

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
  567 U.S. 298 (2012) ................................................................................................. 9

*LaRouche v. Fowler*,
  152 F.3d 974 (D.C. Cir. 1998) ............................................................................... 16

*Libertarian Party v. Dardenne*,
  595 F.3d 215 (5th Cir. 2010) ........................................................................... 17, 18

*Log Cabin Republicans v. United States,*
   658 F.3d 1162 (9th Cir. 2011) ....................................................................................8

*Long v. Jayton-Girard Indep. Sch. Dist.,*
   No. 5:21-CV-111-H, 2021 WL 7906835 (N.D. Tex. Sept. 3, 2021) ...................18

*Lopez v. City of Houston,*
   617 F.3d 336 (5th Cir. 2010) ...................................................................................17

*McCorvey v. Hill,*
   385 F.3d 846 (5th Cir. 2004) .....................................................................................7

*Mindes v. Seaman,*
   453 F.2d 197 (5th Cir. 1971) ...................................................................................11

*Moore v. Hosemann,*
   591 F.3d 741 (5th Cir. 2009) ...................................................................................16

*Murphy v. Hunt,*
   455 U.S. 478 (1982) .................................................................................................17

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1998) .................................................................................................13

*Oliver v. Scott,*
   276 F.3d 736 (5th Cir. 2002) ...................................................................................17

*Orloff v. Willoughby,*
   345 U.S. 83 (1953) ...................................................................................................13

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
   918 F.3d 151 (D.C. Cir. 2019) .................................................................................14

*Pharmachemie B.V. v. Barr Lab'ys, Inc.,*
   276 F.3d 627 (D.C. Cir. 2002) .................................................................................16

*Pulphus v. Ayers,*
   909 F.3d 1148 (D.C. Cir. 2018) ...............................................................................13

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) .................................................................................................16

*Senate Permanent Subcomm. on Investigations v. Ferrer,*
   856 F.3d 1080 (D.C. Cir. 2017) ...............................................................................18

*Sossamon v. Texas,*
   560 F.3d 316 (5th Cir 2009) ....................................................................................14

*Sossamon v. Texas,*
   563 U.S. 277 (2011) .................................................................................................... 12

*Spell v. Edwards,*
   962 F.3d 175 (5th Cir. 2020) ............................................................................ 7, 9, 18

*St. Pierre v. United States,*
   319 U.S. 41 (1943) ..................................................................................................... 11

*Staley v. Harris County,*
   485 F.3d 305 (5th Cir. 2007) ..................................................................................... 9

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ......................................................................................... 6, 11

*Troiano v. Supervisor of Elections in Palm Beach Cnty.,*
   382 F.3d 1276 (11th Cir. 2004) ............................................................................... 14

*Tyson Foods, Inc. v. Bouaphakeo,*
   577 U.S. 442 (2016) .................................................................................................. 11

*Von Hoffburg v. Alexander,*
   615 F.2d 633 (5th Cir. 1980) ................................................................................... 11

*Webman v. Fed. Bureau of Prisons,*
   441 F.3d 1022 (D.C. Cir. 2006) .............................................................................. 12

*Yarls v. Bunton,*
   905 F.3d 905 (5th Cir. 2018) ..................................................................................... 7

## **Statutes**

10 U.S.C. § 1552 ............................................................................................................. 11

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 ("NDAA"),
   Pub. L. No. 117-263, § 525, 136 Stat. 2395, 2571-72 (2022) ................................... 1

## **Rules**

Federal Rule of Civil Procedure 23 ................................................................................. 2

## Other Authorities

168 Cong. Rec. H9425, H9441 (Dec. 8, 2022) .............................................................. 3

NAVADMIN 083/22, https://perma.cc/YL6UUELQ .................................................. 10

Sec'y of Def. Mem. (Aug. 24, 2021), https://perma.cc/N759-S758 ....................................................3

**INTRODUCTION**

On December 23, 2022, the President signed into law the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 ("NDAA"). *See* Pub. L. No. 117-263, § 525, 136 Stat. 2395, 2571-72 (2022). Section 525 of the NDAA directs the Secretary of Defense, within 30 days, to rescind the August 2021 memorandum requiring vaccination of service members for COVID-19. On January 10, 2023, the Secretary rescinded the mandate as directed. *See* ECF No. 214-1. The rescission memorandum prohibits separations based solely on refusal of the COVID-19 vaccine by service members who sought an exemption from the mandate and directs the Services to "remove any adverse actions solely associated with denials of such requests." The memorandum also halts the processing of religious accommodation requests ("RARs") for an exemption to the now-defunct mandate. Following Secretary Austin's memo, the Navy released NAVADMIN 005/23 and ALNAV 009/23, which canceled NAVADMIN 190/21 and ALNAV 062/21—the Navy's implementation of the Department of Defense's mandatory COVID-19 vaccination requirement. Plaintiffs' challenges to the Department of Defense's COVID-19 vaccination requirement and the Navy's implementation of that requirement are therefore moot, in their entirety, and the case should be dismissed.

**PROCEDURAL BACKGROUND**

Thirty-five pseudonymous service members in the Naval Special Warfare community filed this lawsuit in November 2021, alleging that the Department of Defense (DoD) COVID-19 vaccination requirement and the Navy's policies implementing that requirement violated the Religious Freedom Restoration Act (RFRA), the First Amendment, and the Administrative Procedure Act (APA). ECF No. 1. On January 3, 2022, this Court granted a preliminary injunction barring the Navy from "applying MANMED § 15- 105([4])(n)(9); NAVADMIN 225/21; Trident Order #12; and NAVADMIN 256/21 to Plaintiffs," as well as from "taking any adverse action against Plaintiffs on the basis of Plaintiffs' requests for religious accommodation." ECF No. 66. The Navy appealed and

sought a partial stay of the injunction insofar as it prevented the Navy from considering Plaintiffs' vaccination status in making deployment, assignment, and operational decisions. Although the district court and the Fifth Circuit Court of Appeals denied that relief, the Supreme Court granted the partial stay the government had requested. *Austin v. U.S. Navy SEALs 1-26*, 142 S. Ct. 1301 (2022).

On January 24, 2022, Plaintiffs amended their complaint to seek class-wide relief, again claiming the DoD's COVID-19 vaccination requirement and the Navy's policies implementing that requirement violated RFRA and the First Amendment. ECF No. 84. Pseudonymous Plaintiffs Navy SEAL 1, Navy SEAL 2, Navy SEAL 3, and Explosive Ordinance Technician 1 were named class representatives. *Id.* The other thirty-one pseudonymous Plaintiffs remained parties to the litigation. *Id.* Plaintiffs proposed a series of allegedly common questions each concerning the now-defunct Navy implementation of the DoD COVID-19 vaccine requirement. *See id.* ¶ 58 a – h; ¶ 59 a – p. Plaintiffs asserted that the "individual questions, if any, pale in comparison to the numerous common questions of fact and law presented in this lawsuit." *Id.* ¶ 57. Plaintiffs also dropped their APA claim and their claims against the individual-capacity Defendants. *See* ECF No. 84.

On March 28, 2022, this Court certified a class of all Navy service members who had submitted religious-accommodation requests and granted a class-wide preliminary injunction barring the Navy "from applying MANMED § 15-105([4])(n)(9); NAVADMIN 225/21; Trident Order #12; and NAVADMIN 256/21" to the class members. ECF No. 140 at 27. This Court found that Plaintiffs satisfied the requirements of Federal Rule of Civil Procedure 23, because, *inter alia*, the potential class members have suffered the same injury arising from the denial or assumed denial of their religious accommodation request to the COVID-19 vaccine requirement. *See id.*; *see also id.* at 17 ("Without relief, each servicemember faces the threat of discharge and the consequences that accompany it.").

This Court immediately stayed its own injunction "insofar as it precludes the Navy from considering [class members'] vaccination status in making deployment, assignment, and other

operational decisions." ECF No. 140 at 27 (quoting *U.S. Navy SEALs 1-26*, 142 S. Ct. at 1301). The government again appealed, and the Fifth Circuit consolidated the two appeals. During the pendency of the appeal and the district court litigation the challenged requirements were rescinded by statute. Accordingly, Defendants now move to dismiss this case as moot.

## FACTUAL BACKGROUND

**A.    The DoD Mandate.** On August 24, 2021, the Secretary of Defense directed the Secretaries of the Military Departments to ensure that all members of the Armed Forces were fully vaccinated against COVID-19. Sec'y of Def. Mem. (Aug. 24, 2021), https://perma.cc/N759-S758. The Navy subsequently issued orders implementing that requirement. *See* ECF No. 44-1 at 75-76 (ALNAV 062/21, setting deadlines for vaccination); ECF No. 44-1 at 83-87 (NAVADMIN 225/21, providing procedures for disciplining and, if necessary, separating service members who refuse vaccination without an exemption); ECF No. 44-1 at 89-96 (NAVADMIN 256/21, providing for "temporary reassignment[]" of unvaccinated service members); ECF No. 44-1 at 98-99 (Trident Order #12, implementing the requirement for Special Warfare personnel); *see also* ECF No. 44-2 at 122-131 (MANMED § 15-105(4)(n)(9), a general Navy policy, providing that Naval Special Warfare service members who "refus[e] to receive recommended vaccines … based solely on personal or religious beliefs are disqualified" from Special Operations duty assignments).

**B.    The NDAA.** On December 23, 2022, the President signed the NDAA into law. Section 525 directs the Secretary of Defense, within 30 days, to rescind the August 2021 memorandum requiring vaccination of service members against COVID-19. An explanatory statement in the Congressional Record notes that DoD "has mechanisms to correct a servicemember's military record for discharge due to failure to receive the COVID-19 vaccine" and that "the military departments have the ability to consider applications for reinstatement of servicemembers who were previously separated for refusing the vaccine." *See* 168 Cong. Rec. H9425, H9441 (Dec. 8, 2022).

3

On January 10, 2023, the Secretary of Defense rescinded the mandate as directed.  ECF No. 214-1.  The rescission memorandum directs that currently serving service members who sought an exemption may not be "separated solely on the basis of their refusal to receive the COVID-19 vaccination" and directs the Services to "update the records of such individuals to remove any adverse actions solely associated with denials of such requests." *Id.*[1] It further directs that decisionmakers should "cease any ongoing reviews" of requests for accommodation from the COVID-19 vaccination requirement.  *Id.*  The Secretary's memorandum preserved "the ability of Commanders to consider, as appropriate, the individual immunization status of personnel in making deployment, assignment, and other operational decisions." *Id.*

On January 11, the Navy issued implementing guidance "[c]ancel[ing]" it's implementation of the August 2021 vaccination requirement. *See* Ex. 1 (App. 001-002) (NAVADMIN 005/23 cancelling NAVADMIN 091/21 and "suspend[ing]," the derivative enforcement policies, NAVADMIN 225/21 and NAVADMIN 256/21).   The Navy directed commands to "immediately discontinue administrative separation processing of Navy Service Members solely for refusing the COVID-19 vaccine, including those with approved separation letters," and to "immediately suspend any new adverse administrative actions associated with refusing the COVID-19 vaccine."  *Id.*  And on January 20, the Secretary of the Navy ordered the Navy to "cease any ongoing reviews of current Service Members' religious, administrative, or medical accommodation requests solely for exemption from the COVID-19 vaccine or appeals of denials of such requests," and he clarified that "[n]o currently serving Sailor … shall be separated solely on the basis of their failure to receive the COVID-19

---

[1] Former service members administratively discharged on the sole basis that the service member failed to obey a lawful order to receive a vaccine for COVID-19, "may petition their Military Department's Discharge Review Boards and Boards for Correction of Military or Naval Records to individually review and correct personnel records, including records regarding the characterization of their discharge." *Id.*

vaccination if they sought an accommodation on religious, administrative, or medical grounds." Ex. 2 (App. 003-005) (ALNAV 009/23, "cancel[ing]" ALNAV 062/21).[2]  On February 3, 2023, the Navy changed the language of MANMED § 15-105(4)(n)(9) to remove any distinction between service members who are unvaccinated for religious reasons as opposed to medical reasons to align with the practice previously described by the Force Medical Officer of Naval Warfare Command.  Ex. 3 (App. 006-008) (MANMED Change 168 dated Feb. 3, 2023); ECF No. 87 at 36-40. The Commander of the Naval Special Warfare community had previously rescinded Trident Order #12 on May 23, 2022.  Ex. 4 (App. 009-011) (Trident Order #12 Closeout dated May 23, 2022).

On January 30, 2023, the Under Secretary of Defense issued a memorandum titled "Consolidated Department of Defense Coronavirus Disease 2019 Force Health Protection Guidance – Revision 4." Ex. 5 (App. 012-033) (DoD Force Health Protection Guidance (FHPG) of January 30, 2023, Rev. 4).  This memorandum updated the Consolidated DoD Coronavirus Disease 2019 Force Health Protection Guidance. Ex. 6 (App. 034-095) (DoD FHPG, current as of Jan. 30, 2023).  Among other things, the updated guidance rescinds the provision that previously limited travel for those not fully vaccinated to "mission-critical official travel."  *Id.* at 47–48.  The new travel policies do not distinguish between those fully vaccinated against COVID-19 and those who are not.  Ex. 5 at 2, 4, 5, 7-10, 13-16, 18-19 (App. 14, 16, 17, 19-22, 25-28, 30-31).

**C.** **Plaintiffs.** Under the rescission memorandum, neither the named Plaintiffs nor the class members are subject to the August 2021 DoD COVID-19 vaccine requirement nor the

---

[2] In light of these actions and similar actions taken by the Marine Corps and Coast Guard, the district court in a related class action challenging the Marine Corps' rescinded vaccination requirement and a related putative class action challenging the Coast Guard's rescinded vaccination requirement stayed further proceedings until the issue of mootness can be fully briefed. Order, ECF No. 277, *Col. Fin. Mgmt. Off. v. Austin*, No. 8:22-cv-1275-SDM-TGW (M.D. Fla. Jan. 20, 2023); Order, ECF No. 216, *Pilot v. Austin*, No. 8:22-cv-1278-SDM- TGW (M.D. Fla. Jan. 27, 2023).

subsequent Navy implementation of that requirement. The 35 pseudonymous Plaintiffs have not had adverse action taken against them and they have not been subject to involuntary administrative separation. Ex. 7 (App. 096-102) (Declaration of Gareth J. Healy, ("Healy Decl.") ¶¶ 8-10). However, ten of the 35 pseudonymous Plaintiffs had previously chosen to withdraw their religious accommodation requests and voluntarily separate or retire from the Navy. Healy Decl. ¶¶ 3-4. Processing for involuntary administrative separation has been permanently halted and no new adverse actions will be taken against Plaintiffs for failure to receive the COVID-19 vaccine. Healy Decl. ¶ 8.

Similarly, for class members, pursuant to the rescission memorandum, involuntary administrative separation is permanently halted and any adverse action reflecting that process will be removed from the record of each of the class members. ECF No. 214-1; Healy Decl. ¶ 8. Any class member who had a record of past adverse action based solely on COVID-19 vaccine refusal will also have that action removed from their record. Healy Decl. ¶ 9. No new adverse action based on COVID-19 vaccine refusal will be taken against class members. *Id.*

## ARGUMENT

### I. The Court Should Dismiss This Action as Moot Because the Challenged Vaccination Requirement Has Been Repealed and No Remaining Relief is Available to Plaintiffs.

"Plaintiffs must maintain their personal interest in the dispute at all stages of litigation." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). "Even when a plaintiff has standing at the outset '[t]here must be a case or controversy through all stages of a case.'" *Fontenot v. McGraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *K.P. v. LeBlanc*, 729 F.3d 427, 438 (5th Cir. 2013)). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted)).

"Generally, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Id.* (quoting *Ctr. for Individual Freedom v.*

*Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)). The mootness doctrine "ensures federal courts are only deciding live cases or controversies." *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020). Because a challenge is moot when the court cannot grant effectual relief to the prevailing party, "a case challenging a [government policy] usually becomes moot if the challenged [policy] has expired or been repealed." *Id.* After all, "[o]nce the law is off the books, there is nothing injuring the plaintiff and, consequently, nothing for the court to do." *Id.* In short, "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018) (quotation marks omitted).

Consistent with these principles, the Fifth Circuit and other circuits have repeatedly confirmed that when a statute or regulation is amended or repealed after plaintiffs bring a lawsuit challenging the legality of that statute or regulation, mootness is "the default." *Freedom From Religion Found., Inc. v. Abbott*, No. 21-50469, 2023 WL 565082, at *4 (5th Cir. Jan. 27, 2023); *Houston Chronicle Publ'g Co. v. League City*, 488 F.3d 613, 619 (5th Cir. 2007) ("It goes without saying that disputes concerning repealed legislation are generally moot."); *Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 564 (5th Cir. 2006) ("[S]tatutory changes that discontinue a challenged practice are 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" (citation omitted)); *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004) ("Suits regarding the constitutionality of statutes become moot once the statute is repealed."); *Johnson v. Mississippi*, 586 F.2d 387, 388 (5th Cir. 1978) (per curiam) ("[T]he enactment of a superseding statute which satisfies all the principles sought in an attack on the prior statute simply moots the case."); *see also, e.g., Keister v. Bell*, 29 F.4th 1239, 1250 (11th Cir. 2022) ("[W]hen a government fully repeals a challenged law, a case challenging that law is almost surely moot."), *pet. for cert. filed*, No. 22-388 (U.S. Oct. 25, 2022); *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) ("[T]he repeal,

amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal."); *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 643 (D.C. Cir. 2011) ("It is well established that a case must be dismissed as moot if new legislation addressing the matter in dispute is enacted while the case is still pending."); *Log Cabin Republicans v. United States*, 658 F.3d 1162, 1166–68 (9th Cir. 2011) (finding moot a challenge to the military's don't-ask-don't-tell policy when the policy was repealed by statute after judgment).

The Court should follow that ordinary practice here. The NDAA is intervening legislation that terminates the challenged vaccination requirement, rendering moot Plaintiffs' requests for declaratory relief and injunctive relief barring enforcement of that requirement. The NDAA as implemented through the rescission memorandum gives Plaintiffs the relief sought in their complaint.

Under the terms of the rescission, Defendants can no longer enforce the August 2021 DoD COVID-19 requirement nor the Navy's implementation of that requirement with respect to the named Plaintiffs or any member of the class, nor may Defendants take adverse action against them based on that defunct policy. ECF No. 214-1. The declaratory and injunctive relief sought by Plaintiffs is thus no longer available, as there is no requirement from which an exemption can be sought, or a determination made by the Defendants. Indeed, the Secretary's rescission memorandum halts the processing of requests for exemption to the now-defunct mandate as there is no longer a requirement to be exempted from. *Id.*

More specifically, the operative complaint requests that the Court issue a declaration that the "COVID-19 Vaccine Mandate violates Plaintiffs' and the class members' rights under the First Amendment. . . . and the [RFRA]." ECF No. 84 at 29-30. As explained above, the mandate has been rescinded and the religious accommodation process discontinued, so any opinion as to either would be advisory and impermissible. The complaint also requests a preliminary and permanent injunction "prohibiting" Defendants from "enforcing the COVID-19 Vaccine Mandate as to the Plaintiffs and

the class members[.]" *Id.* at 30.  But the rescission itself provides such relief as the Navy is already prohibited from enforcing the prior mandate against Plaintiffs and the class members.

As to Plaintiffs' causes of action, they also seek to have the DoD COVID-19 vaccination requirement and certain Navy policies involved in the implementation of that requirement enjoined and declared unlawful as to the 35 Plaintiffs and as to the class—NAVADMIN 190/21, ALNAV 062/21, NAVADMIN 225/21, NAVADMIN 256/21, Trident Order #12, and MANMED § 15-105(3)(n)(9).  ECF No. 84 at 20-29; ECF No. 104 at 2-3.  The Navy has expressly cancelled NAVADMIN 190/21 and ALNAV 062/21, and the derivative enforcement policies—NAVADMIN 225/21 and NAVADMIN 256/21—are similarly withdrawn in accordance with the direction of the Secretary of Defense.  Ex. 1 & 2 (App. 001-005).  Trident Order #12 was previously withdrawn and cancelled.  Ex. 4 (App. 009-011).  The specific language of MANMED § 15-105(4)(n)(9) that Plaintiffs challenge, *see* ECF No. 84 ¶¶ 51, 75, 111, has been rescinded.  Ex. 3 (App. 006-008).  And that requirement no longer applies to vaccination against COVID-19.  There is accordingly no live dispute regarding any of the policies challenged in this litigation.  The Court therefore can no longer provide plaintiffs with "any effectual relief."  *Spell*, 962 F.3d at 179 (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)).  To the extent Plaintiffs seek an injunction against other possible future adverse acts, they do not have standing to seek relief where there is no "real and immediate threat" of future injury.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again . . . ."); *see also Staley v. Harris County*, 485 F.3d 305, 309 (5th Cir. 2007) (en banc).

Plaintiffs' only remaining request, besides a request for attorneys' fees, includes a catch-all request for "relief under law or equity to which Plaintiffs and the class members may be entitled."  ECF No. 84 at 30.  The Secretary's rescission memorandum confirms that the 25 pseudonymous

service member Plaintiffs remaining in the Navy[3] will not be discharged based on their previous refusal to comply with the vaccination requirement and that no new adverse actions for declining the COVID-19 vaccination will be issued to them.  Healy Decl. ¶ 4.  And because no adverse action was ever entered into the records of any of the pseudonymous Plaintiffs, no adverse action need be removed from their records.  *Id.* ¶¶ 8-10; *see also* ECF No. 66 at 4 (acknowledging that at the time of the issuance of the initial preliminary injunction "[t]he Navy ha[d] made no final determinations on appeal.").  As to Plaintiff class members, they also will not be discharged based on their previous refusal to comply with the vaccination requirement and no new adverse actions for declining COVID-19 vaccination will be issued to them.  Healy Decl. ¶ 4.  Further, any preexisting adverse action issued based solely on a refusal to comply with the vaccination requirement—if there is any—will be removed from their records.  *Id.* ¶¶ 8-10; *see also* NAVADMIN 083/22, https://perma.cc/YL6UUELQ (Navy policy immediately implementing the district court's class-wide preliminary injunction, "suspend[ing] separation processing and adverse administrative consequences of COVID-19 vaccine refusal for Navy service members who submitted requests for religious accommodation from the COVID-19 vaccine requirement").[4]  Accordingly, Plaintiffs have no further relief to be gained in law or equity by

---

[3] Ten of the pseudonymous Plaintiffs withdrew their RARs and voluntarily retired or separated from the Navy during the pendency of this litigation.  Healy Decl. ¶¶ 3-4.

[4] Plaintiffs claim that because NAVADMIN 005/23—which immediately paused separations and adverse action against Navy service members solely for refusing the COVID-19 vaccine—refers only to "new" adverse actions the Navy does not intend to remove prior adverse action from class member records.  ECF No. 274 at 3.  But there is no question that the Navy must do so.  The Secretary of Defense has directed the military Services, including the Navy, to "remove any adverse actions solely associated with denial of [requests for accommodation on religious, administrate, or medical grounds], including letters of reprimand."  ECF No. 214-1 at 1.  And Plaintiffs ignore that NAVADMIN 005/23 further provides that the Navy will issue supplemental guidance regarding implementation of the Secretary's direction.  Thus, Plaintiffs' request for the Court to issue an injunction to the same effect seeks a remedy that they have already obtained from the Secretary of Defense.  That request is therefore moot.  *See Fontenot,* 777 F.3d at 747 ("Because there remains no live controversy between the parties . . . the injunction they seek would be meaningless.").

pursuing this lawsuit challenging the now-rescinded mandate, and thus "lack any legally cognizable interest in the outcome." *Fontenot*, 777 F.3d at 747 (citation omitted); *see also St. Pierre v. United States*, 319 U.S. 41, 42 (1943) ("A federal court is without power to decide moot questions or to give advisory opinions which cannot affect the rights of the litigants in the case before it.").[5]

## II.    Plaintiffs Cannot Challenge Speculative Assignment, Deployment, and Operational Decisions

In Plaintiffs' supplemental memorandum to the Fifth Circuit they claimed that the litigation is not moot because the Secretary's rescission memorandum allows military commanders to consider vaccination status when making "deployment, assignment, and other operational decisions[.]"  ECF No. 274 at 3.  Plaintiffs speculate that this provision might injure them in the future and postulate three potential injuries to unidentified Plaintiffs and class members: "unnecessarily restricting travel necessary for their jobs, demanding repayment of educational expenses and previously awarded and rightfully earned bonuses, and refusing to allow participation in meaningful training opportunities and operational assignments."  *Id.* at 4.  But speculation that a future injury might occur cannot provide a basis for relief for an individual Plaintiff or the class.  *See Lyons*, 461 U.S. at 111; *TransUnion*, 141 S. Ct. at 2208 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.") (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring))).  In any event, the travel restrictions Plaintiffs complain of have also been rescinded.

---

[5] In seeking class certification Plaintiffs previously asserted that the "individual questions, if any, pale in comparison to the numerous common questions of fact and law presented in this lawsuit."  ECF No. 84 ¶ 57.  In addition to such claims being moot, to the extent that Plaintiffs seek to remedy individual personnel actions now, they must exhaust administrative remedies before doing so.  The Fifth Circuit has long required that a plaintiff first exhaust all "available intraservice corrective measures" before bringing to federal court claims implicating "internal military affairs." *Hodges v. Callaway*, 499 F.2d 417, 419–20 (5th Cir. 1974) (quoting *Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir. 1971)); *see also Von Hoffburg v. Alexander*, 615 F.2d 633, 637 (5th Cir. 1980) (collecting cases).  And although this Court previously found that the Navy's religious accommodation process was futile there is no reason to suggest that the entirely separate corrections board process is futile.  *See* 10 U.S.C. § 1552.

On January 30, 2023, the Under Secretary of Defense issued a memorandum titled "Consolidated Department of Defense Coronavirus Disease 2019 Force Health Protection Guidance – Revision 4." Ex. 5 (App. 012-033) (DoD Force Health Protection Guidance (FHPG) of January 30, 2023, Rev. 4). This memorandum updated the Consolidated DoD Coronavirus Disease 2019 Force Health Protection Guidance. Ex. 6 (App. 034-095) (DoD FHPG, current as of Jan. 30, 2023).  Among other things, the updated guidance rescinds the provision that previously limited travel for those not fully vaccinated to "mission-critical official travel."  *Id.* at 47–48.  The new travel policies do not distinguish between those fully vaccinated against COVID-19 and those who are not.  Ex. 5 at 2, 4, 5, 7-10, 13-16, 18-19 (App. 14, 16, 17, 19-22, 25-28, 30-31) (striking distinctions between vaccinated and unvaccinated service members).

Plaintiffs' only other speculation as to how consideration of vaccination status when making deployment, assignment, and other operational decisions may cause them injury involves a hypothetical claim for monetary benefits.  Again, they have not identified an actual Plaintiff who has made such a claim.  But, even if they had, such a claim would likely be subject to Tucker Act jurisdiction and limited to missed payments for work actually performed.  *See Dehne v. United States*, 970 F.2d 890 (Fed. Cir. 1992); *see also Garcia v. United States*, 666 F.2d 960, 966 (5th Cir. 1982) ("The Constitution does not waive the Government's sovereign immunity in a suit for damages"); *Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015) ("RFRA does not therefore authorize suits for money damages against officers in their official capacities."); *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1028 (D.C. Cir. 2006) (Tatel, J., concurring) (internal citation omitted) ("RFRA's purpose does not 'produce evidence of a waiver' of sovereign immunity for damages claims, much less evidence unequivocal enough to satisfy the strict standard for waivers of sovereign immunity.") *cf. Sossamon v. Texas*, 563 U.S. 277 (2011) (holding that identical "appropriate relief" language in the related statute RLUIPA did not waive states' sovereign immunity from money damages).

Furthermore, any hypothetical future dispute about a service member's assignments would need to be assessed based on the facts and circumstances of the particular service member's specific religious-liberty claim, given the legally required narrow tailoring. *Cf. Brown v. Collier*, 929 F.3d 218, 230 (5th Cir. 2019) (requiring "case-by-case" adjudication of religious-liberty claims). Any such questions, should they ever actually arise, are plainly not ripe for this Court's review. *See, e.g.*, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (explaining that the "ripeness requirement" serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and to prevent unnecessary "judicial interference" (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967))); *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 241 (1937) (providing that a justiciable dispute must "admit[] of specific relief through a decree of a conclusive character" and may not ask a court to "advis[e] what the law would be upon a hypothetical state of facts"). Hypothetical disputes about the extent to which a specific service member's decision to remain unvaccinated might or might not affect an assignment, deployment or other military operational decision cannot resuscitate the moot controversy here.[6]

## III.     The Voluntary Cessation Exception Does Not Apply.

Plaintiffs also assert that the NDAA and subsequent rescission memorandum does not moot the litigation because the voluntary cessation exception applies. *See* ECF No. 274 at 5-7. But here Defendants' cessation of the vaccination requirement was not voluntary, as Plaintiffs appear to

---

[6] Additionally, military assignment, deployment and operational decisions are not "susceptible to judicial correction" in light of well-established principles of judicial noninterference with core military decision making, *Pulphus v. Ayers*, 909 F.3d 1148, 1154 (D.C. Cir. 2018); *see U.S. Navy SEALs 1-26*, 142 S. Ct. at 1301 (partial stay order); *id.* at 1302 (Kavanaugh, J., concurring) (explaining that "the 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments'" and that "it is 'difficult to conceive of an area of governmental activity in which the courts have less competence'" (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973))); *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953); Order, *Navy SEAL 1 v. Austin*, No. 22-10645 (11th Cir. Mar. 30, 2022).

concede.  *Id.* at 5. Defendants "most assuredly did not alter [their own course] in order to avoid litigation." *Am. Bar Ass'n*, 636 F.3d at 648.   Rather, intervening legislation—in the form of the NDAA—required DoD to rescind the vaccination mandate. *See id.* (finding voluntary cessation exception did not apply where "intervening legislation simply nullified the [agency's challenged] policy statement").  The NDAA "specifically forbids the kind of [action] challenged in this suit" and "[t]he cessation of the [vaccination requirement] was therefore not voluntary."  *Klayman v. Obama*, 759 F. App'x 1, 3 (D.C. Cir. 2019); *see also J. T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020) ("'The voluntary-cessation doctrine has no apparent relevance' where the 'source of cessation . . . lies beyond the unilateral legal authority of any of the named defendants.'" (quoting *Guedes v. ATF*, 920 F.3d 1, 15 (D.C. Cir. 2019) (per curiam)).

Second, even if Congress's enactment of the NDAA could be considered a voluntary change on the part of Defendants, the Fifth Circuit has held that "courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity." *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir 2009). Indeed, despite the burden typically imposed in instances of voluntary cessation, "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties. Without evidence to the contrary, [the Fifth Circuit] assume[s] that formally announced changes to official governmental policy are not mere litigation posturing." *Id.*; *see also, e.g.*, *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 157–59 (D.C. Cir. 2019) (recognizing that an unambiguous representation by an agency official would be entitled to presumption of regularity and could satisfy burden for voluntary cessation purposes); *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1283 (11th Cir. 2004) ("[W]hen the defendant is not a private citizen

but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur.").

Plaintiffs have provided no basis to suggest that the rescission of the vaccine requirement is pretextual or that the same or a substantially similar requirement will recur. On the contrary, Defendants have gone beyond what was required by Congress in the NDAA, for example, requiring the records of current service members who sought an exemption to be updated. Plaintiffs provide no evidence that the challenged vaccine requirement will be reinstated, that they will once again be subject to that requirement, or that any accommodation they seek regarding a substantially similar new requirement would be denied. Without direct evidence to the contrary, "it is remote, and indeed unrealistically speculative, that these defendants will ever again expose the plaintiffs to the claimed injury that prompted this lawsuit. The very process of the enactment of [the new law] by the state legislature and governor, combined with the presumption of good faith that we afford government actors, overcomes concerns of voluntary cessation." *Amawi v. Paxton*, 956 F.3d 816, 821 (5th Cir. 2020). For these reasons, Plaintiffs cannot overcome the presumption that the NDAA and rescission memorandum moot this case. The "'challenged practice'" has been "discontinued," and "a live controversy no longer exists." *Freedom From Religion Foundation*, 2023 WL 565082, at *5.

## IV. The Capable-of-Repetition-Yet-Evading-Review Exception Does Not Apply.

The mootness exception for issues capable of repetition yet evading review does not apply here for similar reasons. Under that exception, cases that would otherwise be moot are saved from mootness "if '(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again.'" *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016)). This exception applies "only in exceptional situations." *Id.* (quoting *Kingdomware*, 579 U.S. at 170). Plaintiffs—as the party

seeking to assert the exception—bear the burden of showing that it applies.  *See id.*

Plaintiffs summarily assert that "because the vaccine mandate was rescinded during the pendency of this lawsuit, the first element is satisfied."  ECF No. 274 at 7.  To the contrary, the mere fact that a challenged action ends "during the pendency of [a] lawsuit," *id.*, does not render that action "too short to be fully litigated," *Geren*, 977 F.3d at 370 (citation omitted). The entire mootness doctrine would be rendered obsolete if that were the standard.  Indeed, mootness is *only* relevant when the challenged action ends "during the pendency of the lawsuit."  ECF No. 274 at 7.  Plaintiffs thus fail to establish their burden on this first element of the exception.

Nor could Plaintiffs have carried that burden regardless.  The relevant inquiry under the evading-review prong is "whether 'the challenged activity is *by its very nature short in duration,* so that it could not, or probably would not, be able to be adjudicated while fully live.'"  *Pharmachemie B.V. v. Barr Lab'ys, Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002) (quoting *LaRouche v. Fowler,* 152 F.3d 974, 978 (D.C. Cir. 1998)); *see also, e.g., Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 399 (5th Cir. 2000) (considering whether the type of action challenged was "*inherently* capable of evading review" (emphasis added)).  A vaccination requirement is, by its nature, not short in duration.  *Cf. Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009) ("Election controversies are paradigmatic examples of cases that cannot be fully litigated before the particular controversy expires.").

Plaintiffs make an inapt comparison between the DoD's decision to add COVID-19 to the list of required vaccinations and the Governor of New York's COVID-19 lockdown orders.  ECF No. 274 at 7 (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)).  But Plaintiffs' attempted comparison only underscores the differences between a vaccination requirement and the types of challenged actions that are "inherently capable of evading review."  *Bayou Liberty Ass'n, Inc.*, 217 F.3d at 399.  In particular, the Supreme Court in *Roman Catholic Diocese of Brooklyn* held that the case was not moot because the "[t]he Governor [of New York] regularly changes the [COVID-

threat] classification of particular areas without prior notice," including eight times within a month-long period.  141 S. Ct. at 68.  Here, in contrast, the vaccination mandate lasted approximately a year and a half, and ended only when—in Plaintiffs' words—"Congress ordered" Defendants "to rescind the [vaccination] mandate."  ECF No. 274 at 5.  Thus, the vaccination requirement is not the kind of action that is "in its duration too short to be fully litigated prior to cessation or expiration."  *Geren*, 977 F.3d at 370 (citation omitted).

Nor do Plaintiffs present any evidence that they will "be subject to the same action again."  *Id.* (citation omitted).   To establish such evidence, Plaintiffs "must show either a 'demonstrated probability' or a 'reasonable expectation'" that they will be subject to the same challenged COVID-19 vaccination requirement again.  *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010) (quoting *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir. 2002)).  Yet Plaintiffs argue only that the NDAA does not expressly prohibit the reinstatement of "a new mandate" in the future.  ECF No. 274 at 8.  This speculation cannot carry Plaintiffs' burden.   "A 'mere physical or theoretical possibility' is not sufficient to satisfy this prong of the exception."  *Libertarian Party*, 595 F.3d at 217 ((quoting *Murphy v. Hunt,* 455 U.S. 478, 482 (1982)).  "At most, [Plaintiffs'] evidence shows that the Secretary [might] have an opportunity to act in the same allegedly unlawful manner in the future; however, it does not show a reasonable probability that the Secretary will act in that manner if given the opportunity."  *Id.*; *see also Am. Bar Ass'n*, 636 F.3d at 647 ("It does not matter that the [agency] might hereafter . . . promulgate *new* rules" because "[t]hese are merely hypothetical possibilities," and "*possibilities* regarding regulations and enforcement policies that do not presently exist" are "not enough to give rise to a live dispute."); *see also Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010) (requiring more than "merely a theoretical possibility" that the allegedly wrongful conduct would reoccur).

Plaintiffs' speculation about the uncertain future of COVID-19 is similarly insufficient to justify excepting this case from the mootness doctrine.  *See* ECF No. 274 at 8 (alleging that

"Defendants may issue a new mandate if they deem the risk of COVID-19 transmission too high"). Indeed, the Fifth Circuit has already explained that "no one knows what the future of COVID-19 holds" and it is thus "speculative, at best, that the [government] might reimpose [a particular COVID-19] restriction or a similar one." *Spell*, 962 F.3d at 180 (holding moot a challenge to Louisiana's rescinded stay-at-home orders, especially given that "[t]he trend in Louisiana has been to reopen the state, not to close it down"); *see also Long v. Jayton-Girard Indep. Sch. Dist.*, No. 5:21-CV-111-H, 2021 WL 7906835, at *4 (N.D. Tex. Sept. 3, 2021) (holding moot a challenge to school district's rescinded mask mandate because "the mere possibility of COVID-19 worsening or COVID-19 policies being re-imposed is insufficient to satisfy the 'reasonable expectation' requirement of the second prong"). Thus, Plaintiffs' speculation that DoD might reimpose a COVID-19 vaccination mandate in the future does not exempt this case from mootness.

Even if the military were to subject Plaintiffs to a *new* COVID-19 vaccination requirement, there would be no "reasonable expectation" that any such requirement would be "the same" as the now-rescinded, challenged COVID-19 vaccination requirement. *Libertarian Party*, 595 F.3d at 217. If DoD or the Navy were to impose a different vaccination requirement—for example, one applicable to service members who are about to deploy to a particular location—then any RFRA challenge to that policy, and to the imposition of discipline for noncompliance with such a requirement, would raise different issues than in this case. In that circumstance, even if Plaintiffs themselves were subject to a new or different requirement in the future, "'the same parties'" would not be "'engag[ing] in litigation over the same issues'"—a precondition for the capable-of-repetition exception to apply. *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1088 (D.C. Cir. 2017)(citation omitted).

Plaintiffs fail to establish either that the vaccination requirement is "in its duration too short to be fully litigated prior to cessation or expiration," or that there exists any "reasonable expectation

that [they will] be subject to the same [challenged COVID-19 vaccination requirement] again.'" *Geren*, 977 F.3d at 370.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiffs' complaint as moot.

Dated: February 6, 2023                    Respectfully submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ Andrew E. Carmichael*
ANDREW E. CARMICHAEL (VA Bar. No. 76578)
AMY E. POWELL
Senior Trial Counsel
STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
LIAM C. HOLLAND
CASSANDRA M. SNYDER
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3346
Fax: (202) 616-8470
Email: Andrew.e.carmichael@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

**NAVY SEALS 1-3,** et al.**,**

                Plaintiffs,

     v.

**LLOYD AUSTIN, III**, in his official capacity as
Secretary of Defense, *et al.*,

                Defendants.

Case No. 4:21-cv-01236-O

## DEFENDANTS' APPENDIX IN SUPPORT OF THEIR
## ASSERTION OF MOOTNESS

### Table of Appendix

| Bates Stamps | Description |
|---|---|
| App001–App-002 | NAVADMIN 005/23 |
| App003–App005 | ALNAV 009/23 |
| App006–App008 | MANMED Change 168 dated Feb. 3, 2023 |
| App009–App011 | Trident Order #12 Closeout dated May 23, 2022 |
| App012–App033 | DoD Force Health Protection Guidance (FHPG) of January 30, 2023, Rev. 4 |
| App034–App095 | DoD FHPG, current as of Jan. 30, 2023 |
| App096–App102 | Declaration of Captain Gareth J. Healy |

Dated: February 6, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Andrew E. Carmichael*
ANDREW E. CARMICHAEL (VA Bar. No. 76578)
AMY E. POWELL
Senior Trial Counsel

STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
LIAM C. HOLLAND
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3346
Fax: (202) 616-8470
Email: Andrew.e.carmichael@usdoj.gov

*Counsel for Defendants*

# Exhibit 1

```
CLASSIFICATION: UNCLASSIFIED//
ROUTINE
R 112139Z JAN 23 MID600052628036U
FM CNO WASHINGTON DC
TO NAVADMIN
INFO CNO WASHINGTON DC
BT
UNCLAS


NAVADMIN 005/23

PASS TO OFFICE CODES:
FM CNO WASHINGTON DC//N1//
INFO CNO WASHINGTON DC//N1//
MSGID/GENADMIN/CNO WASHINGTON DC/N1/JAN//

SUBJ/REMOVAL OF COVID-19 VACCINATION MANDATE//

REF/A/DOC/NDAA-FY23/HR 7900//
REF/B/DOC/SECDEF/10JAN23//
REF/C/MSG/CNO WASHINGTON DC/311913ZAUG21//
REF/D/MSG/CNO WASHINGTON DC/132050ZOCT21//
REF/E/MSG/CNO WASHINGTON DC/152239ZNOV21//
REF/F/MSG/CNO WASHINGTON DC/151203ZDEC21//
REF/G/MSG/CNO WASHINGTON DC/302215ZMAR22//

NARR/REF A IS THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FY-23.
REF B IS SECDEF MEMO TITLED RESCISSION OF COVID-19 VACCINATION REQUIREMENT
FOR MEMBERS OF THE ARMED FORCES.
REF C IS NAVADMIN 190/21, 2021-2022 NAVY MANDATORY COVID-19 VACCINATION AND
REPORTING POLICY.
REF D IS NAVADMIN 225/21, COVID-19 CONSOLIDATED DISPOSITION AUTHORITY (CCDA).
REF E IS NAVADMIN 256/21, CCDA GUIDANCE TO COMMANDERS.
REF F IS NAVADMIN 283/21, CCDA EXECUTION GUIDANCE TO COMMANDERS.
REF G NAVADMIN 083/22, CCDA INTERIM GUIDANCE REGARDING MEMBERS REQUESTING
RELIGIOUS ACCOMMODATION FROM COVID-19 VACCINATION REQUIREMENTS.

RMKS/1.  On 23 December 2022, reference (a) directed the Secretary of Defense
(SecDef) to rescind the coronavirus disease 2019 (COVID-19) vaccination
mandate within 30 days.  On 10 January 2023, SecDef rescinded the mandate for
all branches of the armed forces in line with reference (b).  The actions
below align the Navy with this guidance.
a.  Cancel reference (c).
b.  All commands will immediately discontinue administrative separation
processing of Navy Service Members solely for refusing the COVID-19 vaccine,
including those with approved separation letters.
c.  All commands will immediately suspend any new adverse administrative
actions associated with refusing the COVID-19 vaccine as described in
references (c) through (g).

2.  Updated operational guidance will be promulgated in a follow-on standard
operational guidance serial.

3.  Additional detailed guidance regarding implementation of this policy will
be promulgated via future NAVADMIN.

4.  Released by Vice Admiral Richard J. Cheeseman, Jr., N1.//

BT
#0001
NNNN
CLASSIFICATION: UNCLASSIFIED//
```

# Exhibit 2

```
CLASSIFICATION: UNCLASSIFIED//
ROUTINE
R 201839Z JAN 23 MID200080671031U
FM SECNAV WASHINGTON DC
TO ALNAV
INFO SECNAV WASHINGTON DC
CNO WASHINGTON DC
CMC WASHINGTON DC
BT
UNCLAS

ALNAV 009/23

MSGID/GENADMIN/SECNAV WASHINGTON DC/-/JAN//

SUBJ/RESCISSION OF COVID-19 VACCINATION REQUIREMENT FOR MEMBERS OF THE ARMED
FORCES//

REF/A/DOC/SECDEF/10JAN23//
REF/B/DOC/ALNAV 062/21//

NARR/REF A IS SECDEF MEMO RESCISSION OF AUGUST 24, 2021 AND NOVEMBER 30, 2021
CORONAVIRUS DISEASE 2019 VACCINATION REQUIREMENTS FOR MEMBERS OF THE ARMED
FORCES.  REF B IS ALNAV 062/21 2021-2022 DEPARTMENT OF NAVY MANDATORY COVID-
19
VACCINATION POLICY OF 30 AUG 21//

RMKS/1.  Per reference (a), this message announces the rescission of the
Coronavirus Disease 2019 (COVID-19) vaccination requirement for members of
the Armed Forces.  As a result, reference (b) is hereby canceled.

2.  COVID-19 vaccines have proven to be safe, effective, and life-saving.  I
am confident that our high vaccination percentage across the Department of
the Navy (DON) has both saved lives, and prevented hospitalizations across
our entire force.

3.  The Navy and Marine Corps are inherently expeditionary forces in
readiness, and my expectation continues to be that all Sailors and Marines be
worldwide deployable.  To defend the nation, we need a healthy and ready
force, this means a Navy and Marine Corps that is ready to deploy.  Having
credible, capable forces requires the DON to minimize addressable risks -
contagious disease is a threat to our fighting forces.  We will continue to
consider medical readiness, of which vaccination plays a key role, in all
appropriate settings.  All commanders have the responsibility and authority
to maintain military readiness, unit cohesion, good order and discipline, and
the health and safety of their commands.

4.  Because reference (b) is now canceled, the Services shall cease any
ongoing reviews of current Service Members' religious, administrative, or
medical accommodation requests solely for exemption from the COVID-19 vaccine
or appeals of denials of such requests.  No currently serving Sailor or
Marine shall be separated solely on the basis of their failure to receive the
COVID-19 vaccination if they sought an accommodation on religious,
administrative, or medical grounds.

5.  We will continue to promote and encourage the COVID-19 vaccination for
everyone.  As with all of our vaccinations, healthcare providers will
continue to medically screen for contraindications.  I thank you for your
selfless devotion to your colleagues, military and civilian, throughout this
pandemic.

6.  Released by the Honorable Carlos Del Toro, Secretary of the Navy.//

BT
```

#0001
NNNN
CLASSIFICATION: UNCLASSIFIED//

# Exhibit 3

# Change 168
# Manual of the Medical Department
# U.S. Navy
# NAVMED P-117

# 3 February 2023

To:  Holders of the Manual of the Medical Department

1.  <u>This Change:</u>  Updates MANMED Chapter 15, article 15-105(4)(n)<u>(9)</u>.

    a.  <u>Changes noted:</u>  The requirement of a waiver for candidates or Naval Special Warfare and Special operations Duty (NSW/SOD) designated personnel failing to receive required vaccines.

    b.  <u>Changes noted for MANMED article 15-105((4)(n)(9)).</u>  Replaced "Candidate or SO designated personnel refusing to receive recommended vaccines (preventive health or theater specific vaccines recommended by the Combatant Command (CCMD)) based solely on personal or religious beliefs are disqualified.  This provision does not pertain to medical contraindications or allergies to vaccine administration." with "Candidates or Naval Special Warfare and Special operations Duty (NSW/SOD) designated personnel failing to receive required vaccines (preventive health or theater-specific vaccines required by the Combatant Command (CCMD)), whether for personal or religious beliefs, medical contraindications or allergies to vaccine administration, or any other reason, are disqualified and must seek a waiver.

2.  <u>Action.</u>  Add updated vaccine waiver requirements verbiage to MANMED Chapter 15 article 15-105(4)(n)<u>(9)</u>.

                                D. K. VIA
                                Chief, Bureau of Medicine and Surgery
                                Acting

pose a significant risk of mentally or physically impairing side effects is disqualifying. Any requirement for a medication that necessitates close monitoring, regular tests, refrigeration, or parenteral administration on a biweekly (every 2 weeks) or more frequent basis is disqualifying. Requirement for medication which would pose a significant health risk if suddenly stopped for 1 month or more is disqualifying.

(c) SO designated personnel taking medicines prescribed by a non-DoD provider are disqualified until reviewed and approved by the Service member's UMO.

(9) *Vaccinations.* Candidates or Naval Special Warfare and Special operations Duty (NSW/SOD) designated personnel failing to receive required vaccines (preventive health or theater-specific vaccines required by the Combatant Command (CCMD)), whether for personal or religious beliefs, medical contraindications or allergies to vaccine administration, or any other reason, are disqualified and must seek a waiver.

(4) *Waiver and Disqualification Requests.* Waiver and disqualification requests are essentially the same personnel action. The distinction between the two lies with whether the originator is requesting that one or more physical standards be waived or not. The outcome of either request is a determination by the responsible waiver authority as to whether the physical standard(s) is waived or not. BUMED-M95 serves as the senior medical reviewer for the waiver authority. (Certain waiver authorities have delegated adjudication of disqualification cases only to lower echelon commanders).

(a) Requests for a waiver of physical standards for SO personnel and candidates must be sent from the member's commander, commanding officer, or officer in charge, via any applicable immediate superior in command (ISIC) or type commander (TYCOM) and BUMED-M95, to the appropriate Bureau of Naval Personnel code (enlisted – BUPERS-3; officers – PERS-416); or Headquarters, USMC (POG-40).

(b) Originators must use the WEBWAVE 2 system to securely transmit cases (which contain HIPAA and PII-protected information). WEBWAVE 2 expedites case adjudication, allows tracking of cases under review and provides an accessible archive of closed cases. The system's business rules are designed to ensure that all necessary components of a request are submitted and requests are directed electronically via the proper routing sequence. BUMED-M95's guideline for timely internal review of routine waiver requests is 10 business days; Urgent cases are acted

upon with 24 hours of receipt. Access to WEBWAVE 2 is controlled by BUMED-M95. Commands needing to submit requests via WEBWAVE 2 but currently without access may contact BUMED-M95 directly to validate their requirement and obtain access/training.

(c) For SO personnel, interim waivers may be granted by BUMED-M95 for periods of up to 6 months.

(1) Interim waivers will not normally be considered for SO candidates, in as much as their suitability must be established before the Navy incurs the expense of TAD orders and training.

(2) Because interim waivers are not reviewed by the relevant Waiver Authority, BUMED-M95 will only grant interim waivers for relatively routine, frequently encountered conditions for which it is confident of the waiver authority's eventual disposition. In any case, interim waivers should be requested sparingly.

(3) BUMED-M95 must receive the final waiver request prior to the expiration of any interim waiver which has been granted (typically 6 months). The final waiver request must include a substantive interval history pertinent to the condition under review.

(4) Individuals with lapsed interim waivers are not physically qualified to parachute or deploy until the final waiver request has been adjudicated.

(5) BUMED-M95's final recommendation will be based on the member's condition at the time the final waiver request is made and may differ from the interim determination, if there has been a change in the member's condition or if information presented in the final request dictates a change in recommendation.

(d) BUMED-M95 will perform 'courtesy screening' for SO candidates, who are potential Navy accessions, referred by their local Navy Recruiting Districts (NRD); however, these screens are not waivers.

(e) The required elements of a waiver or disqualification request are:

(1) A special SF 600, prepared by the UMO, requesting the waiver (or disqualification), referencing the specific standard for which the member is NPQ, a clinical synopsis including brief history, focused examination, clinical course, appropriate ancillary studies and appropriate specialty

# Exhibit 4

App. 009

## UNCLAS

PAGE 1 OF 2

# NSWC CLOSEOUT TO TRIDENT ORDER #12 - MANDATORY VACCINATION FOR

**Originator:** COMNAVSPECWARCOM CORONADO CA

    **TOR:** 05/23/2022 19:46:33

    **DTG:** 231943Z May 22

    **Prec:** Routine

    **DAC:** General

     **To:** AIG 11370

    **CC:** COMNAVSPECWARCOM CORONADO CA

```
RAAUZYUW RUIEAAA3871 1431945-UUUU--RUIEAAA.
ZNR UUUUU ZDH ZUI RUEOMCI0351 1431946
R 231943Z MAY 22
FM COMNAVSPECWARCOM CORONADO CA
TO AIG 11370
INFO RUIEAAA/COMNAVSPECWARCOM CORONADO CA
BT
UNCLAS
SUBJ/NSWC CLOSEOUT TO TRIDENT ORDER #12 - MANDATORY VACCINATION FOR
COVID-19
REF/A/MSG/TRIDENT ORDER #12 - MANDATORY VACCINATION FOR COVID-
19/241857Z SEP 21
REF/B/NAVADMIN/CNO WASHINGTON DC/302215Z MAR 22//
REF/C/UNDERSECRETARY OF DEFENSE FOR PERSONNEL AND READINESS MEMO,
CONSOLIDATED DEPARTMENT OF DEFENSE CORONAVIRUS DISEASE 2019 FORCE
HEALTH PROTECTION GUIDANCE, DATED 4 APR 22//
REF/D/NAVADMIN/CNO WASHINGTON DC/
REF/E/SECRETARY OF THE NAVY MEMO, IMPLEMENTATION OF CONSOLIDATED
DEPARTMENT OF DEFENSE CORONAVIRUS DISEASE 2019 FORCE HEALTH
PROTECTION
GUIDANCE, DATED 29 APR 22//

NARR/(U) REF A IS TRIDENT ORDER #12 ON COVID-19 VACCINATIONS//
REF B IS CNO GUIDANCE ON RELIGIOUS ACCOMMODATIONS FOR COVID-19
VACCINE//
REF C IS USD MEMO ON COVID-19 GUIDANCE//
REF D IS US NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE 6.0//
REF E IS SECNAV MEMO ON COVID-19 GUIDANCE//

(U) THIS ORDER RESCINDS REFERENCE A.//

1. (U) COMNAVSPECWARCOM AND SUBORDINATE COMMANDS EXECUTED MANDATORY
COVID-19 VACCINATIONS IAW PRIOR DEFENSE (DOD), DEPARTMENT OF THE NAVY
(DON), AND UNITED STATES SPECIAL OPERATIONS COMMAND (USSOCOM)
GUIDANCE
IAW REFERENCE A.//

2. (U) COMNAVSPECWARCOM AND SUBORDINATE COMMANDS WILL CONTINUE TO
FOLLOW HIGHER GUIDANCE, AS APPROPRIATE, REGARDING COVID-19
VACCINATION, ACCOMMODATION REQUESTS, AND MITIGATION MEASURES, TO
INCLUDE REFERENCES B THROUGH E.//

3. (U) GIVEN THE SUCCESSFUL EXECUTION OF REFERENCE A AND TO ENSURE
ALIGNMENT WITH THE LATEST HIGHER HEADQUARTERS GUIDANCE REGARDING
COVID-19, THIS ORDER RESCINDS REFERENCE A. COMNAVSPECWARCOM AND
SUBORDINATE COMMANDS WILL CONTINUE TO DEFER TO DOD, DON, AND USSOCOM
```

## UNCLAS

# UNCLAS

PAGE 2 OF 2

GUIDANCE FOR COVID-19 VACCINATION, ACCOMMODATION REQUESTS, AND
MITIGATION MEASURES.//

4. (U) THE LATEST DOD FHP GUIDANCE CAN BE ACCESSED THROUGH URL:
HTTPS://WWW.DEFENSE.GOV/SPOTLIGHTS/CORONAVIRUS-DOD-RESPONSE/LATEST-
DOD-GUIDANCE//

5. (U) ADMIN AND LOGISTICS/DIRECT NSW COVID-19 QUESTIONS AS
FOLLOWS.//
5.A. (U) FHP MEASURES TO NSW FORCE MEDICAL DEPARTMENT:
NSW-FORMEDSTAFF@SOCOM.MIL OR BY PHONE 619-537-1164/1165/1166//
AKNLDG/NO//

BT
#3871
D899


NNNN
Received from AUTODIN 231946Z May 22

# UNCLAS

# Exhibit 5



**UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

**JAN 3 0 2023**

PERSONNEL AND
READINESS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                COMMANDERS OF THE COMBATANT COMMANDS
                DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Consolidated Department of Defense Coronavirus Disease 2019 Force Health
            Protection Guidance – Revision 4

       Effective immediately, the preamble, executive summary, and sections 1.3, 1.4, 2.1, 3.3, 4.1-4.4, 5.1-5.5, 5.9-5.10, 5.12, 6, 7.1-7.7, and 9 of the "Consolidated Department of Defense – Coronavirus Disease 2019 Force Health Protection Guidance," (August 29, 2022 version) are amended as attached. The complete document with amendments is also available at https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/Latest-DOD-Guidance/.

       Where applicable, these changes end coronavirus disease 2019 (COVID-19) screening testing based on vaccination status; end the requirement to ask about COVID-19 vaccination status; update protocols for individuals exposed to someone with COVID-19; no longer require workplace occupancy limits for each Health Protection Condition levels; and modify travel guidance.

       Components should engage with unions to ensure any bargaining obligations pursuant to chapter 71 of title 5, U.S. Code, are satisfied. Additionally, DoD Components should review in-place agreements and are encouraged to bring any conflicting provisions into compliance at the earliest possible opportunity.

       Please direct any questions or comments to the following email address: dha.ncr.ha-support.list.policy-hrpo-kmc-owners@health.mil.

                               Gilbert R. Cisneros, Jr.

Attachment:
As stated

*1. The preamble is amended as follows:*

This guidance issued by the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) presents a uniform and consolidated DoD policy for the Department's response to the coronavirus disease 2019 (COVID-19) pandemic and serves as the DoD COVID-19 Workplace Safety Plan.[1]  Implementation of this guidance will comply with: **1) applicable court orders, Presidential directives, and Office of Management and Budget (OMB) and Safer Federal Workforce Task Force guidance; and 2)** applicable labor obligations to the extent such obligations do not hinder the DoD Components' ability to carry out their missions during this public health emergency.  Prior delegations and exceptions made pursuant to the rescinded references remain valid unless rescinded by the authorizing official.  Individual sections of this guidance will be updated as necessary by the USD(P&R).  **Commanders and supervisors may implement additional, more stringent requirements with respect to masking and physical distancing, as appropriate, to mitigate risk.**

* * *

Furthermore, this guidance consolidates, incorporates, and rescinds the following policy and guidance:

* * *

- **Assistant Secretary of Defense for Readiness Memorandum, "Continued Implementation of the Occupational Safety and Health Administration Emergency Temporary Standard for Healthcare during the Coronavirus Disease 2019 Pandemic," August 19, 2022.**

*2. The Executive Summary is amended as follows:*

The DoD is committed to providing safe working environments across the entire DoD enterprise, which consists of an approximately 2.9 million-person global workforce deployed or stationed in nearly 150 countries, including military Service members and their families, and DoD civilian and contractor personnel that work in a highly complex and large number of diverse and unique environments.  This force health protection (FHP) Guidance ("Guidance") was developed to protect the DoD workforce, **which consists of Service members, DoD civilian employees,** contractor personnel, other occupants, and visitors (collectively referred to as "personnel") before, during, and after our orderly and final return to the physical workplace ("final reentry").  The Guidance is intended to meet the direction of the President's EOs[2] and guidance from the Safer Federal Workforce Task Force ("Task Force") and ~~OMB~~**the Office of Management and Budget**,[3,4] and articulate steps the DoD has been and will be taking to halt the spread of COVID-19.  **To ensure consistent application throughout DoD, if the Eos and guidance change, DoD Components will wait for DoD to update this consolidated guidance before implementing any changes.**

* * *

DoD has long recognized the threat posed by pandemics and disease outbreaks and has previously issued guidance, planning, and policy documents to prepare for and respond to such threats.  The DoD also recognizes that successfully managing the COVID-19 pandemic requires the flexibility to adapt to changing conditions (e.g., variants, and disease prevalence or virulence) and new information (e.g., evolving best health and safety practices).  **DoD continues to promote the importance of taking vaccines and boosters to protect our people against the adverse impacts of COVID-19.  The Department also recognizes that wearing high-quality masks, testing, and improved ventilation are other factors to reduce COVID-19 exposure risks.**

*3. Section 1.3 is amended as follows:*

HPCON level determinations for COVID-19 are based on the CDC COVID-19 Community Levels reported by the CDC,[8] which include screening levels that make use of new case-rates and health and health care systems-related information.  HPCON Levels A, B, and C correspond directly to CDC COVID-19 Community Levels of low, medium, and high ~~community transmission~~, respectively.[9], [10]

* * *

**Footnotes:**

[8] An overview of the CDC COVID-19 Community Levels is available at: https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html.

[9] County Community Levels are available for U.S. States and territories is available at: https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html.  Find community levels by "State or Territory" and then by "County or Metro Area."  Jurisdictions which are not counties, such as the District of Columbia, also are listed under "County or Metro Area."  The Pentagon is in Arlington County, Virginia.

[10] **The CDC COVID-19 Community Levels do not apply in healthcare settings, such as hospitals and retirement homes.  Instead, healthcare settings should continue to use community transmission rates and continue to follow CDC's infection prevention and control recommendations for healthcare settings, as long as they are more restrictive than FHP guidance.**

**Table 1 of section 1.3 is amended as follows:**

a.  In the second column under HPCON D, the fifth paragraph is amended as follows:

"Military Health System (MHS) health care capability and utilization (percent and trend): Degradation of MHS capabilities requiring Crisis Status operations; and >95 percent staffed bed occupancy; or >50 percent military medical treatment facility (MTF) staff in isolation or quarantine ~~or unvaccinated~~; or >60 percent staff absent who provide urgent or emergent care; and Local emergency departments on divert or inability of civilian health care to absorb excess MHS patients; or Clinical or appointment capability reduced >60 percent in key departments."

b.  In the third column under HPCON D:

Item "a" is deleted and the remaining items re-lettered.

~~a.   Less than 25 percent of normal occupancy in the workplace, or the minimum required on-site for essential operations that must be conducted in person.~~

A new "f" is added and the remaining items are re-lettered:_  "**f.  Schools operated by Department of Defense Education Activity (DoDEA) will operate remotely.**"

Footnote 12, associated with item h, is amended as follows: "[12]For information about masking ~~and screening testing~~ at the various HPCON levels, refer to section~~s 2.1 and~~ 5.3."

c.  In the third column under HPCON C, "a," "b," and "c" are deleted and the remaining items re-lettered:

~~a.  Less than 50 percent of normal occupancy in the workplace.~~
~~b.  Consider limiting visitor access to the installation for non-essential mission-related/operational activities.~~
~~c.  Limit social gatherings to less than 50 percent facility/room occupancy.~~

d.  In the third column under HPCON B:

Item "a" is deleted and the remaining items re-lettered:

~~a.  Less than 80 percent of normal occupancy in the workplace.~~

Item "b" is amended as follows:

**a.  Reduce potential workplace SARS-CoV-2 exposures through telework, remote work, flexible scheduling, and other methods, as appropriate.** ~~Permit liberal telework where possible, especially for individuals who self-identify as immunocompromised or being at high risk for severe disease.~~

A new "c" is added and the remaining item re-lettered:

**c.  Each installation and DoD facility will post signage at building entrances and in common areas of DoD owned and controlled facilities and post information on websites as appropriate encouraging individuals, regardless of vaccination status, to consider avoiding crowding, and physically distancing themselves from others in indoor common, areas, meeting rooms, and high-risk settings.**

f.  In the third column under HPCON A:

Item "a" is deleted and the remaining items re-lettered.

~~a. Less than 100 percent of normal occupancy in the workplace, with telework as appropriate.~~

Item "d" is amended as follows:

3

App. 016

"**c.** DoDEA schools will operate following CDC recommendations and guidelines specific to schools as implemented in operational procedures and guidance from the Director, DoDEA.[13] ~~Children are not required to mask.~~ Any DoD guidance that is more stringent than CDC guidance must be followed."

Footnote added to "d": **[13] https://www.dodea.edu/covid-operations.cfm.**

*4. Section 1.4 is amended as follows:*

**1.4.   TELEWORK** ~~WORKPLACE OCCUPANCY LEVELS WITHIN THE HPCON FRAMEWORK.~~

~~Workplace occupancy limits for each HPCON level are included as measures in Table 1.  The workplace occupancy levels in Table 1 are ceilings, not goals. Reduced workplace occupancy may be achieved through telework, remote work, flexible scheduling, and other methods, as appropriate.~~

At HPCON A or higher, **or when a DoD civilian employee is required to remain out of the workplace under section 5.5,** DoD Components are granted an exception to policy from Enclosure 3, Paragraph 3.j.(2) of Department of Defense Instruction 1035.01, "Telework Policy," and may allow DoD civilian employees to telework with a child or other person requiring care or supervision present at home.  **DoD civilian employees must still account for work and non-work hours during their tour of duty and take appropriate leave (paid or unpaid) to account for time spent away from normal work-related duties to care for a child or other person requiring care or supervision.**

~~DoD Component heads have the authority to grant exemptions for workplace occupancy limits that are required for national security and the success of critical missions. DoD Component heads, other than the Secretaries of the MILDEPs, may delegate this workplace occupancy limit authority in writing to a level no lower than a general/flag officer or Senior Executive Service (SES) member (or equivalent).  Secretaries of the MILDEPs may delegate workplace occupancy limit exemption authority in writing to a level no lower than an O-6 installation commander.  The DA&M has workplace occupancy limit exemption authority for all DoD Components located on the Pentagon Reservation and other facilities within the National Capital Region managed by Washington Headquarters Services.  This authority may be delegated at the discretion of the DA&M. DLA has workplace occupancy limit exemption authority for four locations.[14]  When considering a workplace occupancy limit exemption, those with exemption authority must take into account the ability to maintain distance between personnel and other public health and workplace safety measures contained in this Guidance.~~

~~A record of all workplace occupancy limit exemptions will be retained by the exemption authority for the duration of the pandemic and until returning to HPCON 0 and provided for awareness to the public health office concerned and to the installation commander, if different from the exemption authority.  FHP measures and other~~

App. 017

~~appropriate mitigation measures shall be used rigorously in all areas and especially in areas for which an occupancy exemption has been grant.~~

~~[14] DLA Land & Maritime (Columbus, OH), DLA Distribution HQ (New Cumberland, PA), DLA Aviation (Richmond, VA), and DLA Distribution (San Joaquin, CA).~~

*5.  Title of section 2 and section 2.1 are amended as follows:*

# SECTION 2:  VACCINATION ~~VERIFICATION AND MEASURES BASED ON VACCINATION STATUS~~

## 2.1.  VACCINATION **– GENERAL** ~~AND TESTING REQUIREMENTS~~.

**Leaders at all levels should encourage Service members, DoD civilian employees, DoD contractor personnel, and others affiliated with DoD to be up to date on their COVID-19 vaccinations.**

    1.  Service members:

Service members (members of the Armed Forces under DoD authority on active duty or in the Selected Reserve, including members of the National Guard) are **strongly encourgaged** ~~required~~ to be ~~fully vaccinated against~~ **up to date with** COVID-19 **vaccination, including booster doses** ~~subject to any identified contraindications, any administrative or other exemptions established in DoD policy, and any applicable court orders~~.

**To ensure an accurate medical record,** Service members' vaccination status will be ~~validated~~ **maintained** utilizing their Military Service-specific Individual Medical Readiness (IMR) system.  If a Service member has been vaccinated against COVID-19 outside the military health system, that Service member must ~~show official proof~~ **provide documentation** of his or her COVID-19 vaccination ~~status~~ to update the IMR system.

~~Once the applicable mandatory vaccination date has passed, COVID-19 screening testing is required at least weekly for Service members who are not fully vaccinated, including those who have an exemption request under review or who are exempted from COVID-19 vaccination and are entering a DoD facility located in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high or medium.  Service members who are not on active duty and who also are DoD civilian employees or DoD contractor personnel must follow the applicable requirements in section 2.3 for DoD civilian employees or in section 2.4 for DoD contractor personnel.~~

    2.  DoD civilian employees:

       * * *

~~At least weekly COVID-19 testing is required for those DoD civilian employees who are not fully vaccinated when the CDC COVID-19 Community Level is high or medium in the county or equivalent jurisdiction where the DoD facility is located. DoD civilian employees who are not fully vaccinated and who telework or work remotely on a full-time basis are not subject to weekly testing, but must provide a negative result (from a test performed within the prior 72 hours) for entry into a DoD facility located in the county where the COVID-19 Community Level is high or medium.~~

\* \* \*

~~If they have not already done so, supervisors of DoD civilian employees must ask DoD civilian employees whether they are fully vaccinated. Employees who indicate they are fully vaccinated must provide proof of that vaccination status to their supervisors. Acceptable proof includes:~~

~~a. A copy of the COVID-19 Vaccination Record Card (CDC Form MLS-319813_r, published on September 3, 2020);~~
~~b. A copy of medical records documenting the vaccination;~~
~~c. A copy of immunization records from a public health or State immunization information system; or~~
~~d. A copy of any other official documentation containing the data points required to be verified by the supervisor.~~

~~When necessary for implementing FHP measures related to workplace access in section 5.5, supervisors of DoD civilian employees may ask DoD civilian employees whether they are up to date with COVID-19 vaccinations. If there is a supervisory concern about the accuracy of the DoD civilian employee's response, DoD civilian employees are required to provide proof of up-to-date vaccination status. Supervisors must not inquire about disabilities when asking DoD civilian employees about up-to-date vaccination status.~~

\* \* \*

3.  DoD contractor personnel:

~~Vaccination requirements for DoD contractor personnel are outlined in several references.[16] In implementing EO 14042, the DoD will comply with all relevant court orders.~~

~~Onsite DoD contractor personnel will complete the DD Form 3150, "Contractor Personnel and Visitor Certification of Vaccination";[17] maintain a current completed copy; and show it to authorized DoD personnel upon request when they work at a DoD facility where the CDC COVID-19 Community Level is high or medium. Failure to complete the DD Form 3150 may result in denying DoD contractor personnel access to the DoD facility to which access is sought. Onsite DoD contractor personnel who are not fully vaccinated against COVID-19, because they are not performing under a covered contract that requires COVID-19 vaccination, due to a legally required accommodation, or who decline~~

6

~~to provide information about their COVID-19 vaccination status, will be subject to COVID-19 screening testing at least weekly when the CDC COVID-19 Community Level for the facility in which they work is high or medium.  DoD contractor personnel who refuse required COVID-19 screening testing will be denied access to DoD facilities.~~

~~For purposes of the requirements regarding providing information about vaccination status and screening testing, "contractor personnel" are those individuals issued a credential by DoD that affords the individual recurring access to DoD facilities, classified herein as "credentialed recurring access" (CRA) (e.g., Common Access Cardholders) who are performing under a contractor or subcontract between their employer and the DoD.  "Contractor personnel" do not include employees of DoD contractors or subcontractors receiving ad hoc access to DoD facilities (e.g., delivery personnel, taxi services) or employees of DoD contractors or subcontractors who have access to the grounds of, but not the buildings on, DoD installations (e.g., contract groundskeepers, fuel delivery personnel, household goods transportation personnel).~~

~~**DoD Components should not take any steps to require contractors and subcontractors to implement the vaccination requirement for contractor personnel in Executive Order 14042, nor should they include in new solicitations or enforce in existing contracts (or task orders or delivery orders) any clauses implementing EO 14042.**~~

~~[16] Safer Federal Workforce Task Force, "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors," September 24, 2021; Principal Director for Defense Pricing and Contracting Memorandum, "Class Deviation 2021-O0009 Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors," October 1, 2021; EO 14042, "Ensuring Adequate COVID Safety Protocols for Federal Contractors," September 9, 2021.~~
~~[17] https://www.esd.whs.mil/Portals/54/Documents/DD/forms/dd/dd3150.pdf.~~

4.  Official visitors:

"Official visitors" are non-DoD individuals seeking access, one time or recurring, in association with the performance of official DoD business (such as to attend a meeting), but who do not have **"credentialed recurring access"** (CRA**) (e.g., Common Access Cardholders)**. "Official visitors" do not include personnel receiving ad hoc access to DoD facilities (e.g., delivery personnel, taxi services); individuals who have access to the grounds of, but not the buildings on, DoD installations (e.g., contract groundskeepers, fuel delivery personnel, household goods transportation personnel); personnel accessing DoD buildings unrelated to the performance of DoD business (e.g., residential housing); or  personnel accessing DoD facilities to receive a public benefit (e.g., commissary; exchange; public museum; air show; military medical treatment facility; Morale, Welfare, and Recreation resources).

~~Official visitors will complete DD Form 3150; maintain a current completed DD Form 3150; and show it to authorized DoD personnel, upon request when they are visiting a DoD facility where the CDC COVID-19 Community Level is high or medium.  Failure to complete the DD Form 3150 may result in denial of an official visitor's access to the DoD facility to which access is sought.  Service members not on active duty or active duty for training are also subject to the requirements in this paragraph.~~

~~When visiting a DoD facility where the CDC COVID-19 Community Level is high or medium, official visitors who are not fully vaccinated against COVID-19, or who decline to provide information about their vaccination status, must show an electronic or paper copy of negative results from an FDA-authorized or approved COVID-19 test administered no earlier than 72 hours prior to their visit. If unable to show a negative COVID-19 test result, the official visitor may be provided onsite self-testing, if available, or will be denied access to the DoD facility (or facilities) to which access is sought. Service members who are not on active duty or on active duty for training at the time of their official visit are subject to the requirements in this paragraph.~~

*6. Section 3.3 is amended as follows:*

\* \* \*

DoD contractor personnel suspected of having contracted COVID-19, or for whom testing is required for workplace surveillance or official travel, may be offered screening testing, subject to available funding, if such testing is necessary to support mission requirements and is consistent with applicable contracts. ~~For example, if testing is explicitly called for under the contract; or if testing is required to access a DoD facility and the contractor personnel must access the DoD facility to perform under the contract. DoD contracting officers may also modify existing contracts to require contractors to test their personnel, or to permit DoD to test their personnel, as necessary to support mission requirements and subject to available funding.~~

*7. Section 4.1 is rescinded.*

*8. Section 4.2 is amended as follows:*

\* \* \*

- Contact tracing of confirmed COVID-19 positive cases to infected persons**, as described in section 4.4** ~~in accordance with all applicable Federal, State, local, and DoD requirements~~.

*9. Section 4.3 is amended as follows:*

\* \* \*

- DoD Components may, in consultation with public health advisors, conduct **surveillance and** screening testing of Service members to reduce risk in **select high-risk** congregate settings, on ships, at training sites, during events, or in remote locations where early identification, isolation, and quarantine are important.

8

Screening testing protocols may involve testing of all Service members prior to participation in an event (such as an exercise or training evolution) with or without testing during the event. Finally, screening testing may be performed using a surveillance protocol in which a specified percentage of randomly selected Service members are tested during regular intervals over a period of heightened vulnerability such as when case rates are very high or medical resources are in high demand.

1. **Execute the screening testing requirement with FDA approved or authorized COVID-19 self-collection kits or self-tests. Testing should be performed primarily onsite at the installation or facility with proper supervision and documentation of testing results. If onsite COVID-19 screening testing is not feasible, as an alternative self-testing may be performed at home or in other locations. (Note: these COVID-19 self-tests do not require a health care provider's clinical care order and are, therefore, considered an over-the-counter test and do not require medical support to complete).**

2. **Establish guidance for where and how these tests will be distributed and conducted, and how results are to be reported.**

3. **After COVID-19 screening testing procedures are established,** Service members **subject to screening testing are required to have a negative COVID-19 screening test result for entry into a DoD facility. If the COVID-19 screening test is administered onsite, the test will be administered before Service members go to their work areas. Service members who have tested positive and do not have symptoms are exempted from regular screening testing for 30 days following the documented date of their initial positive test of COVID-19. Documented proof of this positive test date shall be provided upon request.**

- Voluntary testing of eligible family members, DoD civilian employees, and DoD contractor personnel (if appropriate and permitted in accordance with applicable contracts) who, if infected with COVID-19, could impact the DoD workforce and missions, may be conducted in support of the DoD's effort to interrupt transmission of the virus among our populations. Testing will be conducted based on availability and managed at the DoD Component level. **DoD civilian employees and DoD contractor personnel with CRA with positive COVID-19 screening tests will be offered, but not required to take, FDA approved or authorized confirmatory laboratory-based molecular (i.e., polymerase chain reaction) testing paid for by the relevant DoD Component. Contact tracing and mitigation measures will be conducted in accordance with sections 4.4 and 5.5.**

*10.  Section 4.4 is amended as follows:*

**4.4.  COVID-19 CONTACT TRACING ~~AND TESTING~~.**

~~DoD Components will conduct contact tracing on all COVID-19 cases identified through testing activities and prioritize investigation of COVID-19 cases, clusters, and outbreaks involving high-risk congregate settings, unusual clusters of cases, and considered for novel or emerging variants that pose a significant risk for severe disease, hospitalization, or death.  Follow-on quarantine or isolation measures and testing will be implemented as indicated.__DoD Components will conduct contact tracing on all COVID-19 cases identified in health care settings and certain high-risk congregate settings, unusual clusters of cases, and cases involving novel or emerging variants that pose a significant risk for severe disease, hospitalization, or death.  In identifying certain settings in which to conduct contact tracing, DoD Component public health emergency officers should consider data reported to local and State public health entities and surveillance programs administered by the DoD and other Federal agencies.__

*11.  Section 5.1 is amended as follows:*

> \* \* \*

- ~~Avoid close contact (within 6 feet of any individual for a total of 15 minutes or more over a 24-hour period) with people.~~
- __Consider exposure risks.__

> \* \* \*

- ~~Launder or replace masks regularly__Use dry, clean masks__ to promote good hygiene.

> \* \* \*

~~b.   Installations will post signage about specific measures applicable to the installation, such as mask wearing and physical distancing requirements, and on installation websites, as appropriate.~~

*12.  Section 5.2 is rescinded.*

*13. Section 5.3. is amended as follows:*

          * * *

- When the CDC COVID-19 Community Level[1] is high in the county or equivalent jurisdiction where a DoD installation or facility is located, indoor mask-wearing is required for all individuals, including Service members, DoD civilian employees, onsite DoD contractor personnel (collectively, "DoD personnel"), and visitors, regardless of vaccination status.  **Each installation and DoD facility will post signage at building entrances and in common areas of DoD owned and controlled facilities when the CDC COVID-19 Community Level is high indicating that masks are required.**

          * * *

- Individuals may choose to wear a mask regardless of the **CDC** COVID-19 Community Level.

          * * *

      11. When individuals are enrolled in a respiratory protection program and are wearing a respirator during the performance of duties requiring respiratory protection. **Components that want to distribute N95 respirators to personnel must follow an OSHA respiratory protection program.**

          * * *

    **d.**  Transportation: ~~All individuals must wear a mask on DoD aircraft, boats and other maritime conveyances, and buses traveling into, within, or out of the United States, and indoor DoD transportation hubs, regardless of vaccination status and the CDC COVID-19 Community Levels.  Masks are optional in outdoor areas of these conveyances (if such outdoor areas exist on the conveyance) or while outdoors at transportation hubs, if these areas are uncrowded.  Masking requirements apply whether the DoD aircraft, boats and other maritime conveyances, and buses are located inside or outside the United States, but exclude these conveyances and other tactical vehicles and craft in their operational environment.  It is recommended that individuals wear a mask in Government cars, vans, or other low occupancy transportation assets, regardless of the CDC COVID-19 Community Level.~~**It is recommended that all individuals wear masks on DoD conveyances (e.g., aircraft, maritime vessels, and buses) and in Government cars, vans, or other low occupancy transportation assets when more than one person is present.**

    e.  Notwithstanding the above, ~~and regardless of the CDC Community Level, masks must be worn by~~ **masking of patients, visitors, and** personnel working in DoD health care facilities (including military medical, dental, and veterinary treatment facilities) **will occur** in

---

[1] See section 1.3 for information about CDC COVID-19 Community Levels.

accordance with ~~requirements specified in 29 CFR § 1910.502 and in accordance with OSHA and~~ CDC guidelines.[22]  ~~Masks will be worn by visitors and patients to DoD military medical and dental treatment facilities except while undergoing medical examinations or procedures that interfere with those activities.~~

> Footnote added: **[22] "Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic," September 23, 2022. Available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html.**

*14.  Section 5.4 is amended as follows:*

> \* \* \*

**Management of Close Contacts of a Case ~~(as determined by contact tracing)~~:**[23]

- ~~Quarantine is not required for Service members who are close contacts and who are up-to-date with an FDA licensed or authorized COVID-19 vaccine, or a World Health Organization Emergency Use Listing COVID-19 vaccine.  Regardless of vaccination status, c~~Close contacts **identified through contact tracing or through exposure** must wear a mask around others **indoors** for 10 days, even if mask wearing is not otherwise required by DoD guidance~~, and if  practical~~, **Service members in the workplace must** test ~~on day~~ **at least once after** 5 **full days** following exposure.  If symptoms develop, then the individual must get tested and isolate until test results are complete.
- ~~Close contact Service members who are not up-to-date with the COVID-19 vaccine must quarantine for 5 days.  The Service member should wear a mask at all times when around other individuals, regardless of those individuals' vaccination status, and even if mask wearing is not otherwise required by DoD guidance.  Testing should occur on day 5 after exposure.  If no symptoms develop, quarantine may end after 5 days, but the Service member must continue to wear a mask around others for an additional 5 days (i.e., masks must be worn for a total of 10 days after exposure, including the time in quarantine).  If any symptoms develop at any time, the individual should be tested for COVID-19 and advised to isolate.~~
- ~~Exceptions to the above protocols for asymptomatic Service members with potential exposure based on close contact who are not fully vaccinated, and whose presence is required in the workplace, may be considered in cases of mission-essential activities that must be conducted on site.  This exception may be granted in writing by the first general/flag officer, SES member, or equivalent, in the chain of command/chain of supervision or, for those locations that do not have general/flag officers or SES leaders, by O-6 installation commanders.  Vaccination status of the Service member should be considered in granting an exception, as more risk will be assumed in granting an exception for a Service member who is not fully vaccinated.  Service members who develop signs or symptoms consistent with COVID-19 during the duty period, he/she will be ordered to return to quarters and provided instructions for compliance with this guidance.  Service members granted an exception must comply with the following practices for 5 days after the last exposure:~~

- o  ~~Obtain a COVID-19 test on calendar day 5;~~
- o  ~~Conduct daily COVID-19 symptom screening with temperature checks;~~
- o  ~~Wear a mask in the workplace for 10 calendar days after exposure, even if mask wearing is not otherwise required by DoD guidance;~~
- o  ~~Practice hand and cough hygiene;~~
- o  ~~Refrain from sharing headsets or other objects used near the face;~~
- o  ~~Continue to physically distance as much as possible; and~~
- o  ~~Clean and disinfect their workspace daily~~

- In all situations, for a full 10 days after ~~last contact with a confirmed case~~ exposure, Service members must continue to self-monitor, and practice strict adherence to all non-pharmaceutical intervention mitigation strategies, and~~, if not fully vaccinated,~~ wear masks, avoid crowds and practice physical distancing, hand and cough hygiene, maintain adequate indoor ventilation, and perform environmental cleaning and disinfection.  In addition, Service members located outside the United States identified as close contacts must follow host-nation policies, as applicable.

~~Testing Quarantined Individuals Who Develop Symptoms:~~

~~Test eligible Service members in quarantine who develop symptoms commonly associated with COVID-19.~~

- ~~If laboratory positive:  The Service member becomes a case and must be isolated (see above).~~
- ~~If laboratory negative:  The Service member must continue to follow procedures for quarantine as outlined above.~~

\* \* \*

- If Service members become symptomatic during this time frame ~~(whether or not they are a close contact of a case)~~ they must self-isolate immediately and ~~be evaluated by a health care provider~~ retest to determine if they ~~may~~ have been re-infected with SARS-CoV-2 or if symptoms are caused by another etiology.  Isolation ~~may be warranted during this time~~ is required, particularly if symptoms developed within 10 days after ~~close contact~~ exposure ~~with~~ to an individual who has contracted COVID-19.

\* \* \*

~~Contacts of Contacts:  There is no indication to quarantine asymptomatic Service members who are contacts of contacts; they should continue to self-monitor for symptoms.~~

13

App. 026

*15. Section 5.5 is amended as follows:*

      \* \* \*

    b.  ~~**Regardless of COVID-19 vaccination status, p**~~**P**ersonnel who test positive for COVID-19 will remain out of the workplace for 5 days ~~**(day 0 is the day symptoms started or date of specimen collection if asymptomatic)**~~.  **To calculate the recommended time frames, day 0 is the day tested if no symptoms, or the date symptoms started.  Personnel who test positive for COVID-19** ~~Individuals~~ may return to the DoD workplace ~~after 5 days~~, if either: (1) they have no symptoms; or (2) if they are ~~afebrile~~ **fever-free** for more than 24 hours **(without the use of fever-reducing medication)** and any remaining symptoms are resolving. Mask wearing must continue in the workplace for an additional 5 days (for a total of 10 days post-positive result), even if mask wearing otherwise is not required by DoD guidance.

    c.  Personnel ~~with potential exposure~~ **exposed** to COVID-19 ~~based on close contact with a person who has a laboratory confirmed, clinically diagnosed, or presumptive case of COVID-19~~ will notify their supervisor.

      1.  ~~Asymptomatic personnel with potential exposure to COVID-19 based on close contact who are:  (1) not fully vaccinated; or (2) are not up-to-date with the COVID-19 vaccine will remain out of the workplace for 5 days.  Regardless of vaccination status, a~~**A**symptomatic personnel ~~with potential exposure~~ **exposed** to COVID-19 ~~close contact~~ must wear a mask in the workplace for 10 days, even if mask wearing otherwise is not required by DoD guidance.

      ~~2.  In cases of mission-essential activities that must be conducted on site, asymptomatic personnel with potential exposure to COVID-19 based on close contact, who otherwise would need to remain out of the workplace, may be granted an exception to continue to work on site provided they remain asymptomatic, do not have a positive test for COVID-19, and comply with the following key practices for 5 days after the last exposure:~~

- ~~Obtain a COVID-19 test on day 5;~~
- ~~Conduct daily pre-screening with temperature checks;~~
- ~~Wear a mask in the workplace for 10 days after exposure, even if mask wearing is not otherwise required by DoD guidance;~~
- ~~Practice hand and cough hygiene;~~
- ~~Refrain from sharing headsets or other objects used near the face;~~
- ~~Continue to physically distance as much as possible; and~~
- ~~Clean and disinfect their workspaces daily.~~

~~This exception may be granted by the first general/flag officer or member of the SES, or equivalent, in the chain of command/chain of supervision or, for those locations that do not have general/flag officers or SES leaders, by O-6 installation commanders.  If the individual develops signs or symptoms consistent with COVID-19 during the duty period, he/she will be sent home immediately.~~

14

\* \* \*

**d.  DoD civilian employees who are remaining out of the workplace because of COVID-19 symptoms and who are waiting for a test result may telework if able to do so.  If they are unable to or do not feel well enough to telework, they may request sick leave, use accrued annual leave or other forms of earned paid time off (e.g., compensatory time off or credit hours), or use unpaid leave, as appropriate.  Weather and safety leave is unavailable in this situation, but to mitigate exposure risks in the workplace, and on a limited basis, up to 1 day of administrative leave may be offered to DoD civilian employees who have COVID-19 symptoms and are remaining out of the workplace while actively seeking to be tested.**

**e.  DoD civilian employees who test positive for COVID-19 may telework during the 5 days they are required to remain out of the workplace if able to do so.  If they are unable to or do not feel well enough to telework, they may request sick leave, use accrued annual leave or other forms of paid time off (e.g., compensatory time off or credit hours), or use unpaid leave in this situation, as appropriate.  Weather and safety leave is not available in this situation.**

*16.  Section 5.9 is amended as follows:*

The SARS-CoV-2 virus is transmitted mainly by large respiratory droplets, but infected individuals generate aerosols and droplets across a large range of sizes and concentrations. There is no need to shut down air HVAC, air handling systems, or air vents to prevent the spread of COVID-19 within a building.  Increasing indoor air movement and ventilation is a cornerstone of COVID-19 transmission mitigation strategy.  Ensure existing HVAC systems in buildings are functioning properly, ensure the amount of outside air supplied to the HVAC system is maximized to the extent appropriate and compatible with the HVAC systems' capabilities, and ensure the use of air filters that have a Minimum Efficiency Reporting Value-13 or higher filter where the system can accommodate this type of filtration efficiency.  In addition to the requirements for existing HVAC systems, building managers should consider other measures to improve ventilation ~~in accordance with~~ as set forth in CDC guidance ~~(e.g., opening windows and doors to let in outside air) at:~~ **(**https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html**) and guidance from American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE; https://www.ashrae.org/file%20library/technical%20resources/ashrae%20journal/2020journaldocuments/72-74_ieq_schoen.pdf).**

*17.  Section 5.10 is amended as follows:*

**a.  General workplace:**  COVID-19 is a recordable occupational illness if a worker contracts the virus as a result of performing his or her occupational duties and if all of the following conditions are met:  (1) COVID-19 illness is a confirmed case; (2) contraction of COVID-19 is work-related as described in 29 CFR § 1904.5 (this condition will

15

require a determination by the commander or supervisor who may require input from the worker's health care provider); (3) the case of illness satisfies the requirement as a recordable illness as set forth in 29 CFR § 1904.7 (e.g., medical treatment beyond first aid is required, the number of calendar days away from work meets the stated threshold).[2]

**b.  Health care providers:  Adhere to COVID-19 illness recordkeeping and reporting procedures contained in 29 CFR §§ 1910.502(q)(2)(ii), 1910.502 (q)(3), and 1910.502(r).**

*18.  Section 5.12 is amended as follows:*

If workers are planning to conduct maintenance in a residence where a person who is known or suspected to have contracted COVID-19 resides and the maintenance is necessary and cannot be delayed, the resident should be asked to remove all items that would impede the work of the maintenance personnel.  The resident should clean the area of any dirt, debris, dust, etc. that would impact the effectiveness of surface disinfectant used by maintenance personnel. Workers should maintain ~~a~~ **the maximum possible** distance ~~of at least 6 feet~~ from the resident who is known to have or suspected of having contracted COVID-19, and ask that the resident remain in a separate room while maintenance is conducted.  If a separate room for the resident is unavailable and the worker is unable to ~~remain 6 feet in~~ **physically** distance from the resident during the work, appropriate protective equipment for ~~close contact~~ **exposure risks** must be worn by the worker.  If necessary, clean and disinfect the work area following the procedures for personnel protection described in section 5.8.

*19.  Section 6 is amended as follows:*

~~For any planned in-person meetings, events, and conferences (referred collectively herein as "meetings") sponsored by DoD with more than 50 participants in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high, the meeting organizer will obtain advance written approval from the DoD or Office of the Secretary of Defense (OSD) Component head concerned to hold the meeting.  The DoD or OSD Component head concerned may delegate this authority in writing to their Principal Deputy (or equivalent) but no lower.  For the Pentagon Reservation, the approval authority is the DA&M and this authority may not be further delegated.~~

~~For any in-person meetings in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high or medium, the meeting organizer will~~ require all attendees, including Service members and DoD civilian employees, to show a completed DD Form 3150, "Contractor Personnel and Visitor Certification of Vaccination" and will follow the applicable requirements in section 5.2 for physical distancing.  For any in-person meetings in a county or equivalent jurisdiction where the CDC COVID-19 Community

---

[2] The reporting requirements are described in more detail in DoDI 6055.07, "Mishap Notification, Investigation, Reporting, and Record Keeping," and at: https://www.osha.gov/recordkeeping.

16

~~level is low, the meeting organizers will follow the applicable requirements in section 5.2 for physical distancing.~~

~~In-person attendees who are not fully vaccinated, or who decline to provide information about their vaccination status, may not attend the meeting if they do not show the meeting organizer proof of a negative FDA approved or authorized COVID-19 test completed no earlier than 72 hours prior to the meeting, and at least weekly if the meeting is greater than one week in duration.  Meetings do not include military training and exercise events conducted by MILDEPs.~~

**For any planned in-person meetings, events, and conferences (referred collectively herein as "meetings") sponsored by DoD in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high or medium, the meeting organizer will require all attendees, including Service members and DoD civilian employees, to physically distance and will limit attendance as necessary to maintain physical distance.  Where the CDC COVID-19 Community Level is high, meeting organizers will require all attendees to wear high-quality masks.  Meetings do not include military training and exercise events conducted by MILDEPs.**

*20.  Section 7.1 is amended as follows:*

**In all cases, no personnel may engage in official travel if they have tested positive for COVID-19 and have not yet met the criteria for discontinuing isolation, they are symptomatic, or they are pending COVID-19 test results.  After discontinuing isolation, personnel should avoid official travel until 10 calendar days after their symptoms started or the date of their positive test.  If these personnel must travel on days 6 through 10, they must properly wear a well-fitting mask when they are around others for the entire duration of travel, even if mask wearing is not otherwise required by DoD guidance.  Official travel should also be delayed if, in the past 10 days, an individual has been exposed to someone who has tested positive for, and/or been symptomatic of, COVID-19.  Prior to travel, all official travelers should be educated on how to self-monitor and what actions to take if one develops signs or symptoms consistent with COVID-19 or contracts COVID-19.**

~~Fully vaccinated individuals are not restricted from official travel, both domestic and international.  Individuals who are not fully vaccinated, or who decline to provide information about their vaccination status, are limited to mission-critical official travel, both domestic and international.  "Mission-critical" will be determined by the traveler's DoD or OSD Component head, who may delegate this authority in writing to the Component's Principal Deputy (or equivalent) but no lower.  For the purpose of this FHP guidance, travel associated with permanent changes of station, travel in connection with Authorized or Ordered Departures issued by the Department of State, or travel in evacuations ordered by the appropriate DoD official is deemed to be "mission-critical."~~

During all official travel, travelers will follow all applicable Federal, State, local, and commercial air carrier requirements, and applicable HN requirements as a means to respect HN law.  ~~In addition to completion of required or recommended ROM, a~~**A**dditional requirements

may be necessary when traveling to, or from, locations outside, and within, the United States~~,~~. **T**~~t~~ravelers will follow any requirements in the Electronic Foreign Clearance Guide pertaining to entry, movement, or operations into a HN.  Travelers will also refer and adhere to local updates in HN for travel and movement within the HN.

~~For travel via military airlift (contracted or organic), Aerial Point of Embarkation (APOE) health screening is mandatory.  Travelers who have a medical issue identified during screening or who refuse to be screened at the APOE may be denied travel.~~

~~The waiver authority available to the Secretaries of the MILDEPs, heads of OSD Components, Chief of the National Guard Bureau, and Commanders of the GCCs for official travel is specified in section 7.4.~~  Travel that is limited to transit between, and through, foreign countries contained wholly within a single GCC area of responsibility, and between GCC areas of responsibility, is not subject to this memorandum and will be managed by each relevant GCC or GCCs as appropriate.

*21.  Section 7.2 is rescinded.*

*22.  Section 7.3 is rescinded and replaced with the following:*

## 7.2.  ROM REQUIREMENTS

**ROM after arrival at the travel destination may or may not be required by the HN. Travelers should consult the Electronic Foreign Clearance Guide (https://www.fcg.pentagon.mil/fcg.cfm) and check with the MILDEPs and GCCs for current information.**

*23.  Section 7.4 is rescinded.*

*24.  Section 7.5 is rescinded and replaced with the following:*

## 7.3.  OFFICIAL TRAVEL FROM THE UNITED STATES TO A FOREIGN COUNTRY.

**1.  Service Members and DoD civilian employees:**

**Service members and DoD civilian employees must follow all requirements imposed by the GCC with responsibility over the destination geographic area, including all applicable HN procedures as a means to respect HN law, and all requirements of the Electronic Foreign Clearance Guide.**

**2.  DoD family members:**

**Service members must attest that, to the best of their knowledge, their family members have followed the same requirements as those set forth for Service members in this guidance.  Failure to do so may result in delay or cancellation of previously authorized travel.  This attestation requirement will be incorporated into travel orders issued to Service members.**

**3.   DoD contractor personnel**

**DoD contracting officers will ensure that all contracts that include performance outside the United States require DoD contractor personnel to comply with the country entry requirements of the respective GCC.**

*25.  Section 7.6 is re-numbered as section 7.4.*

*26.  Section 7.7 is rescinded.*

*27.  Section 9 is amended as follows:*

~~Close contact.  Close contact is defined as someone who was within 6 feet of a person who has contracted COVID-19 for a cumulative total of 15 minutes or more over a 24-hour period starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated and irrespective of whether the person with COVID-19 or the contact of such a person was wearing a face covering or mask or respiratory personal protective equipment.~~

**Exposed.  Persons are considered to be exposed to COVID-19 if they were less than 6 feet away from an infected person (laboratory-confirmed or a clinical diagnosis) for a total of 15 minutes or more over a 24-hour period, unless both parties were wearing masks or respirators.  Individuals and supervisors may also assign the "exposed" classification below the thresholds above based on the following additional criteria:**

- **Cough or heavy breathing:  Was the infected person coughing, singing, shouting, or breathing heavily?  Activities like coughing, singing, shouting and breathing heavily due to exertion increase the risk of transmission.**
- **Symptoms:  Did the infected person have symptoms at the time?  Being around people who are symptomatic increases the risk of transmission.**
- **Ventilation and filtration: How well-ventilated was the space?  Risk of transmission is increased in poorly ventilated vehicles or rooms.**
- **Physical Distance:  Crowded settings can raise the likelihood of being close to someone with COVID-19.  Keep in mind that while maintaining a distance beyond 6 feet of an infected person will limit exposures from larger droplets, exposures can occur beyond 50 feet based on ventilation, masking, and other factors.**

App. 032

\* \* \*

**Fully vaccinated.**

An individual is considered "fully vaccinated" when at least 2 weeks have elapsed after a second dose of a two-dose COVID-19 vaccine series (e.g., PfizerBioNTech/Comirnaty, ~~or~~ Moderna/Spikevax**, or Novavax** vaccines), or 2 weeks after receiving a single dose of a one-dose COVID-19 vaccine (e.g., Johnson & Johnson's Janssen vaccine) that are:  (1) fully licensed **(approved)** or authorized ~~or approved~~ by the FDA; **or** (2) listed for emergency use on the World Health Organization Emergency Use Listing (e.g., AstraZeneca/Oxford)~~; or (3) approved for use in a clinical vaccine trial for which vaccine efficacy has been independently confirmed (e.g., Novavax)~~.

An individual is "not fully vaccinated" if the individual either has not completed the ~~full~~ COVID-19 vaccination **primary** dose series; or declines to provide his or her COVID-19 vaccination status and declines to provide any requested proof of that status.

\* \* \*

**Mask.**  Acceptable masks **high-quality** are non-medical disposable masks; masks made with **layered** breathable fabric (such as cotton); masks made with tightly woven fabric that does not let light pass through when held up to a light source; masks with two or three layers; masks with inner filter pockets, or, on a voluntary basis in non-medical settings, an N95-type filtering face piece. A good practice is to wear a disposable mask underneath a cloth mask for added protection as long as this does not interfere with breathing. Novelty or non-protective masks, masks with ventilation valves, bandanas, and face shields are not authorized as a substitute for masks.  ~~Masks must fit snugly around the nose and chin with no large gaps around the sides of the face.~~**Masks must be well fitting and worn correctly and consistently (around the nose and chin).**

**Physically distance.  Maintain separation between individuals and prevent crowding in areas.**

\* \* \*

**Up-to-Date.**  A person has received all recommended COVID-19 vaccines, including any booster dose(s) recommended when eligible.  **Booster doses are recommended, but are not required.**

# Exhibit 6

Case: 22-10077    Document: 284    Page: 65    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 37 of 104   PageID 7408
Current as of January 30, 2023

# Consolidated Department of Defense Coronavirus Disease 2019 Force Health Protection Guidance

This guidance issued by the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) presents a uniform and consolidated DoD policy for the Department's response to the coronavirus disease 2019 (COVID-19) pandemic and serves as the DoD COVID-19 Workplace Safety Plan.[1]  Implementation of this guidance will comply with **: 1) applicable court orders, Presidential directives, and Office of Management and Budget (OMB) and Safer Federal Workforce Task Force guidance; and 2)** applicable labor obligations to the extent such obligations do not hinder the DoD Components' ability to carry out their missions during this public health emergency.  Prior delegations and exceptions made pursuant to the rescinded references remain valid unless rescinded by the authorizing official.  Individual sections of this guidance will be updated as necessary by the USD(P&R).  **Commanders and supervisors may implement additional, more stringent requirements with respect to masking and physical distancing, as appropriate, to mitigate risk.**

This guidance will be posted, and updated as necessary, at: https://www.defense.gov/Explore/Spotlight/Coronavirus/Latest-DOD-Guidance/.  DoD Components should monitor this website to obtain the most current version of this guidance. Changes from the previous version will be identified in bold and italics.

Furthermore, this guidance consolidates, incorporates, and rescinds the following policy and guidance:

- Secretary of Defense Memorandum, "Guidance for Commanders' Risk-Based Responses and Implementation of the Health Protection Condition Framework During the Coronavirus Disease 2019 Pandemic," April 29, 2021
- Secretary of Defense Memorandum, "Use of Masks and Other Public Health Measures," February 4, 2021
- Secretary of Defense Memorandum, "Updated Conditions-based Approach to Coronavirus Disease 2019 Personnel Movement and Travel Restrictions." March 15, 2021
- Secretary of Defense Memorandum, "Way Forward for SARS-CoV-2 Testing Within the Department of Defense," April 29, 2021
- Deputy Secretary of Defense Memorandum, "Updated Coronavirus Disease 2019 Guidance Related to Travel and Meetings," September 24, 2021
- Deputy Secretary of Defense Memorandum, "Mandatory Coronavirus Disease 2019 Vaccination of DoD Civilian Employees," October 1, 2021
- Under Secretary of Defense Memorandum, "Administrative Leave for Coronavirus Disease 2019 Vaccination of Department of Defense Employees," April 14, 2021
- Under Secretary of Defense Memorandum, "Force Health Protection Guidance for the Novel Coronavirus," January 30, 2020, and all supplements.

---

[1] Executive Order (EO) 13991, "Protecting the Federal Workforce and Requiring Mask-Wearing," January 20, 2021.

Case: 22-10077    Document: 284    Page: 66    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 38 of 104   PageID 7409
Current as of January 30, 2023

- Under Secretary of Defense Memorandum, "Civilian Personnel Guidance for DoD Components in Responding to Coronavirus Disease 2019," March 8, 2020
- Under Secretary of Defense Memorandum, "Updated Guidance for Mask and Screening Testing for all Department of Defense Installations and Other Facilities," March 1, 2022
- **Assistant Secretary of Defense for Readiness Memorandum, "Continued Implementation of the Occupational Safety and Health Administration Emergency Temporary Standard for Healthcare during the Coronavirus Disease 2019 Pandemic," August 19, 2022.**

Note:  The Deputy Secretary of Defense approved the rescission of listed Deputy Secretary of Defense and Secretary of Defense memoranda and consolidation of these references into this guidance in Deputy Secretary of Defense Memorandum, "Updated Coronavirus Disease 2019 Guidance Related to Travel and Meetings," September 24, 2021. This September 24, 2021 memorandum authorized the USD(P&R) to rescind memoranda issued by the Secretary of Defense or the Deputy Secretary of Defense for purposes of updating and consolidating force health protection guidance on travel, meetings, or any other COVID-19 personnel- or health-related matter.

# LIST OF REVISIONS

| Section | Date of Most Recent Revision |
|---|---|
| **Preamble** | January 30, 2023 |
| **Executive Summary** | January 30, 2023 |
| **Section 1 – Health Protection Condition (HPCON) Framework** | |
| 1.1.  HPCON Framework. | August 29, 2022 |
| 1.2.  Authority to Determine HPCON Levels. | August 8, 2022 |
| 1.3.  Criteria for Changing HPCON Levels. | January 30, 2023 |
| 1.4.  Telework. | January 30, 2023 |
| **Section 2 – Vaccination** | |
| 2.1.  Vaccination – General. | January 30, 2023 |
| **Section 3 – Conducting Testing for Suspected COVID-19 Cases and General Eligibility for DoD-Conducted Testing** | |
| 3.1.  Vaccination and Testing Requirements. | April 4, 2022 |
| 3.2.  DoD Laboratories and Tests. | August 8, 2022 |
| 3.3.  Eligibility for DoD Personnel, Other Beneficiaries, and Other Populations for Testing. | January 30, 2023 |
| **Section 4 – Surveillance and Screening Testing** | |
| 4.1.  [Reserved]. | January 30, 2023 |
| 4.2.  Health Surveillance Activities. | January 30, 2023 |
| 4.3.  Methods for Operational Risk Reduction. | January 30, 2023 |
| 4.4.  COVID-19 Contact Tracing. | January 30, 2023 |
| **Section 5 – Protecting Personnel** | |
| 5.1.  General Measures for Personnel. | January 30, 2023 |
| 5.2.  [Reserved]. | January 30, 2023 |
| 5.3.  Masks. | January 30, 2023 |
| 5.4.  Case Management and Restricting Workplace Access – Service Members. | January 30, 2023 |
| 5.5.  Restricting Workplace Access – Personnel Other Than Service Members. | January 30, 2023 |
| 5.6.  Restricting Workplace Access – State and Local Restrictions. | April 4, 2022 |
| 5.7.  Issuance of Medical Personal Protective Equipment. | April 4, 2022 |

App. 037

Case: 22-10077     Document: 284     Page: 68     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 40 of 104   PageID 7411
Current as of January 30, 2023

| | |
|---|---|
| 5.8.   Cleaning and Disinfecting. | April 4, 2022 |
| 5.9.   Heating, Ventilation, and Air Conditioning (HVAC). | January 30, 2023 |
| 5.10. OSHA-Required Illness Recordkeeping | January 30, 2023 |
| 5.11. Safety Audits, Inspections, and Training. | April 4, 2022 |
| 5.12. Maintenance. | January 30, 2023 |
| **Section 6 – Meetings** | January 30, 2023 |
| **Section 7 – Travel** | |
| 7.1.   General Travel Guidance. | January 30, 2023 |
| 7.2.   ROM Requirements. | January 30, 2023 |
| 7.3.   Official Travel from the United States to a Foreign Country. | January 30, 2023 |
| 7.4.   Additional Guidance for Reserve and National Guard Personnel. | April 4, 2022 |
| **Section 8 – Protection of Personally Identifiable Information Related to COVID-19** | |
| 8.1.   General. | April 4, 2022 |
| 8.2.   Additional Requirements for Information Collected from DoD Civilian Employees. | April 4, 2022 |
| **Section 9 – Definitions** | January 30, 2023 |

App. 038

# TABLE OF CONTENTS

EXECUTIVE SUMMARY .................................................................................................... 6
SECTION 1:  HEALTH PROTECTION CONDITION (HPCON) FRAMEWORK ......................... 8
    1.1.  HPCON Framework. ............................................................................................ 8
    1.2.  Authority to Determine HPCON Levels. .............................................................. 8
    1.3.  Criteria for Changing HPCON Levels. ................................................................ 9
    1.4.  Telework .............................................................................................................. 14
SECTION 2:  VACCINATION .......................................................................................... 15
    2.1.  Vaccination – General. ........................................................................................ 15
SECTION 3:  CONDUCTING TESTING FOR SUSPECTED COVID-19 CASES AND GENERAL
ELIGIBILITY FOR DOD-CONDUCTED TESTING ............................................................. 27
    3.1.  Testing Considerations. ....................................................................................... 27
    3.2.  DoD Laboratories and Tests. .............................................................................. 27
    3.3.  Eligibility of DoD Personnel, Other Beneficiaries, and Other Populations for Testing. 28
SECTION 4:  SURVEILLANCE AND SCREENING TESTING ............................................... 30
    4.1.  Conducting Required Screening Testing [Reserved] ........................................... 30
    4.2.  Health Surveillance Activities. ............................................................................ 32
    4.3.  Methods for Operational Risk Reduction. ........................................................... 33
    4.4.  COVID-19 Contact Tracing. ............................................................................... 34
SECTION 5:  PROTECTING PERSONNEL ........................................................................ 35
    5.1.  General Measures for Personnel. ......................................................................... 35
    5.2.  Physical Distancing [Reserved]. ......................................................................... 35
    5.3.  Masks. .................................................................................................................. 36
    5.4.  Case Management and Restricting Workplace Access – Service Members. ......... 38
    5.5.  Restricting Workplace Access – Personnel Other Than Service Members. .......... 40
    5.6.  Restricting Workplace Access – State And Local Restrictions. ............................ 42
    5.7.  Issuance Of Medical Personal Protective Equipment. ......................................... 42
    5.8.  Cleaning And Disinfecting. ................................................................................. 43
    5.9.  Heating, Ventilation, and Air Conditioning (HVAC). ......................................... 43
    5.10.  OSHA-Required Illness Recordkeeping. ........................................................... 44
    5.11.  Safety Audits, Inspections, And Training. .......................................................... 44
    5.12.  Maintenance. ..................................................................................................... 45
SECTION 6:  MEETINGS ............................................................................................... 46
SECTION 7:  TRAVEL ................................................................................................... 47
    7.1.  General Travel Guidance. .................................................................................... 47
    7.2.  Risk Assessment Prior To Travel [Rescinded]. ................................................... 48
    7.3.  ROM Requirements [Rescinded and Replaced]. .................................................. 50
    7.4.  Testing Requirements [Rescinded]. ..................................................................... 51
    7.5.  Specific Guidance By Type Of Travel [Rescinded and Replaced] ........................ 52
    7.6.  Additional Guidance For Reserve And National Guard Personnel. ...................... 56
    7.7.  Additional Guidance To Assist Commanders With Travel Decisions [Rescinded]. ...... 57
SECTION 8:  PROTECTION OF PERSONALLY IDENTIFIABLE INFORMATION RELATED TO COVID-19 58
    8.1.  General. ................................................................................................................ 58
    8.2.  Additional Requirements for Information Collected from DoD Civilian Employees. .... 58
SECTION 9:  DEFINITIONS ............................................................................................ 60

App. 039

# EXECUTIVE SUMMARY

The DoD is committed to providing safe working environments across the entire DoD enterprise, which consists of an approximately 2.9 million-person global workforce deployed or stationed in nearly 150 countries, including military Service members and their families, and DoD civilian and contractor personnel that work in a highly complex and large number of diverse and unique environments. This force health protection (FHP) Guidance ("Guidance") was developed to protect the DoD workforce, **which consists of Service members, DoD civilian employees,** contractor personnel, other occupants, and visitors (collectively referred to as "personnel") before, during, and after our orderly and final return to the physical workplace ("final reentry"). The Guidance is intended to meet the direction of the President's EOs[2] and guidance from the Safer Federal Workforce Task Force ("Task Force") and ~~OMB~~**the Office of Management and Budget**,[3, 4] and articulate steps the DoD has been and will be taking to halt the spread of COVID-19. **To ensure consistent application throughout DoD, if the EOs and guidance change, DoD Components will wait for DoD to update this consolidated guidance before implementing any changes.**

Consistent with Task Force and OMB guidance, this Guidance includes policies and procedures that incorporate the best available data and science-based measures and activities that focus on health and safety and on workplace operations. DoD uses the latest guidance from the Centers for Disease Control and Prevention (CDC), and requirements from the Occupational Safety and Health Administration (OSHA) and other relevant Federal agencies as the starting point for developing COVID-19 policy and guidance.

The Department began publishing FHP guidance and policy to address COVID-19 in January 2020. In February 2021, the Secretary of Defense directed the review of all guidance and policy memoranda previously issued for COVID-19.[5] The review was completed in April 2021, and subsequent updates align DoD COVID-19 policy and guidance with current Task Force, OMB, CDC, and OSHA guidance as appropriate.

The DoD COVID-19 Task Force is responsible for recommending updated DoD COVID-19 policy. The Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff co-chair the DoD COVID-19 Task Force which assembles as needed for meetings virtually and in person and includes representatives from senior leadership across the Department, including the Secretaries of the Military Departments (MILDEPs), Under Secretaries of Defense, and Combatant Commanders.

---

[2] EO 14042, "Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors," September 9, 2021; EO 14043, "Executive Order on Requiring Coronavirus Disease 2019 Vaccination for Federal Employees," September 9, 2021.

[3] Documents from the Safer Federal Workforce Task Force are available at: https://www.saferfederalworkforce.gov/overview/.

[4] Office of Management and Budget Memorandum, Office of Personnel Management, and General Services Administration, M-21-25, "Integrating Planning for A Safe Increased Return of Federal Employees and Contractors to Physical Workplaces with Post-Reentry Personnel Policies and Work Environment," June 10, 2021

[5] Secretary of Defense Memorandum, "Strategic Review and Reissuance of All Coronavirus Disease 2019 Policy Documents," February 2, 2021.

App. 040

Case: 22-10077    Document: 284    Page: 71    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 43 of 104   PageID 7414
Current as of January 30, 2023

DoD has long recognized the threat posed by pandemics and disease outbreaks and has previously issued guidance, planning, and policy documents to prepare for and respond to such threats.  The DoD also recognizes that successfully managing the COVID-19 pandemic requires the flexibility to adapt to changing conditions (e.g., variants, and disease prevalence or virulence) and new information (e.g., evolving best health and safety practices).  **DoD continues to promote the importance of taking vaccines and boosters to protect our people against the adverse impacts of COVID-19.  The Department also recognizes that wearing high-quality masks, testing, and improved ventilation are other factors to reduce COVID-19 exposure risks.**

The DoD is committed to protecting its workforce and stakeholders from the effects of the COVID-19 pandemic, while preserving our ability to complete its mission.  As data becomes available, science-based evidence emerges, and the CDC, OSHA, and other cognizant agencies, departments, and other elements of the Federal Government revise and develop new recommendations to protect the workforce, the DoD will incorporate them into its current and future policies and guidance as appropriate.

Case: 22-10077 Document: 284 Page: 72 Date Filed: 02/13/2023
Case 4:21-cv-01236-O Document 223 Filed 02/06/23 Page 44 of 104 PageID 7415
Current as of January 30, 2023

# SECTION 1: HEALTH PROTECTION CONDITION (HPCON) FRAMEWORK

## 1.1. HPCON FRAMEWORK.

Installations[6] will manage COVID-19 health protection using HPCON levels. HPCON 0 is the base level for the HPCON Framework and represents a return to normal operations.

Table 1, below, contains FHP activities installation commanders will undertake at each HPCON level, in addition to those required elsewhere in this guidance. Installation commanders may deem it necessary to take additional precautions for select personnel and medically vulnerable populations (e.g., those who are elderly, have underlying health conditions or respiratory diseases, or are immunocompromised) and are both encouraged and authorized to do so. Installation commanders may further impose additional requirements appropriate for a particular local setting, operational requirement, and/or based on transmission risk regardless of HPCON level.

## 1.2. AUTHORITY TO DETERMINE HPCON LEVELS.

The authority to determine HPCON levels ("HPCON implementation"), subject to the requirements in section 1.1, is delegated to the Secretaries of the MILDEPs and Geographic Combatant Commanders and may be further delegated in writing to a level no lower than installation commanders in the grade of O-6 or higher. The Director of Administration and Management (DA&M) has HPCON implementation authority for the Pentagon Reservation, subject to the requirements in section 1.1. The Defense Logistics Agency (DLA) has HPCON implementation authority for four locations.[7]

Geographic Combatant Commanders have authority to determine HPCON implementation policy in accordance with operational requirements, and to match relevant Host Nation (HN) and allied forces standards, as applicable. Installation commanders outside the United States have unique geographic constraints and operational considerations for FHP. U.S. personnel should respect relevant HN and allied forces standards, as applicable, and should consult with relevant HN authorities, including public health and medical authorities, when deciding to change HPCON levels.

---

[6] For the purposes of this guidance, a military installation is a base, camp, post, station, yard, center, homeport facility for any ship, or other activity under the jurisdiction of the Secretary of a Military Department or the Secretary of Defense, including any leased facility, which is located within any State, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, the Commonwealth of the Northern Mariana Islands, or Guam. In the case of an activity in a foreign country, a military installation is any area under the operational control of the Secretary of a Military Department or the Secretary of Defense, without regard to the duration of operational control.

[7] DLA Land & Maritime (Columbus, OH), DLA Distribution HQ (New Cumberland, PA), DLA Aviation (Richmond, VA), and DLA Distribution (San Joaquin, CA).

App. 042

Case: 22-10077     Document: 284     Page: 73     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 45 of 104   PageID 7416
Current as of January 30, 2023

## 1.3.  CRITERIA FOR CHANGING HPCON LEVELS.

HPCON level determinations for COVID-19 are based on the CDC COVID-19 Community Levels reported by the CDC,[8] which include screening levels that make use of new case-rates and health and health care systems-related information.  HPCON Levels A, B, and C correspond directly to CDC COVID-19 Community Levels of low, medium, and high ~~community transmission~~, respectively.[9],[10]

Installation commanders must change the HPCON level no later than 2 weeks after the CDC COVID-19 Community Level has been elevated, unless the installation commander documents, in writing, a compelling rationale to maintain the current HPCON level after coordination with the installation Public Health Emergency Officer.

Installations outside the United States should utilize local community-level data, if available, in setting HPCON levels.  Otherwise, installation commanders should consider consulting country-level data for their HN and case-rate information available from the CDC at: https://covid.cdc.gov/covid-data-tracker/#global-counts-rates and the World Health Organization at https://covid19.who.int/.  Other sources of data on which installation commanders may rely include academic institutions if such HN data is inaccessible.[11]

Elevation to HPCON D should be based on the determination that there is substantial loss of medical capabilities in the local community.  The factors listed in Table 1, below, must be considered when determining whether to move to or from HPCON D.

---

[8] An overview of the CDC COVID-19 Community Levels is available at: https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html.

[9] County Community Levels are available for U.S. States and territories is available at: https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html.  Find community levels by "State or Territory" and then by "County or Metro Area."  Jurisdictions which are not counties, such as the District of Columbia, also are listed under "County or Metro Area."  The Pentagon is in Arlington County, Virginia.

[10] **The CDC COVID-19 Community Levels do not apply in healthcare settings, such as hospitals and retirement homes.  Instead, healthcare settings should continue to use community transmission rates and continue to follow CDC's infection prevention and control recommendations for healthcare settings, as long as they are more restrictive than FHP guidance.**

[11] Note: local areas within a country may experience very different COVID-19 case rates than country-specific data.

**TABLE 1:  Force Health Protection Measures by HPCON Level for the COVID-19 Pandemic**

| HPCON D Severe | High COVID-19 Community Level* Risk, with degraded availability of medical countermeasures, and substantial loss of medical capability | Utilize measures from HPCON A, B and C with the following modifications: |
|---|---|---|
| | High COVID-19 Community Level* in the county in which the installation is located.<br><br>AND any of the following<br><br>**Civilian healthcare capability and utilization (percent and trend)***:<br>>50 percent staffed of hospital beds filled with individuals who have COVID-19 as the primary admission criteria; or<br>>70 percent of staffed intensive care unit (ICU) beds filled with individuals who have COVID-19 as the primary admission criteria; or<br>Overall staffed hospitals and ICUs have limited to no capacity.<br>**OR**<br><br>**Military Health System (MHS) health care capability and utilization (percent and trend):**<br>Degradation of MHS capabilities requiring Crisis Status operations; and >95 percent staffed bed occupancy; or<br>>50 percent military medical treatment facility (MTF) staff in isolation or quarantine ~~or unvaccinated~~; or<br>>60 percent staff absent who provide urgent or emergent care; and<br>Local emergency departments on divert or inability of civilian health care to absorb excess MHS patients; or<br>Clinical or appointment capability reduced >60 percent in key departments.<br>**OR**<br><br>**Other factors:**<br>Loss of vaccine effectiveness in available vaccines resulting in vaccinated individuals routinely experiencing severe disease, hospitalization or death; or | a. ~~Less than 25 percent of normal occupancy in the workplace, or the minimum required on-site for essential operations that must be conducted in person.~~<br>**a.** Strongly consider declaring a local Public Health Emergency.<br>**b.** Consider limiting visitor access to the installation to only those required for mission essential activities.<br>**c.** Cancel non-mission-essential activities.<br>**d.** Close non-essential services (e.g., fitness centers, leisure and recreational facilities, beauty/barber shops, non-essential retail, dine-in eating establishments).<br>**e.** Consider potential delay or cancelation of exercises.<br>**f.** **Schools operated by Department of Defense Education Activity (DoDEA) will operate remotely.**<br>**g.** Restrict or suspend social gatherings to the greatest extent possible.<br>**h.** Follow any other applicable force health protection guidance at: https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/Latest-DOD-Guidance/.[12] |

---

[12] For information about masking ~~and screening testing~~ at the various HPCON levels, refer to section~~s 2.1 and~~ 5.3.

App. 044

Case: 22-10077    Document: 284    Page: 75    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 47 of 104    PageID 7418
Current as of January 30, 2023

| | | |
|---|---|---|
| | Elevated case levels resulting in significant curtailment of essential services either on installation or in civilian communities immediately adjacent to the installation (e.g., emergency response, security, facility maintenance, and energy/communication).<br><br>**\*CDC COVID-19 Community Level (by county) can be found at:** https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.html | |
| **HPCON C**<br><u>High</u> | **<u>High COVID-19 Community Level\* Risk</u>**<br><br>**High COVID-19 Community Level\* in the county in which the installation is located.**<br><br>**\*CDC COVID-19 Community Level (by county) Civilian county level data can be found at: https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.htm.** | **Utilize measures from HPCON A and B with the following modifications:**<br>**a. ~~Less than 50 percent of normal occupancy in the workplace.~~**<br>**b. ~~Consider limiting visitor access to the installation for non-essential mission-related/operational activities.~~**<br>**c. ~~Limit social gatherings to less than 50 percent facility/room occupancy.~~**<br>**<u>a.</u>** MTFs may limit elective surgeries in accordance with guidance from the Defense Health Agency and the Assistant Secretary of Defense for Health Affairs.<br>**<u>b.</u>** Consider re-scoping, modifying, or potentially canceling exercises.<br>**<u>c.</u>** Indoor common areas and large venues may be closed. Dining establishments may be limited to takeout.<br>**<u>d.</u>** Gyms may be closed at this level or operate at diminished occupancy.<br>**<u>e.</u>** Maximize telework to the greatest extent practical.<br>**<u>f.</u>** Follow any other applicable force health protection guidance at: https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/Latest-DOD-Guidance/. |
| **HPCON B**<br><u>Moderate</u> | **<u>Medium COVID-19 Community level\* Risk</u>**<br><br>**Medium COVID-19 Community Level\* in the county in which the installation is located.** | **Utilize measures from HPCON A with the following modifications:**<br>**a. ~~Less than 80 percent of normal occupancy in the workplace.~~**<br>**<u>a.</u> <u>Reduce potential workplace SARS-CoV-2 exposures through telework, remote work, flexible scheduling, and other methods, as appropriate.</u> ~~Permit liberal telework where possible, especially for~~** |

Case: 22-10077     Document: 284     Page: 76     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 48 of 104   PageID 7419
Current as of January 30, 2023

|  |  |  |
|---|---|---|
|  | *CDC COVID-19 Community Level (by county) Civilian county level data can be found at: https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.htm. | ~~individuals who self-identify as immunocompromised or being at high risk for severe disease.~~<br>**b.** Consider limiting occupancy of common areas where personnel are likely to congregate and interact by marking approved sitting areas or removing furniture to maintain physical distancing.<br>**c. Each installation and DoD facility will post signage at building entrances and in common areas of DoD owned and controlled facilities and post information on websites as appropriate encouraging individuals, regardless of vaccination status, to consider avoiding crowding, and physically distancing themselves from others in indoor common, areas, meeting rooms, and high-risk settings.**<br>**d.** Follow any other applicable Force Health Protection Guidance at: https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/Latest-DOD-Guidance/. |
| **HPCON A** <u>Low</u> | **Low COVID-19 Community Level[*] Risk**<br><br>**Low COVID-19 Community Level[*] in the county in which the installation is located.**<br><br>**\*CDC COVID-19 Community Level (by county) Civilian county level data can be found at: https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.htm.** | **a.** ~~Less than 100 percent of normal occupancy in the workplace, with telework as appropriate.~~<br>**a.** Communicate to personnel how and when to report illness and seek care for potential influenza-like illness.<br>**b.** Common areas and large venues (e.g., sit-down dining, movie theaters, gyms, sporting venues, and commissaries) should adhere to established cleaning and sanitation protocols<br>**c.** DoDEA schools will operate following CDC recommendations and guidelines specific to schools as implemented in operational procedures and guidance from the Director, DoDEA.[13] ~~Children are not required to mask.~~ Any DoD guidance that is more stringent than CDC guidance must be followed.<br>**d.** Follow any other applicable Force Health Protection Guidance at: https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/Latest-DOD-Guidance/. |

---

[13] **https://www.dodea.edu/covid-operations.cfm.**

Case: 22-10077    Document: 284    Page: 77    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 49 of 104    PageID 7420
Current as of January 30, 2023

| **HPCON 0** | **<u>Normal Baseline</u>** | a. Resume routine standard operations.<br>b. Maintain standard precautions such as routine hand washing, cough on sleeve, good diet, exercise, vaccinations, education, routine health alerts, and regular preparedness activities. |
|---|---|---|

App. 047

## 1.4.  ~~TELEWORK~~ WORKPLACE OCCUPANCY LEVELS WITHIN HPCON FRAMEWORK.

~~Workplace occupancy limits for each HPCON level are included as measures in Table 1.  The workplace occupancy levels in Table 1 are ceilings, not goals.  Reduced workplace occupancy may be achieved through telework, remote work, flexible scheduling, and other methods, as appropriate.~~

At HPCON A or higher, **or when a DoD civilian employee is required to remain out of the workplace under section 5.5,** DoD Components are granted an exception to policy from Enclosure 3, Paragraph 3.j.(2) of Department of Defense Instruction 1035.01, "Telework Policy," and may allow DoD civilian employees to telework with a child or other person requiring care or supervision present at home.  **DoD civilian employees must still account for work and non-work hours during their tour of duty and take appropriate leave (paid or unpaid) to account for time spent away from normal work-related duties to care for a child or other person requiring care or supervision.**

~~DoD Component heads have the authority to grant exemptions for workplace occupancy limits that are required for national security and the success of critical missions.  DoD Component heads, other than the Secretaries of the MILDEPs, may delegate this workplace occupancy limit authority in writing to a level no lower than a general/flag officer or Senior Executive Service (SES) member (or equivalent).  Secretaries of the MILDEPs may delegate workplace occupancy limit exemption authority in writing to a level no lower than an O-6 installation commander.  The DA&M has workplace occupancy limit exemption authority for all DoD Components located on the Pentagon Reservation and other facilities within the National Capital Region managed by Washington Headquarters Services.  This authority may be delegated at the discretion of the DA&M.  DLA has workplace occupancy limit exemption authority for four locations.[14]  When considering a workplace occupancy limit exemption, those with exemption authority must take into account the ability to maintain distance between personnel and other public health and workplace safety measures contained in this Guidance.~~

~~A record of all workplace occupancy limit exemptions will be retained by the exemption authority for the duration of the pandemic and until returning to HPCON 0 and provided for awareness to the public health office concerned and to the installation commander, if different from the exemption authority.  FHP measures and other appropriate mitigation measures shall be used rigorously in all areas and especially in areas for which an occupancy exemption has been grant.~~

---

~~[14]DLA Land & Maritime (Columbus, OH), DLA Distribution HQ (New Cumberland, PA), DLA Aviation (Richmond, VA), and DLA Distribution (San Joaquin, CA).~~

App. 048

Case: 22-10077    Document: 284    Page: 79    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 51 of 104    PageID 7422
Current as of January 30, 2023

# SECTION 2:  VACCINATION ~~VERIFICATION AND MEASURES BASED ON VACCINATION STATUS~~

## 2.1.  VACCINATION <u>– GENERAL</u> ~~AND TESTING REQUIREMENTS~~.

**<u>Leaders at all levels should encourage Service members, DoD civilian employees, DoD contractor personnel, and others affiliated with DoD to be up to date on their COVID-19 vaccinations.</u>**

1.  Service members:

   Service members (members of the Armed Forces under DoD authority on active duty or in the Selected Reserve, including members of the National Guard) are **<u>strongly encouraged</u> ~~required~~** to be **~~fully vaccinated against~~ <u>up to date with</u>** COVID-19 **<u>vaccination, including booster doses</u> ~~subject to any identified contraindications, any administrative or other exemptions established in DoD policy, and any applicable court orders~~**.

   **<u>To ensure an accurate medical record,</u>** Service members' vaccination status will be **~~validated~~ <u>maintained</u>** utilizing their Military Service-specific Individual Medical Readiness (IMR) system.  If a Service member has been vaccinated against COVID-19 outside the military health system, that Service member must **~~show official proof~~ <u>provide documentation</u>** of his or her COVID-19 vaccination **~~status~~** to update the IMR system.

   ~~Once the applicable mandatory vaccination date has passed, COVID-19 screening testing is required at least weekly for Service members who are not fully vaccinated, including those who have an exemption request under review or who are exempted from COVID-19 vaccination and are entering a DoD facility located in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high or medium.  Service members who are not on active duty and who also are DoD civilian employees or DoD contractor personnel must follow the applicable requirements in section 2.3 for DoD civilian employees or in section 2.4 for DoD contractor personnel.~~

2.  DoD civilian employees:

> Currently, the requirement for all Federal civilian employees to be vaccinated is not in effect.  A U.S. district court judge issued a nationwide preliminary injunction prohibiting implementation and enforcement of civilian employee vaccination requirements based on EO 14043.  Requirements subject to the injunction and not currently in effect are included in this guidance in a strikeout form for ease of reinstitution by USD(P&R) should the injunction be lifted.

   ~~At least weekly COVID-19 testing is required for those DoD civilian employees who are not fully vaccinated when the CDC COVID-19 Community Level is high or medium in the county or equivalent jurisdiction where the DoD facility is located.  DoD civilian~~

Current as of January 30, 2023

~~employees who are not fully vaccinated and who telework or work remotely on a full-time basis are not subject to weekly testing, but must provide a negative result (from a test performed within the prior 72 hours) for entry into a DoD facility located in the county where the COVID-19 Community Level is high or medium.~~

~~To ensure the safety of the DoD workforce,[15] DoD civilian employees are required to be fully vaccinated, unless they have received a temporary or permanent exemption. "DoD civilian employee" includes foreign nationals employed by DoD outside the United States, to the maximum extent possible while respecting host nation agreement and laws. It also includes DoD civilian employees who are engaged in full-time telework or remote work.~~

~~**If they have not already done so, supervisors of DoD civilian employees must ask DoD civilian employees whether they are fully vaccinated. Employees who indicate they are fully vaccinated must provide proof of that vaccination status to their supervisors. Acceptable proof includes:**~~

~~a. **A copy of the COVID-19 Vaccination Record Card (CDC Form MLS-319813_r, published on September 3, 2020);**~~
~~b. **A copy of medical records documenting the vaccination;**~~
~~c. **A copy of immunization records from a public health or State immunization information system; or**~~
~~d. **A copy of any other official documentation containing the data points required to be verified by the supervisor.**~~

~~**When necessary for implementing FHP measures related to workplace access in section 5.5, supervisors of DoD civilian employees may ask DoD civilian employees whether they are up to date with COVID-19 vaccinations. If there is a supervisory concern about the accuracy of the DoD civilian employee's response, DoD civilian employees are required to provide proof of up-to-date vaccination status. Supervisors must not inquire about disabilities when asking DoD civilian employees about up-to-date vaccination status.**~~

~~DoD requires that individuals who started their Government service after November 22, 2021, be fully vaccinated prior to their start date, except in limited circumstances where an accommodation is legally required. However, should DoD have an urgent, mission-critical hiring need to onboard new staff prior to those new staff becoming fully vaccinated, the DoD head may delay the vaccination requirement—in the case of such limited delays, DoD will require new hires to be fully vaccinated within 60 days of their start date and to follow safety protocols for not fully vaccinated individuals until they are fully vaccinated.~~

DoD civilian employees are eligible to receive the COVID-19 vaccine at any DoD vaccination site, including military medical treatment facilities. They may also opt to receive the COVID-19 vaccine at locations other than DoD vaccination sites, such as retail stores, private medical practices, and/or local and State public health department sites.

---

~~[15] Executive Order 14043, "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees," September 9, 2021.~~

16

Current as of January 30, 2023

DoD civilian employees are authorized administrative leave to receive COVID-19 vaccination doses. ~~DoD civilian employees are authorized official duty time to receive COVID-19 vaccination doses, including first, second, and booster shots. For DoD civilian employees who are unable to receive a COVID-19 vaccination within their duty hours, regular overtime rules are applicable.~~ In most circumstances, DoD authorizes employees to take up to 4 hours to travel to the vaccination site, complete any vaccination dose, and return to work—for example, up to 8 hours of duty time for employees receiving two doses (If an employee needs to spend less time getting the vaccine, only the needed amount of duty time should be granted). Employees taking longer than 4 hours must document the reasons for the additional time (e.g., they may need to travel long distances to get the vaccine). Reasonable transportation costs that are incurred as a result of obtaining the vaccine from a site preapproved by DoD are handled the same way as local travel or temporary duty cost reimbursement is handled based on DoD policy.

DoD civilian employees who experience an adverse reaction to a COVID-19 vaccination should be granted no more than 2 workdays of administrative leave for recovery associated with a single COVID-19 vaccination dose.

DoD will grant leave-eligible employees up to 4 hours of administrative leave per dose to accompany a family member who is receiving any COVID-19 vaccination dose. For example, up to a total of 12 hours of leave for a family member receiving three doses—for each family member the employee accompanies. If an employee needs to spend less time accompanying a family member who is receiving the COVID-19 vaccine, DoD will grant only the needed amount of administrative leave. Employees should obtain advance approval from their supervisor before being permitted to use administrative leave for COVID-19 vaccination purposes. Employees are not credited with administrative leave or overtime work for time spent outside their tour of duty helping a family member get vaccinated.

DoD civilian employees should use the time and attendance code for "physical fitness" to record administrative leave for COVID-19 vaccination recovery time that prevents the employee from working or for taking a family member to be vaccinated for COVID-19) The type hour code is "LN" and the environmental/hazard/other code is "PF." Non-appropriated fund employers should code administrative leave related to COVID-19 in a way that can be easily reported.

3. DoD contractor personnel:

~~**Vaccination requirements for DoD contractor personnel are outlined in several references.[16] In implementing EO 14042, the DoD will comply with all relevant court orders.**~~

---

~~**[16]Safer Federal Workforce Task Force, "COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors," September 24, 2021; Principal Director for Defense Pricing and Contracting Memorandum, "Class Deviation 2021-O0009 Ensuring Adequate COVID 19 Safety Protocols for Federal Contractors," October 1, 2021; EO 14042, "Ensuring Adequate COVID Safety Protocols for Federal Contractors," September 9, 2021.**~~

App. 051

~~Onsite DoD contractor personnel will complete the DD Form 3150, "Contractor Personnel and Visitor Certification of Vaccination";[17] maintain a current completed copy; and show it to authorized DoD personnel upon request when they work at a DoD facility where the CDC COVID-19 Community Level is high or medium.  Failure to complete the DD Form 3150 may result in denying DoD contractor personnel access to the DoD facility to which access is sought.  Onsite DoD contractor personnel who are not fully vaccinated against COVID-19, because they are not performing under a covered contract that requires COVID-19 vaccination, due to a legally required accommodation, or who decline to provide information about their COVID-19 vaccination status, will be subject to COVID-19 screening testing at least weekly when the CDC COVID-19 Community Level for the facility in which they work is high or medium.  DoD contractor personnel who refuse required COVID-19 screening testing will be denied access to DoD facilities.~~

~~For purposes of the requirements regarding providing information about vaccination status and screening testing, "contractor personnel" are those individuals issued a credential by DoD that affords the individual recurring access to DoD facilities, classified herein as "credentialed recurring access" (CRA) (e.g., Common Access Cardholders) who are performing under a contractor or subcontract between their employer and the DoD.  "Contractor personnel" do not include employees of DoD contractors or subcontractors receiving ad hoc access to DoD facilities (e.g., delivery personnel, taxi services) or employees of DoD contractors or subcontractors who have access to the grounds of, but not the buildings on, DoD installations (e.g., contract groundskeepers, fuel delivery personnel, household goods transportation personnel).~~

**DoD Components should not take any steps to require contractors and subcontractors to implement the vaccination requirement for contractor personnel in Executive Order 14042, nor should they include in new solicitations or enforce in existing contracts (or task orders or delivery orders) any clauses implementing EO 14042.**

4.  Official visitors:

"Official visitors" are non-DoD individuals seeking access, one time or recurring, in association with the performance of official DoD business (such as to attend a meeting), but who do not have **"credentialed recurring access" (**CRA**) (e.g., Common Access Cardholders)**. "Official visitors" do not include personnel receiving ad hoc access to DoD facilities (e.g., delivery personnel, taxi services); individuals who have access to the grounds of, but not the buildings on, DoD installations (e.g., contract groundskeepers, fuel delivery personnel, household goods transportation personnel); personnel accessing DoD buildings unrelated to the performance of DoD business (e.g., residential housing); or  personnel accessing DoD facilities to receive a public benefit (e.g., commissary; exchange; public museum; air show; military medical treatment facility; Morale, Welfare, and Recreation resources).

~~Official visitors will complete DD Form 3150; maintain a current completed DD Form 3150; and show it to authorized DoD personnel, upon request when they are visiting a DoD facility where the CDC COVID-19 Community Level is high or medium.  Failure to~~

---

~~[17] https://www.esd.whs.mil/Portals/54/Documents/DD/forms/dd/dd3150.pdf.~~

18

Case: 22-10077      Document: 284      Page: 83      Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 55 of 104   PageID 7426
Current as of January 30, 2023

~~complete the DD Form 3150 may result in denial of an official visitor's access to the DoD facility to which access is sought.  Service members not on active duty or active duty for training are also subject to the requirements in this paragraph.~~

~~When visiting a DoD facility where the CDC COVID-19 Community Level is high or medium, official visitors who are not fully vaccinated against COVID-19, or who decline to provide information about their vaccination status, must show an electronic or paper copy of negative results from an FDA-authorized or approved COVID-19 test administered no earlier than 72 hours prior to their visit.  If unable to show a negative COVID-19 test result, the official visitor may be provided onsite self-testing, if available, or will be denied access to the DoD facility (or facilities) to which access is sought.  Service members who are not on active duty or on active duty for training at the time of their official visit are subject to the requirements in this paragraph.~~

Official visitors will follow applicable DoD policies and procedures, as well as the policies and procedures of the Department or Agency they are visiting, if different from the DoD's.  See section 6, below, on Meetings, for how requirements apply to attendees of in-person in meetings, events, and conferences hosted by the DoD.

All official visitors must comply with all applicable FHP guidance.

> Currently, the requirement for all Federal civilian employees to be vaccinated is not in effect.  A U.S. district court judge issued a nationwide preliminary injunction prohibiting implementation and enforcement of civilian employee vaccination requirements based on EO 14043.  Requirements subject to the injunction and not currently in effect are included in this guidance in a strikeout form for ease of reinstitution by USD(P&R) should the injunction be lifted.

## ~~2.2.  ENFORCEMENT OF DOD CIVILIAN EMPLOYEE COVID-19 VACCINATION REQUIREMENT.~~

~~a.   DoD civilian employees who refuse to be vaccinated, or to provide proof of vaccination, are subject to disciplinary measures, up to and including removal from Federal service, unless the DoD civilian employee has received an exemption or the DoD civilian employee's timely request for an exemption is pending a decision.~~

~~b.   Progressive enforcement actions include, but are not limited, to:~~

~~(1) A 5 calendar-day period of counseling and education;~~
~~(2) A short suspension without pay, generally 14 calendar days or less, with an appropriate notice period.  SES members may only be suspended for more than 14 calendar days;~~
~~(3) Removal from Federal service for failing to follow a direct order.~~

~~c.   During the notice periods preceding adverse employment actions, DoD civilian employees generally should not be placed on administrative leave.  DoD Components should~~

require DoD civilian employees to continue to telework or report to the worksite and follow all mitigation measures applicable to not fully vaccinated DoD civilian employees when reporting to the worksite.

d.   DoD Components will designate officials, at the appropriate organizational level, to handle the disciplinary process to promote consistent application of disciplinary measures.  Such officials will decide each case with due regard to the facts and circumstances of that case.

e.   Supervisors should contact their servicing human resources and legal offices to discuss options available to address individual situations regarding enforcement of this requirement.

f.   DoD Components are encouraged to identify an occupational health office, medical office, or other resource with which a DoD civilian employee may consult during the period of counseling and education.

## 2.3.  EXEMPTIONS FROM DOD CIVILIAN EMPLOYEE COVID-19 VACCINATION REQUIREMENT.

a.   DoD civilian employees may request an exemption on the basis of a medical condition or circumstance or a sincerely held religious belief, practice or observance.  Because all DoD civilian employees must now be vaccinated against COVID-19 as a condition of employment, exemptions will be granted in limited circumstances and only where legally required.  The information collected must be handled in accordance with the privacy requirements in section 8.

b.   Personnel.

(i)  Decision Authority.  Management official(s) will be designated to serve as Decision Authorities to make decisions concerning requests for exemption from the COVID-19 vaccination requirement, in consultation with the organization's servicing legal office.  Decision Authorities will be at an appropriate level within the organization to consider the impact, if any, that granting a request will have on the DoD Component operations and to promote similar cases being handled in a consistent manner, with due regard for the facts and circumstances of each case.  Each employee's request must be considered on its own merits.

(ii)  Subject Matter Experts. DoD Components may identify subject matter experts in areas such as human resources (HR), equal employment opportunity (EEO), medicine, and religious matters to serve as advisors to assist Decision Authorities.  Such advisors may provide individual advice, as needed by the Decision Authority, but may not be used to develop a group or consensus recommendation or decision.

(iii)  Administrative Support.  DoD Components will provide appropriate personnel and other resources to administratively support the Decision Authorities, including support necessary to assist the Decision Authorities with preparing written products.

App. 054

Current as of January 30, 2023

c.   Employee Notice.  DoD Components will inform DoD civilian employees how to make a request for an exemption.  Requests needed to have been submitted no later than November 8, 2021, absent extenuating circumstances, to be considered timely.

d.   Employee Requests. To make a request for exemption from the COVID-19 vaccination requirement, DoD civilian employees must submit a request to their direct supervisor.  For purposes of submitting this exemption request, "direct supervisor" includes an authorized human resources official. The employee must provide an official statement which describes the medical or religious reason the employee objects to vaccination against COVID-19.  Generally, such requests must be in writing.  DoD civilian employees may use DD Form 3176 or DD Form 3177 to submit their requests.  DoD civilian employees who make oral requests may be provided a sample written request format and/or be interviewed to develop the basis for the request.  While the use of the DD Form 3176 and DD Form 3177 is optional for DoD civilian employees, when DoD civilian employees make a request, they must provide the following information:

(1)  Medical Exemption Requests.

- A description of the medical condition or circumstance that is the basis for the request for a medical exemption from the COVID-19 vaccination requirement;
- An explanation of why the medical condition or circumstance prevents the employee from being safely vaccinated against COVID-19;
- If it is a temporary medical condition or circumstance, a statement concerning when it will no longer be a medical necessity to delay vaccination against COVID-19; and
- Any additional information, including medical documentation that addresses the employee's particular medical condition or circumstance, which may be helpful in resolving the employee's request for a medical exemption from the COVID-19 vaccination requirement.

(2)  Religious.

- A description of the religious belief, practice, or observance that is the basis for the request for a religious exemption from the COVID-19 vaccination requirement;
- A description of when and how the DoD civilian employee came to hold the religious belief or observe the religious practice;
- A description of how the DoD civilian employee has demonstrated the religious belief or observed the religious practice in the past;
- An explanation of how the COVID-19 vaccine conflicts with the religious belief, practice, or observance;
- A statement concerning whether the DoD civilian employee has previously raised an objection to a vaccination, medical treatment, or medicine based on a religious belief or practice.  If so, a description of the circumstances, timing, and resolution of the matter; and

21

Case: 22-10077    Document: 284    Page: 86    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 58 of 104    PageID 7429
Current as of January 30, 2023

- ~~Any additional information that may be helpful in resolving the DoD civilian employee's request for a religious exemption from the COVID-19 vaccination requirement.~~

e. ~~Supervisor Responsibilities.~~

~~(i)  Following receipt of an employee's request for exemption, supervisors must update Section B of the employee's DD Form 3175 to indicate that a request for exemption determination is pending.~~

~~(ii)  As necessary, supervisors will engage with the employee to ensure completeness of the employee's exemption request.~~

~~(iii)  In coordination with human resources officials, supervisors will prepare an exemption request package that contains factual information about the circumstances of the employee's request.  A complete exemption request package will include the basis for the employee's request and any supporting documentation submitted by the employee, a description of the nature of the employee's job responsibilities and work environment, and any circumstances relevant to a management-level assessment of the reasonably foreseeable effects on the agency's operations, including protecting the agency's workforce and members of the public with whom the employee interacts in the workplace from COVID-19, if the employee remains unvaccinated.~~

~~(iv)  Supervisors will forward the exemption request package to the Decision Authority Support Office.~~

f. ~~Decision Authority Support Office.~~

~~(i)  DoD Components will establish Decision Authority Support Offices to support exemption request Decision Authorities.~~

~~(ii)  The Decision Authority Support Office will intake exemption request packages and, under the supervision of the Decision Authority, provide administrative support to the Decision Authority.~~

~~(iii)  At the request of the Decision Authority, the Decision Authority Support Office may coordinate with subject matter experts to obtain written documentation which includes relevant factual information and, as necessary, a professional opinion related to the factual information, for inclusion in the exemption request package.~~

~~(iv)  The Decision Authority Support Office may not provide a consensus opinion or recommendation to the Decision Authority.~~

g. ~~Decision Authority Determination.~~

(i)  The Decision Authority first analyzes the exemption request package. As necessary, the Decision Authority may request additional information and consult with subject matter experts.

(ii)  After conducting a review of the exemption request, the Decision Authority makes a determination, prepares a written statement that includes the reasons for the determination (which may involve drafting assistance based on the Decision Authority's instructions regarding its contents), and obtains a legal review of the determination.

(iii)  In cases where the exemption is temporary or denied, the Decision Authority's determination must specify a date by which the DoD civilian employee must be fully vaccinated against COVID-19.  In specifying that date, DoD civilian employees must be given a minimum period of 14 days to receive their first (or only) dose of a COVID-19 vaccine.

h.  Employee Notification of Determination.  The Decision Authority Support Office will transmit the Decision Authority's written determination to the DoD civilian employee's supervisor, who, in turn, provides the DoD civilian employee with a copy of the written determination, updates the DD Form 3175, and informs the DoD civilian employee of next steps.

i.  A chart illustrating the exemption request process is below.

| Position | Role/Responsibility | Output | Submit to |
|---|---|---|---|
| Requesting employee | Provide vaccination status via DD Form 3175 to indicate exemption pending. | Completed DD Form 3175. | Supervisor |
| Requesting employee | Request exemption. | Completed DD Form 3176 (medical) or DD Form 3177 (religious), as appropriate, or other request that contains the information required by FHP 23, Revision 3. | Supervisor |
| Supervisor, in consultation with HR officials | Provide relevant information concerning employee's occupation and work environment, including: availability of measures to physically distance requestor from co- | Exemption request package that includes employee's request and supervisory information concerning employee's occupation, work environment, and other circumstances of the request. | Decision Authority Support Office |

23

Current as of January 30, 2023

| | | | |
|---|---|---|---|
| | ~~workers and members of the public, the volume of exemption requests in the organization, and any other relevant information concerning the circumstances of the employee's request.~~ | | |
| ~~Decision Authority Support Office~~ | ~~Receive and track processing of exemption request package. Supplement package with individual advice from subject matter experts and relevant factual information, as directed by the Decision Authority.~~ | ~~Exemption request package that includes employee's request; supervisor information concerning employee's occupation, work environment, and other circumstances of the request; and any supporting documentation relevant to the Decision Authority's analysis.~~ | ~~Decision Authority~~ |
| ~~Decision Authority~~ | ~~Review submitted documentation, request any reasonably necessary additional information, and prepare written decision in consultation with legal advisors and with the advice of subject matter experts, as appropriate.~~ | ~~Written decision that addresses employee's individual circumstances and has been reviewed by appropriate legal advisors.~~ | ~~Supervisor~~ |
| ~~Supervisor~~ | ~~Receive decision, discuss with employee. If exemption approved, implement mitigation measures and, if~~ | ~~If approved, employee continues to comply with generally-applicable mitigation measures (for instance, as~~ | ~~Employee~~ |

App. 058

Case: 22-10077     Document: 284     Page: 89     Date Filed: 02/13/2023
Case 4:21-cv-01236-O     Document 223     Filed 02/06/23     Page 61 of 104     PageID 7432
Current as of January 30, 2023

| | | |
|---|---|---|
| | ~~necessary, address any follow-on requests for accommodation in accordance with Component EEO procedures. If disapproved, provide opportunity for counseling by medical professional or other appropriate expert/ initiate requirement for vaccination. Work with the legal advisor(s) and, as appropriate, HR LMER and EEO offices.~~ | ~~applicable, screening testing, masking, and physical distancing) and any other mitigation measures directed by the Decision Authority or management officials. If disapproved, vaccination tracking and/or progressive discipline.~~ |

~~j.   Exemption Criteria.~~

~~(i)  Religious Exemption Requests.  Requests for religious exemption will be analyzed pursuant to the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb et seq. RFRA prohibits the Government from substantially burdening a person's exercise of religion, unless it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.  In the first instance, Decision Authorities are to determine whether the requestor has met his or her burden to establish that the vaccination requirement imposes a substantial burden on exercise of a sincerely held religious belief.  If so, Decision Authorities analyze the request to determine whether the burden on religious exercise is the least restrictive means of furthering the Government's compelling interest in health and safety of the DoD workforce, and the health and safety of members of the public with whom they interact. If vaccination is not the least restrictive means, the exemption will be granted and supervisors will implement the less restrictive means.~~

~~(ii)  Medical Exemption Requests. Pursuant to the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq. Decision Authorities will analyze requests for medical exemption to determine whether the medical condition or circumstance prevents the employee from safely being vaccinated.  If so, the employee will be exempt from vaccination (temporarily or permanently, as appropriate).  Supervisors will direct compliance with applicable FHP guidance and direct any mitigation measures that are necessary to prevent the spread of the virus that causes COVID-19 in the workplace and to the members of the public with whom the employee interacts.  If such measures result in the employee being unable to perform the essential functions of the position, such matters will be referred to the equal employment opportunity reasonable accommodation process.~~

~~k.   Additional Guidance.~~

(i)  Information collected concerning medical and religious exemption requests must be maintained in accordance with the privacy requirements in section 8.  Requests for medical exemption will be treated as medical records to be maintained separately from other personnel files.

(ii)  Discipline for failure to meet the COVID-19 vaccination requirement will not be initiated against a DoD civilian employee while a request for a medical or religious exemption from the COVID-19 vaccination requirement is pending determination.  If a DoD civilian employee submits a request after discipline is initiated, disciplinary measures may be held in abeyance where appropriate.

(iii)  DoD civilian employees who are not fully vaccinated but who have a pending request for exemption from vaccination are required to comply with any mitigation measures that are applicable to all DoD civilian employees in the worksite who are not fully vaccinated. Requests for reasonable accommodation related to those mitigation measures will be combined with any pending medical or religious exemption to vaccination request, for purposes of making a final determination concerning those measures.  Without making a finding concerning whether a sufficient basis for a reasonable accommodation concerning those measures exists, the supervisor may use the normal interactive process to pursue a temporary accommodation that protects the health and safety of the workplace while a decision concerning those measures is pending. Otherwise, requests for reasonable accommodation related to force health protection and mitigation measures may be analyzed separately from requests for exemption from vaccination.

(iv)  A DoD civilian employee who receives an exemption from the vaccination requirement may, because of the exemption, be unable to perform the duties and responsibilities of the position without a change in working conditions. Supervisors will immediately implement any mitigation measures required by the Decision Authority and applicable FHP guidance. Supervisors may engage in the normal interactive process concerning any other measures necessary to protect the health and safety of the workplace.

(v)  Requests for exemption from candidates for employment will be handled consistent with the procedures in this section.

(vi)  Unless responsibility is otherwise established in a written support agreement, the Combatant Command Support Agent identified in DoD Directive 5100.03, "Support of the Headquarters of Combatant and Subordinate Unified Command," is responsible for administration of exemption processes applicable to DoD employees assigned, detailed, or otherwise deployed to a Combatant Command area of responsibility.

App. 060

# SECTION 3:  CONDUCTING TESTING FOR SUSPECTED COVID-19 CASES AND GENERAL ELIGIBILITY FOR DoD-CONDUCTED TESTING

This section provides guidance on COVID-19 testing for eligible persons suspected of having contracted COVID-19.

## 3.1.  TESTING CONSIDERATIONS.

Health care providers will use their clinical judgment and awareness of laboratory testing resource availability, and will work closely with local and installation public health authorities or Public Health Emergency officers, to guide COVID-19 diagnostic testing.  Providers are encouraged to test for other causes of respiratory illness as clinically indicated.  The CDC testing priorities may be found at:  https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing.html.

Asymptomatic individuals may be tested based on a clinician's judgment and as deemed appropriate by public health professionals and in accordance with current guidance.

DoD Components must ensure appropriate infection prevention and control procedures are followed throughout the entire testing process.  This includes employing the appropriate biosafety precautions when collecting and handling specimens, consistent with CDC guidance.

## 3.2.  DOD LABORATORIES AND TESTS.

The DoD is committed to maximizing testing capability for operational needs and to increasing standardization and synchronization of testing across the Department.  However, differences among operational environments, deployment cycles, and congregate setting limitations drive differences in testing demands to mitigate operational risk.  This testing includes molecular tests and, for certain limited circumstances, alternative options such as serial rapid antigen testing.

DoD Components will ensure that diagnostic testing and screening testing performed by laboratories within the Military Health System are conducted at laboratories designated by the Defense Health Agency's (DHA) Center for Laboratory Medicine Services (CLMS).  CLMS manages diagnostic and screening testing policy, certification, and exceptions in accordance with current guidance.  CLMS may be contacted at:  dha.ncr.clinic-support.mbx.clms@mail.mil.

DoD Components must comply with Food and Drug Administration (FDA) regulations for diagnostic testing and screening testing, including by complying with COVID-19 emergency use authorizations (EUAs) or biologics license applications (BLAs), and other current guidance. The FDA COVID-19 EUA list is available at:  https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/vitro-diagnostics-euas.

App. 061

Case: 22-10077     Document: 284     Page: 92     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23    Page 64 of 104   PageID 7435
Current as of January 30, 2023

DoD Components may consider non-clinical, Research Use Only molecular tests[18] for surveillance testing using a pooled specimen testing protocol, consistent with applicable law and regulations. Results from any positive pools will only be reported in aggregate and must not be placed into any individual's medical record. Any positive pool must be followed by testing every individual sample in that pool with an FDA EUA-authorized molecular test, or an FDA-EUA or BLA authorized test (when available), and performed in a clinical laboratory registered by CLMS, or an equivalent civilian laboratory.

FDA EUA-authorized diagnostic and screening tests that are authorized for pooled testing for screening testing purposes may be performed at Clinical Laboratory Improvement Program-registered laboratories, in accordance with the terms of the applicable EUA.

DoD Components must coordinate planned updates to pooled testing protocols with the Assistant Secretary of Defense for Health Affairs (ASD(HA)). The Secretaries of MILDEPs will retain authority to prioritize pooled testing populations and assignments to MILDEP pooled testing laboratories and resources.

DoD Components are encouraged to employ next-generation sequencing (NGS) technology for COVID-19 surveillance testing. As with testing completed via pooled testing, testing requirements using NGS must be coordinated with the ASD(HA).

DoD Components must record COVID-19 diagnostic and screening testing results in the electronic health record or occupational health record of the individual tested in accordance with Department of Defense Instruction (DoDI) 6040.45, "DoD Health Record Life Cycle Management," and applicable processes for DoD contractor personnel. DHA will assist DoD Components, as needed, to ensure this occurs.

## 3.3. ELIGIBILITY OF DOD PERSONNEL, OTHER BENEFICIARIES, AND OTHER POPULATIONS FOR TESTING.

DoD Components may test Service members (including members of the Reserve Components when on active duty for a period of more than 30 days, or on full-time National Guard duty of more than 30 days) suspected of having contracted COVID-19, for purposes of disease surveillance, and for official travel in accordance with this guidance. Reserve Component Service members on active duty for a period of 30 days or less will follow their Component's guidelines.

DoD civilian employees (who are not otherwise DoD health care beneficiaries) suspected of having contracted COVID-19 may be offered screening testing if their supervisor has determined that their presence in the DoD workplace or official travel is required. DoD civilian employees may also be offered screening testing in connection with workplace disease surveillance.

---

[18] Research Use Only assays are products in the laboratory research phase of development and are not approved for clinical diagnostic use (https://www.fda.gov/media/87374/download).

Case: 22-10077      Document: 284      Page: 93      Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 65 of 104   PageID 7436
Current as of January 30, 2023

DoD contractor personnel suspected of having contracted COVID-19, or for whom testing is required for workplace surveillance or official travel, may be offered screening testing, subject to available funding, if such testing is necessary to support mission requirements and is consistent with applicable contracts. ~~For example, if testing is explicitly called for under the contract; or if testing is required to access a DoD facility and the contractor personnel must access the DoD facility to perform under the contract. DoD contracting officers may also modify existing contracts to require contractors to test their personnel, or to permit DoD to test their personnel, as necessary to support mission requirements and subject to available funding.~~

For testing of foreign national employees in locations outside the United States who are suspected of having contracted COVID-19, DoD Components should refer to country-specific labor agreements or contracts and consult with supporting legal counsel for guidance and any limitations concerning such tests.

# SECTION 4:  SURVEILLANCE AND SCREENING TESTING

**4.1.  ~~CONDUCTING REQUIRED SCREENING TESTING.~~ [RESCINDED]**

~~To establish COVID-19 screening testing for individuals for whom weekly screening testing is required, DoD Components will:~~

a. ~~Execute the screening testing requirement with FDA approved or authorized COVID-19 self-collection kits or self-tests at least weekly (depending on the type of test kit used).  Testing should be performed primarily onsite at the installation or facility with proper supervision and documentation of testing results.  If onsite COVID-19 screening testing is not feasible, as an alternative self-testing may be performed at home or in other locations.  (Note: these COVID-19 self-tests do not require a health care provider's clinical care order and are, therefore, considered an over-the-counter test and do not require medical support to complete).~~

    1. ~~COVID-19 self-tests must have Instructions for Use and FDA approval, 510(k) premarket clearance or have an FDA EUA.  These tests will be made available through the DLA.~~

    2. ~~Funding for COVID-19 screening testing, if self-collection kits or self-tests are not available:~~

        i. ~~Each DoD Component will reimburse Service members and DoD civilian employees for COVID-19 screening tests that require payment for purposes of meeting the screening testing requirement (e.g., if the screening test is not available through the DoD Component and must be administered by a facility who charges for the test).~~

        ii. ~~For COVID-19 screening testing of DoD contractor personnel with CRA, DoD Components will offer, if available, COVID-19 screening testing similar to that offered to DoD civilian employees at the DoD Component's expense and at no cost to the contractor personnel or the contractor.~~

b. ~~Establish guidance for where and how these tests will be distributed and conducted, and how results are to be reported.~~

    1. ~~DoD civilian employees are responsible for providing documentation of negative COVID-19 test results, upon receipt, to the appropriate supervisor.  For purposes of screening testing requirements, "supervisor" includes authorized human resources officials.  DoD civilian employees may not be required to use their own personal equipment for the purpose of documenting test results; offsite tests may not be used if there is not a means to document results using Government equipment.  The supervisor is~~

responsible for maintaining any COVID-19 test results provided by DoD civilian employees in accordance with the privacy protection measures in section 8.

2.  DoD contractor personnel with CRA will maintain their most recent COVID-19 test result and show the result to authorized DoD personnel upon request.

c.  After COVID-19 screening testing procedures are established, personnel subject to screening testing are required to have a negative COVID-19 screening test result for entry into a DoD facility.  DoD Components may bar DoD civilian employees who refuse required screening testing from their worksites on the installation or facility to protect the safety of others.  If the COVID-19 screening test is administered offsite, the negative result must be from a test performed within the prior 72 hours.  If a COVID-19 screening test is administered onsite, the test will be administered before DoD civilian employees and contractor personnel go to their work areas.  Personnel who have tested positive and do not have symptoms are exempted from regular screening testing for 90 days following the documented date of their initial positive test of COVID-19.  Documented proof of this positive test date shall be provided upon request.

d.  DoD civilian employees and DoD contractor personnel with CRA with positive COVID-19 screening tests will be offered, but not required to take, FDA approved or authorized confirmatory laboratory-based molecular (i.e., polymerase chain reaction) testing paid for by the relevant DoD Component.  Contact tracing and mitigation measures will be conducted in accordance with sections 4.4 and 5.5.  If the confirmatory test is negative, the individual is not considered to be COVID-19 positive and is allowed to return to the workplace.

e.  For DoD civilian employees, COVID-19 screening testing is expected to take no more than 1 hour of regular duty time, per test, to complete required testing as directed by the DoD Component.  Laboratory-based confirmatory COVID-19 testing for initial positive screening test results is expected to take no more than 2 hours of duty time.  This includes time for travel to the testing site, time to complete testing, and time to return to work.  Commanders and supervisors will monitor duty time usage and keep duty time used for testing within these parameters to the extent possible.

f.  A religious or medical exemption from COVID-19 vaccination is not an exemption from required COVID-19 screening testing.  If a DoD civilian employee requires a religious or medical exemption from participation in COVID-19 screening tests, DoD Components should follow existing processes to determine if an appropriate flexibility or accommodation may be provided.

31

Case: 22-10077     Document: 284     Page: 96     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 68 of 104   PageID 7439
Current as of January 30, 2023

## 4.2.  HEALTH SURVEILLANCE ACTIVITIES.

To assess the threat and inform our understanding of COVID-19 transmission, DoD Components will continue to employ existing syndromic, respiratory, and COVID-19 surveillance programs and efforts.  Appropriate DoD Components will continue, and expand as feasible, the following core surveillance activities:

- Syndromic surveillance through the Electronic Surveillance System for Early Notification of Community-based Epidemics to monitor for COVID-19-like illness.

- Respiratory surveillance testing of samples occurring at sites participating in the DoD Global Respiratory Pathogen Surveillance program for influenza-like-illness, including COVID-19.

- Surveillance for acute or febrile respiratory diseases or illnesses at initial entry training sites, with data collection and reporting in accordance with DoD Component testing plans.

- Clinical diagnoses of COVID-19 cases identified in military medical treatment facilities and reported through case-based surveillance in the Disease Reporting System-internet.

- Contact tracing of confirmed COVID-19 positive cases to infected persons**, as described in section 4.4** ~~in accordance with all applicable Federal, State, local, and DoD requirements~~.

- Continued reporting of Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2)/COVID-19 test results in accordance with all applicable Federal, State, local, and DoD requirements, and as appropriate, to respect HN guidelines.

- Expansion of whole genome sequencing efforts for respiratory surveillance testing with a focus on variants of concern[19] and interest to the DoD, and cases of re-infection and infection in vaccinated individuals (i.e., "vaccine breakthroughs"). Sequencing efforts are led by the Global Emerging Infections Surveillance Program (dha.ncr.health-surv.mbx.promis@mail.mil).

- Leverage alternative technologies, such as wastewater surveillance, to supplement existing COVID-19 surveillance systems as a capability that provides an efficient pooled community sample to understand more fully the extent of COVID-19 infections in communities.

---

[19] The President's "National Strategy for the COVID-19 Response and Pandemic Preparedness," January 21, 2021.

Case: 22-10077    Document: 284    Page: 97    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 69 of 104    PageID 7440
Current as of January 30, 2023

**4.3.  METHODS FOR OPERATIONAL RISK REDUCTION.**

- DoD Components may perform COVID-19 testing of asymptomatic DoD personnel prior to deployment or redeployment and may perform COVID-19 tests prior to start of Service member training, as determined appropriate by the medical staff and approved by the commander or supervisor, in accordance with DoD Component plans.

- DoD Components will ensure DoD personnel who are tested using a screening testing protocol are notified of their test results.

- Symptomatic DoD personnel will be managed in accordance with current guidance.

- DoD Components may, in consultation with public health advisors, conduct **surveillance and** screening testing of Service members to reduce risk in **select high-risk** congregate settings, on ships, at training sites, during events, or in remote locations where early identification, isolation, and quarantine are important. Screening testing protocols may involve testing of all Service members prior to participation in an event (such as an exercise or training evolution) with or without testing during the event.  Finally, screening testing may be performed using a surveillance protocol in which a specified percentage of randomly selected Service members are tested during regular intervals over a period of heightened vulnerability such as when case rates are very high or medical resources are in high demand.

    1. **Execute the screening testing requirement with FDA approved or authorized COVID-19 self-collection kits or self-tests.  Testing should be performed primarily onsite at the installation or facility with proper supervision and documentation of testing results.  If onsite COVID-19 screening testing is not feasible, as an alternative self-testing may be performed at home or in other locations.  (Note: these COVID-19 self-tests do not require a health care provider's clinical care order and are, therefore, considered an over-the-counter test and do not require medical support to complete).**

    2. **Establish guidance for where and how these tests will be distributed and conducted, and how results are to be reported.**

    3. **After COVID-19 screening testing procedures are established, Service members subject to screening testing are required to have a negative COVID-19 screening test result for entry into a DoD facility. If the COVID-19 screening test is administered onsite, the test will be administered before all Service members go to their work areas. Service members who have tested positive and do not have symptoms are exempted from regular screening testing for 30 days following the documented date of their initial positive test of COVID-19.  Documented proof of this positive test date shall be provided upon request.**

Case: 22-10077     Document: 284     Page: 98     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 70 of 104   PageID 7441
Current as of January 30, 2023

- Voluntary testing of eligible family members, DoD civilian employees, and DoD contractor personnel (if appropriate and permitted in accordance with applicable contracts) who, if infected with COVID-19, could impact the DoD workforce and missions, may be conducted in support of the DoD's effort to interrupt transmission of the virus among our populations.  Testing will be conducted based on availability and managed at the DoD Component level.  **DoD civilian employees and DoD contractor personnel with CRA with positive COVID-19 screening tests will be offered, but not required to take, FDA approved or authorized confirmatory laboratory-based molecular (i.e., polymerase chain reaction) testing paid for by the relevant DoD Component.  Contact tracing and mitigation measures will be conducted in accordance with sections 4.4 and 5.5.**

## 4.4.  COVID-19 CONTACT TRACING ~~AND TESTING~~.

~~DoD Components will conduct contact tracing on all COVID-19 cases identified through testing activities and prioritize investigation of COVID-19 cases, clusters, and outbreaks involving high-risk congregate settings, unusual clusters of cases, and considered for novel or emerging variants that pose a significant risk for severe disease, hospitalization, or death.  Follow-on quarantine or isolation measures and testing will be implemented as indicated.__DoD Components will conduct contact tracing on all COVID-19 cases identified through testing activity in health care settings and certain high-risk congregate settings, unusual clusters of cases, and cases involving novel or emerging variants that pose a significant risk for severe disease, hospitalization, or death.  In identifying certain settings in which to conduct contact tracing, DoD Component public health emergency officers should consider data reported to local and State public health entities and surveillance programs administered by the DoD and other Federal agencies.__

34

Case: 22-10077    Document: 284    Page: 99    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 71 of 104   PageID 7442
Current as of January 30, 2023

# SECTION 5:  PROTECTING PERSONNEL

## 5.1.  GENERAL MEASURES FOR PERSONNEL.

a.   Personnel should frequently wash hands with soap and water for at least 20 seconds.
When soap and running water are not available, they should use an alcohol-based hand sanitizer,
with at least 60-percent ethanol or 70-percent isopropanol as active ingredients, and rub their
hands together until they are dry.  In addition, personnel should be advised to:

- Avoid touching their eyes, nose, or mouth with unwashed hands.
- Cover coughs and sneezes or cough/sneeze into the inside of elbows/upper sleeve.
- ~~**Avoid close contact (within 6 feet of any individual for a total of 15 minutes or more over a 24-hour period) with people.**~~
- **Consider exposure risks.**
- Self-screen for COVID-19 symptoms[20] before entering a DoD facility or interacting with members of the public in person as part of your official duties.  Stay home if you have symptoms or feel sick, including "not feeling well," or "start of a cold or allergies," and similar circumstances.
- Recognize personal risk factors.  According to the CDC, certain people, including older adults and those with underlying conditions such as cancer, heart or lung disease, chronic kidney disease requiring dialysis, liver disease, diabetes, immune deficiencies, or obesity, are at higher risk for developing more serious complications from COVID-19.  See additional information on the CDC website at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
- ~~Launder or replace masks regularly~~ **Use dry, clean masks** to promote good hygiene.
- To prevent the spread of COVID-19 in elevators, take the stairs when possible.
- Regularly disinfect surfaces commonly touched by others such as touch screens, mice, and desktops with an alcohol or germicidal wipe as described in section 5.8.

~~**b.   Installations will post signage about specific measures applicable to the installation, such as mask wearing and physical distancing requirements, and on installation websites, as appropriate.**~~

## 5.2.  ~~PHYSICAL DISTANCING.~~ [RESCINDED]

~~**Supervisors will maintain at least six feet of separation between individuals in DoD workplaces whenever possible and regardless of the CDC COVID-19 Community Levels. This requirement does not apply to students in DoD schools.  Installation commanders will implement measures designed to ensure at least six feet of separation in indoor areas whenever possible (including common areas, elevators, stairs, and escalators) and outdoor**~~

---

[20] COVID-19 symptoms can be found at:  https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

App. 069

~~areas which are crowded or in which personnel are required to congregate, such as building entrances and security checkpoints.~~

~~Supervisors will limit requirements for face to face interactions in circumstances when physical distance cannot be maintained and will consider use of telecommunication tools even when onsite.~~

~~Installation commanders will determine whether stairwells or sides of stairwells should be designated as "up" and "down" to promote physical distancing.  Installation commanders will consider placing signs limiting the number of personnel allowed inside elevators and use floor markings showing where personnel should stand in elevator lobbies and within elevators to reinforce physical distancing.~~

**5.3.  MASKS.**

a.  The following masking guidance applies to all DoD installations and other facilities owned, leased, or otherwise controlled by the DoD:

- When the CDC COVID-19 Community Level[21] is high in the county or equivalent jurisdiction where a DoD installation or facility is located, indoor mask-wearing is required for all individuals, including Service members, DoD civilian employees, onsite DoD contractor personnel (collectively, "DoD personnel"), and visitors, regardless of vaccination status.  **Each installation and DoD facility will post signage at building entrances and in common areas of DoD owned and controlled facilities when the CDC COVID-19 Community Level is high indicating that masks are required.**

- When the CDC COVID-19 Community Level is medium or low in the county where a DoD installation or facility is located, indoor mask-wearing is not required.

- Individuals may choose to wear a mask regardless of the **CDC** COVID-19 Community Level.

b.  Exceptions to mask wearing are limited to:

1.  When an individual is alone in an office with a closed door and floor-to-ceiling walls;
2.  Brief periods of time when eating and drinking while maintaining distancing and in accordance with instructions from commanders and supervisors;
3.  When the mask is required to be lowered briefly for identification or security purposes;
4.  When necessary as a reasonable accommodation for a person with a disability or to reasonably accommodate participation in a religious service;

---

[21] See section 1.3 for information about CDC COVID-19 Community Levels.

Case: 22-10077    Document: 284    Page: 101    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 73 of 104    PageID 7444
Current as of January 30, 2023

5. When clear or unrestricted visualization of verbal communication is required for safe and effective operations (e.g., air traffic control, emergency dispatch, police/fire/emergency services);

6. When the person who would be wearing the mask is under the age of two, sleeping, unconscious, incapacitated, or otherwise unable to remove the mask without assistance;

7. When engaged in training in which mask wearing is not feasible or creates a hazard, such as swim qualification, amphibious, and aquatic training events;

8. When individuals are alone (or with members of their household or close social pod) in their housing, private outdoor space, or personally owned vehicle;

9. When personnel are operating machinery, tools, and/or other items during the use of which a mask would present a safety hazard (for example, the use of a gaiter may be needed for flight line safety reasons);

10. When environmental conditions are such that mask wearing presents a health and safety hazard (e.g., extreme elevated temperatures); and

11. When individuals are enrolled in a respiratory protection program and are wearing a respirator during the performance of duties requiring respiratory protection. **Components that want to distribute N95 respirators to personnel must follow an OSHA respiratory protection program.**

c. Case-by-case exceptions to the requirements for mask wearing as determined at a level no lower than a general/flag officer in the grade of O-7, SES member (or equivalent), or, for installations that do not have officials at these levels, O-6 installation commanders.

d. Transportation: ~~All individuals must wear a mask on DoD aircraft, boats and other maritime conveyances, and buses traveling into, within, or out of the United States, and indoor DoD transportation hubs, regardless of vaccination status and the CDC COVID-19 Community Levels. Masks are optional in outdoor areas of these conveyances (if such outdoor areas exist on the conveyance) or while outdoors at transportation hubs, if these areas are uncrowded. Masking requirements apply whether the DoD aircraft, boats and other maritime conveyances, and buses are located inside or outside the United States, but exclude these conveyances and other tactical vehicles and craft in their operational environment. It is recommended that individuals wear a mask in Government cars, vans, or other low occupancy transportation assets, regardless of the CDC COVID-19 Community Level.~~ **It is recommended that all individuals wear masks on DoD conveyances (e.g., aircraft, maritime vessels, and buses) and in Government cars, vans, or other low occupancy transportation assets when more than one person is present.**

e. Notwithstanding the above, ~~and regardless of the CDC Community Level, masks must be worn by~~ **masking of patients, visitors, and** personnel working in DoD health care facilities (including military medical, dental, and veterinary treatment facilities) **will occur** in accordance with ~~requirements specified in 29 CFR § 1910.502 and in accordance with OSHA and~~ CDC guidelines[22]. ~~Masks will be worn by visitors and patients to DoD military~~

---

[22] **"Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic," September 23, 2022. Available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html.**

App. 071

~~medical and dental treatment facilities except while undergoing medical examinations or procedures that interfere with those activities.~~

## 5.4.  CASE MANAGEMENT AND RESTRICTING WORKPLACE ACCESS – SERVICE MEMBERS.

**Testing of Service members:**

- Test based on clinical judgment and public health considerations.
  - If laboratory positive:  The Service member becomes a COVID-19 case and must be isolated.
    - The Service member will stay isolated for 5 days (day 0 is the day symptoms started or date of specimen collection if asymptomatic).
    - The Service member may leave isolation after 5 days, if no symptoms are present or if he/she is afebrile for more than 24 hours and any remaining symptoms are resolving.  Mask wearing must continue for 5 days after leaving isolation when around others, even if mask wearing is not otherwise required by DoD guidance.
    - If fever, shortness of breath, or severe fatigue start or persist, the Service member will stay isolated until these symptoms resolve.  The Service member should be seen and managed by medical personnel.
    - A negative test is not required to discontinue isolation due to difficulty interpreting persistent positive results.  This is consistent with the CDC's recommendation to NOT test during the 90-day period following initial diagnosis.  This applies to all viral testing methodologies, including antigen testing.
  - If laboratory negative:  The Service member should be followed to ensure he/she clinically improves.
    - If laboratory negative and asymptomatic or clinically improved: The Service member has no restrictions.
    - If laboratory negative and the Service member does NOT clinically improve or worsens, and no other etiology is found, then consider re-testing for COVID-19.

**Management of Close Contacts of a Case ~~(as determined by contact tracing)~~:[23]**

- ~~Quarantine is not required for Service members who are close contacts and who are up-to-date with an FDA licensed or authorized COVID-19 vaccine, or a World Health Organization Emergency Use Listing COVID-19 vaccine.  Regardless of vaccination status, c~~Close contacts **identified through contact tracing or through exposure** must wear a mask around others **indoors** for 10 days, even if mask wearing is not otherwise required by DoD guidance~~, and if practical~~, **Service members in the workplace must** test ~~on day~~ **at least once after** 5 **full days** following exposure.  If symptoms develop, then the individual must get tested and isolate until test results are complete.
- ~~Close contact Service members who are not up-to-date with the COVID-19 vaccine must quarantine for 5 days.  The Service member should wear a mask at all times when~~

---

[23] For more information on contact tracing with respect to Service members, see:
https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/contact-tracing.html.

~~around other individuals, regardless of those individuals' vaccination status, and even if mask wearing is not otherwise required by DoD guidance. Testing should occur on day 5 after exposure. If no symptoms develop, quarantine may end after 5 days, but the Service member must continue to wear a mask around others for an additional 5 days (i.e., masks must be worn for a total of 10 days after exposure, including the time in quarantine). If any symptoms develop at any time, the individual should be tested for COVID-19 and advised to isolate.~~

- ~~Exceptions to the above protocols for asymptomatic Service members with potential exposure based on close contact who are not fully vaccinated, and whose presence is required in the workplace, may be considered in cases of mission-essential activities that must be conducted on site. This exception may be granted in writing by the first general/flag officer, SES member, or equivalent, in the chain of command/chain of supervision or, for those locations that do not have general/flag officers or SES leaders, by O-6 installation commanders. Vaccination status of the Service member should be considered in granting an exception, as more risk will be assumed in granting an exception for a Service member who is not fully vaccinated. Service members who develop signs or symptoms consistent with COVID-19 during the duty period, he/she will be ordered to return to quarters and provided instructions for compliance with this guidance. Service members granted an exception must comply with the following practices for 5 days after the last exposure:~~
  - ~~Obtain a COVID-19 test on calendar day 5;~~
  - ~~Conduct daily COVID-19 symptom screening with temperature checks;~~
  - ~~Wear a mask in the workplace for 10 calendar days after exposure, even if mask wearing is not otherwise required by DoD guidance;~~
  - ~~Practice hand and cough hygiene;~~
  - ~~Refrain from sharing headsets or other objects used near the face;~~
  - ~~Continue to physically distance as much as possible; and~~
  - ~~Clean and disinfect their workspace daily~~
- In all situations, for a full 10 days after ~~last contact with a confirmed case~~ <u>exposure</u>, Service members must continue to self-monitor, and practice strict adherence to all non-pharmaceutical intervention mitigation strategies, and~~, if not fully vaccinated,~~ wear masks, avoid crowds and practice physical distancing, hand and cough hygiene, maintain adequate indoor ventilation, and perform environmental cleaning and disinfection. In addition, Service members located outside the United States identified as close contacts must follow host-nation policies, as applicable.

~~**Testing Quarantined Individuals Who Develop Symptoms:**~~

~~Test eligible Service members in quarantine who develop symptoms commonly associated with COVID-19.~~

- ~~If laboratory positive: The Service member becomes a case and must be isolated (see above).~~
- ~~If laboratory negative: The Service member must continue to follow procedures for quarantine as outlined above.~~

App. 073

Current as of January 30, 2023

**Recommendations for Testing During the Period Following Initial Diagnosis of COVID-19:[24]**

- For Service members previously diagnosed with COVID-19 who remain asymptomatic after recovery, polymerase chain reaction retesting is not recommended within 90 days from the date of initial diagnosis. Furthermore, in the event of subsequent close contact with confirmed COVID-19 positive individuals, additional quarantine (including any required post-travel quarantine) is not necessary or recommended for 90 days as long as the Service member remains symptom-free.

- If Service members become symptomatic during this time frame ~~(whether or not they are a close contact of a case)~~ they must self-isolate immediately and ~~be evaluated by a health care provider~~ retest to determine if they ~~may~~ have been re-infected with SARS-CoV-2 or if symptoms are caused by another etiology.  Isolation ~~may be warranted during this time~~ is required, particularly if symptoms developed within 10 days after ~~close contact~~ exposure ~~with~~ to an individual who has contracted COVID-19.

**Aircrew Notification:**  In situations where a Service member is identified as a case within 72 hours after medical transport in the en route care system, local public health authorities at the receiving MTF, or at the closest MTF if the case is transferred to a civilian medical facility, must notify the regional Theater Patient Movement Requirements Center to initiate contact tracing and air crew exposure procedures.

~~**Contacts of Contacts:**  There is no indication to quarantine asymptomatic Service members who are contacts of contacts; they should continue to self-monitor for symptoms.~~

**5.5.  RESTRICTING WORKPLACE ACCESS – PERSONNEL OTHER THAN SERVICE MEMBERS.**

a.  Personnel other than Service members who have signs or symptoms consistent with COVID-19[25] will notify their supervisor and not come to the DoD workplace.  Personnel who develop any signs or symptoms consistent with COVID-19 during the workday must immediately distance from other workers, put on a mask even if mask wearing is not otherwise required by DoD guidance, notify their supervisor, and promptly leave the DoD workplace.

b.  ~~Regardless of COVID-19 vaccination status, p~~Personnel who test positive for COVID-19 will remain out of the workplace for 5 days ~~(day 0 is the day symptoms started or date of specimen collection if asymptomatic)~~.  To calculate the recommended time frames, day 0 is the day tested if no symptoms, or the date symptoms started.  Personnel who test positive for COVID-19 ~~Individuals~~ may return to the DoD workplace ~~after 5 days~~, if either: (1) they have no symptoms; or (2) if they are ~~afebrile~~ fever-free for more than 24 hours (without the use of fever-reducing medication) and any remaining symptoms are resolving.

---

[24] Beyond the 90-day recovery window, Service members revert to protocols for individuals who have never been diagnosed with COVID-19.

[25] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

App. 074

Current as of January 30, 2023

Mask wearing must continue in the workplace for an additional 5 days (for a total of 10 days post-positive result), even if mask wearing otherwise is not required by DoD guidance.

c. Personnel ~~with potential exposure~~ <u>exposed</u> to COVID-19 ~~based on close contact with a person who has a laboratory confirmed, clinically diagnosed, or presumptive case of COVID-19~~ will notify their supervisor.

1. ~~Asymptomatic personnel with potential exposure to COVID-19 based on close contact who are:  (1) not fully vaccinated; or (2) are not up-to-date with the COVID-19 vaccine will remain out of the workplace for 5 days.  Regardless of vaccination status, a~~<u>A</u>symptomatic personnel ~~with potential exposure~~ <u>exposed</u> to COVID-19 ~~close contact~~ must wear a mask in the workplace for 10 days, even if mask wearing otherwise is not required by DoD guidance.

~~2.  In cases of mission-essential activities that must be conducted on site, asymptomatic personnel with potential exposure to COVID-19 based on close contact, who otherwise would need to remain out of the workplace, may be granted an exception to continue to work on site provided they remain asymptomatic, do not have a positive test for COVID-19, and comply with the following key practices for 5 days after the last exposure:~~

- ~~Obtain a COVID-19 test on day 5;~~
- ~~Conduct daily pre-screening with temperature checks;~~
- ~~Wear a mask in the workplace for 10 days after exposure, even if mask wearing is not otherwise required by DoD guidance,~~
- ~~Practice hand and cough hygiene;~~
- ~~Refrain from sharing headsets or other objects used near the face;~~
- ~~Continue to physically distance as much as possible; and~~
- ~~Clean and disinfect their workspaces daily.~~

~~This exception may be granted by the first general/flag officer or member of the SES, or equivalent, in the chain of command/chain of supervision or, for those locations that do not have general/flag officers or SES leaders, by O-6 installation commanders.  If the individual develops signs or symptoms consistent with COVID-19 during the duty period, he/she will be sent home immediately.~~

<u>2.</u>  ~~3.~~ Personnel performing duties outside the United States will also follow applicable geographic Combatant Commander guidance to address HN policies.

d. <u>DoD civilian employees who are remaining out of the workplace because of COVID-19 symptoms and who are waiting for a test result may telework if able to do so.  If they are unable to or do not feel well enough to telework, they may request sick leave, use accrued annual leave or other forms of earned paid time off (e.g., compensatory time off or credit hours), or use unpaid leave, as appropriate.  Weather and safety leave is unavailable in this situation, but to mitigate exposure risks in the workplace, and on a limited basis, up to 1 day of administrative leave may be offered to DoD civilian employees who have</u>

Case: 22-10077     Document: 284     Page: 106     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 78 of 104   PageID 7449
Current as of January 30, 2023

**COVID-19 symptoms and are remaining out of the workplace while actively seeking to be tested.**

> **e.   DoD civilian employees who test positive for COVID-19 may telework during the 5 days they are required to remain out of the workplace if able to do so.  If they are unable to or do not feel well enough to telework, they may request sick leave, use accrued annual leave or other forms of paid time off (e.g., compensatory time off or credit hours), or use unpaid leave in this situation, as appropriate.  Weather and safety leave is not available in this situation.**

## 5.6.  RESTRICTING WORKPLACE ACCESS – STATE AND LOCAL RESTRICTIONS.

In States and localities that require members of the general public to stay at home, DoD Service members and civilian employees may report to work as directed to do so by a commander or supervisor.

## 5.7.  ISSUANCE OF MEDICAL PERSONAL PROTECTIVE EQUIPMENT.

Medical personal protective equipment (PPE) items, such as N95 respirators, are reserved for use in high-risk procedures and for use by those at increased risk of severe disease, and should not be issued outside of these circumstances unless local commanders or supervisors determine they are necessary to respect HN or local jurisdiction guidelines.  In those instances, commanders or supervisors, in consultation with public health specialists and legal counsel, and with consideration of national or local jurisdictional agreements, such as Status of Forces Agreements, will determine if medical PPE items will be issued to non-medical personnel to respect such guidelines.  The PPE supply must be optimized and the below guidelines should be followed, in addition to consulting CDC-published strategies found at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html.

Although it is likely that expired respirators will be scarce 2 years into the pandemic, stockpiles of new respirators may eventually pass their expiration date.  N95 respirators in the pandemic stockpiles that have exceeded their manufacturer's recommended shelf-life and expiration date should not be discarded.  Current CDC guidance addresses this issue describing strategies for optimizing the supply of N95 respirators in health care settings where there is a limited supply.[26]  Use of expired respirators may be prioritized for situations where personnel are not exposed to the virus that causes COVID-19, such as for training and fit testing.  The manufacturer should be contacted for additional guidance on the use of expired respirators for any other reasons.  Those responsible for ordering respirators should not do so with the idea that expired devices can be readily re-used; rather, expired devices should be discarded as per National Institute for Occupational Safety and Health pre-pandemic policy.

---

[26] https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/index.html.

Case: 22-10077    Document: 284    Page: 107    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 79 of 104    PageID 7450
Current as of January 30, 2023

## 5.8.  CLEANING AND DISINFECTING.

The CDC and OSHA have established enhanced cleaning and disinfection guidance for the cleaning and disinfection of work areas, including those areas previously occupied by workers with known or suspected COVID-19.  Enhanced cleaning and disinfection should also be performed for common use, high-touch, high-density spaces and equipment such as in lobbies, restrooms, break areas, office elevators, and stairwells.  It should also include tools and equipment that are shared by multiple users.

Personnel who are cleaning workspaces or conducting maintenance activities in areas previously occupied by someone who is known or suspected to have contracted COVID-19 should wear gloves, face shields (if there is a risk of splash), disposable gowns or aprons, and other protection as recommended on the Safety Data Sheet or EPA label of the cleaning or disinfectant product.  When using electrostatic sprayers for disinfection, personnel should wear PPE as specified in the EPA product label.  Personnel should follow all personal hygiene requirements (e.g., handwashing, equipment doffing) after completion of work activities as recommended by CDC guidance at: https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html and https://www .cdc.gov/niosh/docs/2012-126/pdfs/2012-126.pdf.  Segregation of such work areas prior to cleaning and disinfection is necessary.  When the cleaning and disinfection procedures described above are complete, demarcation of areas where the individuals known or suspected to have contracted COVID-19 previously worked is not necessary.

## 5.9.  HEATING, VENTILATION, AND AIR CONDITIONING (HVAC).

The SARS-CoV-2 virus is transmitted mainly by large respiratory droplets, but infected individuals generate aerosols and droplets across a large range of sizes and concentrations. There is no need to shut down air HVAC, air handling systems, or air vents to prevent the spread of COVID-19 within a building.  Increasing indoor air movement and ventilation is a cornerstone of COVID-19 transmission mitigation strategy.  Ensure existing HVAC systems in buildings are functioning properly, ensure the amount of outside air supplied to the HVAC system is maximized to the extent appropriate and compatible with the HVAC systems' capabilities, and ensure the use of air filters that have a Minimum Efficiency Reporting Value-13 or higher filter where the system can accommodate this type of filtration efficiency.  In addition to the requirements for existing HVAC systems, building managers should consider other measures to improve ventilation ~~in accordance with~~ **as set forth in** CDC guidance ~~(e.g., opening windows and doors to let in outside air) at:~~ **(**https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html**) and guidance from American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE; https://www.ashrae.org/file%20library/technical%20resources/ashrae%20journal/2020journaldocuments/72-74_ieq_schoen.pdf).**

### 5.10.  OSHA-REQUIRED ILLNESS RECORDKEEPING.

**a.  General workplace:**  COVID-19 is a recordable occupational illness if a worker contracts the virus as a result of performing his or her occupational duties and if all of the following conditions are met:  (1) COVID-19 illness is a confirmed case; (2) contraction of COVID-19 is work-related as described in 29 CFR § 1904.5 (this condition will require a determination by the commander or supervisor who may require input from the worker's health care provider); (3) the case of illness satisfies the requirement as a recordable illness as set forth in 29 CFR § 1904.7 (e.g., medical treatment beyond first aid is required, the number of calendar days away from work meets the stated threshold).[27]

**b.  Health care providers:  Adhere to COVID-19 illness recordkeeping and reporting procedures contained in 29 CFR §§ 1910.502(q)(2)(ii), 1910.502 (q)(3), and 1910.502(r).**

### 5.11.  SAFETY AUDITS, INSPECTIONS, AND TRAINING.

To ensure maximum compliance with physical distancing guidance and telework arrangements, routine industrial hygiene and safety surveys required by DoDI 6055.05, "Occupational and Environmental Health," and DoDI 6055.01, "DoD Safety and Occupational Health (SOH) Program," may be discontinued at the discretion of the Component's Designated Agency Safety and Health Official, for the duration of the pandemic or the workplace returns to HPCON 0, whichever comes sooner.

The annual survey requirements specified in paragraph 3.8 of DoDI 6055.12, "Hearing Conservation Program (HCP)," may be suspended by DoD Components at the discretion of the Component's Designated Agency Safety and Health Official during the COVID-19 pandemic so long as there is a good faith effort to complete required services and compliance is not otherwise possible.  These requirements should resume upon the conclusion of the pandemic or the workplace returns to HPCON 0, whichever comes sooner.

Spirometry can be safely performed by following the CDC guidance for increased ventilation and regular room cleaning and disinfection, patient screening, and implementation of single use disposable items.  The guidance for pulmonary function tests is contained in the Defense Health Agency Deputy Assistant Director for Medical Affairs Memorandum, "Outpatient Pulmonary Function Tests (PFT) During COVID-19 Pandemic," August 18, 2020, and interim technical guidance for the safe performance of spirometry is available from the American College of Occupational and Environmental Medicine.[28]

---

[27] The reporting requirements are described in more detail in DoDI 6055.07, "Mishap Notification, Investigation, Reporting, and Record Keeping," and at: https://www.osha.gov/recordkeeping.

[28] September 1, 2021.  https://acoem.org/Guidance-and-Position-Statements/Guidance-and-Position-Statements/Occupational-Spirometry-and-Fit-Testing-in-the-COVID-19-Era-2021-Interim-Recommendations-from-the-A.

App. 078

Current as of January 30, 2023

**5.12. MAINTENANCE.**

If workers are planning to conduct maintenance in a residence where a person who is known or suspected to have contracted COVID-19 resides and the maintenance is necessary and cannot be delayed, the resident should be asked to remove all items that would impede the work of the maintenance personnel.  The resident should clean the area of any dirt, debris, dust, etc. that would impact the effectiveness of surface disinfectant used by maintenance personnel. Workers should maintain ~~a~~ **the maximum possible** distance ~~of at least 6 feet~~ from the resident who is known to have or suspected of having contracted COVID-19, and ask that the resident remain in a separate room while maintenance is conducted.  If a separate room for the resident is unavailable and the worker is unable to ~~remain 6 feet in~~ **physically** distance from the resident during the work, appropriate protective equipment for ~~close contact~~ **exposure risks** must be worn by the worker.  If necessary, clean and disinfect the work area following the procedures for personnel protection described in section 5.8.

Case: 22-10077    Document: 284    Page: 110    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 82 of 104    PageID 7453
Current as of January 30, 2023

# SECTION 6:  MEETINGS

~~For any planned in-person meetings, events, and conferences (referred collectively herein as "meetings") sponsored by DoD with more than 50 participants in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high, the meeting organizer will obtain advance written approval from the DoD or Office of the Secretary of Defense (OSD) Component head concerned to hold the meeting.  The DoD or OSD Component head concerned may delegate this authority in writing to their Principal Deputy (or equivalent) but no lower.  For the Pentagon Reservation, the approval authority is the DA&M and this authority may not be further delegated.~~

~~For any in-person meetings in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high or medium, the meeting organizer will require all attendees, including Service members and DoD civilian employees, to show a completed DD Form 3150, "Contractor Personnel and Visitor Certification of Vaccination" and will follow the applicable requirements in section 5.2 for physical distancing.  For any in-person meetings in a county or equivalent jurisdiction where the CDC COVID-19 Community level is low, the meeting organizers will follow the applicable requirements in section 5.2 for physical distancing.~~

~~In-person attendees who are not fully vaccinated, or who decline to provide information about their vaccination status, may not attend the meeting if they do not show the meeting organizer proof of a negative FDA approved or authorized COVID-19 test completed no earlier than 72 hours prior to the meeting, and at least weekly if the meeting is greater than one week in duration.  Meetings do not include military training and exercise events conducted by MILDEPs.~~

For any planned in-person meetings, events, and conferences (referred collectively herein as "meetings") sponsored by DoD in a county or equivalent jurisdiction where the CDC COVID-19 Community Level is high or medium, the meeting organizer will require all attendees, including Service members and DoD civilian employees, to physically distance and will limit attendance as necessary to maintain physical distance.  Where the CDC COVID-19 Community Level is high, meeting organizers will require all attendees to wear high-quality masks.  Meetings do not include military training and exercise events conducted by MILDEPs.

App. 080

Case: 22-10077    Document: 284    Page: 111    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 83 of 104    PageID 7454
Current as of January 30, 2023

# Section 7:  Travel

This section covers official and unofficial travel and provides current pre- and post-travel guidance for Service members, DoD family members, DoD civilian employees, and DoD contractor personnel.

Heads of DoD and OSD Components may implement more restrictive guidance and additional FHP measures based on mission requirements and local risk assessments, in consultation with their medical staffs and public health authorities.

The Secretaries of the MILDEPs, heads of OSD Components, Commanders of the **Geographic Combatant Commands (**GCCs**)**, and the Commander, U.S. Transportation Command (USTRANSCOM), may choose to exempt assigned aircrew and aircraft maintenance recovery team members on commercial, military contracted, and organic military aircraft from this section, to the extent permissible, consistent with applicable legal requirements.  In addition, patients and their attendants in the en-route care system are exempt from restriction of movement (ROM) requirements and may be exempted from testing requirements by the Theater Validating Flight Surgeon until they arrive at their final treatment destination.  Medical care will not be delayed due to ROM requirements.

The Commander, USTRANSCOM, may further waive the requirements of this section in order to continue execution of the Joint Deployment and Distribution Enterprise as required to project and sustain the joint force globally.  This includes forces (aircrews, vessel crews, and mission essential personnel) ordered on prepare-to-deploy orders alert status, air refueling, global patient movement, mortuary affairs support, inland surface, sea, and air sustainment missions, support to other federal departments and agencies (as approved by the Secretary of Defense); and moves of personnel and equipment that support USTRANSCOM's global posture requirements.

## 7.1.  GENERAL TRAVEL GUIDANCE.

**In all cases, no personnel may engage in official travel if they have tested positive for COVID-19 and have not yet met the criteria for discontinuing isolation, they are symptomatic, or they are pending COVID-19 test results.  After discontinuing isolation, personnel should avoid official travel until 10 calendar days after their symptoms started or the date of their positive test.  If these personnel must travel on days 6 through 10, they must properly wear a well-fitting mask when they are around others for the entire duration of travel, even if mask wearing is not otherwise required by DoD guidance.  Official travel should also be delayed if, in the past 10 days, an individual has been exposed to someone who has tested positive for, and/or been symptomatic of, COVID-19.  Prior to travel, all official travelers should be educated on how to self-monitor and what actions to take if one develops signs or symptoms consistent with COVID-19 or contracts COVID-19.**

~~**Fully vaccinated individuals are not restricted from official travel, both domestic and international.  Individuals who are not fully vaccinated, or who decline to provide information about their vaccination status, are limited to mission-critical official travel, both domestic and international.  "Mission-critical" will be determined by the traveler's**~~

Case: 22-10077    Document: 284    Page: 112    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 84 of 104   PageID 7455
Current as of January 30, 2023

~~DoD or OSD Component head, who may delegate this authority in writing to the Component's Principal Deputy (or equivalent) but no lower.  For the purpose of this FHP guidance, travel associated with permanent changes of station, travel in connection with Authorized or Ordered Departures issued by the Department of State, or travel in evacuations ordered by the appropriate DoD official is deemed to be "mission-critical."~~

During all official travel, travelers will follow all applicable Federal, State, local, and commercial air carrier requirements, and applicable HN requirements as a means to respect HN law.  ~~In addition to completion of required or recommended ROM, a~~**A**dditional requirements may be necessary when traveling to, or from, locations outside, and within, the United States~~.~~**,** ~~t~~**T**ravelers will follow any requirements in the Electronic Foreign Clearance Guide pertaining to entry, movement, or operations into a HN.  Travelers will also refer and adhere to local updates in HN for travel and movement within the HN.

~~For travel via military airlift (contracted or organic), Aerial Point of Embarkation (APOE) health screening is mandatory.  Travelers who have a medical issue identified during screening or who refuse to be screened at the APOE may be denied travel.~~

~~The waiver authority available to the Secretaries of the MILDEPs, heads of OSD Components, Chief of the National Guard Bureau, and Commanders of the GCCs for official travel is specified in section 7.4.~~  Travel that is limited to transit between, and through, foreign countries contained wholly within a single GCC area of responsibility, and between GCC areas of responsibility, is not subject to this memorandum and will be managed by each relevant GCC or GCCs as appropriate.

## ~~7.2.  RISK ASSESSMENT PRIOR TO TRAVEL.~~ [RESCINDED]

~~It is important for the appropriate commander or supervisor, assisted by medical personnel, to complete a risk assessment for each traveler before travel, as set forth below, including an assessment of the health status and itinerary.  Specifically:~~

- ~~For Service members, a risk assessment is required before all travel.~~
- ~~For DoD family members, reimbursement for official travel may only occur after the Service members certifies, to the best of his or her knowledge, that family members have completed a risk assessment.  DoD family members are strongly encouraged to complete a risk assessment before unofficial travel as well.~~
- ~~For DoD civilian employees, a risk assessment is required before official travel.  DoD civilian employees are strongly encouraged to complete a risk assessment before unofficial travel as well.~~

~~The risk assessment of the health status of the traveler will include, at a minimum, determining:~~

- ~~Whether the individual is familiar with how to self-monitor, and what actions to take, if he or she develops signs or symptoms consistent with COVID-19 or~~

48

~~contracts COVID-19;~~

- ~~Whether the individual has exhibited any signs or symptoms consistent with COVID-19 within the previous 10 days;~~
- ~~Whether the individual has had close contact with anyone having, or known to have exhibited, signs or symptoms consistent with COVID-19, or who has tested positive for COVID-19 within the previous 10 days;~~
- ~~Whether the individual has recently recovered from COVID-19 and, if so, when and if they have documentation of a positive viral test and documentation of recovery from a health care provider;~~
- ~~Whether the individual is fully vaccinated or up-to-date with COVID-19 vaccines and, if so, when, and whether they have proof of vaccination (CDC vaccination card or other medical documentation);~~
- ~~Whether the individual has traveled to a country, State, territory, county, or city with high or increasing risk of COVID-19 as defined by the CDC in Travel Health Notices;~~
- ~~Whether the individual is at increased risk of severe illness of COVID-19 as defined by the CDC. Additional details can be found at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html. For DoD civilian personnel, disclosure of this information is voluntary; and~~
- ~~The status of community spread of COVID-19 for the travel destination.~~

~~DoD Components may consider requiring contractors with contracts calling for official travel outside the United States to direct their employees to perform a risk assessment prior to such travel. When required, the contractor may tailor the assessment elements according to company policy and should document the risk assessment. At a minimum, when required, the risk assessment should include a self-health assessment performed by the traveler, and a review of the travel itinerary by the traveler's supervisor. The contractor should not be required to disclose the results of the assessment with the DoD. DoD contractor personnel are encouraged to complete a risk assessment before unofficial travel as well.~~

~~In all cases, no personnel may engage in official travel if they have tested positive for COVID-19 and have not yet met the criteria for discontinuing isolation, they are symptomatic, or they are pending COVID-19 test results. After discontinuing isolation, personnel should avoid official travel until 10 calendar days after their symptoms started or the date of their positive test. If these personnel must travel on days 6 through 10, they must properly wear a well-fitting mask when they are around others for the entire duration of travel, even if mask wearing is not otherwise required by DoD guidance. Official travel should also be delayed if, in the past 10 days, an individual has been in close contact with someone who has tested positive for, and/or been symptomatic of, COVID-19 and requires self-quarantine. Prior to travel, all official travelers should be educated on how to self-monitor and what actions to take if one develops signs or symptoms consistent with COVID-19 or contracts COVID-19.~~

Current as of January 30, 2023

## 7.3.  ROM REQUIREMENTS. [RESCINDED]

a.  **Steps to Be Taken During ROM.**  During any required or recommended ROM period, individuals will, to the fullest extent practicable:

- Restrict movement to their residence or other appropriate domicile[29] as much as possible.
- Maintain a distance of greater than 6 feet from anyone who did not, or will not, travel with them, including family members or roommates; wear masks at all times around individuals; and employ hand washing practices in accordance with CDC guidance; avoid crowds; avoid the use of public transportation; and avoid close interaction with pets or other animals for 10 days after travel even if the ROM period is shorter than 10 days.
- Consider their ROM location as their authorized duty location.
- Self-monitor for subjective fever (that is, feeling feverish) or actual fever (≥100.4°F or ≥38°C) by taking their temperature twice a day, and self-monitor for cough, difficulty breathing, or other COVID-19 signs and symptoms as described by the CDC at:  https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.  If signs or symptoms consistent with COVID-19 develop during the 14-day self-monitoring period, individuals will, to the fullest extent practicable, immediately self-isolate, limit close contact with others, and, if appropriate, seek advice by telephone or other authorized communication modalities from an appropriate healthcare provider to determine whether medical evaluation and testing for COVID-19 is needed.
- For Service members, notify their chain of command if they, or persons in their household, develop signs or symptoms consistent with COVID-19.  Such health information will be used only for FHP purposes and will be protected in accordance with applicable laws and policy.
- DoD civilian employees should notify supervisors if they develop, or have had contact with anyone who exhibits, signs or symptoms consistent with COVID-19.  Such health information will be used only for FHP purposes and will be protected in accordance with applicable laws and policy.
- Telework when practicable per direction of their commander or supervisor.
- For personnel whose presence is required in the workplace by their supervisor, consider whether and when to return to work during the ROM period in accordance with section 5.

b.  **Additional ROM Guidance:**

- If ROM is conducted prior to travel, travel to and from an APOE following ROM completion will, to the maximum extent possible, be conducted in a manner that minimizes the risk of personnel being exposed to, or contracting, the virus that causes COVID-19 during travel.

---

[29] The ROM location for Dynamic Force Employment organizations and individuals will be identified through a case-by-case determination coordinated with the force provider and GCC.

App. 084

- ~~For MILDEP ships and submarines, underway time from port of embarkation/debarkation to port of debarkation/embarkation may be used to meet ROM requirements provided no cases have occurred while underway and there has been no contact with personnel from other vessels (e.g., resupply vessels) that would permit transmission.~~

~~c.  Exceptions to ROM:~~

- ~~Pre- and post-travel ROM is not required for individuals who have fully recovered from a laboratory-confirmed diagnosis of COVID-19 within the previous 90 days prior to travel, or for individuals who are fully vaccinated. Those fully recovered and fully vaccinated will self-monitor for COVID-19 symptoms after travel. However, Service members will isolate and get tested for COVID-19 if they develop signs or symptoms consistent with COVID-19.~~
- ~~ROM after arrival at the travel destination may or may not be required by the HN. if travelers have undergone COVID-19 screening testing prior to travel. If the relevant GCC requires a ROM upon arrival in the country as a means of respecting HN law, then a pre-deployment ROM is not required. Travelers should consult the Electronic Foreign Clearance Guide (https://www.fcg.pentagon.mil/fcg.cfm) and check with the MILDEPs and GCCs for current information.~~

## 7.2.  ROM REQUIREMENTS

~~ROM after arrival at the travel destination may or may not be required by the HN. Travelers should consult the Electronic Foreign Clearance Guide (https://www.fcg.pentagon.mil/fcg.cfm) and check with the MILDEPs and GCCs for current information.~~

## 7.4.  TESTING REQUIREMENTS. [RESCINDED]

~~a.  Pre-travel, post-travel, and ROM-associated COVID-19 screening testing is authorized for official domestic and international air travel at military medical treatment facilities on a non-reimbursable basis for Service members, DoD civilian employees, DoD contractor employees who are traveling for official DoD business, members of the Selected Reserve (including members of the National Guard), and family members approved to accompany DoD personnel. Testing is authorized for official travel on presentation of an electronic or paper copy of orders at military medical treatment facilities. The cost of testing recommended or required for official travel, and not available through a MTF or not covered (or reimbursable) through travel insurance, can be claimed in a travel voucher as a miscellaneous expense under agency travel policies.~~

~~b.  The testing guidance indicated below is recommended for personnel conducting official international air travel. It is recommended that personnel maintain proof of the negative test during travel. If the destination location requires a specific test or stricter test~~

~~timing, personnel must follow the destination location requirement instead, which may be reflected in the Electronic Foreign Clearance Guide.~~

- ~~Pre-travel viral[30] testing is recommended 1 to 3 days prior to departure of the commercial or military airlift for both travel from the United States to a foreign country or from a foreign country to the United States.~~
- ~~Post-international travel viral testing 3 to 5 days after the completion of travel is recommended for active duty Service members and DoD civilian employees.~~

~~c.   The testing guidance indicated below is recommended for active duty Service members conducting unofficial international air travel.  It is recommended that the individuals maintain proof of the negative test during travel.  Active duty Service members are authorized to receive pre-international and post-international travel testing.~~

- ~~Pre-travel viral testing is recommended 1 to 3 days before departure of the commercial or military airlift for travel from the United States to a foreign country.  Travelers will adhere to the destination testing requirements.~~
- ~~Pre-travel viral testing is recommended 1 day before departure of the commercial or military airlift for travel from a foreign country to the United States.~~
- ~~Post-international travel viral testing 3 to 5 days after the completion of travel is recommended for active duty Service members and DoD civilian employees.~~

## ~~7.5.  SPECIFIC GUIDANCE BY TYPE OF TRAVEL~~ [RESCINDED]

### ~~7.5.1  Travel from the United States to a Foreign Country~~
~~a)  Official Travel~~
  ~~i)   Service members~~
- ~~Will conduct a travel-associated ROM as follows unless a ROM exception described above applies:~~
  - ~~Upon arrival at the foreign country destination:~~
    - ~~As a means to respect HN regulations, Service members will observe applicable HN public health measures.~~
    - ~~ROM will be conducted as follows:~~
      - ~~At least 10 days without testing; or, after an appropriate risk assessment, the head of an OSD Component or Secretary of a MILDEP may, consistent with applicable HN public health measures, decrease to a ROM for 5 days with a negative viral test at the end of the 5-day ROM.~~
      - ~~MILDEPs maintain the authority to determine how necessary~~

---

~~[30] Testing in this guidance refers to tests that utilize molecular or, in certain limited circumstances, antigen testing methods, in accordance with the DoD Coronavirus Task Force Diagnostics and Testing Lead Memorandum, "Optimization of Coronavirus Disease 2019 (COVID-19) Testing Resources," March 8, 2021.~~

App. 086

Case: 22-10077    Document: 284    Page: 117    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 89 of 104    PageID 7460
Current as of January 30, 2023

~~ROM and movement, including the mode of transportation to final destinations, are executed.~~

- ~~If it is necessary as a means to respect HN regulations to undertake a pre-arrival ROM to observe applicable HN public health measures, the Service member will follow the 10-day or 5-day ROM procedures described above at an appropriate domicile prior to departure and complete pre-travel testing within one to three days prior to departure.~~
- ~~Only one ROM is required, either before travel or after arrival.~~
- ~~Must follow all requirements imposed by the GCC with responsibility over the destination geographic area, including all applicable HN procedures as a means to respect HN law, and all requirements of the Electronic Foreign Clearance Guide.~~

~~ii) DoD family members~~
- ~~Service members must attest that, to the best of their knowledge, their family members have followed the same requirements as those set forth for Service members in this guidance. Failure to do so may result in delay or cancellation of previously authorized travel. This attestation requirement will be incorporated into travel orders issued to Service members.~~

~~iii) DoD civilian employees~~
- ~~Will conduct a travel-associated ROM and other FHP practices as described above for Service members.~~

~~iv) DoD contractor personnel~~
- ~~DoD contracting officers will ensure that all contracts that include performance outside the United States require DoD contractor personnel to comply with the country entry requirements of the respective GCC (which may include screening, ROM, and testing), as reflected in the Electronic Foreign Clearance Guide, and all applicable HN procedures necessary to respect HN law. The GCC may waive such additional requirements, consistent with existing authorities.~~

~~b) Unofficial Travel~~
~~i) Service members will comply with their respective MILDEP guidance, DoD Component-specific guidance, and/or GCC and applicable HN procedures, as necessary to respect HN law, for the areas to which, and through which, they are traveling.~~
~~ii) DoD family members, DoD civilian employees, and DoD contractor personnel must comply with the guidance and/or applicable HN procedures, as necessary to respect HN law, for the areas to which, and through which, they are traveling, and are strongly recommended to follow the FHP guidance for Service members provided within this document and any other DoD Component-specific guidance.~~

~~7.5.2. Travel From or Through a Foreign Country to the United States~~
~~a) Official Travel~~
~~i) Service members~~
- ~~It is recommended that Service members conduct testing as described above, prior to departure. Service members will conduct a risk assessment as~~

Case: 22-10077    Document: 284    Page: 118    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 90 of 104   PageID 7461
Current as of January 30, 2023

described in "Determining Whether to Travel," above.  If COVID-19 infection is indicated by the risk assessment or testing, delay travel and consult a health care provider for clearance to travel.
- Service members will conduct a risk assessment as described in "Determining Whether to Travel" above upon arrival in the United States. Those who become ill, or have had close contact with a person known to have contracted COVID-19, during travel will follow the requirements in section 5 related to workplace access.
- ROM will be conducted as follows:  Unless a ROM exception described above applies, if traveling from or having traveled through a foreign country, the Service member will, upon arrival at his or her destination domicile:
  o ROM for at least 10 days without testing.
    ▪ After an appropriate risk assessment, the head of the OSD Component or Secretary of the MILDEP concerned may decrease to a ROM for 5 days with a negative viral test at the end of the 5-day ROM.
    ▪ Personnel whose presence is required in the workplace by their supervisor may return to work during the ROM period in accordance with section 5.
  o For any travel-associated ROM, follow the procedures specified above in the "Steps to Be Taken During ROM" section.  The ROM requirements may be reduced or waived by the appropriate head of an OSD Component or Secretary of a MILDEP on a case-by-case basis with appropriate risk assessment and mitigation measures.
  o Comply with all installation, State, and local government guidance.
  o Are recommended to get tested for COVID-19 between 3 and 5 days after arrival, regardless of their vaccination status.
  ii) It is recommended that DoD family members conduct pre-travel screening and testing as described above and are strongly recommended to follow the FHP guidance that is provided within this document for Service members during all travel.
  iii) It is recommended that DoD civilian employees and DoD contractor personnel conduct pre-travel screening and testing as described above and are strongly recommended to follow the FHP guidance for Service members that is provided in this document during all travel.  Any applicable requirements in section 5 must be met prior to returning to a DoD workplace.
b) Unofficial Travel
  i) Service members
    - It is recommended that Service members conduct pre-travel testing as described above.  Service members will follow risk assessment and ROM procedures described above in the Official Travel section.
    - Service members will comply with DoD Component-specific guidance and/or procedures of the GCC, including those necessary to respect HN procedures applicable to the countries to which, and through which, they are traveling.
    - Service members will conduct a risk assessment as described in "Determining Whether to Travel" above upon arrival in the United States.

Case: 22-10077    Document: 284    Page: 119    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 91 of 104   PageID 7462
Current as of January 30, 2023

~~Those who become ill, or have had close contact with a person known to have contracted COVID-19 during travel, must self-isolate (if ill) or quarantine (if exposed but not ill) and notify their chain of command or supervisor. Exception:  Individuals fully recovered from a laboratory-confirmed diagnosis of COVID-19 infection within the previous 3 months or those who are fully vaccinated are not required to quarantine as long as they remain symptom-free.~~

~~ii) DoD family members may follow the FHP guidance, including pre-travel screening, for Service members provided within this document.~~

~~iii) DoD civilian employees and DoD contractor personnel may follow the FHP guidance, including pre-travel screening for Service members provided within this document.  Any applicable requirements in section 5 must be met prior to returning to a DoD workplace.~~

~~**7.5.3.  Travel Within the United States**~~

~~**a)  Official Travel**~~

~~i)  Service members~~
- ~~Will comply with military installation, State, and local government travel restrictions.~~
- ~~Will comply with their DoD Component-specific guidance and/or procedures for screening, ROM, and testing, and should review and consider CDC guidance.~~

~~ii)  DoD family members are strongly recommended to follow the FHP guidance for Service members provided within this document during all travel.~~

~~iii) DoD civilian employees and DoD contractor personnel will conduct pre-travel screening as described above and are strongly recommended to follow the guidance for Service members provided within this document for Service members during all travel.  Any applicable requirements in section 5 must be met prior to returning to a DoD workplace.~~

~~**b)  Unofficial Travel**~~

~~i)  Service members~~
- ~~Will comply with military installation, State, and local government travel restrictions.~~
- ~~Will comply with their DoD Component-specific guidance and/or procedures for screening, ROM, and testing.~~

~~ii)  DoD family members are strongly recommended to follow the FHP guidance for Service members provided within this document during all travel.~~

~~iii) DoD civilian employees and DoD contractor personnel are strongly recommended to follow the guidance for Service members provided above.  Any applicable requirements in section 5 must be met prior to returning to a DoD workplace.~~

Case: 22-10077     Document: 284     Page: 120     Date Filed: 02/13/2023
Case 4:21-cv-01236-O     Document 223     Filed 02/06/23     Page 92 of 104     PageID 7463
Current as of January 30, 2023

## 7.3.  OFFICIAL TRAVEL FROM THE UNITED STATES TO A FOREIGN COUNTRY.

**1.  Service members and DoD civilian employees:**

Service members and DoD civilian employees must follow all requirements imposed by the GCC with responsibility over the destination geographic area, including all applicable HN procedures as a means to respect HN law, and all requirements of the Electronic Foreign Clearance Guide.

**2.  DoD family members**

Service members must attest that, to the best of their knowledge, their family members have followed the same requirements as those set forth for Service members in this guidance.  Failure to do so may result in delay or cancellation of previously authorized travel.  This attestation requirement will be incorporated into travel orders issued to Service members.

**3.  DoD contractor personnel:**

DoD contracting officers will ensure that all contracts that include performance outside the United States require DoD contractor personnel to comply with the country entry requirements of the respective GCC.

## 7.6~~4~~.  ADDITIONAL GUIDANCE FOR RESERVE AND NATIONAL GUARD PERSONNEL.

1. The Secretaries of the MILDEPs may issue any additional procedural guidance as necessary for Reserve Component personnel.

2. Reserve Component (including National Guard) personnel on official travel will complete any required health and ROM measures, including home-based quarantine or self-isolation if required, prior to the end of the official duty period.

3. Reserve Component (including National Guard) personnel on official travel who are not eligible for treatment at a military medical treatment facility, or who are not within the established access radius around a military medical treatment facility, may obtain COVID-19 official travel related testing at a civilian testing site and submit for reimbursement on their travel voucher.

4. For National Guard (NG) members supporting Federal Emergency Management Agency mission assignments or for other activities undertaken by NG personnel in a title 10 or title 32 duty status, the Chief of the National Guard Bureau, in coordination with the Secretaries of the Army and the Air Force, may issue redeployment guidance to the States, territories, and the District of Columbia to support mission requirements, while minimizing risks to NG members and local communities. Reserve Component personnel in support of another department or agency will

Case: 22-10077    Document: 284    Page: 121    Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 93 of 104   PageID 7464
Current as of January 30, 2023

complete any required health and ROM measures, including home-based quarantine or self-monitoring, prior to the end of the period of support to that other department or agency.

## ~~7.7.  ADDITIONAL GUIDANCE TO ASSIST COMMANDERS WITH TRAVEL DECISIONS.~~ [RESCINDED]

~~1.   The Department of Defense Joint Travel Regulations are available at: https://www.defensetravel.dod.mil/site/travelreg.cfm~~

~~2.   The DoD COVID-19 Response and Operations Platform, available at https://covid-status.data.mil/#/, provides travel scenarios and COVID-19 installation status and information to scope, plan, and approve travel by providing awareness of Health Protection Condition levels and COVID-19 hotspots.~~

~~3.   The Defense Health Agency's Armed Forces Health Surveillance Division provides a "Trajectory of Civilian COVID-19 Cases by County" for the U.S. at the AFHSB COVID-19 Dashboard, available at:~~
   - ~~https://go.intelink.gov/25BWvsS~~
   - ~~https://covid-status.data.mil/#/~~

~~COVID-19 Signs and Symptoms are available at: https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html~~

Case: 22-10077    Document: 284    Page: 122    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 94 of 104    PageID 7465
Current as of January 30, 2023

# SECTION 8:  PROTECTION OF PERSONALLY IDENTIFIABLE INFORMATION RELATED TO COVID-19

## 8.1.  GENERAL.

Under this Force Health Protection Guidance, the DoD may collect and maintain sensitive and private information about individuals, including medical information.  All personally identifiable information (PII) on individuals must be appropriately safeguarded.  In implementing this guidance, DoD Components may collect, use, maintain, and/or disseminate only the minimum amount of PII necessary to prevent the spread of COVID-19 and to protect personnel in DoD workplaces.  All personally identifiable information (PII) on individuals must be appropriately safeguarded under the Privacy Act of 1974 and DoDI 5400.11, "DoD Privacy and Civil Liberties Programs."

Due to the public health emergency, DoD Components are authorized to collect COVID-19 information from individuals whose place of duty is in the DoD workplace, to the extent such collection is necessary to implement the guidance above on workplace access and restriction.  DoD Components are authorized to use DD Form 3112, "Personnel Accountability and Assessment Notification for Coronavirus Disease 2019 (COVID-19) Exposure," to collect this information (e.g., affected individual information, type of confirmed or possible health or safety issue).  This form is located at:  https://www.esd.whs.mil/Portals/54/Documents/DD/forms/dd/dd3112.pdf.

Currently, the requirement for all Federal civilian employees to be vaccinated is not in effect.  A U.S. district court judge issued a nationwide preliminary injunction prohibiting implementation and enforcement of civilian employee vaccination requirements based on EO 14043.  Requirements subject to the injunction and not currently in effect are included in this guidance in a strikeout form for ease of reinstitution by USD(P&R) should the injunction be lifted.

## 8.2.  ADDITIONAL REQUIREMENTS FOR INFORMATION COLLECTED FROM DOD CIVILIAN EMPLOYEES.

Medical information obtained from DoD civilian employees, including vaccination status, will be accessible only to immediate supervisors, authorized human resources officials, and, for exemption requests, Decision Authorities and subject matter experts, who must access the information to implement the guidance in this memorandum.  The Rehabilitation Act's requirements on confidentiality of medical information apply whether or not a DoD civilian employee has a disability.

DoD personnel will use appropriate safeguards in handling and storing DoD civilian employee medical information, including a DoD civilian employee's proof of vaccination; any medical information on the DD Forms 3175, 3176, and 3177, and COVID-19 test results.  Appropriate safeguards may include encrypting emails and electronic files, and role-based access

App. 092

Case: 22-10077    Document: 284    Page: 123    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 95 of 104    PageID 7466
Current as of January 30, 2023

to electronic storage environments where this information is maintained.  In the event the
information is maintained in paper form, supervisors and other authorized DoD personnel must
ensure DoD civilian employee medical information remains confidential and is maintained
separately from other personnel files (e.g., stored in a separate, sealed envelope marked as
confidential DoD civilian employee medical information and maintained in locked file cabinets
or a secured room).  DoD Components are advised to refer to applicable internal guidance on the
handling, storage, and disposition of DoD civilian employee medical records, and to consult their
Component Privacy Officer as needed for further guidance.

~~Consistent with the Religious Freedom Restoration Act of 1993, 42 U.S.C. chapter 21B,
and Title VII of the Civil Rights Act, 42 U.S.C. chapter 21, subchapter VI, individuals seeking a
religious exemption from the vaccination requirement will submit to DoD supporting
information about their religious beliefs and practices in order for DoD to evaluate the exemption
request.  Information collected from individuals under this guidance supporting vaccine
exemption requests will be treated in accordance with applicable laws and policies on privacy,
including the Privacy Act of 1974 and DoDI 5400.11, "DoD Privacy and Civil Liberties
Programs," the Rehabilitation Act of 1973, as amended ("Rehabilitation Act"), and 5 CFR part
293, subpart E.  While such information may be sensitive and is to be safeguarded, it is not
covered by the Health Insurance Portability and Accountability Act (HIPAA) and the associated
HIPAA Rules.~~

~~Information gathered under this guidance collected from DoD civilian employees related
to exemption requests may be shared with immediate supervisors, authorized human resources
officials, Decision Authorities, and, in appropriate cases, subject matter experts, who must access
the information to implement the exemption process.  DoD Components are advised to consult
their Component Privacy Officer and servicing legal office if there is a need to share medical or
religious information collected under this guidance with DoD personnel beyond what this
guidance permits or with individuals outside of DoD.  Religious information will be accessible
only to those persons who have a role in carrying out the exemption procedures outlined in
section 2 of this memorandum.~~

Case: 22-10077     Document: 284     Page: 124     Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 223   Filed 02/06/23   Page 96 of 104   PageID 7467
Current as of January 30, 2023

# SECTION 9:  DEFINITIONS

~~Close contact.  Close contact is defined as someone who was within 6 feet of a person who has contracted COVID-19 for a cumulative total of 15 minutes or more over a 24-hour period starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated and irrespective of whether the person with COVID-19 or the contact of such a person was wearing a face covering or mask or respiratory personal protective equipment.~~

**Exposed.  Persons are considered to be exposed to COVID-19 if they were less than 6 feet away from an infected person (laboratory-confirmed or a clinical diagnosis) for a total of 15 minutes or more over a 24-hour period, unless both parties were wearing masks or respirators.  Individuals and supervisors may also assign the "exposed" classification below the thresholds above based on the following additional criteria:**

- **Cough or heavy breathing:  Was the infected person coughing, singing, shouting, or breathing heavily?  Activities like coughing, singing, shouting and breathing heavily due to exertion increase the risk of transmission.**
- **Symptoms:  Did the infected person have symptoms at the time?  Being around people who are symptomatic increases the risk of transmission.**
- **Ventilation and filtration: How well-ventilated was the space?  Risk of transmission is increased in poorly ventilated vehicles or rooms.**
- **Physical Distance:  Crowded settings can raise the likelihood of being close to someone with COVID-19.  Keep in mind that while maintaining a distance beyond 6 feet of an infected person will limit exposures from larger droplets, exposures can occur beyond 50 feet based on ventilation, masking, and other factors.**

**Family member.**  See the definition in 5 CFR § 630.201.

**Fully vaccinated.**

An individual is considered "fully vaccinated" when at least 2 weeks have elapsed after a second dose of a two-dose COVID-19 vaccine series (e.g., PfizerBioNTech/Comirnaty, ~~or~~ Moderna/Spikevax**, or Novavax** vaccines), or 2 weeks after receiving a single dose of a one-dose COVID-19 vaccine (e.g., Johnson & Johnson's Janssen vaccine) that are:  (1) fully licensed **(approved)** or authorized ~~or approved~~ by the FDA; **or** (2) listed for emergency use on the World Health Organization Emergency Use Listing (e.g., AstraZeneca/Oxford)~~; or (3) approved for use in a clinical vaccine trial for which vaccine efficacy has been independently confirmed (e.g., Novavax)~~.

An individual is "not fully vaccinated" if the individual either has not completed the ~~full~~ COVID-19 vaccination **primary** dose series; or declines to provide his or her COVID-19 vaccination status and declines to provide any requested proof of that status.

Those with previous COVID-19 infection(s) or previous serology are not considered fully vaccinated on that basis for the purpose of this guidance.

Case: 22-10077    Document: 284    Page: 125    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 223    Filed 02/06/23    Page 97 of 104    PageID 7468
Current as of January 30, 2023

**HPCON level.**  A framework to inform an installation's population of specific health protection actions recommended in response to an identified health threat, stratified by the scope and severity of the health threat.

**Mask.**  Acceptable **high-quality** masks are non-medical disposable masks; masks made with **layered** breathable fabric (such as cotton); masks made with tightly woven fabric that does not let light pass through when held up to a light source; masks with two or three layers; masks with inner filter pockets, or, on a voluntary basis in non-medical settings, an N95-type filtering face piece.  A good practice is to wear a disposable mask underneath a cloth mask for added protection as long as this does not interfere with breathing. Novelty or non-protective masks, masks with ventilation valves, bandanas, and face shields are not authorized as a substitute for masks.  ~~Masks must fit snugly around the nose and chin with no large gaps around the sides of the face.~~ **Masks must be well fitting and worn correctly and consistently (around the nose and chin).**

**Physically distance.  Maintain separation between individuals and prevent crowding in areas.**

**United States.**  The 50 States, U.S. commonwealths, U.S. territories, and the District of Columbia.

**Up-to-Date.**  A person has received all recommended COVID-19 vaccines, including any booster dose(s) recommended when eligible.  **Booster doses are recommended, but are not required.**

61

# Exhibit 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **NAVY SEALs 1-3,** *et al.,* | |
| Plaintiffs, | |
| v. | Case No. 4:21-cv-01236-O |
| **LLOYD J. AUSTIN, III** in his official capacity as United States Secretary of Defense, *et al.,* | |
| Defendants. | |

### <u>DECLARATION OF GARETH J. HEALY</u>

I, Gareth J. Healy, U.S. Navy, hereby state and declare as follows:

1.    I am a Captain in the United States Navy, currently serving as Deputy Director for Military Personnel Plans and Policy (OPNAV N13B), located in Arlington, Virginia.  As part of my duties as Deputy Director for Military Personnel Plans and Policy (OPNAV N13B),  I make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.

2.    I have been assigned to my current position since September 12, 2022.  Prior to my current assignment, I served as Commander, Task Force 75 with operational command of Navy Expeditionary Combat Forces under U.S. Seventh Fleet.  As part of my duties currently, I am responsible for the development of polices and plans for the accession, retention, and promotion of active and reserve military personnel while translating essential mission capabilities into manpower, training and education requirements to enable Navy's warfighting readiness.  The scope of these duties span officer and enlisted community management, the analysis of manpower requirements at all sea and shore based commands, and the resourcing requirements to shape the Navy's Total Force.  Additionally, I oversee the offices that both

1

process all Religious Accommodation requests (to include COVID-19 vaccination waiver requests) and separation/retirement actions directed to the Navy's COVID-19 Consolidated Disposition Authority (CCDA). As such, I am aware of the following information regarding the named Plaintiffs in the captioned litigation.

3.    Five named Plaintiffs (Navy SEALs 16, 21, 24, 25 and EOD 1) submitted religious accommodation appeals that were denied. Exhibit A attached hereto pertains. Their religious accommodation appeals were all denied after this Court entered its first injunction on January 3, 2022 which enjoined the Navy from taking any adverse action against the named Plaintiffs. Accordingly, none of these Plaintiffs were subject to adverse action. One of these Plaintiffs (Navy SEAL 21) has since left active duty in September 2022.

4.    Seven named Plaintiffs (Navy SEALs 6, 11, 17, 18, 4, 7 and Navy Diver 1) similarly had their appeals mooted upon leaving active duty. The following Plaintiffs retired from active duty: Navy SEAL 11 (retired September 2022), Navy SEAL 18 (retired November 2022) and Navy Diver 1 (retired May 2022). The following Plaintiffs have separated: Navy SEALs 6 (September 2022), Navy SEAL17 (March 2022), Navy SEAL 4 (October 2022) and Navy SEAL 7 (November 2022).

5.    Seventeen Plaintiffs submitted religious accommodation appeals that were not adjudicated prior to the Secretary of Defense's memo of 10 January 2023 which directed the service to cease any ongoing reviews. Consistent with that memo, those appeals will not be adjudicated. As those members were never given a final order to vaccinate, they were not subject to adverse action. Fourteen of those Plaintiffs remain on active duty (Navy SEAL 8, SWCC 5, Navy SEAL 20, Navy SEAL 9, Navy SEAL 2, Navy Diver 2, Navy SEAL 5, Navy

2

SEAL 15, SWCC 4, Navy SEAL 3, Navy SEAL 14, Navy SEAL 26, Navy SEAL 13 and SWCC

1) and three remain reservists (Navy SEAL 12, Navy SEAL 1 and SWCC3).

6.     Six Plaintiffs submitted initial requests for religious accommodations that were

denied but did not submit appeals.  These Plaintiffs were nonetheless included in the Court's

January 3, 2022 order which enjoined the Navy from taking any adverse action against them on

the basis of their religious accommodation request. ·Accordingly, none of these plaintiffs were

subject to adverse action. Two of these plaintiffs has left active duty.  Navy Diver 3 retired from

active duty in January 2022.  Navy SEAL 19 separated in January 2023.  Three of these

Plaintiffs remain on active duty (Navy SEAL 23, SWCC 2 and Navy SEAL 22).  Navy SEAL 10

remains in his reserve status.

7.     As a result of the class action certification and corresponding injunction issued by

the U.S. District Court for the Northern District of Texas, the Navy released NAVADMIN

083/22, on March 30, 2022, and NAVADMIN 102/22, on April 2022, which suspended

separation processing and adverse administrative consequences for Navy service members who

submitted requests for religious accommodation from the COVID-19 vaccine requirement.

8.     Following Secretary Austin's memo, the Navy released NAVADMIN 005/23,

which canceled NAVADMIN 190/21, the Navy Mandatory COVID-19 Vaccination

Requirement for Members of the Armed Forces.  All commands were direct to discontinue any

administrative separation solely on the basis of COVID-19 vaccine refusal as well as to suspend

any new adverse administrative actions associated with refusing the COVID-19 vaccine.

9.     Secretary Austin also ordered the Military Departments to update the records of

service members who refused to receive the COVID-19 vaccination if they sought an

accommodation on religious, administrative, or medical grounds to remove any adverse actions

solely associated with denials of such requests. Accordingly, any members of the class who had

any such adverse action entered into their record before the issuance of the Court's class-wide

injunction will have that action removed from their record.

      10.    Because none of the named Plaintiffs in this litigation were in the process of being

administratively separated nor were they the subject of adverse administrative action there is no

adverse action that needs to be removed from their official record.


      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct. Executed this 6th day of February, 2023.

                       G. J. HEALY
                    Captain, U.S. Navy

Healy Declaration - Exhibit A

| Pseudonym | Status | Religious Accomodation Request |
|-----------|--------|-------------------------------|
| Navy SEAL 21 | Separated AD in Sep 22 | appeal submitted but denied |
| Navy SEAL 24 | Active duty | appeal submitted but denied |
| EOD 1 | Active duty | appeal submitted but denied |
| Navy SEAL 16 | Active duty | appeal submitted but denied |
| Navy SEAL 25 | Active duty | appeal submitted but denied |
| Navy SEAL 6 | Separated AD in Sep 22 | appeal submitted but mooted |
| Navy SEAL 11 | Retired AD in Sep 22 | appeal submitted but mooted |
| Navy Diver 1 | Retired AD in May 22 | appeal submitted but mooted |
| Navy SEAL 17 | Separated AD in Mar 22 | appeal submitted but mooted |
| Navy SEAL 18 | Retired AD in Nov 22 | appeal submitted but mooted |
| Navy SEAL 7 | Separated AD in Nov 22 | appeal submitted but  mooted |
| Navy SEAL 4 | Separated AD in Oct 22 | appeal submitted but mooted |
| Navy SEAL 8 | Active duty | appeal submitted but unadjudicated |
| SWCC 5 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 20 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 9 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 2 | Active duty | appeal submitted but unadjudicated |
| Navy Diver 2 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 5 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 15 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 12 | Reservist | appeal submitted but unadjudicated |
| SWCC 4 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 3 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 14 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 26 | Active duty | appeal submitted but unadjudicated |
| SWCC 3 | Reservist | appeal submitted but unadjudicated |
| Navy SEAL 13 | Active duty | appeal submitted but unadjudicated |
| Navy SEAL 1 | Reservist | appeal submitted but unadjudicated |
| SWCC 1 | Active duty | appeal submitted but unadjudicated |
| Navy Diver 3 | Retired AD in Jan 22 | original request denied |
| Navy SEAL 23 | Active duty | original request denied |
| Navy SEAL 10 | Reservist | original request denied |
| Navy SEAL 19 | Separated AD Jan 23 | original request denied |
| SWCC 2 | Active duty | original request denied |
| Navy SEAL 22 | Active duty | original request denied |

# Plaintiffs' Response in Opposition to Defendants' Suggestion of Mootness and Appendix in Support

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

**U.S. NAVY SEALs 1-3**; on behalf of
themselves and all others similarly situated;
**U.S. NAVY EXPLOSIVE ORDNANCE
DISPOSAL TECHNICIAN 1**, on behalf of
himself and all others similarly situated; **U.S.
NAVY SEALS 4-26**; **U.S. NAVY SPECIAL
WARFARE COMBATANT CRAFT
CREWMEN 1-5**; and **U.S. NAVY DIVERS
1-3**,

                  Plaintiffs,

    v.

**LLOYD J. AUSTIN, III**, in his official
capacity as United States Secretary of
Defense; **UNITED STATES
DEPARTMENT OF DEFENSE**; **CARLOS
DEL TORO**, in his official capacity as
United States Secretary of the Navy,

                  Defendants.

Case No. 4:21-cv-01236-O

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' ASSERTION OF MOOTNESS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.       This Case is Not Moot Because the Class Members Can Still Obtain Relief and Have
         A Concrete Interest in the Outcome. .......................................................................... 2

         A.       Navy policies harming the class members, including some the Court preliminarily
                  enjoined Defendants from enforcing, are still in effect. ............................... 3

         B.       The Secretary's January 10, 2023 Memorandum creates a de facto COVID-19
                  vaccine mandate that is presently causing injury. ....................................... 6

II.      "Assignment, Deployment, and Other Operational Decisions" Considering Vaccination
         Status Without a Legally Sufficient Accommodation Process Are Challenged by
         Plaintiffs and Remains a Live Controversy. .............................................................. 12

III.     Even if Defendants Had Ceased All Challenged Conduct, the Voluntary Cessation
         Doctrine Applies. ...................................................................................................... 14

IV.      Defendants' Conduct Is Capable of Repetition Yet Evades Review. .......................... 17

CONCLUSION ....................................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) .............................................................. 2

*Alvarez v. Smith*, 558 U.S. 87 (2009) ........................................................................... 2

*Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301 (2022) ................................................ 9

*Bostock v. Clayton Cnty.,* 140 S. Ct. 1731 (2020) ........................................................ 13

*Cath. Leadership Coal. of Texas v. Reisman* 764 F.3d 409, (5th Cir. 2014) ............................... 17

*Chafin v. Chafin*, 568 U.S. 165 (2013) ......................................................................... 2

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) ........................................... 14

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) .................................................... 16

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................... 7

*Empower Texans, Inc. v. Geren*, 977 F.3d 367 (5th Cir. 2020) ........................................... 18

*F.A.A. v. Cooper,* 566 U.S. 284 (2012) ........................................................................ 14

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007) ............................. 17

*First Nat'l Bank of Bos. V. Bellotti*, 435 U.S. 765 (1978) ............................................... 18

*Freedom From Religion Found., Inc. v. Abbott*, No. 21-50469, 2023 WL 565082 (5th Cir. Jan.
 27, 2023) ........................................................................................................ 6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167 (2000) ......... 2, 15

*Honig v. Doe*, 484 U.S. 305 (1988) ............................................................................ 18

*J. T. v. District of Columbia*, 983 F.3d 516 (D.C. Cir. 2020) ............................................. 15

*Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth.*, 162 F.2d 627 (11th Cir. 1998) ......... 16

*Kingdomware Tech., Inc. v. United States*, 136 S. Ct. 1969 (2016) ........................................ 18

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993) ........................................................................................................... 12

*Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012) ............... 7, 12

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ....................... 16

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ................................. 18, 19

*Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498 (1911) ......................................................... 18

*Speech First, Inc. v. Fenves*, 979 F.3d 319, 327 (5th Cir. 2020), *as revised* (Oct. 30, 2020)... 6, 17

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ................................................................................ 15

*Tanzin v. Tanvir,* 141 S. Ct. 486 (2020) ...................................................................................... 13

*Tucker v. Gaddis*, 40 F.4th 289 (5th Cir. 2022) .......................................................................... 16

*Webman v. Fed. Bureau of Prisons,* 441 F.3d 1022 (D.C. Cir. 2006) .......................................... 14

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................................ 2

**Statutes**

42 U.S.C. § 2000bb-1(c) ........................................................................................................ 13, 14

**Other Authorities**

Heather Mongilio, *Navy Nearing 1,500 COVID-19 Separations*, USNI News (Jul. 27, 2022) ..... 5

Heather Mongilio, *Pentagon Unclear How Military Would Manage End of Mandatory COVID-19 Vaccines*, USNI NEWS (Dec. 7, 2022) ..................................................................... passim

https://web.archive.org/web/20220526022338/https://www.navy.mil/US-Navy-COVID-19-Updates/ ............................................................................................................................. 5

Meghann Myers, *Four weeks later, military still waiting on post-vaccine guidance*, MILITARY TIMES (Feb. 9, 2023) ........................................................................................................ 3, 13

NAVADMIN 093/22, U.S NAVY COVID-19 STANDARDIZED OPERATIONAL

    GUIDANCE 6.0 (Apr. 11, 2022).................................................................. 7

Oral Argument, *Doster v. Kendall*, No. 22-3497 (6th Cir. Jul. 25, 2022) .................................... 6

Oral Argument, *U.S. Navy SEALs 1-26 v. Biden,* No.  22-10077 (5th Cir. Feb. 6, 2023)........ 1, 11

*Suspend*, Merriam-webster.com Dictionary, https://www.merriam-

    webster.com/dictionary/suspend (last accessed Feb. 10, 2023).................................................. 5

*U.S. Navy COVID-19 Updates*, https://www.navy.mil/Resources/COVID-19-Updates/ .............. 5

## INTRODUCTION

Defendants have failed to satisfy their burden to demonstrate that this case is moot.[1] The plain language of Defendant Secretary of Defense's January 10, 2023 Memorandum repealing the August 24, 2021 COVID-19 vaccination mandate confirms that the rescission was in name only, and Plaintiffs and the Navy Class (collectively "Plaintiffs") continue to suffer the very harms they presented to this Court at the outset of this litigation, minus only the danger of being immediately separated from service for non-compliance with the mandate. Within the very document that cancels the DoD mandate, a de facto vaccination mandate remains, leaving the door wide open for commanders to continue considering vaccination status "in making deployment, assignment, and other operational decisions," something the Navy has previously argued includes virtually every aspect of the class members' careers, while completely eliminating the opportunity for class members to continue asserting their religious objections. Pls.' App. 0003. Moreover, contrary to Defendants' assertions, the Navy's other applicable discriminatory policies remain in effect. Thus, the coercion and discrimination that the class has suffered since 2021 has not ended, and the Navy's farcical process for religious accommodation requests has gone from a 50-step process ending in denial to a "zero-step process," as Judge Duncan recently pointed out at oral argument in the Fifth Circuit. Without the continued protection of the injunctive relief the pursuit of a permanent injunction and declaratory judgment, the class members' religious liberty rights continue to be violated, and many class members will eventually be separated from the Navy because they will be ineligible to meet milestones or obtain required training.

---

[1] The same day Defendants filed the instant motion, Defendants' appellate counsel declined to tell the Fifth Circuit that they contend the entire case was moot. *See* Oral Argument at 30:18-42, 37:13-47, *U.S. Navy SEAL 1-26 v. Biden,* No. 22-10077 (5th Cir. Feb. 6, 2023), *available at* https://www.ca5.uscourts.gov/OralArgRecordings/22/22-10077_2-6-2023.mp3.

## ARGUMENT

**I.    This Case is Not Moot Because the Class Members Can Still Obtain Relief and Have A Concrete Interest in the Outcome.**

Article III of the Constitution grants courts the authority to adjudicate "Cases" and "Controversies." An "actual controversy" must exist not only "at the time the complaint is filed," but through "all stages" of the litigation. *Alvarez v. Smith*, 558 U.S. 87, 92 (2009). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 190 (2000). Otherwise, "in a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). While the rescission of the explicit mandate is certainly a development welcomed by the class members and does address some of the harm they were suffering, that does not mean the case is moot. Rather, "a case becomes moot only when it is *impossible* for a court to grant *any effectual relief whatever* to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted) (emphasis added). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (citation omitted).

While Defendants rest their assertion of mootness on the basis that the "NDAA is intervening legislation that terminates the [Secretary's] vaccination requirement," Dkt. 222 at 8,

thereby rendering "mootness . . . 'the default,'" *id.* at 7, Defendants' discriminatory actions continue. The Executive Branch believes that Congress's direction to rescind the mandate was a "mistake,"[2] and nothing in the NDAA prevents Defendants from instituting a new mandate. Defendants apparently have no desire to ensure Plaintiffs' religious liberties are imminently protected, as four weeks later, "the Pentagon's personnel and readiness office has yet to complete the requested paperwork to make the change a reality for thousands of unvaccinated troops in limbo."[3] And if the class members had any hope of returning to the operational fold with the rescission of the formal mandate, such hopes were dashed when Defendant Secretary Del Toro stated in December that the repeal of the mandate will "unquestionably . . . create almost two classes of citizens in our services . . . Those that can't deploy and those that can deploy."[4]

A live controversy exists because Plaintiffs are suffering the same irreparable injury for the same reasons and based on policies that existed prior to the Secretary's repeal of the vaccine mandate. Plaintiffs maintain a significant interest in obtaining relief from this Court to ensure that Defendants permanently comply with their obligations under RFRA and the First Amendment. Thus, this case is not moot.

### A. Navy policies harming the class members, including some the Court preliminarily enjoined Defendants from enforcing, are still in effect.

Defendants' claim that the rescission of the mandate resolved all remaining controversy is false according to the face of the current DoD and Navy policies. The Memorandum issued on January 10, 2023, which notes that the DoD mandate "has helped ensure the vaccination of *many*

---

[2] Heather Mongilio, *Pentagon Unclear How Military Would Manage End of Mandatory COVID-19 Vaccines*, USNI NEWS (Dec. 7, 2022), https://news.usni.org/2022/12/07/pentagon-unclear-how-military-would-handle-end-of-mandatory-covid-19-vaccines.
[3] Meghann Myers, *Four weeks later, military still waiting on post-vaccine guidance*, MILITARY TIMES (Feb. 9, 2023), https://www.militarytimes.com/news/your-military/2023/02/09/four-weeks-later-military-still-waiting-on-post-vaccine-guidance/.
[4] Mongilio, *supra* n.2.

*Americans*," expressly states that "[o]ther standing Departmental policies, procedures, and processes regarding immunizations remain in effect. These include the ability of commanders to consider, as appropriate, the individual immunization status of personnel in making deployment, assignment, and other operational decisions, including when vaccination is required for travel to, or entry into, a foreign nation." Pls.' App. 0002 (emphasis added), 0003.  ALNAV 009/23, which was issued on January 23, expressly "cancel[s]" only one Navy policy: ALNAV 062/21, the Navy mandate. Defs. App. 004. It further states that "[w]e will continue to consider medical readiness, of which vaccination plays a key role, in all appropriate settings." *Id.* And NAVAMIN 005/23, the only other post-rescission policy from the Navy that Plaintiffs are aware of, "cancel[s]" only one policy: NAVADMIN 190/21, the Navy's mandate and reporting policy. Defs. App. 002. NAVADMIN 005/23 references NAVADMINs 225/21 and 256/21 (both of which were part of the Court's preliminary injunctions), as well as NAVADMINs 283/21 and 083/22, but *does not cancel them*. Defs. App. 002. Thus, it is apparent that the Navy intends for these policies to remain in effect. Indeed, NAVADMIN 005/23 provides only that "[a]ll commands will immediately suspend *any new adverse administrative actions* associated with refusing the COVID-19 vaccine as described in [NAVADMINs 190/21, 225/21, 256/21, 283/21, and 083/21]." Defs.' App. 001-02 (emphasis added).

"Adverse administrative actions" are quite narrow according to the Navy, and the Navy has already argued that much of the discriminatory treatment of the class members is not "adverse action" as this Court used the term in the preliminary injunction. *See* Dkt. 110; Dkt. 171. Nor does this new NAVADMIN speak to what will happen to "adverse administrative actions" already begun. NAVADMIN 005/23 also states that more guidance is yet to come, making Defendants' motion premature. *See* Defs. App. 002 ("Updated operational guidance will be promulgated in a

4

follow-on standard operational guidance serial. . . Additional detailed guidance regarding implementation of this policy will be promulgated via future NAVADMIN."). And finally, NAVADMIN 005/23 states that "[a]ll commands will immediately *suspend* any new adverse administrative actions associated with refusing the COVID-19 vaccine as described in [225/21 and 256/21]." *Id.* (emphasis added). Suspension of new adverse administrative actions is very different from permanent relief or cancelling the policies. To "suspend" is to "to cause to stop temporarily," "to set aside or make temporarily inoperative," or "to defer to a later time on specified conditions."[5]

Finally, the new DoD and Navy policies made the accommodation process *worse*: DoD and Navy state their intention to continue using vaccination status to make a wide range of decisions involving the class members, yet now will no longer consider requests for religious accommodation. *See* Pls.' App. 0002 ("The Secretaries of the Military Departments will further cease any ongoing reviews of current Service member religious . . . accommodation requests solely for exemption from the COVID-19 vaccine"); Defs, App. 004 ("the Services shall cease any ongoing review of current Service Members' religious . . . accommodation requests solely for exemption from the COVID-19 vaccine"). Defendants have made no representations as to how they intend to remedy their "theatr[ical]"religious accommodation process that resulted in the denial of every religious accommodation request related to the vaccine mandate,[6] and instead, cancelled it altogether. Dkt. 66. Indeed, Defendants have made clear that a de facto mandate is in

---

[5] *Suspend*, Merriam-webster.com Dictionary, https://www.merriam-webster.com/dictionary/suspend (last accessed Feb. 10, 2023).

[6] The Navy had not reported granting any religious accommodations before this Court entered preliminary injunctive relief. As of the last available data from November 2022, the Navy claimed to have granted a handful of religious accommodations, *see U.S. Navy COVID-19 Updates*, https://www.navy.mil/Resources/COVID-19-Updates/, but those accommodations were granted only to servicemembers about to retire, *see* Heather Mongilio, *Navy Nearing 1,500 COVID-19 Separations*, USNI News (Jul. 27, 2022), https://news.usni.org/2022/07/27/navy-nearing-1500-covid-19-vaccine-separations. That explanatory note was removed from the Navy's website several months ago. *See* https://web.archive.org/web/20220526022338/https://www.navy.mil/US-Navy-COVID-19-Updates/. Several Plaintiffs were also close to retirement yet did not receive such accommodation.

place that allows commanders to continue considering vaccination status "in making deployment, assignment, and other operational decisions" now without any process for religious accommodations. Pls.' App. 0003. Based on Defendants' previous conduct and their admissions in a similar case involving the Air Force in the Sixth Circuit, it is likely they will use these broad categories to discriminate against and coerce Plaintiffs and treat them as second-class citizens who are prevented from advancing in their military careers.[7]

Because these discriminatory policies remain in effect and continue to cause irreparable injury to Plaintiffs, *See* Pls.' App. 0087-88; 0091-92; 0095-96; 0103-109; 0119-20; 0125-27; 0132-33; 01366-67; 0140-41; 0144-54, the case is not moot. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 327-29 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (rejecting mootness where public university repealed some, but not all, objectionable policies in response to litigation). The Memorandum does not give Plaintiffs all the relief sought by this litigation. Dkt. 222 at 8-9; *cf. Freedom From Religion Found., Inc. v. Abbott*, No. 21-50469, 2023 WL 565082, at *4 (5th Cir. Jan. 27, 2023) (vacating only permanent injunctive relief as moot where speech forum was closed so no further First Amendment injury could occur).

**B. The Secretary's January 10, 2023 Memorandum creates a de facto COVID-19 vaccine mandate that is presently causing injury.**

The Memorandum expressly allows commanders to continue to consider vaccination status "in making deployment, assignment, and other operational decisions." Pls.' App. 0002. These broad, undefined categories of decisions cloaked as impenetrable military judgments have already resulted in ongoing irreparable injury to Plaintiffs' religious liberty rights. *See* Dkt. 140 at 25-26

---

[7] During oral argument in *Doster*, the Court asked, "Is it the Executive Branch's position that you don't have to worry about RFRA until somebody sues?" Defendant's counsel responded, "More or less, yes. RFRA itself is not a record review statute and does not require the government to take any particular process." Oral Argument at 18:38-18:55, *Doster v. Kendall*, No. 22-3497 (6th Cir. Jul. 25, 2022).

(citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) and *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012)). Continued application of a de facto mandate continues this injury and also irreparably damages Plaintiffs' careers. *See* Pls.' App. 0087-88; 0091-92; 0095-96; 0103-09; 0119-20; 0125-27; 0132-33; 0136-67; 0140-41; 0144-54. As explained below, the general categories of harm cited in Plaintiffs' First Amended Complaint, Dkt. 84, carry forward today and are hardly speculative. The de facto mandate is preventing Plaintiffs from ever returning to an operational status, which directly harms their military career and inflicts coercive pressure on them to take the vaccine. *See* Pls.' App. 0087-88; 0091-92; 0095-96; 0103-09; 0119-20; 0125-27; 0132-33; 0136-67; 0140-41; 0144-54.

The evidence shows that Plaintiffs were assigned demeaning tasks to coerce compliance with the vaccine requirement, including collecting trash and picking the lint out of Velcro, Dkt. 97 at 0007 and 0015; Dkt. 119 at 0053 and 0084. Class members are now exclusively assigned to non-operational roles pursuant to still-effective Navy policy NAVADMIN 093/22[8] and continue to experience the same coercion and damage to their religious liberty rights, not to mention their careers.

SEAL 22 is one of three unvaccinated Navy Special Warfare personnel whose non-operational role is to complete random tasks assigned within his command that are not commensurate with his highly specialized training. Pls.' App 0101-08. During the week of February 6, 2023, the Trident cell SEAL 22 works for traveled to a cold weather training trip to Montana that he was not allowed to attend due to his unvaccinated status. Pls. App. 0107. As a

---

[8] NAVADMIN 093/22, U.S NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE 6.0 (Apr. 11, 2022), https://www.mynavyhr.navy.mil/Portals/55/Messages/NAVADMIN/NAV2022/NAV22093.txt?ver=ruF6V-tpipc3-hA0KIHZ6g%3D%3D.

result, SEAL 22 remained at his command and was tasked with moving buildings and transporting laptops, which is well-below his rank as a E-7. Pls.' App. 0107-08.

SWCC 5 continues to be perpetually sidelined to a non-operational "shore duty" training command due to his unvaccinated status. Pls.' App. 0133. The individual who authorizes orders for SWCCs to attach and detach from units has stated that he is unable to provide SWCC 5 and other unvaccinated members with orders to operational units. *Id; see also* Pls.' App. 0130. As a result, SWCC 5's career is at a standstill, and he can only be transferred to another non-operational unit, which halts SWCC 5's ability to continue to promote through the Navy. *Id.* Because of the Navy's discriminatory action of placing SWCC 5 in a non-operational status and removing him from operational duties, SWCC 5 is now ranked significantly behind his peers within his group of enlistment. *Id.*

Class member and Elite Surface Warfare Officer Lieutenant Commander select Levi Beaird is currently stashed in a non-operational command with no end in sight due to his unvaccinated status. *See* Pls.' App. 0144-54. The government-issued housing that should have only been a temporary measure is woefully inadequate for the longterm needs of his family of six, yet he cannot go anywhere else. Pls.' App. 0153-54. Lieutenant Commander select Beaird is presently faced with the threat of having to repay the costs of his military education and bonus pay that he was awarded back in 2017. Pls.' App. 0151. At no point has anyone in his command ever reached out to him to explain the reason why his bonus incentive payments were suddenly halted in November 2022. Pls.' App. 0154. The irreparable injury being imposed on Lieutenant Commander select Beaird continues today despite the Secretary's repeal of the August 24, 2021 mandate. *Id.*

Sidelining Sailors like SEAL 22, SWCC 5, and Lieutenant Commander select Beaird is the Navy's *modus operandi* for unvaccinated service members. Until Plaintiffs have a meaningful

opportunity to participate in Naval activities in the same way as vaccinated sailors do, unless the Navy can meet their exacting burden under RFRA, the Navy's mandate is not truly repealed.[9] *See, e.g.*, Dkt. 97 at 10, 18. Navy-wide, Plaintiffs are presently serving in non-operational roles, Pls.' App. 0080, 0088, 0092, 0096, 0104, 0120, 0126, 0133, 0137, 0141, 0147, and continue to be subjected to vaccine coercion under the threat of being rejected from necessary promotions and assignments that are the gateway to maintaining their careers in the Navy. Pls.' App. 0087-88; 0091-92; 0095-96; 0103-09; 0119-20; 0125-27; 0132-33; 0136-67; 0140-41; 0144-54. Plaintiffs are also being denied special duty pay that is the expected and well-deserved benefit of being among the world's elite class of combat warriors. *See, e.g.,* Pls.' App. 0147.

Despite this Court's injunctive relief, the continuing discriminatory actions will achieve the intended result of these servicemembers being involuntarily separated from service. Simply because the Navy has been foreclosed from overtly punishing and formally issuing adverse administrative and discharge paperwork to the Plaintiffs for seeking religious accommodations from the vaccine mandate does not account for the "deployment, assignment, and other operational decisions" that have been and will continue to be intentionally made to irreversibly damage the Plaintiffs' careers as reprisal for their vaccination status.  Defendants have taken an extraordinarily broad view of what constitutes an "operational decision," and as stated above, there is sufficient evidence demonstrating that they will seek to impose that broad view to continue punishing servicemembers for their religious beliefs. *See Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1305–06 (2022) (Alito, J., dissenting) ("[T]he terms seemingly allow the Navy to do just about anything it wants short of punishing [Plaintiffs] and drumming them out of service."). Indeed,

---

[9] With the repeal of the mandate also came the repeal of the COVID-19 vaccine religious accommodation process. In fact, without Plaintiffs' knowledge or consent, their religious accommodation requests (RAR) have now simply disappeared from their personnel accounts, as if their RAR, or this lawsuit, never happened. *See e.g.,* Pls.' App. 0123.

Plaintiffs have already filed a motion before this Court that remains pending, disputing Defendants' interpretation of both what constitutes a deployment, assignment, or operational decision and what constitutes an adverse action. *See* Dkt. 95. Thus, absent continued litigation in this Court, Defendants will continue ignoring their obligations under RFRA and the First Amendment. Without the protection of this Court's injunctive relief while the impact of the mandate's recission is understood as the Navy continues to delay additional guidance, Plaintiffs will suffer irreparable injury merely because they sought protection for their religious beliefs. And absent permanent relief, the Navy will no doubt continue its present course of discriminatory treatment.

Defendants' arguments presume that this is merely a case about records and personnel files.[10] But Plaintiffs have demonstrated that it is much more. This case challenges the Navy's treatment of sailors with sincere religious beliefs against COVID-19 vaccination as second-class citizens simply because they requested accommodation of those beliefs. Those sailors want to continue to serve in the Navy and receive equal opportunity for promotions, assignments, benefits, and special pay as their vaccinated peers, unless the Navy can meet its exacting burden under RFRA to accommodate individual service members' religious beliefs. But so long as Defendants treat religious service members as a separate "class[]" of the military, the constitutional injury is not rectified, regardless of the existence of a formal mandate.[11] Defendants' assurances that

---

[10] Defendants claim that "ten of the 35 pseudonymous Plaintiffs had previously chosen to withdraw their religious accommodation requests and voluntarily separate or retire from the Navy." Dkt. 222 at 6. Defendants' attempt to characterize these SEALs as recanting their religious beliefs is factually incorrect. Some of the original Plaintiffs have indeed retired or separated due to completing their service requirement or for medical reasons, but to the best of Plaintiffs' counsel's knowledge, none withdrew their RAR before retiring. If withdrawing their RAR was part of the separation or retirement process, those Plaintiffs were unaware and their RA was never discussed during that process. *See e.g.* Pls.' App. 0083-84; 0099-100.
[11] Mongilio, *supra* n.2.

Plaintiffs "will not be discharged based on previously refusal to comply[12] with the vaccination requirement," that "no new adverse actions for declining COVID-19 vaccination will be issued to them," and that "any preexisting adverse action issued based solely on refusal to comply with the vaccination requirement—if there is any—will be removed from their records" are the bare minimum actions necessary to rectify Defendants' discriminatory actions. And while all of this is a step in the right direction, as demonstrated above, those assurances do not ultimately solve the "real and immediate threat" of constitutional injury the Plaintiffs are presently suffering.

For these reasons, Plaintiffs maintain a cognizable interest in pursuing their claims in this Court to protect themselves from suffering ongoing harm based on their religious objections to the COVID-19 vaccine. Neither the Memorandum nor NAVADMIN 005/23 take any action to correct the detrimental career impacts that have been and continue to be suffered by Plaintiffs because of the sham religious accommodation process implemented by Defendants that led to the denial of every religious accommodation request submitted by Plaintiffs. In fact, as Judge Duncan implied during the February 6, 2023, oral argument at the Fifth Circuit, in which the Court thoroughly addressed the issue of mootness, the sham process is even more damaging now that the Navy's fifty-step process is a zero-step process[13] because "the Secretaries of the Military Departments will further cease any ongoing reviews of current Service member religious . . . accommodation requests solely for exemption from the COVID-19 vaccine or appeals of denials of such requests." Pls.' App. 0002.

---

[12] Defendants' framing of the Plaintiffs and class members as service members that "refus[ed] to comply with the vaccine requirement" is further evidence of the animosity toward the Plaintiffs for their religious beliefs. Plaintiffs did not refuse to comply with the requirement, but rather, asked for an accommodation from that requirement to protect their constitutional right to freely exercise their religion in the Navy.
[13] Oral Argument at 29:33-29:37.

Thus, a live controversy still exists. Precedent from the Supreme Court and the Fifth Circuit hold that a case is not mooted if the challenged conduct continues after the repeal of an unconstitutional policy. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993) ("There is no mere risk that [Defendant] will repeat its allegedly wrongful conduct; it has already done so."); *Opulent Life*, 697 F.3d at 286 (holding a case was not moot where a defendant "doubled down" on its challenged action after repealing a policy). That is exactly what is happening here. Defendants have doubled down on their wrongful conduct by repealing the vaccine mandate in name only, denying Plaintiffs any avenue to seek a religious accommodation based on vaccination status,[14] and continuing to take adverse actions against Plaintiffs that will ultimately accomplish the same result as the vaccine mandate: forcing all servicemembers with religious objections to the COVID-19 vaccine out of the Navy. To rectify the previous harms and to prevent ongoing violations of RFRA and the First Amendment, Plaintiffs must obtain permanent relief from this Court.

## II.    "Assignment, Deployment, and Other Operational Decisions" Considering Vaccination Status Without a Legally Sufficient Accommodation Process Are Challenged by Plaintiffs and Remains a Live Controversy.

As demonstrated above and in the declarations submitted to this Court by Plaintiffs and class members, decisions regarding the operational status of service members are causing current harm in the form of lost promotions, threat of recoupment of expenses and bonuses, lack of training opportunity, and most importantly, constant coercion to become vaccinated to avoid a stalled career. *See* Pls.' App. 0087-88; 0091-92; 0095-96; 0103-09; 0119-20; 0125-27; 0132-33; 0136-37; 0140-41; 0144-54. Defendants argue that all travel-related concerns have been rectified with

---

[14] This lack of process makes any adverse actions taken against the Plaintiffs and lack of deployability even worse, as the Navy will not even *consider* requests for religious accommodation. Plaintiffs are thereby left with no avenue to protect their fundamental rights in the Navy and must rely on this Court.

the Department of Defense's new Force Health Protection Guidance. But this guidance is not Navy-specific, and in the very week that Defendants' motion was filed, SEAL 22 spent his time moving buildings because he was precluded from traveling with his Trident cell to Montana for cold weather training. Pls.' App. 0106-07. To date, the Navy has not issued any policies implementing NAVADMIN 005/23, and has similarly not canceled any policies pursuant to that guidance.[15] Any controversy regarding assignment, deployment, and operational decisions is far from speculative, as we presently know that Defendant Del Toro envisions "two classes" within the military and has merely only "suspend[ed] any new adverse actions associated with refusing the COVID-19 vaccine as described in [NAVADMIN 225/21 and 256/21]," NAVADMIN 005/23, to effectuate that intent.[16] And now, with no process to evaluate religious accommodation requests for the COVID-19 and the Navy's removal of religious accommodation requests ("RARs") from service members' Navy Standard Integrated Personnel System personnel accounts, there is no way for Plaintiffs to correct these harms outside the intervention of this Court. *See* Pls.' App. 0123.

Defendants also argue that any claim for monetary damages would be barred by sovereign immunity. But the Plaintiffs' complaint asserts claims under the Religious Freedom Restoration Act ("RFRA"), a "super statute." *Bostock v. Clayton Cnty.,* 140 S. Ct. 1731, 1754 (2020). RFRA provides that a "person whose religious exercise has been burdened in violation of this section may . . . *obtain appropriate relief against a government.*" 42 U.S.C. § 2000bb-1(c) (emphasis added). The Supreme Court has held that RFRA permits the recovery of monetary damages against government officers in their official capacities. *See Tanzin v. Tanvir,* 141 S. Ct. 486 (2020). The plain text of RFRA makes no distinction between government actors in their individual versus their official capacity in its waiver of sovereign immunity – simply "appropriate relief *against a*

---

[15] Myers, *supra* n.3.
[16] *See* Mongilio, *supra* n.2.

*government.*" 42 U.S.C. § 2000bb-1(c) (emphasis added). "Appropriate relief" does not change depending on the capacity of a government defendant. In *Tanzin*, the unanimous court stated that "[a] damages remedy is not just 'appropriate' relief as viewed through the lens of suits against Government employees. It is also the only form of relief that can remedy some RFRA violations . . . Given the textual cues just noted, it would be odd to construe RFRA in a manner that prevents courts from awarding such relief." *Tanzin,* 141S. Ct. at 492 (emphasis in original). While the government indeed enjoys sovereign immunity, it has waived that immunity from money damages under RFRA. *See F.A.A. v. Cooper,* 566 U.S. 284, 291 (2012) ("Congress need not state its intent in any particular way," and the Supreme Court has "never required that Congress use magic words" to waive sovereign immunity as to money damages.). Defendants' reliance on a concurring opinion in *Webman* does not account for the *Tanzin* decision. *Webman v. Fed. Bureau of Prisons,* 441 F.3d 1022, 1028 (D.C. Cir. 2006) (Tatel, J. concurring).

Plaintiffs' challenge to discriminatory "deployment, assignment, and other operational decisions" based on vaccination status thus remains a live controversy this Court can address and through which the Court can provide meaningful relief to the class, whether by monetary damages, declaratory judgment, or permanent injunctive relief.

## III.   Even if Defendants Had Ceased All Challenged Conduct, the Voluntary Cessation Doctrine Applies.

Courts have long recognized that defendants cannot automatically moot a case simply by ending their unlawful conduct once sued. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "[I]f it did, the courts would be compelled to leave [t]he defendant[s] . . . free to return to [their] old ways." *Id.* Instead, because Defendants claim their "voluntary compliance moots a case" they "bear[] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at

14

190. By Defendants' own admission, they voluntarily ceased at least *some* of the unlawful conduct at issue in this case. *See* Dkt. 222 at 15 (stating Defendants "have gone beyond what was required by Congress"). Defendants cannot argue both that they are going above and "beyond" to cure previous harms while at the same time maintain that every action they have taken was involuntarily forced by Congress. Congress only mandated that the current vaccine mandate be rescinded and did not prohibit Defendants from establishing a new mandate. The specifics for how that mandate was to be rescinded rested solely with Defendants, which distinguishes this case from the authorities cited by Defendants addressing situations where government actors lacked any unilateral authority over the challenged policy. *See, e.g.*, *J. T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020).

Although Defendants admit that they voluntarily ceased at least *some* of the challenged conduct, the only remaining issue is whether they have met the formidable burden of showing that the complained of conduct cannot recur. A simple review of Plaintiffs' evidence should allow this Court to quickly determine that Defendants do not satisfy this burden. Not only do Defendants retain the authority to reinstitute a new vaccine mandate at any time, but, as explained above, the very rescission document demonstrating de minimis compliance with the FY 2023 NDAA also institutes a de facto vaccine mandate–with no formal repeal, recission, or cancellation of two enjoined policies. This "authority to reinstate [the challenged policies] at any time" from officials "with a track record of 'moving the goalposts'" subjects Plaintiffs to a credible threat of widespread enforcement of Defendants' discriminatory vaccination requirements in the future. *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021). Defendants also continue to defend the merits of their mandate. *See* Mongilio, *supra* n.2; Pls.' App. 0003 ("The Department's COVID-19 vaccination efforts will leave a lasting legacy in the many lives we saved, the world-class Force

we have been able to field, and the high legal of readiness we have maintained . . .”); Defs.’ App. 004 (COVID-19 vaccines have proven to be safe, effective, and life-saving. I am confident that our high vaccination percentage across the Department of the Navy has both saved lives, and prevented hospitalizations across our entire force.”). And as discussed above, and as Secretary Del Toro admits, the rescission of the official mandate has only resulted in a de facto mandate which treats religious sailors as second-class citizens. Thus, the wrongful conduct alleged in this suit is reasonably likely to recur, and the voluntary cessation doctrine applies.

The fact that Defendants are government actors does not change the doctrine’s application. When the government changes a law or policy in response to litigation, as here, the voluntary cessation doctrine prevents dismissal of a plaintiff’s claim based on mootness. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (finding voluntary cessation doctrine applied because although public school district suspended the offending policy, it vigorously defended the constitutionality of its race-based program, and did not deny that if the litigation was resolved in its favor it would resume using race to assign students); *Tucker v. Gaddis*, 40 F.4th 289, 293 (5th Cir. 2022) (holding a prison’s changed policy did not moot a case where the prison gave no assurances that it would not repeat the challenged conduct); *DeJohn v. Temple Univ.*, 537 F.3d 301, 309-10 (3d Cir. 2008) (holding public university’s policy change during litigation and continued defense of that policy on appeal did not moot case); *cf. Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth.*, 162 F.2d 627, 629-30 (11th Cir. 1998) (holding First Amendment claims against airport solicitation policy were moot because the change in policy came one month after the start of litigation, was based on “substantial deliberation” by the government and had been consistently applied for three years during the litigation).

16

Indeed, even if this Court applies the more relaxed standard it sometimes uses when the defendant is a government actor, the result is the same. This Court considers three factors when applying its more relaxed standard: "(1) the absence of a controlling statement of future intention [not to repeat the challenged policy]; (2) the suspicious timing of the change; and (3) the [governmental entity's] continued defense of the challenged polic[y]" after the supposedly mooting event. *Speech First,* 979 F.3d at 328 (holding that the government had engaged in only partial voluntary cessation because parts of the overbroad speech policy remained). These factors are easily satisfied here. First, Defendants have made no representations that they will *not* continue to discriminate against Plaintiffs based on their religious beliefs. In fact, their actions and statements demonstrate an intent to do just the opposite—specifically treating unvaccinated religious sailors as second-class citizens. Second, Defendants continue to defend the repealed policy and have publicly stated that the vaccine mandate was a lawful order at the time it was issued. Even under this Court's more relaxed standard, Plaintiffs' claims are not moot.

## IV.    Defendants' Conduct Is Capable of Repetition Yet Evades Review.

Even if the case were moot, a well-established exception permitting the Court to adjudicate the case is if the Defendants' conduct is capable of repetition yet evading review. *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007). To fall within this exception, Plaintiffs must show "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Cath. Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014). Under the first element, a case evades review if its duration is too short to receive "complete judicial review," including review by the Supreme Court.

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 774 (1978); *see also Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020).

Here, the vaccine mandate was in effect for less than 18 months, a time period the Supreme Court has repeatedly held to be insufficient to obtain complete judicial review. *See, e.g., Kingdomware Tech., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (holding two years is too short); *First Nat. Bank*, 435 U.S. at 774 (holding 18 months is too short); *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911) (holding two years is too short). Further, the vaccine mandate at issue in this lawsuit is "inherently capable of evading review" because it involves a virus that the Navy's own commanders admit is constantly changing and a vaccine that has grown less and less effective against that virus over time. *See* Dkt. 210-1 at 10–13 (discussing the evolving nature of the COVID-19 virus and the effectiveness of vaccines). Thus, the first element is satisfied.

When analyzing the second element, courts are concerned with whether the conduct was "*capable* of repetition and not . . . whether the claimant had demonstrated that a reoccurrence of the dispute was more probable than not." *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988). Plaintiffs need not demonstrate with "mathematical precision" that they will be subject to the same illegal conduct; rather, they just need to show "a reasonable expectation" that the challenged action will reoccur. *Id.* In *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), the Supreme Court held that a church's First Amendment challenge to New York's COVID-19 lockdown orders was not moot because it was capable of repetition, yet evading review. The church "remain[ed] under a constant threat" that the government would reinstitute a lockdown in its area. *Id.* at 68. Because the challenged action was too short in duration to be fully litigated prior to cessation, and there was a reasonable expectation that the church would be subject to the same action in the future, the case was not moot. *Id*. Plaintiffs have a reasonable expectation that the challenged action—

application of a vaccine mandate that violated their religious beliefs—will recur. The FY23 NDAA forced Defendants to rescind the 2021 mandate to be vaccinated against COVID-19. Yet, as explained above, Defendants implemented a de facto mandate in the very document that repealed the original mandate in name only. Defendants remain free to make decisions about sailors that will unlawfully harm their careers based on their vaccination status. Defendants provide no assurances that they will not continue to discriminate against Plaintiffs in violation of RFRA and the First Amendment because they sought religious accommodations from the mandate and remain unvaccinated against COVID-19.

Defendants also retain the power to institute an identical and more widespread vaccine mandate at any time, and they have already stated they have a compelling interest in doing so. Nothing in the FY23 NDAA, the Memorandum, ALNAV 009/23, or NAVADMIN 005/23 prevents the Navy from restoring these very same policies in the same broad and sweeping manner that Defendants previously used to inflict the very same constitutional injury on the Plaintiffs this Court already saw fit to enjoin. Unlike cases concerning COVID-19 stay at home orders or mask mandates in schools, this is not a case speculating about future edicts. NAVADMIN 225/21 and NAVADMIN 256/21 still exist and the Plaintiffs continue to be sidelined by the Navy's de facto mandate. Yet, this Court's injunction and the ultimate outcome of this lawsuit can prevent further loss of Plaintiffs' constitutional rights. Thus, Plaintiffs' claims are capable of repetition but evade review, and this case is not moot.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion.

Respectfully submitted this 13th day of February, 2023.

/s/ Heather Gebelin Hacker

KELLY J. SHACKELFORD
  Texas Bar No. 18070950
JEFFREY C. MATEER
  Texas Bar No. 13185320
HIRAM S. SASSER, III
  Texas Bar No. 24039157
DAVID J. HACKER
  Texas Bar No. 24103323
MICHAEL D. BERRY
  Texas Bar No. 24085835
JUSTIN BUTTERFIELD
  TEXAS BAR NO. 24062642
DANIELLE A. RUNYAN*
  New Jersey Bar No. 027232004
Holly M. Randall
  Texas Bar No. 24128002
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444
jmateer@firstliberty.org
hsasser@firstliberty.org
dhacker@firstliberty.org
mberry@firstliberty.org
jbutterfield@firstliberty.org
drunyan@firstliberty.org
hrandall@firstliberty.org

JORDAN E. PRATT
  Florida Bar No. 100958*  **
FIRST LIBERTY INSTITUTE
227 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (972) 941-4444
jpratt@firstliberty.org

*Admitted pro hac vice.
** Not yet admitted to the D.C. Bar, but
admitted to practice law in Florida. Practicing
law in D.C. pursuant to D.C. Court of
Appeals Rule 49(c)(8) under the supervision
of an attorney admitted to the D.C. Bar.

HEATHER GEBELIN HACKER
  Texas Bar No. 24103325
ANDREW B. STEPHENS
  Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
Tel.: (512) 399-3022
heather@hackerstephens.com
andrew@hackerstephens.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, I electronically filed the foregoing document through the Court's ECF system and will serve a copy on each of the Defendants according to the Federal Rules of Civil Procedure.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER

21

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; **U.S. NAVY SEALS 4-26; U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>          Plaintiffs,<br><br>  v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>          Defendants. | Case No. 4:21-cv-01236-O |

## APPENDIX IN OPPOSITION TO DEFENDANTS' ASSERTION OF MOOTNESS

| Tab | Description | Bates Number(s) |
|---|---|---|
| 1 | Secretary of Defense, Memorandum, "Rescission of August 24, 2021 and November 30, 2021 Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces" (Jan. 10, 2023). | 0001-0003 |
| 2 | Heather Mongilio, *Pentagon Unclear How Military Would Manage End of Mandatory COVID-19 Vaccines*, USNI NEWS (Dec. 7, 2022). | 0004-0011 |
| 3 | Meghann Myers, *Four weeks later, military still waiting on post-vaccine guidance*, MILITARY TIMES (Feb. 9, 2023). | 0011-0017 |
| 4 | Paul D. Shinkman, *Pentagon: No Back Pay to Troops* | 0018-0025 |

| | *Discharged for Refusing COVID-19 Vaccine*, US NEWS (Jan. 17, 2023). | |
|---|---|---|
| 5 | U.S. Navy COVID-19 Updates (Nov. 30, 2022) | 0026-0044 |
| 6 | Heather Mongilio, *Navy Nearing 1/500 COVID-19 Separations*, USNI News (Jul. 27, 2022). | 0045-0050 |
| 7 | U.S. Navy COVID-19 Updates (May 25, 2022). | 0051-0069 |
| 8 | NAVADMIN 093/22, U.S NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE 6.0 (Apr. 11, 2022). | 0070-0077 |
| 9 | Declaration of U.S. Navy SEAL 3 | 0078-0081 |
| 10 | Declaration of U.S. Navy SEAL 7 | 0082-0085 |
| 11 | Declaration of U.S. Navy SEAL 9 | 0086-0089 |
| 12 | Declaration of U.S. Navy SEAL 13 | 0090-0093 |
| 13 | Declaration of U.S. Navy SEAL 15 | 0094-0097 |
| 14 | Declaration of U.S. Navy SEAL 19 | 0098-0101 |
| 15 | Declaration of U.S. Navy SEAL 22 | 0102-0117 |
| 16 | Declaration of U.S. Navy SEAL 26 | 0118-012 |
| 17 | Declaration of U.S. Navy SWCC 1 | 0124-0130 |
| 18 | Declaration of U.S. Navy SWCC 5 | 0131-0134 |

| 19 | Declaration of U.S. Navy EOD 1 | 0135-0138 |
|----|-------------------------------|-----------|
| 20 | Declaration of U.S. Navy SEAL 5 | 0139-0142 |
| 21 | Declaration of Levi Beaird, Lieutenant Commander (SEL), USN | 0143-0158 |

Respectfully submitted this 13 day of February 2023.

KELLY J. SHACKELFORD
  Texas Bar No. 18070950
JEFFREY C. MATEER
  Texas Bar No. 13185320
HIRAM S. SASSER, III
  Texas Bar No. 24039157
DAVID J. HACKER
  Texas Bar No. 24103323
MICHAEL D. BERRY
  Texas Bar No. 24085835
DANIELLE A. RUNYAN*
  New Jersey Bar No. 027232004
JUSTIN BUTTERFIELD
  Texas Bar No. 24062642
Holly M. Randall
  Texas Bar No. 24128002
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444
jmateer@firstliberty.org
hsasser@firstliberty.org
dhacker@firstliberty.org
mberry@firstliberty.org
rgardner@firstliberty.org
drunyan@firstliberty.org
hrandall@firstliberty.org


JORDAN E. PRATT
  Florida Bar No. 100958*  **
FIRST LIBERTY INSTITUTE
227 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (972) 941-4444
jpratt@firstliberty.org


*Admitted pro hac vice.
** Not yet admitted to the D.C. Bar, but
admitted to practice law in Florida. Practicing
law in D.C. pursuant to D.C. Court of
Appeals Rule 49(c)(8) under the supervision
of an attorney admitted to the D.C. Bar.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER
  Texas Bar No. 24103325
ANDREW B. STEPHENS
  Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
Tel.: (512) 399-3022
heather@hackerstephens.com
andrew@hackerstephens.com

*Attorneys for Plaintiffs*

# Tab 1



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JAN 1 0 2023

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                      COMMANDERS OF THE COMBATANT COMMANDS
                      DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Rescission of August 24, 2021 and November 30, 2021 Coronavirus Disease 2019
                 Vaccination Requirements for Members of the Armed Forces

       I am deeply proud of the Department's work to combat the coronavirus disease 2019
(COVID-19). Through your leadership, we have improved the health of our Service members
and the readiness of the Force, and we have provided life-saving assistance to the American
people and surged support to local health care systems and agencies at all levels of government.
The Department has helped ensure the vaccination of many Americans, while simultaneously
providing critical and timely acquisition support for life-saving therapeutics, tests, and treatments
for COVID-19. We have demonstrated the ability to support and defend the Nation under the
most trying of circumstances.

       The Department will continue to promote and encourage COVID-19 vaccination for all
Service members. The Department has made COVID-19 vaccination as easy and convenient as
possible, resulting in vaccines administered to over two million Service members and 96 percent
of the Force — Active and Reserve — being fully vaccinated. Vaccination enhances operational
readiness and protects the Force. All commanders have the responsibility and authority to
preserve the Department's compelling interests in mission accomplishment. This responsibility
and authority includes the ability to maintain military readiness, unit cohesion, good order and
discipline, and the health and safety of a resilient Joint Force.

       On December 23, 2022 the James M. Inhofe National Defense Authorization Act
(NDAA) for Fiscal Year (FY) 2023 was enacted. Section 525 of the NDAA for FY 2023
requires me to rescind the mandate that members of the Armed Forces be vaccinated against
COVID-19, issued in my August 24, 2021 memorandum, "Mandatory Coronavirus Disease 2019
Vaccination of Department of Defense Service Members." I hereby rescind that memorandum.
I also hereby rescind my November 30, 2021 memorandum, "Coronavirus Disease 2019
Vaccination for Members of the National Guard and the Ready Reserve."

       No individuals currently serving in the Armed Forces shall be separated solely on the
basis of their refusal to receive the COVID-19 vaccination if they sought an accommodation on
religious, administrative, or medical grounds. The Military Departments will update the records
of such individuals to remove any adverse actions solely associated with denials of such
requests, including letters of reprimand. The Secretaries of the Military Departments will further
cease any ongoing reviews of current Service member religious, administrative, or medical
accommodation requests solely for exemption from the COVID-19 vaccine or appeals of denials
of such requests.

Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of Federal law.  Service members have the right to observe the tenets of their religion or to observe no religion at all, as provided in applicable Federal law and Departmental policy.  Components shall continue to apply the uniform standards set forth in DoD Instruction 1300.17, "Religious Liberty in the Military Services."

Other standing Departmental policies, procedures, and processes regarding immunizations remain in effect.  These include the ability of commanders to consider, as appropriate, the individual immunization status of personnel in making deployment, assignment, and other operational decisions, including when vaccination is required for travel to, or entry into, a foreign nation.

For Service members administratively discharged on the sole basis that the Service member failed to obey a lawful order to receive a vaccine for COVID-19, the Department is precluded by law from awarding any characterization less than a general (under honorable conditions) discharge.  Former Service members may petition their Military Department's Discharge Review Boards and Boards for Correction of Military or Naval Records to individually request a correction to their personnel records, including records regarding the characterization of their discharge.

The Under Secretary of Defense for Personnel and Readiness shall issue additional guidance to ensure uniform implementation of this memorandum, as appropriate.

The Department's COVID-19 vaccination efforts will leave a lasting legacy in the many lives we saved, the world-class Force we have been able to field, and the high level of readiness we have maintained, amidst difficult public health conditions.  Our efforts were possible due, first and foremost, to the strength and dedication of our people.  I remain profoundly greatful to the men and women of the Department of Defense for their efforts to protect our Force, the Department of Defense community, and to aid the American people.

2

Tab 2



🛒 👤

NEWS MENU | SEARCH

Home » Budget Industry » Pentagon Unclear How Military Would Manage End of Mandatory COVID-19 Vaccines

# Pentagon Unclear How Military Would Manage End of Mandatory COVID-19 Vaccines

By: **Heather Mongilio**
December 7, 2022 7:17 PM



*Hospital Corpsman 2nd Class Gregzon Fontanilla, from Guam, prepares a COVID-19 vaccine aboard the America-class amphibious assault ship USS Tripoli (LHA-7) on May 10, 2022. US Navy Photo*

The Pentagon has no ready answers on how the Department of Defense would implement pending legislation that would allow service members to refuse the COVID-19 vaccine without facing separa-

Pls.' Opp. to Assertion of Mootness App. 0005

tion, officials said this week.

Congressional Republicans negotiated with the Democrat-led House and Senate to include language that would rollback the military's COVID-19 mandate as part of the Fiscal Year 2023 National Defense Authorization Act, according to a bill released late Tuesday.

"Does that August 2021 policy still make sense?" House Armed Services Committee chair Rep. Adam Smith, D-Wash., said on Wednesday. "Is it still the right policy? We don't believe that it is and I don't believe that it is"

The new law would nullify the mandate put in place by Secretary of Defense Lloyd Austin in 2021 that required service members to be vaccinated against COVID-19 using either Pfizer or Moderna's mRNA vaccine, or the one-shot Johnson and Johnson or Novavax vaccines.

Section 525 of the NDAA, released Tuesday night, requires the DoD to remove the COVID-19 mandate.

"We believe in the importance of the Secretary following public health guidance in order to protect the health and welfare of servicemembers and their families, to include mandating vaccines based on readiness requirements," according to the bill language.

Also included in the NDAA is language calling for the Department of Defense to consider reinstating service members who were separated due to refusal to get the COVID-19 vaccine. However, the bill does not demand that the service members who were separated be brought back into the service.

Under the mandate, those who did not comply would be separated. As of Nov. 28, the Navy separated 2,064 sailors, both reservists and active-duty, for failure to get vaccinated against COVID-19. As of Dec. 1, the Marine Corps separated 3,717 Marines.

The language in the NDAA leaves it up to the services to determine if they will reinstate anyone separated for refusal to take the vaccine. It is not clear how the Navy or Marine Corps will handle the service members who were separated. The Navy referred questions about reinstating sailors to the Office of the Secretary of Defense.

It is also unclear if sailors and Marines can be deployed. Currently, any sailor or Marine with a pending or confirmed exemption from the vaccine cannot be deployed due to not having the vaccine, even

Pls.' Opp. to Assertion of Mootness App. 0006

if they are still part of the Navy.

Sabrina Singh, deputy Pentagon press secretary, declined to answer a question about the deploy-ment status of troops if the vaccine mandate falls, saying she could not comment on pending litigation when asked by reporters on Wednesday. The Pentagon's legislative team is working with members of the House and Senate to express the secretary of defense's desire that the vaccine mandate stays.

"We have our legislative team that continues to work with members on the Hill, members of Congress in both chambers," Singh said. "That's part of their role and responsibilities and engaging with mem-bers on the Hill to make sure that they know where the Secretary's priorities are. […] I think the Secretary was pretty clear and forceful and his response over the weekend when he said that he sup-ports continuing the vaccine mandate in the NDAA."

Also up in the air is the question of the sailors who filed religious exemption requests for the vaccine. A decision by a federal judge in March put a preliminary injunction in place barring the Navy from sep-arating them. It is not clear how the NDAA will affect the lawsuit, which is expected to be heard in February in the Fifth Circuit Court of Appeals.

Secretary of the Navy Carlos Del Toro spoke against removing the mandate at a Navy League event Tuesday, raising concerns such as what happens to sailors who need to go to countries with strict vaccine requirements.

Congress needs to understand the secondhand consequences of their decisions, the Navy secretary said.

"But unquestionably it'll create almost two classes of citizens in our services," Del Toro said. "Those that can't deploy and those that can deploy. And that creates all sorts of problems."

White House Press Secretary Karine Jean-Pierre called removing the mandate a mistake during a press conference Wednesday. The president will weigh the entirety of the NDAA, once passed, before deciding if he'll sign it. She did not say if he will veto due to the removal of the COVID-19 vaccine mandate.

"What we saw, what we think happened here is Republicans in Congress have decided that they rather fight against the health and well-being of our troops than protecting them, and we believe that it is a mistake," Jean-Pierre said.

Pls.' Opp. to Assertion of Mootness App. 0007

During a Defense Writers' Group breakfast, Wednesday, Marine Corps commandant Gen. David Berger said that the mandate was political, but vaccination is not. There are multiple vaccines service members receive because it's required for military readiness. In general, there are nine vaccines required by the military, while others may be needed depending on the geographic area of service.

"Marines know that when their leadership says you need to do something because that's important to warfighting and your own health, the politics part of it isn't a part of that," Berger said.

One of the reasons Republican leaders had for striking the mandate say requiring the vaccine hurts military recruitment and retention. Singh told reporters that there were a host of other reasons, including competition with big companies and eligibility concerns, that were leading to recruitment issues besides the minimal effect of the mandate.

There are recruiting issues from the vaccine mandate, Berger said during a Reagan National Defense Forum panel Saturday. But that is mostly tied to the misinformation about the vaccine preventing people from getting it, he said.

Mat Staver, a lawyer representing a Navy Surface Warfare Commanding Officer among other service members, over the vaccine mandate said he knows service members who are telling their children not to serve because of the vaccine mandate.

Staver welcomed the language in the NDAA, calling the original vaccine mandate unconstitutional.

"It has caused an incredible abuse of the service members of all branches of the military. It has not been effective," Staver told USNI News. "It has undermined morale, it has been used to punish honorable individuals who are irreplaceable."

Those who were separated due to vaccine refusal should be reinstated, Staver said. He plans to continue with the lawsuits against the military due to the punishment of his clients for not taking the vaccine.

Even if the services do reinstate service members separated over the vaccine, it is unclear what positions they will be able to hold or if they will be deployable.

The bill language also does not address if the military would need to address service members who chose to retire or leave the service instead of getting vaccinated.

**Related**







2,100 Sailors in Limbo as Pentagon Grapples With End of COVID-19 Vaccine Mandate
January 5, 2023
In "Military Personnel"

Pentagon Rescinds COVID-19 Vaccine Mandate, Questions Remain for Separated Sailors
January 10, 2023
In "Military Personnel"

Pentagon COVID-19 Personnel Policy Delays Leave Unanswered Questions
February 7, 2023
In "Budget Industry"

Article Keywords: Congress, Coronavirus, COVID 19, COVID-19 vaccine, FY 2023 NDAA, NDAA, vaccine, vaccine exemption, vaccine mandate

Categories: Budget Industry, Military Personnel, News & Analysis, U.S. Marine Corps, U.S. Navy

# About Heather Mongilio

**Heather Mongilio is a reporter with USNI News. She has a master's degree in science journalism and has covered local courts, crime, health, military affairs and the Naval Academy.**

Follow @hmongilio

View all posts by Heather Mongilio →

ALSO ON **USNI NEWS**

Report on U.S.-China Strategic ...

4 days ago · 12 comments

The following is the Feb. 8 2023, Congressional Research Service report, ...

USS Carter Hall Heading Back to ...

3 days ago · 15 comments

The amphibious warship that has served as the nerve center for the recovery of ...

CBO Report on Super Hornet Availability

3 days ago · 21 comments

The following is the Feb. 9, 2023, Congressional Budget Office report, Availability ...

U.S. Des Near th ...

9 days ag

USS Nitze on the ec Bosphoru

## USNI News Comment Policy

Please be thoughtful and respectful of others. Personal attacks and abusive language are not tolerated.

Got it

**44 Comments**

1   Lo

G

Join the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS    (?)

Name

Share                                                    **Best**    Newest

**Hoex**                                                          —

🕐 2 months ago

Nice to see some steps are being taken to end this insanity. It's amazing they're STILL fixated o making sure everyone gets one dose of the shots, but don't care if service members are up-to-d their boosters. There was never any logic to these mandates. Hope we can finally get a resoluti this.

7          0      •    Reply   •   Share ›

AJ       **AT2 Jeff** ↱ Hoex                                        —

🕐 2 months ago

MENU

Home

Documents

Top Stories

COVID-19

Fleet and Marine Tracker

Advertise

Pls.' Opp. to Assertion of Mootness App. 0010

About



© 2012-2023 U.S. NAVAL INSTITUTE

Powered by Unleashed Technologies

Pls.' Opp. to Assertion of Mootness App. 0011

Tab 3

2/12/23, 9:57 PM
Four weeks later, military still waiting on post-vaccine guidance

Case: 22-10077     Document: 284     Page: 176     Date Filed: 02/13/2023
Case 4:21-cv-01236-O     Document 225     Filed 02/13/23     Page 17 of 162     PageID 7518

Your Military

# Four weeks later, military still waiting on post-vaccine guidance

By Meghann Myers

📅 Thursday, Feb 9

    



A health worker administers a dose of COVID-19 vaccine. On Friday, Oct. 7, 2022 The Associated Press reported on stories circulating online incorrectly claiming COVID-19 mRNA vaccines alter recipients' DNA by changing its shape to a "triple helix." (Matt Rourke/AP)

A month after the Defense Department canceled the requirement that service members are vaccinated against COVID-19, the Pentagon's personnel and readiness office has yet to complete the requested paperwork to make the change a reality for thousands of unvaccinated troops in limbo.

The long delay has prompted lawmakers to reach out to Defense Secretary Lloyd Austin with their concerns.

Defense Under Secretary Gil Cisneros, DoD's personnel chief, told Military Times on Jan. 11 that his office was looking into specific policies on religious considerations and combatant command regulations with respect to traveling to countries with vaccine mandates.

"There are still things that we need to kind of tie up," he said.

Pentagon personnel chief on vaccine mandate repeal, recruiting and parental leave

Gil Cisneros, Under Secretary of Defense for Personnel and Readiness, discusses some of the top issues facing his office as 2023 gets un…

Pls.' Opp. to Assertion of Mootness App. 0013

Gil Cisneros, under secretary of defense for personnel and readiness, discusses some of the top issues facing his office in 2023.

But that process is still ongoing, a Pentagon spokeswoman told Military Times Thursday, though lawmakers first asked for an implementation plan on Dec. 23.

"The Department is working to leverage existing policies and procedures, where appropriate, to manage post-repeal issue sets and is examining whether additional guidance is necessary," Cmdr. Nicole Schwegman said.

In a Feb. 8 letter sent to the Pentagon, the chairman of the House Armed Services Committee and the chairman of its subcommittee on military personnel pressed Austin for answers on the new guidance, saying that a Jan. 26 letter from his office on their progress was only four sentences long and "failed to include any implementation plan."

"While we acknowledge and appreciate your rescission memorandum writ large, many questions remain and have gone unanswered regarding the implementation of the rescission," Rep. Mike Rogers, R-Ala., and Rep. Jim Banks, R-Ind., wrote in the letter.

The representatives included a list of 14 questions for DoD, including data on involuntary separations for vaccine refusal, service members required to pay back bonuses and confirmation that any academy graduates denied their commissions for refusing the vaccine were still able to earn their college degrees.

The letter also asks whether DoD intends to offer reinstatement for any troops discharged because of the mandate.

**RELATED**



Troops booted over COVID vaccines would get jobs back under GOP plan

The legislation would also upgrade the discharge status of some individuals.

By **Leo Shane III**

Though Republican lawmakers have pushed for that provision since last summer, it was not part of the 2023 National Defense Authorization Act, the law that compelled Austin to rescind the mandate.

Pls. Opp. to Assertion of Mootness App. 0014

Since the new Congress came into session, Republican members have reopened that discussion with bills introduced in both the Senate and House of Representatives.

"I'm glad that we were able to remove the COVID-19 vaccine mandate last Congress, but there is more work to do," said Sen. Ted Cruz, R-Texas, in a statement. "[This bill] would correct the wrongs done to unvaccinated service members who were discharged for exercising their conscience."

The bill would allow reinstatement of any separated troops, as well as restore rank and back pay for any troops who faced discipline before their discharges. It would also upgrade any general discharges.

Previously, separated troops' reasons for discharge were noted in their paperwork, allowing them to come back into service if they got vaccinated.

Now, under Austin's rescission memo, they can apply for a records correction with their service's board, and ostensibly re-enlist or re-commission if they choose.

What the Pentagon is not considering, however, is offering restitution for vaccine refusal.

"We are not pursuing, as a matter of policy, backpay for those who refused the vaccine," Air Force Brig. Gen. Pat Ryder, a Pentagon spokesman, told reporters in January. "At the time that those orders were refused, it was a lawful order."

Rogers and Banks requested a response from DoD by Feb. 22.

---

About **Meghann Myers**

Meghann Myers is the Pentagon bureau chief at Military Times. She covers operations, policy, personnel, leadership and other issues affecting service members.

---

Share:     

Tags:    Military Covid-19 Vaccine…    Covid Vaccine Mandate    Vaccine Mandate Repeal

**In Other News** ›

This week in Congress: A full slate of leaders for VA
Defense and veterans hearings on Capitol Hill for the week of Feb. 13.



'Unidentified object' downed over Lake Huron
U.S. officials say an "unidentified object" has been shot down Sunday for the third time in as many days, this time over Lake Huron.



Marines, bonded by kidney donation, now head to Super Bowl



### Downed objects believed to be balloons, Sen. Schumer says

Senate Majority Leader Chuck Schumer says the U.S. believes the unidentified objects American fighter jets shot down over Canada and Alaska were balloons.



### Former Marine earns one of Princeton's highest honors

Former Marine Shaun Cason is the first decorated military veteran to receive the award.



Load More

**Featured Video**

'Object' shot down U.S. fighter over Alaska

'Object' shot down U.S. fighter over Alaska


House Armed Services Vice Chair: F-35 engine fix imminent


DoD policy official talks Taiwan threat from China


VA takes to the streets to count homeless veterans

**Trending Now**

Former Marine earns one of Princeton's highest honors

Pls.' Opp. to Assertion of Mootness App. 0016

2/12/23, 9:57 PM                              Four weeks later, military still waiting on post-vaccine guidance

'Unidentified object' downed over Lake Huron

2 West Point football players to face off in the Super Bowl

Downed objects believed to be balloons, Sen. Schumer says

Fighter aircraft shoot down car-sized 'object' flying near Alaska

---

[Facebook] [Twitter] [RSS]                    Military Times © 2023

**Terms of Use**          **Get Us**          **Contact Us**                          **About Us**

Privacy Policy            Subscribe           Advertise                               About Us

Terms of Service         Newsletters         General Contacts, Subscription Services   Careers

                         RSS Feeds           Editorial Staff                          Jobs for Veterans



# Tab 4

asdf

Pentagon spokesman Air Force Brig. Gen. Patrick Ryder makes remarks during a briefing at the Pentagon in Washington on Tuesday, Jan. 17, 2023.   🖼 (ANDREW HARNIK/AP)

The Pentagon on Tuesday shut down speculation it's considering back pay for service members it discharged for refusing to get a COVID-19 vaccine, distancing itself from an already politically hazardous issue that has become even more prejudicial for the military with Republican control of Congress.

[ **READ:** Pentagon Formally Rescinds COVID-19 Vaccine Mandate for Troops ]

"Right now, we are not pursuing, as a matter of policy, back pay for those who refused the vaccine," Air Force Brig. Gen. Pat Ryder, a spokesman for the Defense Department, told reporters in response to one of several questions about the issue.

"At the time those orders were refused, it was a lawful order," Ryder added.

He spoke a week after the Pentagon formally rescinded the policy that required all troops to receive the shots with very few exemptions, in line with new legislation signed into law on Dec. 23 that forced the change. Politico had reported on Friday, citing an unnamed spokesperson, that the department was considering issuing back pay at that time. Ryder on Tuesday distanced the Pentagon from any such speculation.

Defense Secretary Lloyd Austin in announcing the congressionally mandated repeal was unapologetic for the policy, saying in a memo on Jan. 10 that he is "deeply proud for the Department's work to combat the coronavirus disease," which he said "will leave a lasting legacy in the many lives we saved." He cited the orders from Congress that he change the policy, said no further service members would be discharged for refusing the vaccine and announced that any troops under existing investigation or judicial process would be cleared.

It remains unclear the extent to which the department would allow service members who have been discharged to rejoin. However, Tuesday's statements following Austin's memo align with a general air in the department of disinterest in further accommodating those affected by the policy.

Roughly 99% of all active-duty troops received the vaccine. More than 8,400 service members were discharged from the military for refusing to take it. All of those kicked out of military service received at least a "general discharge under honorable conditions," with others receiving the higher "honorable discharge." The difference affects medical and other benefits service members receive after leaving the military.

Republicans in Congress raised almost immediate alarm after Austin first announced the policy in August 2021, followed by a series of deadlines that each department determined for itself, beginning with the Air Force and Space Force at the beginning of November that year.

Then-Sen. Jim Inhofe of Oklahoma, the top ranking Republican on the Senate Armed Services Committee at the time, expressed particular concern that November that he did not believe the military had a clear understanding of how the mandate would affect the military at a time several branches, particularly the Army, were already suffering from dramatic recruitment shortfalls.

Those concerns accelerated in the new Congress when the House succeeded in adding the policy overturn in the latest defense budget, which some Democrats eventually

Pls.' Opp. to Assertion of Mootness App. 0021

endorsed to ensure the bill's passage.

[ **READ:** New York Eyes Nixed COVID-19 Vaccine Rule for Health Workers ]

Republican members centered particularly on an assertion that the vaccine mandate – like other so-called "woke" policies – contributed to massive military recruitment deficits, particularly acute in the Army, which missed its 2022 goals by 25%. The Pentagon says no data exists supporting a link between the two issues.

"Look, I've been vaccinated and I've had COVID. ... I'll recommend from my point of view you get vaccinated," Sen. Lindsey Graham, South Carolina Republican, said at a press conference with other members of his party in December. "We're having a dilemma, and that's finding people to serve in the military. Our recruiting goals are way short. The conflict in the world is getting worse, not better. We need more people in the military, not less."

House Speaker Kevin McCarthy of California, then the top-ranked Republican in the House, tweeted at the time that the military vaccine mandate was "wrong."

"Our heroes have been fired. Our country is less safe. I told the President directly – it's time to end the mandate and rehire our service members," McCarthy said.

**Tags: Pentagon, Coronavirus, vaccines**

U.S.News

**Coronavirus Bulletin**

Stay informed daily on the latest news and advice on COVID-19 from the editors at U.S. News & World Report.

| Email Address | Sign Up |

**Sign in to manage your newsletters »**

Pls.' Opp. to Assertion of Mootness App. 0022

Sign up to receive the latest updates from U.S News & World Report and our trusted partners and sponsors. By clicking submit, you are agreeing to our Terms and Conditions & Privacy Policy.

---

<span style="border-top: 3px solid red;"></span>

## YOU MAY ALSO LIKE

---

**The 10 Worst Presidents**

---

**Cartoons on President Donald Trump**

---

**Photos: Obama Behind the Scenes**

---

**Photos: Who Supports Joe Biden?**

---

**Biden Trip to Mark Ukraine Invasion**

---

See More »

○

## RECOMMENDED ARTICLES

BEST STATES

HEALTHIEST COMMUNITIES

NEWS

THE REPORT

PHOTOS

ELECTIONS

EVENTS



About    Editorial Guidelines    Contact    Press    Advertise

Newsletters    Jobs    Site Map    Store

Copyright 2023 © U.S. News & World Report L.P.

Terms & Conditions/Privacy Policy/California Privacy Notice/California Do Not Sell My Personal
Information Request

Pls.' Opp. to Assertion of Mootness App. 0025

Tab 5

An official website of the United States government   Here's how us know ⌄

Resources ❯
COVID-19 Updates



You are at the official site for Navy information and updates on Coronavirus Disease 19 (COVID-19). Visit frequently to learn about the latest policies, leadership messages, and guidance on how to protect yourself, your family, and your Shipmates.

Department of the Navy Return to the Workplace COVID-19 Guidance and Resources 2020 (updated July 28, 2020) (PDF). Information to assist the military and civilian employees on workforce management, reporting, testing, personnel protection, telework policy, travel and more. Information is subject to change. Consult the following links for updated guidance: ALNAV Library, NAVADMIN Library, and MARADMIN Library.

**NEED TO A REPORT COVID-19 CASE?**

Go to MyNavy Portal at - https://www.mnp.navy.mil/group/navy-covid-19-reporting (CAC Enabled)

If you have any questions or experience any difficulties please contact the OPNAV COVID Cell via email OPNAV_COVID_CRISIS_RESPONSE_CELL@us.navy.mil or by phone at (703) 571-2822.

- For Navy-specific questions related to COVID-19 numbers and vaccination data, please email PTGN_CHINFONEWSDESK@NAVY.MIL.

# NAVY COVID-19 UPDATE

### Nov. 30, 2022

- The next report is expected to post Dec. 28, 2022.

- As of Nov. 30, 2022, 2,258 active component and 3,024 Ready Reserve service members remain unvaccinated.

- As a result of the class action certification and corresponding injunction issued by the U.S. District Court for the Northern District of Texas, NAVADMIN 083/22, released March 30, 2022, suspended separation processing and adverse administrative consequences for Navy service members who submitted requests for religious accommodation from the COVID-19 vaccine requirement.

- There have been 2,041 separations for refusing the COVID-19 vaccine. In accordance with NAVADMIN 083/22, Sailors who submitted religious accommodation requests may no longer be separated for vaccine refusal. Vaccine refusers who have not submitted religious accommodation requests remain subject to adverse administrative action, including separation.

  - There have been 1,639 Active Component Sailors and 402 Reserve Component Sailors separated, all with an honorable characterization of

              

Skip to main content (Press Enter).

Pls.' Opp. to Assertion of Mootness App. 0027

- There have been 32 Entry Level Separations (ELS). In accordance with the Naval Military Personnel Manual (MILPERSMAN) 1910-154 and NAVADMIN 225/21, this reflects service members who, since the time of the vaccine mandate, were separated during initial training periods

Search

vaccinated as defined in NAVADMIN 190/21 prior to returning to service.

- As of Nov. 30, 2022, there are 3,325 active duty and 862 Ready Reserve requests for a religious accommodation from immunization for the COVID-19 vaccine.

- As of Nov. 30, 2022, active duty service members currently have 15 permanent medical exemptions and 153 temporary medical exemptions, and Ready Reserve service members currently have one permanent medical exemption and 42 temporary medical exemptions.

- Starting with the Dec. 10 report, the vaccination and religious accommodation request data is provided by the data collected by the COVID-19 Consolidated Disposition Authority (CCDA), as directed in NAVADMIN 249/21: CCDA Data Reporting Requirements. On Feb. 22, 2022, NAVADMIN 042/22 was released updating these reporting requirements.

- On Dec. 15, 2021, NAVADMIN 283/21 was released outlining execution guidance regarding separation of Navy service members refusing the COVID-19 vaccine.

- On Dec. 22, 2021, NAVADMIN 289/21 was released outlining guidance encouraging COVID-19 vaccine boosters.

|  | Cases | Hospitalized | Recovered | Deaths | Cumulative Total COVID Cases* |
|---|---|---|---|---|---|
| MIL | 134 | 1 | 107,371 | 17 | 107,522 |
| CIV | 499 | 1 | 65,309 | 122 | 65,930 |
| DEP | 13 | 1 | 12,687 | 7 | 12,707 |
| CTR | 84 | 0 | 15,793 | 49 | 15,926 |
| TOTAL | 730 | 3 | 201.160 | 195 | 202,085 |

*Active Cases + Recovered + Deaths = Cumulative Total COVID Cases

UNVACCINATED

|  | Active Duty | Ready Reserve |
|---|---|---|
| Unvaccinated | 2,258 | 3,024 |
| Religious Accommodation Request | 3,325 | 862 |

APPROVED EXEMPTIONS

|  | Active Duty | Ready Reserve |
|---|---|---|
| Permanent Medical | 15 | 1 |
| Temporary Medical | 153 | 42 |
| Religious Accommodation | 50 | 1 |

- In accordance with Navy mandatory COVID-19 vaccination and reporting policy guidance, the deadline for active-duty Navy service members to be fully vaccinated was Nov. 28, 2021. Ready Reserve Navy service members will be fully vaccinated by Dec. 28, 2021. New accessions will be fully vaccinated as soon as practicable following service entry.

- In order to ensure a fully vaccinated force, U.S. Navy policy is to process for separation all Navy service members who refuse the lawful order to receive the COVID-19 vaccination and do not have an approved exemption. All waiver requests are reviewed on a case-by-case basis and each request will be given full consideration with respect to the facts and circumstances submitted in the request.

- The Navy issued a press release outlining guidance to commands for service members who refuse to comply with the service's order mandating

 Skip to main content (Press Enter)



- Fully Vaccinated: Per NAVADMIN 190/21, Navy service members are considered fully vaccinated two weeks after completing the second dose of a two-dose COVID-19 vaccine, or one dose of a one-dose COVID-19 vaccine. Booster doses are still ...
    - Unvaccinated: Per NAVADMIN 249/21, this includes Navy service members who:
        - refused the vaccine
        - started the vaccination series, but are not complete
        - are pending medical exemption
        - have an approved medical exemption
        - are pending religious accommodation exemption
        - have an approved religious exemption
        - have not had access to the vaccination due to operational schedule and/or remote location
    - Medical: Medical exemptions will be determined by health care providers based on the health of the requestor, and the nature of the immunization under consideration in line with BUMEDINST 6230.15B and MILPERSMAN 1730-020.
    - Religious Accommodation: A religious accommodation is a category of administrative exemptions that provides an accommodation to a service member for an otherwise applicable military policy, practice, or duty. In accordance with The Religious Freedom Restoration Act, if such a military policy, practice or duty substantially burdens a service member's exercise of religious, accommodation unless:
        - The military policy, practice, or duty is in furtherance of a compelling governmental interest (e.g. mission accomplishment, safety, force health).
        - It is the least restrictive means of furthering that compelling governmental interest.
        - For more information, including frequently asked questions and Navy instructions, visit https://www.mynavyhr.navy.mil/Support-Services/Religious-Accommodations/
- Hyperlinks to currently applicable Navy Administrative Messages:
    - NAVADMIN 234/22: U.S. NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE 7.0 (CORRECTED COPY)
    - NAVADMIN 187/22: UPDATED COVID-19 VACCINATION OPTION - NOVAVAX
    - NAVADMIN 139/22: CCDA GUIDANCE UPDATE
    - NAVADMIN 130/22: COVID-19 DESIGNATION OF MISSION CRITICAL TRAVEL FOR UNVACCINATED INDIVIDUALS AND UPDATED TRAVEL GUIDANCE
    - NAVADMIN 102/22: CCDA ADDITIONAL GUIDANCE REGARDING MEMBERS REQUESTING RELIGIOUS ACCOMMODATION FROM COVID-19 VACCINATION REQUIREMENTS
    - NAVADMIN 083/22: CCDA INTERIM GUIDANCE REGARDING MEMBERS REQUESTING RELIGIOUS ACCOMMODATION FROM COVID-19 VACCINATION REQUIREMENTS
    - NAVADMIN 042/22: UPDATED COVID CONSOLIDATED DISPOSITION AUTHORITY DATA REPORTING REQUIREMENTS AND LESSONS LEARNED
    - NAVADMIN 289/21: GUIDANCE ENCOURAGING COVID-19 VACCINE BOOSTER
    - NAVADMIN 283/21: CCDA EXECUTION GUIDANCE TO COMMANDERS
    - NAVADMIN 256/21: CCDA GUIDANCE TO COMMANDERS
    - NAVADMIN 249/21: CCDA DATA REPORTING REQUIREMENTS
    - NAVADMIN 225/21: COVID-19 CONSOLIDATED DISPOSITION AUTHORITY (CCDA)
    - ALNAV 062/21: 2021-2022 DEPARTMENT OF THE NAVY MANDATORY COVID-19 VACCINATION POLICY
    - NAVADMIN 190/21: 2021-2022 NAVY MANDATORY COVID-19 VACCINATION AND REPORTING POLICY

---

# Go to the Links below for more information

- Guidance & Infographics
- NAVADMINs
- ALNAVs
- ALNAVRESFOR
- MyNavyHR Videos



Skip to main content (Press Enter).



Pls.' Opp. to Assertion of Mootness App. 0029

- DoD, Navy Leadership Statements
- ~~TRANSCOM Policy~~

---

## Guidance & Infographics

- U.S. Navy Return to the Workplace COVID-19 Guidance and Resources (July 28, 2020)
- U.S. Navy Response to the COVID-19 Pandemic Infographic (May 19, 2020)
- Return-to-Work Guidelines Infographic (May 18, 2020)
- Navy Telework Capabilities Graphic (May 6, 2020)
- COVID-19 Healthcare Provider Guidance (April 30, 2020)

Back to links

---

## NAVADMINs

- Oct. 19, 2022: U.S. Navy Covid-19 Standardized Operational Guidance 7.0 (Corrected Copy)
- Aug. 23, 2022: 187/22 Updated COVID-19 Vaccination Option - NOVAVAX
- June 2, 2022: 139/22 CCDA Guidance Update
- June 2, 2022: 130/22 COVID-19 Designation of Mission Critical Travel for Unvaccinated Individuals and Updated Travel Guidance
- Apr. 22, 2022: 102/22 CCDA Additional Interim Guidance Regarding Members Requesting Religious Accommodation from COVID-19 Vaccination Requirements
- Mar. 30, 2022: 083/22 CCDA Interim Guidance Regarding Members Requesting Religious Accommodation from COVID-19 Vaccination Requirements
- Feb. 22, 2022: 042/22 Updated COVID consolidated Disposition Authority Data Reporting Requirements and Lessons Learned
- Jan. 15, 2022: 007/22 U.S. Navy COVID-19 Standardized Operational Guidance 5.0
- Dec. 22, 2021: 289/21 Guidance Encouraging COVID-19 Vaccine Booster
- Dec. 15, 2021: 283/21 CCDA Execution Guidance to Commanders
- Nov. 15, 2021: 256/21 CCDA Guidance to Commanders
- Nov. 1, 2021: 249/21 CCDA Data Reporting Requirements
- Oct. 13, 2021: 225/21 COVID-19 Consolidated Disposition Authority (CCDA)
- Aug. 30, 2021: 190/21 2021-2022 Navy Mandatory COVID-19 Vaccination and Reporting Policy
- Aug. 23, 2021: 180/21 Update 3 to Navy COVID-19 Reporting Requirements
- July 29, 2021: 161/21 Updated Mask Guidance for All DOD Installations and Other Facilities
- July 28, 2021: 159/21 Special Leave Accrual for the Navy
- July 13, 2021: 150/21 Department of Defense COVID-19 Testing Prior to Overseas Travel (Update 2)
- June 16, 2021: 129/21 Physical Readiness Program Update for Calendar Year 2021 (CY2021) Physical Fitness Assessment
- June 15, 2021: 123/21 Procedures for Foreign Visit requests to U.S. Navy Commands During COVD-19 Pandemic
- June 2, 2021: 110/21 U.S. Navy COVID-19 Standing Guidance Update 1
- May 21, 2021: 100/21 Cancellation of Urinalysis Policy Update
- May 21, 2021: 100/21 Cancellation of Urinalysis Policy Update
- May 21, 2021: 99/21 U.S. Navy COVID 19 Standard Guidance

---

 Skip to main content (Press Enter).





2/13/23, 4:16 PM

Case: 22-10077     Document: 284     Page: 194     Date Filed: 02/13/2023
USCA5 184 Updated
Case 4:21-cv-01236-O    Document 225    Filed 02/13/23    Page 35 of 162    PageID 7536

- Apr. 30, 2021: 086/21 Updated Guidance to Commanders on Adjusting Health Protection Conditions and Base Services During COVID-19 Pandemic

- ... COVID-19 Personnel Movement and Travel Restrictions)

- Mar. 10, 2021: 059/21 Use of Masks and other Public Health Measures during COVID-19 pandemic

- Mar. 03, 2021: 052/21 Procedures for Foreign Visit Requests to U.S. Navy Commands during COVID-19 pandemic

- Feb. 16, 2021: 038/21 Process to Request Exception on use of Masks and Other Public Health Measures During COVID-19 Pandemic (Corrected Copy)

- Feb. 16, 2021: 037/21 U.S. Navy COVID-19 Standardized Operational Guidance Version 4.0 (Cancelled May 21, 2021 per NAVADMIN 099/21)

- Jan. 29, 2021: 026/21 Department of Defense COVID-19 Testing Prior to Overseas Travel (Update 1)

- Jan. 7, 2021: 003/21 DEPARTMENT OF DEFENSE COVID-19 TESTING PRIOR TO OVERSEAS TRAVEL

- Dec. 16, 2020: 327/20 SARS-COV-2 VACCINATION AND REPORTING POLICY

- Dec. 15, 2020: 325/20 CNO Message to the Fleet - COVID-19 Vaccine

- November 10, 2020: 302/20 Termination of Global Authorized Departure for Individuals at Higher Risk From COVID-19

- November 4, 2020: 298/20 US NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE VERSION 3.1 (Cancelled Feb. 16, 2021 per NAVADMIN 037/21)

- October 13, 2020: 277/20 UPDATE 2 TO COVID-19 REPORTING REQUIREMENTS

- September 30, 2020: 266/20 US NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE VERSION 3.0 (Cancelled Nov. 4. 2020 per NAVADMIN 298/20)

- August 24, 2020: 236/20 UPDATED PROCEDURES FOR FOREIGN VISIT REQUESTS TO U.S. NAVY COMMANDS DURING COVID-19 PANDEMIC

- August 21, 2020: 235/20 Announcement of Approval of Humanitarian Service Medal (HSM) and Armed Forces Service Medal (AFSM) for Department of Defense Coronavirus (COVID 19) Operations and Activities

- August 14, 2020: 231/20 Flexibility For Fiscal Year 2020 Sexual Assault Prevention Response and Suicide Prevention General Military Training Requirements

- August 10, 2020: 225/20 Third Extension of Global Authorized Departure For Individuals At Higher Risk From COVID-19

- August 4, 2020: 217/20 U.S. Navy COVID-19 Standardized Operational Guidance Version 2.1 (Cancelled Sep. 30, 2020 per NAVADMIN 266/20)

- July 13, 2020: 197/20: Second Extension of Global Authorized Departure for Individuals at Higher Risk from COVID-19

- July 9, 2020: 195/20: Casualty and Mortuary Affairs Processes in Response to COVID-19 Update Two

- July 8, 2020: 194/20: Face Coverings in Uniform

- July 7, 2020: 193/20: Physical Readines Program Policy Update for Physical Fitness Assessment Cycle Two 2020 Due to COVID19 Mitigation

- July 2, 2020: 189/20: Navy Mitigation Measures In Response to Coronavirus Outbreak Update 6

- June 30, 2020: 185/20: CNO Message to the Fleet on Sustaining Readiness

- June 25, 2020: 178/20: COVID-19 Testing

- June 17, 2020: 173/20: U.S. Navy COVID-19 Standardized Operational Guidance Version 2.0 (Cancelled Aug. 4, 2020 per NAVADMIN 217/20)

- June 12, 2020: 169/20: Permanent Change of Station Post Stop Movement Priority Plan

- June 12, 2020: 168/20: Navy Mitigation measures In Response to Coronavirus Outbreak Update 5 (Cancelled July 2, 2020 per NAVADMIN 189/20)

- June 10, 2020: 164/20 Extension of Termination of Global Authorized Departure for Individuals at Hight Risk from COVID-10

- June 4, 2020: 163/20: Modification-2 to the Notice of Convening FY-21 Active-Duty Officer Continuation Selection Boards and Announcement of Continuation Policy

- May 29, 2020: 160/20: Guidance on Conducting Ceremonies for Retirement or Transfer to the Fleet Reserve Delayed Due to the Coronavirus Pandemic

- May 29, 2020: 159/20: Termination of Departure Authority for Individuals at Higher Risk From COVID-19

- May 26, 2020: 155/20: U.S. Navy COVID-19 Standardized Operational Guidance (Cancelled June 17, 2020 per NAVADMIN 173/20)

- May 20, 2020: 148/20: Updated Policy for the Use of Embedded Computer Capabilities and Peripherals to Support Two-Way





Skip to main content (Press Enter).

- May 19, 2020: 145/20: Advancement Eligibility Related to Changes to the Navy-Wide Advancement Exam and Physical Fitness Assessment Schedules Due to COVID-19 Mitigation
- May 6, 2020: CNO Message to the Fleet
- May 4, 2020: 132/20 Manning Initiatives Announced to Mitigate Fleet Gaps
- May 1, 2020: 129/20 Guidance on Evaluation of Deployability, Temporary Limited Duty, and Referral to the Disability Evaluation System (DES) during the Coronavirus (covid-19) Pandemic
- May 1, 2020: 128/20 Naval History and Heritage Ideas and Online Resources to Support Fleet Learning and at Home Education during the Pandemic
- April 30, 2020: 126/20 Protection of Service Members and Families Executing Inbound/Outbound Household Goods Moves During Covid-19 Stop Movement
- April 27, 2020: 121/20: Supplemental Number Two for E4 Though E7 February 2020 (Cycle 106) Selective Reserve and March 2020 (Cycle 247) E4 Through E6 Active-Duty, Full-Time Support and Canvasser Recruiter Navy-Wide Advancement Examinations
- April 21, 2020: 116/20: Navy Mitigation Measures in Response to Coronavirus Outbreak Update 4. *(Cancelled June 12, 2020 per NAVADMIN 168/20)*
- April 21, 2020: 115/20: Update to Navy COVID-19 Reporting Requirements
- April 21, 2020: 114/20: Policy Guidance Update for Identification Card Services for COVID-19
- April 17, 2020: 113/20 – Restriction of Movement (ROM) Guidance Update
- April 15, 2020: 109/20 – COVID-19 Update Guidance to Support Fleet Operations
- April 10, 2020: 105/20: Expanded Opportunity For Retention On Active-Duty In A Retired Status For Active-Duty Officers With Pending Statutory Retirements
- April 8, 2020: 104/20: CNO Message to the Fleet
- April 7, 2020: 101/20: Exception to Policy for Small Arms Training and Qualification Criteria and Navy Security Forces Annual Sustainment Training Requirements
- April 7, 2020: 102/20: Casualty and Mortuary Affairs Processes in Response to COVID-19
- April 5, 2020: 100/20: Navy Guidance on the Use of Face Coverings
- April 3, 2020: 99/20: Mobilization Processing of Navy Reserve Personnel in Support of COVID-19 Response Operations
- April 3, 2020: 98/20: Procedures for Navy Entities to Contribute Additively Manufactured Parts or Services in Response to COVID-19
- April 2, 2020: 97/20: Common Access Card Issuance Policy Update for COVID-19
- March 27, 2020: 93/20: Commercial Virtual Remote (CVR) Collaboration Environment
- March 27, 2020: 92/20: Urinalysis Policy Update (Cancelled May 21, 2021 per NAVADMIN 100/21)
- March 26, 2020: 89/20: Voluntary Extensions for Active Component Navy Members with Approved Separation or Retirement Dates
- March 25, 2020: 88/20: Requirements for Authorized and Ordered Departures
- March 23, 2020: 83/20: Restriction of Movement Guidance
- March 23, 2020: 82/20: Navy Transition Assistance Program Policy Update for COVID-19
- March 21, 2020: 80/20: Navy Mitigation Measures in Response to Coronavirus Outbreak: Update 3
- March 19, 2020: 75/20: Maintaining and Protecting the Navy Accessions Supply Chain
- March 19, 2020: 74/20: Mitigation Measures in Response to Coronavirus Outbreak (Update 2)
- March 18, 2020: 73/20: Temporary Relaxation of Hair Grooming Standards in Response to Coronavirus Outbreak
- March 18, 2020: 72/20: Navywide Advancement Examinations
- March 18, 2020: 71/20: Physical Readiness Policy Update
- March 17, 2020: 69/20: Enlisted Advancement Exams Postponed
- March 17, 2020: 68/20: Effective use of Remote Work Options
- March 14, 2020: 65/20: Overseas Travel
- March 12, 2020: 64/20: Navy Mitigation Measures in Response to Coronavirus Outbreak

Back to links





## ALNAVs

- Aug. 30, 2021: [062/21 2021-2022 Department of the Navy Mandatory COVID-19 Vaccination Policy](#)
- Apr. 30, 2021: [032/21 Update to Department of the Navy Health Protection Condition Policies](#)
- June 12, 2020 – [67/20: Cancellation of ALNAV 044/20 and 49/20 Per SECDEF Memo transitions to a conditions based movement order](#)
- May 21, 2020 – [59/20: 101 Days of Summer Safety](#)
- May 4, 2020 – [52/20: Public Service 2020](#)
- April 22, 2020 – [49/20: Modifications to ALNAV 044/20: Reissuance of Department of the Navy Travel Restrictions in Response to Coronavirus Disease 2019](#)
- April 21, 2020 – [44/20: Reissuance of Department of the Navy Travel Retrictions in Response to Coronavirus Disease 2019](#)
- April 3, 2020 – [SECNAV Vector 18: Serving Our Country](#) (also posted on [ALNAV site](#))
- March 31, 2020 – [35/20: Special Duty Medical Examinations Update to Policy in Response to the Coronavirus Disease 2019](#)
- March 23, 2020 – [29/20: State and Local Shelter-in-Place Orders' Impact on Department of the Navy Operations](#)
- March 20, 2020 – [28/20: (SECNAV Vectors Blog: Vector 16: Agility in Time of Crisis](#) (As posted [to ALNAV site)](#)
- March 14, 2020 – [26/20: Official and Personal Domestic Travel Force Health Protection Guidance for Department of the Navy (CONUS Travel Guidance)](#)
- March 13, 2020 – [24/20: Acting Secretary of the Navy Thomas B. Modly's Vector 15 message](#) (Re. Force Protection Guidance)
- March 12, 2020 – [25/20: Force Protection Guidance for the Department of the Navy](#)

Back to links

---

## ALNAVRESFOR

- June 15, 2022 – 23: [Additional Guidance Regarding Administration of Unvaccinated Navy Reserve Personnel Including Those Requesting Religious Accommodation From COVID-19 Vaccination Requirements](#)
- Jan. 24, 2022 – 5: [Supplemental Guidance for Administrative Disposition of Selected Reserve Service Members Who Are Not Fully Vaccinated Against COVID-19](#)
- Jan. 7, 2022 – 1: [Guidance for Administrative Disposition of Selected Reserve Service Members Who Are Not Fully Vaccinated Against COVID-19](#)
- Sep. 8, 2021 – 10: [Mandatory Vaccination Coronavirus Disease 2019 for Navy Reserve](#)
- June 22, 2020 – 13: [Reserve Force Conditions-Based Approach to Personnel Movement](#)
- May 21, 2020 – 12: [CNRF-Navy Reserve Force Policy for COVID-19 Update 2](#)
- April 16, 2020 – 11: [CNRF-Navy Reserve Force Policy Update for COVID-19](#)
- April 16, 2020 – 10: [CNRF-Message to the Force from VADM McCollum](#)
- March 20, 2020 – 09: [Navy Reserve Enhanced Telecommuting Procedures](#)
- March 17, 2020 – 08: [Reserve Mitigation Measures in Response to Coronavirus](#)

Back to links

---

  

Skip to main content (Press Enter).

Pls.' Opp. to Assertion of Mootness App. 0033

## MyNavyHR Videos

- Dec. 17, 2021 – News You Can Use: CCDA Execution Guidance Pt. 2
- Dec. 17, 2021 – News You Can Use: CCDA Execution Guidance Pt. 1
- Nov. 22, 2021 – News You Can Use: Temporary BAH Increase
- Nov. 17, 2021 – News You Can Use: CCDA Guidance to Commanders (COVID-19)
- Oct. 15, 2021 – News You Can Use: COVID-19 Vaccine Deadlines
- Sep. 13, 2021 – News You Can Use: Mandatory COVID-19 Vaccine
- Jul. 19, 2021 – News You Can Use: COVID-19 Testing for Traveling Overseas UPDATE
- May 28, 2021 – News You Can Use: COVID-19 Vaccination Information
- Feb. 10, 2021 – News You Can Use: Face Mask Update
- May 29, 2020 – Boards Resume
- May 29, 2020 – Retirements During COVID-19:
- May 29, 2020 – Medical and Dental Elective Procedures
- May 4, 2020 – Retired/Separated Sailors' Return to Active Duty Options
- May 4, 2020 – Personnel Mitigation Measures
- May 4, 2020 – MyNavy Family App Update
- May 4, 2020 – Selective Reenlistment Bonus Update
- April 29, 2020 – Coronavirus (COVID-19) Tutor.com
- April 22, 2020 – Leave Accumulation Update
- April 22, 2020 – Sea Duty Incentive Pay
- April 22, 2020 – Stop Movement
- April 22, 2020 – CAC and USID Cards Update
- April 14, 2020 – Naval Academy Update
- April 14, 2020 – Contacting Navy College Education Counselors
- April 9, 2020 – Reducing Team Stress
- April 9, 2020 – Retire to Retain Policy
- April 8, 2020 – Face Coverings Update
- April 8, 2020 – Basic Allowance for Subsistence
- April 8, 2020 – CAC Offices Update
- March 27, 2020 – Town Hall With Fleet K
- March 23, 2020 – NAVADMIN 80/20
- March 23, 2020 – Transition Assistance Program
- March 23, 2020 – Coronavirus (COVID-19) Japan CDC Warning Level 3 Update
- March 23, 2020 - COVID-19 Identity Management
- March 20, 2020 – Board Suspension
- March 20, 2020 – Relaxed Grooming Standards
- March 19, 2020- Advancement Exams Postponement Clarification
- March 19, 2020 – Restriction of Movement Update
- March 19, 2020 – PFA Suspension Update
- March 18, 2020 – Advancement Exams Postponed
- March 18, 2020 – Details on Upcoming Advancement Exams
- March 18, 2020 – Orders, Coronavirus Warning Signs
- March 17, 2020 – Coronavirus Testing
- March 17, 2020 – Leave and Liberty, Travel Reimbursements
- March 16, 2020 – Freeze on PCS Moves

  

## Navy.mil Releases

- Nov. 15, 2021: [Navy Updates Guidance for COVID-19 Vaccine Refusal](#)
- Oct. 20, 2021: [Navy Identifies Sailor Who Died of COVID-Related Complications](#)
- Oct. 6, 2021: [Navy Identifies NAWDC Sailor Who Died of COVID-Related Complications](#)
- Sept. 20, 2021: [Navy Identifies Sailor Who Died of COVID-Related Complications](#)
- Sept. 20, 2021: [NEPLO Surges Medical Teams Back Into COVID Hotspot](#)
- Sept. 1, 2021: [Navy Supports Mandatory COVID-19 Vaccination for all Active Duty and Reserve Sailors](#)
- Aug. 18, 2021: [Navy Identifies Sailor Who Died of COVID-19 Related Complications](#)
- Aug. 17, 2021: [Navy Identifies Reserve Sailor Who Died of COVID-19 Related Complications](#)
- July 28, 2021: [Navy Identifies Reserve Sailor Who Died of COVID-19 Related Complications](#)
- July 28, 2021: [Navy Identifies Naval Medical Center Camp Lejeune Sailor Who Died of COVID-19 Related Complications](#)
- May 26, 2021: [Navy Administers One Million Vaccines since the Beginning of the COVID-19 Pandemic](#)
- May 26, 2021: [Navy Advancement Results for E-4 through E-6 Delayed Due to COVID-19](#)
- May 24, 2021: [U.S. Navy Issues COVID-19 Standing Guidance](#)
- May 22, 2021: [Navy Resumes Regular Urinalysis Operations](#)
- May 7, 2021: [U.S. Naval Hospital Naples Makes History with Unit Bravo Strike](#)
- May 4, 2021: [Theodore Roosevelt Carrier Strike Group Gets Vaccinated](#)
- May 4, 2021: [Expeditionary Strike Group 7 Sailors Stay COVID-Free While at Sea](#)
- May 3, 2021: [U.S. Navy Issues Updated Guidance to Commanders On Adjusting Health Protection Conditions and Base Services During COVID-19 Pandemic](#)
- Apr. 30, 2021: [Virginia Beach Sailor Dies of COVID-Related Complications](#)
- Apr. 29, 2021: [Iwo Jima ARG and 24th MEU Reach Milestone, 60 days COVID-Free](#)
- Apr. 20, 2021: [From COVID Testing to MHS GENESIS support, Lab Techs Do It All](#)
- Apr. 19, 2021: [COVID-19 Vaccines Distributed Onboard Washington Navy Yard](#)
- Apr. 19, 2021: [COVID-19 Vaccine Appointments Available to All Eligible DOD Beneficiaries](#)
- Apr. 13, 2021: [Candid Comments Shared on Choosing COVID-19 Vaccine](#)
- Apr. 13, 2021: [Public Health Experts handling the Public Health Crisis](#)
- Apr. 12, 2021: [Nimitz Sailors Receive First Dose of Moderna COVID-19 Vaccine](#)
- Mar. 17, 2021: [DOD Health System Archives COVID-19 Vaccination Data](#)
- Mar. 16, 2021: [From Sea to Shining Sea: Combating the Pandemic One Mile at a Time](#)
- Mar. 12, 2021: [U.S. Navy Accelerates Progress in Providing Vaccinations for Sailors](#)
- Mar. 11, 2021: [USS Dwight D. Eisenhower Receives Second COVID-19 Vaccination Shot](#)
- Mar. 11, 2021: [Naval Medical Research Center continues Research in Fight Against COVID-19](#)
- Mar. 10, 2021: [Suicide and COVID-19: How Navy Region Southeast is fighting back](#)
- Mar. 09, 2021: [Nursing the COVID Vaccine Forward](#)
- Mar. 09, 2021: [Porter Receives First Dose of COVID-19 Vaccine](#)
- Mar. 05, 2021: [USS Lake Champlain Sailors Receive COVID-19 Vaccine](#)
- Mar. 01, 2021: [Fleet Readiness Center Southeast supports COVID-19 containment efforts through 3D printing](#)
- Feb. 26, 2021: [U.S. 5th Fleet Responds to COVID-19 Aboard USS San Diego and USS Philippine Sea](#)
- Feb. 24, 2021: [Navy Identifies Assault Craft Unit 4 Sailor Who Died of COVID-Related Complications](#)
- Feb. 15, 2021: [Sailors Embarked on a U.S. Pacific Fleet Ship Test Positive for COVID-19](#)
- Feb. 13, 2021: Navy Identifies USS Wasp Sailor Who Died of COVID-Related Complications

  

Skip to main content (Press Enter).

- Feb. 4, 2021: USS Ronald Reagan Begins Second Round of COVID-19 Vaccinations
- Feb. 1, 2021: ~~Sailor Assigned to Kings Bay Unit Dies of COVID-Related Complications~~
- Jan. 28, 2021: ~~Navy Shifts 2021 Fitness Cycle to July~~
- Jan. 28, 2021: Navy Medical Personnel to Join in Texas COVID-19 Response
- Jan. 28, 2021: Initiation Innovation: Navigating Chief Season in the Midst of COVID
- Jan. 26, 2021: Navy, DoD Respond to COVID-19 in Navajo Nation
- Jan. 23, 2021: Fleet Forces Establishes Vaccination Cell to Expedite Delivery to Fleet
- Jan. 22, 2021: NSA Souda Bay Receives COVID Vaccine
- Jan. 22, 2021: Frontline Workers at Naval Station Rota, Spain Begin Receiving COVID-19 Vaccine
- Jan. 13, 2021: USS Ronald Reagan Begins COVID-19 Vaccinations
- Jan. 12, 2021: Navy Expeditionary Combat Command Leadership Receives COVID-19 Vaccine
- Jan. 12, 2021: Navy Exchange Great Lakes Buoys A-School Students Placed on Restriction of Movement After Holiday Break
- Jan. 9, 2021: NAS Sigonella Receives First Shipment of COVID-19 Vaccine
- Jan. 7, 2021: Service Members Transferring Overseas Must Test Negative for COVID-19 Before Flying
- Jan. 6, 2021: CDC Explains Benefits of COVID-19 Vaccine
- Jan. 5, 2021: U.S. 7th Fleet Sailors Receive COVID Vaccine
- Jan. 5, 2021: Additional Naval Military Treatment Facilities Receiving COVID-19 Vaccine
- Jan. 4, 2021: Commander of Military Sealift Command Receives COVID-19 Vaccine
- Dec. 22, 2020: Navy Announces Expanded Operational Stress Control Program: Here Are the Details
- Dec. 21, 2020: Southwest Regional Maintenance Center Hosts Blood Drives Benefitting Service Members
- Dec. 17, 2020: FLU SEASON 2020: Protect Yourself Against Two Viruses
- Dec. 16, 2020: U.S. Navy Issues Vaccine Guidance to Combat COVID-19
- Dec. 15, 2020: NMCSD Receives First Shipment of COVID-19 Vaccines
- Dec. 15, 2020: Naval Medical Forces Atlantic Hospitals to Be Among First to Receive COVID-19 Vaccine
- Dec. 14, 2020: COVID-19 Vaccine Headed to Naval Medical Center San Diego, Naval Hospital Camp Pendleton
- Nov. 12, 2020: Navy Publishes Scientific Paper on USS Theodore Roosevelt COVID-19 Outbreak
- Nov. 12, 2020: Navy/Marine Corps COVID-19 Study Findings Published in New England Journal of Medicine
- Nov. 6, 2020: Navy: ROM Is Official Duty Status
- Nov. 4, 2020: U.S. Navy Updates Guidance to Combat COVID-19
- Oct. 28, 2020: Navy Junior ROTC Units Contend With New Normal in New School Year; Naval Science Instructors Meet New Challenges
- Oct. 23, 2020: COVID-19 Special Leave Accrual – What You Need to Know
- Oct. 22, 2020: Navy Researchers Evaluate UV Light Sources to Combat COVID-19
- Oct. 20, 2020: Amid COVID-19, Information Warfare Training Command San Diego Safely Trains USS Carl Vinson's IW Warriors
- Oct. 19, 2020: Naval Chaplaincy School, Center Uses Virtual Training for Mission Success
- Oct. 19, 2020: Office of Naval Reserves Robotics Enters COVID-19 Fight
- Oct 16, 2020: Clothing, Textile Research Facility Pivots 3D Knitting Research to Face Covering Development
- Sept. 30, 2020: U.S. Navy Issues Standardized Operational Guidance 3.0
- Sept. 3, 2020: NAVCENT Medical Personnel Embed with Bahrain Ministry of Health to Manage Pandemic Response
- Sept. 3, 2020: Yokosuka Fleet Logistics Center Supports Incoming Personnel During Pandemic
- Aug. 19, 2020: Naval Safety Training Keeps Momentum with Virtual Learning
- Aug. 12, 2020: Recruit Training Command and Partners Work Together to Transform Drill Halls Into Barracks
- Aug. 10, 2020: USS Germantown's COVID-19 Rapid Response Team: Fighting Pandemic From The Deckplate
- Aug. 4, 2020: Lebanese Armed Forces, U.S. Navy Conduct Resolute Union Virtually Amid COVID-19 Pandemic
- Aug. 4, 2020: Staying the Course during COVID-19: Losing Weight and Feeling Great!
- July 31, 2020: Naval Laboratory Researcher's Invention Allows to Study Nanoparticle Gases
- July 31, 2020: MARMC SST Advances OSD Grasp of COVID Risk
- July 29, 2020: NHC Annapolis' Operational Approach to COVID-19 Prevention puts U.S. Naval Academy on Track for Fall 2020 Semester





2/13/23, 4:16 PM

Case: 22-10077    Document: 284    Page: 200    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 225    Filed 02/13/23    Page 41 of 162    PageID 7542

- July 23, 2020: [Nimitz Receives COVID-19 Convalescent Plasma Administration Certification](#)

- July 23, 2020: [4th Fleet Commander Hosts Maritime Staff Talks with Argentina, Chile](#)

- July 22, 2020: [NAVWAR Trident Warrior Team Assesses New Tracking Technology for COVID-19 Mitigation](#)

- July 21, 2020: [Sailors Support COVID Response in Texas](#)

- July 17, 2020: [Change of Command in the Era of a Global Pandemic: Commander, Maritime Prepositioning Ships Squadron Two Changes the Helm](#)

- July 15, 2020: [Adaptability and Resilience: EMF-M's Historic Stateside Deployment Supporting COVID-19](#)

- July 14, 2020: [A SPRINT to Guam: Psychological First Aid in the COVID-19 Pandemic](#)

- July 14, 2020: [Navy Childcare Center Supports Sailors Through COVID-19](#)

- June 25, 2020: [Navy Establishes COVID-19 Surveillance Testing Program](#)

- June 10, 2020: [Navy Mobilizing Reservists Under SurgeMain Program to Support Ship Maintenance](#)

- June 10, 2020: [Addressing Mental Health Key to NDW Fleet and Family Support Center During Pandemic](#)

- June 10, 2020: [USS Kidd Commanding Officer Sends Thank You Letter to San Diego](#)

- June 9, 2020: [Findings From USS Theodore Roosevelt Public Health Investigation Support Force Health Protection](#)

- June 9, 2020: [U.S. Navy Navigates to 'New Normal'](#)

- June 9, 2020: [High School on U.S. Navy Base in Japan Holds Socially Distanced Graduation Ceremony](#)

- June 9, 2020: [Navy Emergency Liaisons Deploy in Record Numbers for Pandemic](#)

- June 8, 2020: [Mission Essential Training Continues During COVID-19 at Great Lakes Schools](#)

- June 5, 2020: [Center for Seabees Learning Sites Adjust Courses in Response to COVID-19](#)

- June 5, 2020: [Safety, Standards Uncompromised as Naval Special Warfare Center Restarts Paused Training Phases](#)

- June 4, 2020: [I am Navy Medicine: Hospital Corpsman 3rd Class Marc Gasbarri](#)

- June 4, 2020: [Navy Pharmacy Adjusts Procedures in Response to COVID-19](#)

- May 29, 2020: [Navy Approves Interim Retirement Ceremony Rules](#)

- May 29, 2020: [Base Port Operations: 'Commitment and Ability to Protect America has Not Changed'](#)

- May 27, 2020: [Mental Health During the Pandemic: Understanding How Your Mind Responds to Disasters](#)

- May 27, 2020: [Navy Issues COVID-19 Standardized Operational Guidance](#)

- May 27, 2020: [Naval District Washington Recovery Working Group Plans for Post COVID-19 'New Normal'](#)

- May 27, 2020: [Virtual Fleet Week NY Concludes; City Thanks Servicemembers for Help in COVID-19 Fight](#)

- May 26, 2020: [Officer Training Command Uses Remote Learning to Train Leaders During Pandemic](#)

- May 22, 2020: [Navy Releases Commander Guidance on Adjusting Health Protection Conditions (HPCON)](#)

- May 21, 2020: [Navy Reserve Extends Drill Postponement until June 30, Provides Additional Guidance for COVID-19](#)

- May 21, 2020: [Former CNO Mullen Talks Leadership, National Security Challenges in a Post-COVID-19 World](#)

- May 21, 2020: [Supply Corps Reservists Apply Data, Logistics Expertise to COVID-19 Pandemic](#)

- May 21, 2020: [USS Theodore Roosevelt Returns to Sea](#)

- May 19, 2020: [Navy Clarifies Advancement Eligibility Due to Coronavirus Postponements](#)

- May 19, 2020: [USS Kidd Conducts Crew Swap, Transitions to Next Phase of COVID-19 Response](#)

- May 19, 2020: [Naval District Washington Personnel Adapt to Teleworking During COVID-19 Pandemic](#)

- May 17, 2020: [NEPLOs Coordinate Cross-Country Move of Navy Medical Personnel in COVID-19 Fight](#)

- May 15, 2020: [USNS Mercy Departs Los Angeles; Military Relief Efforts Continue](#)

- May 14, 2020: [Navy Exchange Service Command Provides Over Half Million Cloth Face Masks](#)

- May 14, 2020: [Senior Enlisted Academy Achieves Mission Success through Virtual Training during COVID-19](#)

- May 14, 2020: [Individual Ready Reserve Sailors Serve at Navy Medical Center Portsmouth](#)

- May 14, 2020: [NAVWAR Launches Data Fusion Tool, Maintains Fleet Readiness in Wake of Worldwide Pandemic](#)

- May 13, 2020: [Blue Angels to Salute Tennessee and Arkansas COVID-19 Responders](#)

- May 13, 2020: [U.S. Navy Ceremonial Guard Marches Forward During COVID-19 Pandemic](#)

- May 13, 2020: [The NEX Has You "Covered"](#)

- May 12, 2020: [Naval War College Faculty Steps Up to Assist U.S. Northern Command Planning Effort During COVID-19](#)

- May 12, 2020: [Crew Endurance Team Emphasizes Role of Sleep in Immunity](#)

- May 12, 2020: [Puget Sound Teams Fast-Track Biocontainment Prototype for Covid-19 Testing](#)





- May 8, 2020: [Fleet Activities Yokosuka Rolls Out Family Partner Program](#)
- May 8, 2020: NEX Norma's Launch... Supports Shield to Help Stop Spread of COVID-19
- May 7, 2020: National Capital Region Military Treatment Facilities Continue Providing Quality Care During COVID-19 Pandemic
- May 6, 2020: [Blue Angels to Salute Florida COVID-19 Responders](#)
- May 6, 2020: [Navy Exchange Service Command Associates Screened for COVID-19 Symptoms](#)
- May 4, 2020: [Naval Special Warfare Center Resumes Portions of Paused SEAL and SWCC Training](#)
- May 4, 2020: [NAVSUP Leading Way in 100% Safety Checks for HHG Moves](#)
- May 4, 2020: [Manning Initiatives Announced to Mitigate Fleet Gaps](#)
- May 4, 2020: [Blue Angels to Salute Texas, Louisiana COVID-19 Responders](#)
- May 4, 2020: [NMCP Staff Members Build a Ventilator In Wake of COVID-19](#)
- May 4, 2020: [HSC-26 Maintains Mission Readiness during COVID-19 Pandemic](#)
- May 2, 2020: [USS Constitution Hosting Daily Virtual Tours on Facebook Live](#)
- May 2, 2020: [NEX San Diego, Sustainable Support System Supplying Ships and Sailors](#)
- May 1, 2020: [Fleet Activities Yokosuka Call Center Serves Thousands](#)
- April 30, 2020: [NEXConnect Keeps Internet 'Light' On for Navy Community](#)
- April 30, 2020: [Undersea Warfare Center Partners With University of Alaska for COVID-19 Preparation](#)
- April 30, 2020: [Blue Angels, Thunderbirds to Salute Maryland, Washington D.C., Virginia, Georgia COVID-19 Responders](#)
- April 29, 2020: [Human Resources Comprehensive FAQ](#)
- April 29, 2020: [Truman Sailors Join Forces to Protect Against COVID-19](#)
- April 29, 2020: [Online Tutoring Now Available for Military and Civilian Families](#)
- April 29, 2020: [Barracks at Naval Base Guam Ordnance Annex Refurbished for Warfighter Support](#)
- April 29, 2020: [Naval Sea Systems Command Continues Fleet Support Despite COVID-19 Restrictions](#)
- April 29, 2020: [Navy MWR Digital Library Always Open](#)
- April 28, 2020: [Navy Provides Medical Care to Sailors of USS Kidd, Disinfects Ship](#)
- April 28, 2020: [Information Warfare Training Command Virginia Beach Employs Virtual Training to Help Keep Sailors, America Safe](#)
- April 28, 2020: [Sailors on Isolated Facility Use Radio to Keep Shipmates Informed, Connected](#)
- April 27, 2020: [USS Nimitz Departs for Training](#)
- April 27, 2020: [Navy Cancels Active/FTS E4 Exam, Sets Schedule for Finishing Advancement Cycles](#)
- April 27, 2020: [Florida Team Trains Culinary Specialists Virtually During Pandemic](#)
- April 26, 2020: [Thunderbirds, Blue Angels to Salute New York, New Jersey, Pennsylvania COVID-19 Responders](#)
- April 24, 2020: [America Strong: Blue Angels, Thunderbirds to Conduct Multi-City Flyovers](#)
- April 24, 2020: [Undersea Warfare Center Begins Producing Safety Equipment for Naval Hospital](#)
- April 24, 2020: [USS Kidd Evacuates Sailor, Embarks COVID-19 Medical Response Team](#)
- April 24, 2020: [CFAY Delivers Goodie Bags to ROM Sailors](#)
- April 24, 2020: [Naval Supply Systems Command Human Resources Office Perseveres Through Pandemic](#)
- April 23, 2020: [Employees at Fleet Readiness Center Make 1,800 Cloth Masks for Coworkers](#)
- April 23, 2020: [Fleet Readiness Center East Manufacturing Face Shields to Support Local Health Care Workers](#)
- April 22, 2020: [Sea Duty Incentive Pay Expands During Time of COVID-19 Crisis](#)
- April 22, 2020: [NEX Customers Can Support NMCRS During COVID-19 Crisis](#)
- April 22, 2020: [Combating Coronavirus: Navy Provides Protective Gear to First Responders](#)
- April 22, 2020: [Navy Reserve Unit Shows Agility in Crisis With First Virtual Drill](#)
- April 22, 2020: [Navy Civil Servants' Support to COVID-19 Response Earns Meritorious Civilian Service Awards](#)
- April 21, 2020: [Navy Extends Travel and PCS Restrictions, Authorizes Leave Accrual](#)
- April 21, 2020: [Navy Updates ID Card Guidance](#)
- April 20, 2020: [Staff Work to Continue Strong Support for Navy Wounded Warriors' Pay, Benefits Needs](#)
- April 20, 2020: [Military Resale Unites to Support Servicemembers During COVID-19 Pandemic](#)
- April 20, 2020: [Surface Warfare Center Designs Portable Oxygen Manifolds for Camp Pendleton COVID-19 Response](#)
- April 20, 2020: [Overseas Navy Personnel Fight COVID-19 One Stitch at a Time](#)
- April 20, 2020: USS George Washington Preventive Maintenance Team Makes Masks to Combat COVID-19





- April 17, 2020: [Navy Conducting Public Health Outbreak Investigation on USS Theodore Roosevelt](#)
- April 17, 2020: [NAVFAC Southwest Batting COVID-19 with $2.6 Million for Disinfection Services](#)
- April 17, 2020: [Navy Hospitals Car-Based Triage Assists Emergency Dept in Wake of COVID-19](#)
- April 17, 2020: [Air Warfare Center Works to Keep Americans Safe In, Out of the Fleet](#)
- April 17, 2020: [Reserve Component Command Fort Worth Mobilizes Second Wave of Reservists to Assist in Global COVID-19 Combat Support](#)
- April 17, 2020: [Undersea Warfare Center Launches 'Operation Sewcial Distancing' to Craft Face Masks](#)
- April 17, 2020: [Don't Let COVID-19 Keep You From the Emergency Department](#)
- April 16, 2020: [Navy Identifies USS Theodore Roosevelt Sailor Who Died of COVID-19](#)
- April 16, 2020: [Surface Warfare Center Designs Face Shields for Staff at State Prison](#)
- April 16, 2020: [Norfolk Team Tackles Unique COVID-19 Contracting Challenges](#)
- April 16, 2020: [USS Theodore Roosevelt's Clean Fight](#)
- April 16, 2020: [Supervisor of Shipbuilding, Conversion, Repairs Turns to Fusion for Face Masks](#)
- April 15, 2020: [Engineering/Expeditionary Warfare Center 3-D Prints Masks to Aid Pandemic Response](#)
- April 15, 2020: [NAVFAC Partners with USACE for FEMA "Whole-of-Nation" Effort Combating COVID-19](#)
- April 15, 2020: [Navy MWR at Home Helps Sailors, Families 'Stay Active, Stay Informed, Stay Connected'](#)
- April 15, 2020: [Navy Reserve App to Deliver Real-Time Access to Business Processes](#)
- April 14, 2020: [Fleet and Family Services Still Open for Business Over Phone, Web](#)
- April 14, 2020: [Navy Museums Donate PPE to Local Clinics](#)
- April 14, 2020: [Chaplains Prove Essential to COVID-19 Response](#)
- April 14, 2020: [Navy Exchange Service Command Hosts Virtual "We Stand Together" Concert Series](#)
- April 14, 2020: [Humanitarian Response Program Offers Expertise For COVID-19 Response](#)
- April 13, 2020: [Emergency Physician of 44 Years Postpones Retirement to Fight COVID-19](#)
- April 13, 2020: [Navy Authorizes Retiring Officers to Stay Until December](#)
- April 13, 2020: [Leadership Tips in Challenging Times](#)
- April 13, 2020: [NEX Creates New Program to Bring the Store to a Sailor's Door](#)
- April 13, 2020: [Navy Sailor Assigned to USS Theodore Roosevelt Dies of COVID-Related Complications](#)
- April 10, 2020: [Naval Academy Cancels All Public Commissioning Week 2020 Events; USNA and NROTC Ceremonies Go Virtual](#)
- April 10, 2020: [3rd Marine Logistics Group Supports USS Theodore Roosevelt](#)
- April 10, 2020: [Commander, Fleet Activities Yokosuka Hosts a "Camp In" to Support Physical Distancing](#)
- April 11, 2020: [Chief of Navy Reserve Releases Message to the Force](#)
- April 10, 2020: [Naval Academy Cancels All Public Commissioning Week 2020 Events; USNA and NROTC Ceremonies Go Virtual](#)
- April 10, 2020: [3rd Marine Logistics Group Supports USS Theodore Roosevelt](#)
- April 10, 2020: [Commander, Fleet Activities Yokosuka Hosts a "Camp In" to Support Physical Distancing](#)
- April 8, 2020: [Naval Base San Diego Mission Ready While Fighting COVID-19](#)
- April 8, 2020: [Navy Exchange Service Command Issues PPE Guidance for Associates](#)
- April 8, 2020: [Meal Allowance Rules Modified for Sailors Restricted to Government Quarters](#)
- April 8, 2020: [NCIS: Sailors, Marines, Civilians Beware of Card-Cracking Scams](#)
- April 7, 2020: [NAVWAR Enterprise Delivers Innovative Solutions for Increased Readiness in Support of COVID-19 Relief Efforts](#)
- April 7, 2020: [Navy Lodge Program Supports Those on Restriction of Movement Status Due to COVID-19](#)
- April 7, 2020: [Navy Mandates Face Covering: What You Need to Know](#)
- April 6, 2020: [NAVCO Launching SHIP2SHORE Virtual Outreach Program](#)
- April 6, 2020: [Navy Exchange Service Command Donates 240 N-95 Masks to Naval Air Station Pensacola Fire Department](#)
- April 6, 2020: [Info Warfare Training Detachment Entertains Base-Bound Sailors While Social Distancing](#)
- April 5, 2020: [7th Fleet Commander Arrives in Guam During COVID-19 Recovery](#)
- April 4, 2020: [Rapid Mobilization Process Established for Reservists Supporting COVID-19 Response](#)
- April 3, 2020: [Navy Deploys Expeditionary Medical Facility Personnel to Support Federal COVID-19 Response](#)
- April 3, 2020: [Navy College Program Continues During COVID-19 Pandemic](#)
- April 3, 2020: [NAVSUP FLC Norfolk Helps Comfort Get Underway for New York](#)

        

Skip to main content (Press Enter).

- April 2, 2020: [Navy, Marine Corps Partner With Industry, FEMA to 3-D Print Face Shields](#)

- April 2, 2020: [Before COVID-19, U.S. Naval War College War Game Examined Epidemic Response](#)

- April 1, 2020: [Comfort Treats First Patients in New York](#)

- April 1, 2020: [U.S. Navy Support Facility Diego Garcia Ramps Up Social Distancing](#)

- April 1, 2020: [Undersea Warfare Center Builds Face Shields for Local Medical Community](#)

- April 1, 2020: [DC-Area Fleet/Family Support Center Offers Webinars to Help Navigate COVID-19](#)

- March 31, 2020: [24/7 Chaplain Hotline for Reserve Sailors Starts April 1](#)

- March 30, 2020: [Comfort Arrives in New York](#)

- March 29, 2020: [Comfort Underway to Support City of New York](#)

- March 27, 2020: [Navy Exchange Service Command Closes Tailor/Embroidery, Laundry, Dry Cleaning Shops Due To COVID-19](#)

- March 27, 2020: [USNS Mercy Arrives in Los Angeles](#)

- March 27, 2020: [Amid COVID-19 Restrictions SkillBridge Internships Continue](#)

- March 27, 2020: [St Louis Native Supports Nation's COVID-19 Response Efforts Aboard USNS Mercy](#)

- March 27, 2020: [Navy Strengthens Supply Chain During COVID-19 Pandemic](#)

- March 26, 2020: [Navy Authorizes Enlistment Extensions, Re-Entry Opportunities](#)

- March 26, 2020: [Navy Base in Japan Works to Keep COVID-19 at Bay](#)

- March 25, 2020: [U.S. Navy Reports Updated Positive COVID-19 Cases](#)

- March 25, 2020: [Navy Consolidates COVID-19 Prevention Policies in NAVADMIN 080/20](#)

- March 25, 2020: [Naval Postgraduate School Continues Prep for Spring Classes Online](#)

- March 24, 2020: [Navy Reserve Arrives to Support USNS Mercy](#)

- March 24, 2020: [Containing COVID-19: Why the Navy Sent Me Home](#)

- March 24, 2020: [TAP Available Online for Transitioning Sailors](#)

- March 23, 2020: [USNS Mercy Departs San Diego](#)

- March 23, 2020: [U.S. Naval War College Turns to Virtual Town Hall, All-Hands Call in Response to COVID-19](#)

- March 22, 2020: [Navy Exchange Service Command Closes Barber and Beauty Shops in Response to COVID-19](#)

- March 22, 2020: [Navy Preventive Medicine Teams Embark Ships in 7th Fleet](#)

- March 21, 2020: [Naval War College Moves Lectures, Seminars Online, Postpones Events to Fight COVID-19](#)

- March 20, 2020: [Navy Exchange Suspends All In-Store Vendor and Sales Events](#)

- March 20, 2020: [Navy Increasing Health Protection Measures on Installations to Fight COVID-19](#)

- March 20, 2020: [Telework Increased for Reserve Sailors; Some Admin Requirements Waived](#)

- March 19, 2020: [Recruit, Officer Graduation Ceremonies Canceled Till Further Notice](#)

- March 19, 2020: [Navy Postpones Selection Boards](#)

- March 18, 2020: [Navy Authorizes COs to Relax Some Grooming Standards if Necessary](#)

- March 18, 2020: [NCIS: Beware of Coronavirus-Themed Scams](#)

- March 18, 2020: [Chief of Chaplains Provides COVID19 Mitigation Guidance](#)

- March 18, 2020: [Navy Cancels Spring 2020 Fitness Cycle, Delays Advancement Exam](#)

- March 18, 2020: [Navy School Closed After Third COVID-19 Case](#)

- March 17, 2020: [Updated Training Track Guidance Issued](#)

- March 16, 2020: [Navy Museums Temporarily Close](#)

- March 15, 2020: [COVID-19: Important Information for U.S. Navy Reservists](#)

- March 15, 2020: [Navy Sets Coronavirus Transfer and Travel Rules: What You Need to Know (March 15, 2020)](#)

Back to links





Skip to main content (Press Enter).

Supporting Video

- Feb. 4, 2022: Message from CNP: It's Time to Get Your COVID-19 Booster
- Jan. 10, 2022: COVID-19 Testing Conducted on NAS Sigonella
- Dec. 14, 2021: U.S. Navy Surgeon General COVID Booster Update
- Dec. 1, 2021: Message from Fleet Master Chief Koshoffer: CCDA Reminder
- Sep. 30, 2021: Get the Facts, and Get the Vax!
- Aug. 20, 2021: COVID Q and A - With Capt. Dianna Wolfson and Dr. Julia Cheringal
- Jul. 22, 2021: NMCSD Nurse Shares Why She Got The COVID-19 Vaccine
- Jun. 17, 2021: YOU ASKED: What is the Navy's way forward with the COVID-19 vaccine?
- May 28, 2021: We can do this - COVID-19 Vaccines - Active duty Servicemember and Spouse
- May 26, 2021: U.S. Navy Surgeon General COVID update
- Apr. 27, 2021: Surviving COVID-19 #2
- Apr. 14, 2021: Getting Your COVID-19 Vaccine is Quick and Easy (Fleet version)
- Mar. 22, 2021: COVID-19 Then And Now - Immunizations
- Feb. 3, 2021: Reagan Sailors give their reasons for receiving the COVID-19 vaccine
- Jan. 13, 2021: NMCSD COVID-19 Vaccine Video
- Jan. 11, 2021: Coronavirus Vaccines on USS San Antonio
- Dec. 16, 2020: Lieutenant Emily Micciolo talks about receiving COVID-19 vaccine
- Dec. 16, 2020: Captain Shelley Perkins talks about the first round of COVID-19 vaccination at Naval Hospital Camp Pendleton
- Dec. 16, 2020: U.S. Navy Lieutenant Commander Devon Czarzasty talks about the COVID-19 Vaccination
- Dec. 16, 2020: NMCSD's Coronavirus Vaccine MAO
- Dec. 15, 2020: NMCSD COVID-19 Vaccine Interview
- Dec. 15, 2020: NMCSD COVID-19 Vaccine Transfer to NHCP
- Dec. 15, 2020: COVID-19 vaccine arrives at Naval Hospital Camp Pendleton
- Dec. 15, 2020: NMCSD Distributes COVID-19 Vaccine
- Dec. 15, 2020: Naval Medical Center San Diego COVID-19 Vaccine Teleconference
- Dec. 15, 2020: COVID-19 Vaccine Arrives at Naval Hospital Pensacola
- June 3, 2020: Basic Information on COVID19 Contact Tracing Process in the U.S. Navy
- April 25, 2020: America Strong
- April 3, 2020: Secretary Modly appearance on Hugh Hewitt Show to discuss Navy response to COVID-19
- March 24, 2020 (Facebook Live Press Conference): Secretary of the Navy, Chief of Naval Operations, Navy Surgeon General, Master Chief Petty Officer of the Navy
- March 24, 2020: Acting Secretary of the Navy Thomas B. Modly – Message to the Fleet
- March 23, 2020: USNS Mercy (T-AH 19) Deploys in COVID-19 Response Support
- March 23, 2020 (Facebook Video): Press Availability on USNS Mercy Deployment
- March 21, 2020: Chief of Naval Personnel Virtual Town Hall
- March 19, 2020: CNO's Message to the Fleet on Coronavirus
- March 18, 2020: Coronavirus Terms to Know
- March, 14, 2020: Message From Chief of Naval Operations ADM Mike Gilday and Master Chief Petty Officer of the Navy Russell Smith
- March 14, 2020: Stop the Spread of Germs Everyday
- Feb. 26, 2020: Navy Surgeon General's Message

Back to links

  

## DoD, Navy Leadership Statements

[DoD Workplaces](#)

- Oct.4, 2021: [Mandatory Coronavirus Disease 2019 Vaccination of DoD Civilian Employees](#)
- Aug. 24, 2021: [Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members](#)
- Dec. 15, 2020: [CNO Gilday Issues a Message to the Fleet on the COVID Vaccine](#)
- April 14, 2020: [U.S. Naval Forces Europe-Africa and U.S. 6th Fleet Resiliency Letter](#)
- April 11, 2020: [Chief of Navy Reserve Releases Message to the Force](#)
- March 31, 2020: [Vice Chief of Naval Operations Message to Navy Leadership](#)
- March 30, 2020: [COVID-19 Navy Update: CNO and MCPON Message to the Fleet](#)
- March 27, 2020: [Memo from Secretary of Defense to all DoD Personnel](#)
- March 26, 2020: [Chief of Naval Operations Statement on USS Theodore Roosevelt](#)
- March 25, 2020 (DoD Statement): [Overseas Stop Movement Order in Response to COVID-19](#)
- March 18, 2020: [Hospital Ships, Other DOD Assets Prepare for Coronavirus Response](#)
- March 14, 2020: [Statement by the Department of Defense on COVID-19 Response Measures on the Pentagon Reservation](#)
- March 13, 2020: [Department of Defense Statement on Enhanced Protection Measures at Pentagon](#)

Back to links

---

## TRANSCOM Release

- Jan. 10, 2021: [USTRANSCOM Leaders Receive COVID-19 Vaccine](#)
- Dec. 22, 2020: [Maintaining Warfighting Readiness amidst the COVID-19 Pandemic](#)
- Mar. 17, 2020: [Most Defense Personal Property Pick-ups and Pack-outs Paused; Deliveries Continue](#)

Back to links

---

## More Resources

- [Navy Remote Work Information & Guidance (CAC Required) Published by the DON Deputy Chief Information Officer for the Navy](#)
- [Military Health System Nurse Advice Line](#)
- [MyNavy Career Center](#)
- [Psychological Health Resource Center](#)
- [Navy Marine Corps Public Health Center](#)
- [Department of Defense Coronavirus Update Site](#)
- [Centers for Disease Control and Prevention COVID-19 Website](#)
- [Military OneSource: Coronavirus Information for Our Military Community](#)
- [Coronavirus Guidance from TRICARE](#)
- [Navy-Marine Corps Relief Society: Coronavirus Response](#) (video)
- [Health Information Privacy (Dept. of Health and Human Services)](#)


Skip to main content (Press Enter).









Get plenty
of sleep



Try to eat
healthy,
well-balanced
meals



Stretch,
meditate
and
exercise
regularly



MAINTAINING
MENTAL A





NCIS TIPS:
Download iTunes or G
www.ncis.navy.mil









Select Language

Powered by Google **Translate**

Google Translation Disclaimer

| | | | |
|---|---|---|---|
| Site Map | No Fear Act Data | Veterans Crisis Line | Plain Writing |
| FOIA | USA.gov | NCIS Tips | Privacy Program |
| Navy.com | Section 508 | Information Quality | DOD Strategic Plans |
| Privacy Policy | SAPR | Open Government | |










**U.S. Navy Office of Information**

Chief of Information
Attn: US Navy
1200 Navy Pentagon
Washington DC 20350-1200

Hosted by Defense Media Activity - WEB.mil







Tab 6



Home » Budget Industry » Navy Nearing 1,500 COVID-19 Vaccine Separations

# Navy Nearing 1,500 COVID-19 Vaccine Separations

**By: Heather Mongilio**
**July 27, 2022 6:54 PM** • Updated: July 28, 2022 10:03 AM



Pls.' Opp. to Assertion of Mootness App. 0046

*Hospital Corpsman 3rd Class Robert Moore, assigned to USS George W. Bush (CVN-77) medical department, administers a COVID-19 vaccine at the McCormick Gym onboard Naval Station Norfolk, April 8, 2021. US Navy Photo*

*This story has been updated with additional information from the Office of the Chief of Naval Personnel.*

The Navy separated 259 sailors for their refusal to get vaccinated against COVID-19 in the last month, according to the Navy's monthly COVID-19 update.

Of the total 1,466 separations, 1,121 are active-duty sailors, while 323 are reservists. Another 22 separations are sailors who were in their first 180 days of service.

The Navy has the second highest number of separations of the Department of Defense military branches. The Marine Corps, which leads the services, has separated more than double the number of service members.

As of the last Marine Corps update, published on June 6, the service had separated 3,069 Marines.

The Army has the third highest, with 1,379 separations, slightly below the Navy, it announced July 22. The Air Force has the fewest separations at 834, according to its July 12 update.

The Navy is not able to separate any sailors who have requested a religious exemption to the COVID-19 vaccine due to a ruling in the Fifth Circuit. The Department of Defense has filed an appeal in the case, according to court records.

The Navy received 3,371 requests for religious waivers from active-duty sailors and 873 from reservists. The service has granted 13 religious accommodations to members of the Individual Ready Reserve on the condition that they get vaccinated if called to active-duty or reserve status.

It also granted 43 religious waivers to sailors who are the process of retiring or leaving the service.

The sea service also granted 19 permanent and 189 temporary medical exemptions to active-duty sailors. It gave three permanent and 65 temporary medical waivers to reservists.

Pls.' Opp. to Assertion of Mootness App. 0047

2/13/23, 4:19 PM                    Navy Nearing 1,500 COVID-19 Vaccine Separations - USNI News

Case: 22-10077      Document: 284      Page: 211      Date Filed: 02/13/2023
Case 4:21-cv-01236-O   Document 225   Filed 02/13/23   Page 52 of 162   PageID 7553

Since the beginning of the pandemic in early 2020, there have been 102,697 cases of COVID-19 among sailors, according to the Navy statistics, resulting in 17 deaths.

There are 3,147 active-duty and 3,432 reserve sailors who are unvaccinated.

---

**Related**



[Navy Exceeds 1,500 COVID-19 Vaccine Refusal Separations](#)
August 24, 2022
In "News & Analysis"



[COVID-19 Vaccine Refusal Separations Increase to 884](#)
May 9, 2022
In "Budget Industry"



[Navy Nearing 1,000 COVID-19 Vaccine Denial Separations](#)
May 18, 2022
In "Military Personnel"

Article Keywords: Coronavirus, COVID 19, COVID-19 pandemic, COVID-19 vaccine, lawsuit, religious exemption, vaccine, vaccine exemption, vaccine mandate, vaccine refusal
Categories: Budget Industry, Military Personnel, News & Analysis, U.S. Air Force, U.S. Army, U.S. Marine Corps, U.S. Navy

---

# About Heather Mongilio

**Heather Mongilio is a reporter with USNI News. She has a master's degree in science journalism and has covered local courts, crime, health, military affairs and the Naval Academy.**

Follow @hmongilio

**View all posts by Heather Mongilio →**

---

Pls.' Opp. to Assertion of Mootness App. 0048

ALSO ON **USNI NEWS**

| | | | |
|---|---|---|---|
| **USNI News Fleet and Marine Tracker: Feb. …** | **French Navy to Set Sail for …** | **Former Navy Captain Sentenced to …** | **Ukrai… Contin…** |
| 6 hours ago · 1 comment | 10 days ago · 8 comments | 10 days ago · 10 comments | 4 days a… |
| These are the approximate positions of the U.S. Navy's deployed carrier strike … | French Navy amphibious warship FS Dixmude (L9015) and frigate FS La … | A former U.S. 7th Fleet operations officer was sentenced Thursday to … | The Dni… to be a … Russo-U… |

## USNI News Comment Policy

Please be thoughtful and respectful of others. Personal attacks and abusive language are not tolerated.

[ Got it ]

## 55 Comments

 **Login** ▾

**G**

Join the discussion…

LOG IN WITH        OR SIGN UP WITH DISQUS  ⑦

Name

Share                                Best   Newest   Oldest

Load more comments

**Subscribe**      **Privacy**      **Do Not Sell My Data**

2/13/23, 4:19 PM                    Navy Nearing 1,500 COVID-19 Vaccine Separations - USNI News

Case: 22-10077      Document: 284      Page: 213      Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 225    Filed 02/13/23    Page 54 of 162    PageID 7555

MENU

## Home
---
## Documents
---
## Top Stories
---
## COVID-19
---
## Fleet and Marine Tracker
---
## Advertise
---
## About
---



© 2012-2023 U.S. NAVAL INSTITUTE

Powered by Unleashed Technologies

Pls.' Opp. to Assertion of Mootness App. 0050

Tab 7

### U.S. Navy COVID-19 Updates



You are at the official site for Navy information and updates on Coronavirus Disease 19 (COVID-19). Visit frequently to learn about the latest policies, leadership messages, and guidance on how to protect yourself, your family, and your Shipmates.

Department of the Navy Return to the Workplace COVID-19 Guidance and Resources 2020 (updated July 28, 2020) (PDF). Information to assist the military and civilian employees on workforce management, reporting, testing, personnel protection, telework policy, travel and more. Information is subject to change. Consult the following links for updated guidance: ALNAV Library, NAVADMIN Library, and MARADMIN Library.

### NEED TO A REPORT COVID-19 CASE?

Go to MyNavy Portal at - https://www.mnp.navy.mil/group/navy-covid-19-reporting (CAC Enabled)

If you have any questions or experience any difficulties please contact the OPNAV COVID Cell via email OPNAV_COVID_CRISIS_RESPONSE_CELL@navy.mil or by phone at (703) 571-2822.

- For Navy-specific questions related to COVID-19 numbers and vaccination data, please email PTGN_CHINFONEWSDESK@NAVY.MIL.

# NAVY COVID-19 UPDATE

### May 25, 2022

- As of May 25, 2022, 3,989 active component and 3,262 Ready Reserve service members remain unvaccinated.
- As a result of the recent class action certification and corresponding injunction issued by the U.S. District Court for the Northern District of Texas, NAVADMIN 083/22, released March 30, 2022, suspends separation processing and adverse administrative consequences for Navy service members who submitted requests for religious accommodation from the COVID-19 vaccine requirement.
- There have been 1,074 separations for refusing the COVID-19 vaccine. In accordance with NAVADMIN 083/22, Sailors who submitted religious accommodation requests may no longer be separated for vaccine refusal. Vaccine refusers who have not submitted religious accommodation requests remain subject to adverse administrative action, including separation.
  - There have been 954 Active Component Sailors and 98 Reserve Component Sailors separated, all with an honorable characterization of service. Guidance for separating Navy service members refusing the vaccine was set by the COVID-19 Consolidated Disposition Authority and is detailed in NAVADMIN 283/21.
  - There have been 22 Entry Level Separations (ELS). In accordance with the Naval Military Personnel Manual (MILPERSMAN) 1910-154 and NAVADMIN 225/21, this reflects service members who, since the time of the vaccine mandate, were separated during initial training periods within their first 180 days of active duty.

Skip to main content (Press Enter).

- Thirteen religious accommodation requests for members of the Individual Ready Reserve (IRR) have been conditionally approved. A conditional

Search

  

who requested accommodation. 11 more conditional approvals have been completed since then.  The terms of NAVADMIN 083/22 and the protections afforded by the injunction will continue to apply to these requesters, notwithstanding the previous adjudication of their religious accommodation request. NAVADMIN 102/22 provides updated guidance to commanding officers for unvaccinated service members who submitted a religious accommodation request.

- As of May 25, 2022, there are 3,422 active duty and 869 Ready Reserve requests for a religious accommodation from immunization for the COVID-19 vaccine.
- As of May 25, 2022, active duty service members currently have 14 permanent medical exemptions and 213 temporary medical exemptions, and Ready Reserve service members currently have one permanent medical exemption and 78 temporary medical exemptions.
- Starting with the Dec. 10 report, the vaccination and religious accommodation request data is provided by the data collected by the COVID-19 Consolidated Disposition Authority (CCDA), as directed in NAVADMIN 249/21: CCDA Data Reporting Requirements. On Feb. 22, 2022, NAVADMIN 042/22 was released updating these reporting requirements.
- On Dec. 15, 2021, NAVADMIN 283/21 was released outlining execution guidance regarding separation of Navy service members refusing the COVID-19 vaccine.
- On Dec. 22, 2021, NAVADMIN 289/21 was released outlining guidance encouraging COVID-19 vaccine boosters.

|  | Cases | Hospitalized | Recovered | Deaths | Cumulative Total COVID Cases* |
|---|---|---|---|---|---|
| MIL | 1,008 | 1 | 93,630 | 17 | 94,655 |
| CIV | 1,668 | 6 | 45,543 | 119 | 47,330 |
| DEP | 118 | 0 | 11,521 | 7 | 11,646 |
| CTR | 245 | 0 | 12,397 | 49 | 12,691 |
| TOTAL | 3,039 | 7 | 163,091 | 192 | 166,322 |

* Active Cases + Recovered + Deaths = Cumulative Total COVID Cases

UNVACCINATED

|  | Active Duty | Ready Reserve |
|---|---|---|
| Unvaccinated | 3,989 | 3,262 |
| Religious Accommodation Request | 3,422 | 869 |

APPROVED EXEMPTIONS

|  | Active Duty | Ready Reserve |
|---|---|---|
| Permanent Medical | 14 | 1 |
| Temporary Medical | 213 | 78 |
| Religious Accommodation | 27 | 1 |

- In accordance with Navy mandatory COVID-19 vaccination and reporting policy guidance, the deadline for active-duty Navy service members to be fully vaccinated was Nov. 28, 2021. Ready Reserve Navy service members will be fully vaccinated by Dec. 28, 2021. New accessions will be

Skip to main content (Press Enter)

- In order to ensure a fully vaccinated force, U.S. Navy policy is to process for separation all Navy service members who refuse the lawful order to

- The Navy issued a press release outlining guidance to commands for service members who refuse to comply with the service's order mandating

  

dose of a two- dose COVID-19 vaccine or two weeks after receiving a single dose of a one-dose COVID-19 vaccine. Booster shots are still under evaluation and will be addressed via separate message.

- Unvaccinated: Per NAVADMIN 249/21, this includes Navy service members who:
  - refused the vaccine
  - started the vaccination series, but are not complete
  - are pending medical exemption
  - have an approved medical exemption
  - are pending religious accommodation exemption
  - have an approved religious exemption
  - have not had access to the vaccination due to operational schedule and/or remote location
- Medical: Medical exemptions will be determined by health care providers based on the health of the requestor, and the nature of the immunization under consideration in line with BUMEDINST 6230.15B and MILPERSMAN 1730- 020.
- Religious Accommodation: A religious accommodation is a category of administrative exemptions that provides an accommodation to a service member for an otherwise applicable military policy, practice, or duty. In accordance with The Religious Freedom Restoration Act, if such a military policy, practice or duty substantially burdens a service member's exercise of religious, accommodation unless:

- The military policy, practice, or duty is in furtherance of a compelling governmental interest (e.g. mission accomplishment, safety, force health).
- It is the least restrictive means of furthering that compelling governmental interest.
  - For more information, including frequently asked questions and Navy instructions, visit https://www.mynavyhr.navy.mil/Support- Services/Religious-Accommodations/
- Hyperlinks to Navy Administrative Messages:
  - NAVADMIN 102/22: CCDA ADDITIONAL GUIDANCE REGARDING MEMBERS REQUESTING RELIGIOUS ACCOMMODATION FROM COVID-19 VACCINATION REQUIREMENTS
  - NAVADMIN 083/22: CCDA INTERIM GUIDANCE REGARDING MEMBERS REQUESTING RELIGIOUS ACCOMMODATION FROM COVID-19 VACCINATION REQUIREMENTS
  - NAVADMIN 042/22: UPDATED COVID CONSOLIDATED DISPOSITION AUTHORITY DATA REPORTING REQUIREMENTS AND LESSONS LEARNED
  - NAVADMIN 007/22: U.S. NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE 5.0
  - NAVADMIN 289/21: GUIDANCE ENCOURAGING COVID-19 VACCINE BOOSTER
  - NAVADMIN 283/21: CCDA EXECUTION GUIDANCE TO COMMANDERS
  - NAVADMIN 256/21: CCDA GUIDANCE TO COMMANDERS
  - NAVADMIN 249/21: CCDA DATA REPORTING REQUIREMENTS
  - NAVADMIN 225/21: COVID-19 CONSOLIDATED DISPOSITION AUTHORITY (CCDA)
  - ALNAV 062/21: 2021-2022 DEPARTMENT OF THE NAVY MANDATORY COVID-19 VACCINATION POLICY
  - NAVADMIN 190/21: 2021-2022 NAVY MANDATORY COVID-19 VACCINATION AND REPORTING POLICY

## Go to the Links below for more information

- Operational Guidance
- NAVADMINs
- ALNAVs
- ALNAVRESFOR
- MyNavyHR Videos

Skip to main content (Press Enter).

- **Supporting Video**
  - *D. D. Navy Leadership Statement*
- More Resources

  

## Operational Guidance

- U.S. Navy Updates Guidance to Combat COVID-19 (Nov. 4, 2020)
- COVID-19 Mitigation Framework Infographic (May 19, 2020)
- U.S. Navy Response to the COVID-19 Pandemic Infographic (May 19, 2020)
- Return-to-Work Guidelines Infographic (May 18, 2020)
- Navy Telework Capabilities Graphic (May 6, 2020)
- COVID-19 Healthcare Provider Guidance (April 30, 2020)
- Cyber Awareness – Protect Sailors and Families Online (February 2020)

Back to links

## NAVADMINs

- Aug. 30, 2021: 190/21 2021-2022 Navy Mandatory COVID-19 Vaccination and Reporting Policy
- Aug. 23, 2021: 180/21 Update 3 to Navy COVID-19 Reporting Requirements
- July 29, 2021: 161/21 Updated Mask Guidance for All DOD Installations and Other Facilities
- July 28, 2021: 159/21 Special Leave Accrual for the Navy
- July 13, 2021: 150/21 Department of Defense COVID-19 Testing Prior to Overseas Travel (Update 2)
- June 16, 2021: 129/21 Physical Readiness Program Update for Calendar Year 2021 (CY2021) Physical Fitness Assessment
- June 15, 2021: 123/21 Procedures for Foreign Visit requests to U.S. Navy Commands During COVD-19 Pandemic
- June 2, 2021: 110/21 U.S. Navy COVID-19 Standing Guidance Update 1
- May 21, 2021: 100/21 Cancellation of Urinalysis Policy Update
- May 21, 2021: 100/21 Cancellation of Urinalysis Policy Update
- May 21, 2021: 99/21 U.S. Navy COVID 19 Standard Guidance
- May 14, 2021: 95/21 Interim Update on DOD Mask Guidance
- May 4, 2021: 88/21 SARS-COV-2 Vaccination and Reporting Policy Update
- Apr. 30, 2021: 086/21 Updated Guidance to Commanders on Adjusting Health Protection Conditions and Base Services During COVID-19 Pandemic
- Apr. 05, 2021: 073/21 Navy Mitigation Measures in Response to Coronavirus Outbreak Update 7 (Conditions-Based Approach to COVID-19 Personnel Movement and Travel Restrictions)
- Mar. 10, 2021: 059/21 Use of Masks and other Public Health Measures during COVID-19 pandemic
- Mar. 03, 2021: 052/21 Procedures for Foreign Visit Requests to U.S. Navy Commands during COVID-19 pandemic
- Feb. 16, 2021: 038/21 Process to Request Exception on use of Masks and Other Public Health Measures During COVID-19 Pandemic (Corrected Copy)
- Feb. 16, 2021: 037/21 U.S. Navy COVID-19 Standardized Operational Guidance Version 4.0 (Cancelled May 21, 2021 per NAVADMIN 099/21)
- Jan. 29, 2021: 026/21 Department of Defense COVID-19 Testing Prior to Overseas Travel (Update 1)
- Jan. 7, 2021: 003/21 DEPARTMENT OF DEFENSE COVID-19 TESTING PRIOR TO OVERSEAS TRAVEL

Skip to main content (Press Enter).

- Dec. 16, 2020: 327/20 SARS-COV-2 VACCINATION AND REPORTING POLICY

  

per NAVADMIN 298/20)

- August 24, 2020: 236/20 UPDATED PROCEDURES FOR FOREIGN VISIT REQUESTS TO U.S. NAVY COMMANDS DURING COVID-19 PANDEMIC
- August 21, 2020: 235/20 Announcement of Approval of  Humanitarian Service Medal (HSM) and Armed Forces Service Medal (AFSM) for Department of Defense Coronavirus (COVID 19) Operations and Activities
- August 14, 2020: 231/20 Flexibility For Fiscal Year 2020 Sexual Assault Prevention Response and Suicide Prevention General Military Training Requirements
- August 10, 2020: 225/20 Third Extension of Global Authorized Departure For Individuals At Higher Risk From COVID-19
- August 4, 2020: 217/20 U.S. Navy COVID-19 Standardized Operational Guidance Version 2.1 (Cancelled Sep. 30, 2020 per NAVADMIN 266/20)
- July 13, 2020: 197/20: Second Extension of Global Authorized Departure for Individuals at Higher Risk from COVID-19
- July 9, 2020: 195/20: Casualty and Mortuary Affairs Processes in Response to COVID-19 Update Two
- July 8, 2020: 194/20: Face Coverings in Uniform
- July 7, 2020: 193/20: Physical Readiness Program Policy Update for Physical Fitness Assessment Cycle Two 2020 Due to COVID19 Mitigation
- July 2, 2020: 189/20: Navy Mitigation Measures In Response to Coronavirus Outbreak Update 6
- June 30, 2020: 185/20: CNO Message to the Fleet on Sustaining Readiness
- June 25, 2020: 178/20: COVID-19 Testing
- June 17, 2020: 173/20: U.S. Navy COVID-19 Standardized Operational Guidance Version 2.0 (Cancelled Aug. 4, 2020 per NAVADMIN 217/20)
- June 12, 2020: 169/20: Permanent Change of Station Post Stop Movement Priority Plan
- June 12, 2020: 168/20: Navy Mitigation measures In Response to Coronavirus Outbreak Update 5  (Cancelled July 2, 2020 per NAVADMIN 189/20)
- June 10, 2020: 164/20 Extension of Termination of Global Authorized Departure for Individuals at Hight Risk from COVID-10
- June 4, 2020: 163/20: Modification-2 to the Notice of Convening FY-21 Active-Duty Officer Continuation Selection Boards and Announcement of Continuation Policy
- May 29, 2020: 160/20:  Guidance on Conducting Ceremonies for Retirement or Transfer to the Fleet Reserve Delayed Due to the Coronavirus Pandemic
- May 29, 2020: 159/20:  Termination of Departure Authority for Individuals at Higher Risk From COVID-19
- May 26, 2020: 155/20: U.S. Navy COVID-19 Standardized Operational Guidance (Cancelled June 17, 2020 per NAVADMIN 173/20)
- May 20, 2020: 148/20: Updated Policy for the Use of Embedded Computer Capabilities and Peripherals to Support Two-Way Collaboration
- May 20, 2020: 147/20: Guidance to Commanders on Adjusting Health Protection Conditions and Base Services
- May 19, 2020: 145/20: Advancement Eligibility Related to Changes to the Navy-Wide Advancement Exam and Physical Fitness Assessment Schedules Due to COVID-19 Mitigation
- May 15, 2020: 144/20: Recommencement of Selection Boards and Announcement of Revised Schedule
- May 6, 2020: CNO Message to the Fleet
- May 4, 2020: 132/20 Manning Initiatives Announced to Mitigate Fleet Gaps
- May 1, 2020: 129/20 Guidance on Evaluation of Deployability, Temporary Limited Duty, and Referral to the Disability Evaluation System (DES) during the Coronavirus (covid-19) Pandemic
- May 1, 2020: 128/20 Naval History and Heritage Ideas and Online Resources to Support Fleet Learning and at Home Education during the Pandemic
- April 30, 2020: 126/20 Protection of Service Members and Families Executing Inbound/Outbound Household Goods Moves During Covid-19 Stop Movement

- April 27, 2020: 121/20: Supplemental Number Two for E4 Though E7 February 2020 (Cycle 106) Selective Reserve and March 2020 (Cycle 247) E4 Through E6 Active Duty, Full Time Support and Canvasser Recruiter Navy Wide Advancement Examination

*NAVADMIN 108/20)*

  

- April 15, 2020: 109/20 – COVID-19 Update Guidance to Support Fleet Operations
- April 10, 2020: 105/20: Expanded Opportunity For Retention On Active-Duty In A Retired Status For Active-Duty Officers With Pending Statutory Retirements
- April 8, 2020: 104/20: CNO Message to the Fleet
- April 7, 2020: 101/20: Exception to Policy for Small Arms Training and Qualification Criteria and Navy Security Forces Annual Sustainment Training Requirements
- April 7, 2020: 102/20: Casualty and Mortuary Affairs Processes in Response to COVID-19
- April 5, 2020: 100/20: Navy Guidance on the Use of Face Coverings
- April 3, 2020: 99/20: Mobilization Processing of Navy Reserve Personnel in Support of COVID-19 Response Operations
- April 3, 2020: 98/20: Procedures for Navy Entities to Contribute Additively Manufactured Parts or Services in Response to COVID-19
- April 2, 2020: 97/20: Common Access Card Issuance Policy Update for COVID-19
- March 27, 2020: 93/20: Commercial Virtual Remote (CVR) Collaboration Environment
- March 27, 2020: 92/20: Urinalysis Policy Update (Cancelled May 21, 2021 per NAVADMIN 100/21)
- March 26, 2020: 89/20: Voluntary Extensions for Active Component Navy Members with Approved Separation or Retirement Dates
- March 25, 2020: 88/20: Requirements for Authorized and Ordered Departures
- March 23, 2020: 83/20: Restriction of Movement Guidance
- March 23, 2020: 82/20: Navy Transition Assistance Program Policy Update for COVID-19
- March 21, 2020: 80/20: Navy Mitigation Measures in Response to Coronavirus Outbreak: Update 3
- March 19, 2020: 75/20: Maintaining and Protecting the Navy Accessions Supply Chain
- March 19, 2020: 74/20: Mitigation Measures in Response to Coronvavirus Outbreak (Update 2)
- March 18, 2020: 73/20: Temporary Relaxation of Hair Grooming Standards in Response to Coronavirus Outbreak
- March 18, 2020: 72/20: Navywide Advancement Examinations
- March 18, 2020: 71/20: Physical Readiness Policy Update
- March 17, 2020: 69/20: Enlisted Advancement Exams Postponed
- March 17, 2020: 68/20: Effective use of Remote Work Options
- March 14, 2020: 65/20: Overseas Travel
- March 12, 2020: 64/20: Navy Mitigation Measures in Response to Coronavirus Outbreak

Back to links

## ALNAVs

- Aug. 30, 2021: 062/21 2021-2022 Department of the Navy Mandatory COVID-19 Vaccination Policy
- Apr. 30, 2021: 032/21 Update to Department of the Navy Health Protection Condition Policies
- June 12, 2020: 67/20: Cancellation of ALNAV 044/20 and 49/20 Per SECDEF Memo transitions to a conditions based movement order
- May 21, 2020 – 59/20: 101 Days of Summer Safety
- May 4, 2020 – 52/20: Public Service 2020
- April 22, 2020 – 49/20: Modifications to ALNAV 044/20: Reissuance of Department of the Navy Travel Restrictions in Response to Coronavirus Disease 2019
- April 21, 2020 - 44/20: Reissuance of Department of the Navy Travel Restrictions in Response to Coronavirus Disease 2019

- April 3, 2020 – SECNAV Vector 18: Serving Our Country (also posted on ALNAV site)

- March 31, 2020 – 25/20: Special Duty Medical Examination Update in Delivering Readiness amongst the Coronavirus Disease 2019

- March 20, 2020 – 20/20: (SECNAV Vectors Blog: Vector 16: Agility in Time of Crisis (As posted to ALNAV site)

  

- March 12, 2020 – 25/20: Force Protection Guidance for the Department of the Navy

Back to links

## ALNAVRESFOR

- June, 22, 2020 – 13: Reserve Force Conditions-Based Approach to Personnel Movement
- May 21, 2020 – 12: CNRF-Navy Reserve Force Policy for COVID-19 Update 2
- April 16, 2020 – 11: CNRF-Navy Reserve Force Policy for COVID-19
- April 16, 2020 – 10: CNRF-Message to the Force from VADM McCollum
- March 20, 2020 – 09: Navy Reserve Enhanced Telecommuting Procedures
- March 17, 2020 – 08: Reserve Mitigation Measures in Response to Coronavirus

Back to links

## MyNavyHR Videos

- Feb. 10, 2021: News You Can Use - Face Mask Update
- May 29, 2020 – Boards Resume
- May 29, 2020 – Retirements During COVID-19:
- May 29, 2020 – Medical and Dental Elective Procedures
- May 4, 2020 – Retired/Separated Sailors' Return to Active Duty Options
- May 4, 2020 – Personnel Mitigation Measures
- May 4, 2020 – MyNavy Family App Update
- May 4, 2020 – Selective Reenlistment Bonus Update
- April 29, 2020 – Coronavirus (COVID-19) Tutor.com
- April 22, 2020 – Leave Accumulation Update
- April 22, 2020 – Sea Duty Incentive Pay
- April 22, 2020 – Stop Movement
- April 22, 2020 – CAC and USID Cards Update
- April 14, 2020 – Naval Academy Update
- April 14, 2020 – Contacting Navy College Education Counselors
- April 9, 2020 – Reducing Team Stress
- April 9, 2020 – Retire to Retain Policy
- April 8, 2020 – Face Coverings Update

Skip to main content (Press Enter).

- April 8, 2020 – [Basic Allowance for Subsistence](#)
- ~~April 8, 2020~~
- ~~March 23, 2020~~ [NAVADMIN 86/20](#)

  

- March 20, 2020 – [Board Suspension](#)
- March 20, 2020 – [Relaxed Grooming Standards](#)
- March 19, 2020- [Advancement Exams Postponement Clarification](#)
- March 19, 2020 – [Restriction of Movement Update](#)
- March 19, 2020 – [PFA Suspension Update](#)
- March 18, 2020 – [Advancement Exams Postponed](#)
- March 18, 2020 – [Details on Upcoming Advancement Exams](#)
- March 18, 2020 – [Orders, Coronavirus Warning Signs](#)
- March 17, 2020 – [Coronavirus Testing](#)
- March 17, 2020 – [Leave and Liberty, Travel Reimbursements](#)
- March 16, 2020 – [Freeze on PCS Moves](#)
- March 16, 2020 – [HHG Reimbursements for Canceled Moves, PCS Orders to Alert-Level 2 Countries](#)
- March 16, 2020 – [Nonessential OCONUS Travel](#)

Back to links

## Navy.mil Releases

- Nov. 15, 2021: [Navy Updates Guidance for COVID-19 Vaccine Refusal](#)
- Oct. 20, 2021: [Navy Identifies Sailor Who Died of COVID-Related Complications](#)
- Oct. 6, 2021: [Navy Identifies NAWDC Sailor Who Died of COVID-Related Complications](#)
- Sept. 20, 2021: [Navy Identifies Sailor Who Died of COVID-Related Complications](#)
- Sept. 20, 2021: [NEPLO Surges Medical Teams Back Into National Guard Hotspot](#)
- Sept. 1, 2021: [Navy Supports Mandatory COVID-19 Vaccination for all Active Duty and Reserve Sailors](#)
- Aug. 18, 2021: [Navy Identifies Sailor Who Died of COVID-19 Related Complications](#)
- Aug. 17, 2021: [Navy Identifies Reserve Sailor Who Died of COVID-19 Related Complications](#)
- July 28, 2021: [Navy Identifies Reserve Sailor Who Died of COVID-19 Related Complications](#)
- July 28, 2021: [Navy Identifies Naval Medical Center Camp Lejeune Sailor Who Died of COVID-19 Related Complications](#)
- May 26, 2021: [Navy Administers One Million Vaccines since the Beginning of the COVID-19 Pandemic](#)
- May 26, 2021: [Navy Advancement Results for E-4 through E-6 Delayed Due to COVID-19](#)
- May 24, 2021: [U.S. Navy Issues COVID-19 Standing Guidance](#)
- May 22, 2021: [Navy Resumes Regular Urinalysis Operations](#)
- May 7, 2021: [U.S. Naval Hospital Naples Makes History with Unit Bravo Strike](#)
- May 4, 2021: [Theodore Roosevelt Carrier Strike Group Gets Vaccinated](#)
- May 4, 2021: [Expeditionary Strike Group 7 Sailors Stay COVID-Free While at Sea](#)
- May 3, 2021: [U.S. Navy Issues Updated Guidance to Commanders On Adjusting Health Protection Conditions and Base Services During COVID-19 Pandemic](#)
- Apr. 30, 2021: [Virginia Beach Sailor Dies of COVID-Related Complications](#)
- Apr. 29, 2021: [Iwo Jima ARG and 24th MEU Reach Milestone, 60 days COVID-Free](#)

- Apr. 20, 2021: [From COVID Testing to MHS GENESIS support, Lab Techs Do It All](#)
- Apr. 19, 2021: [COVID-19 Vaccines Distributed Onboard Washington, New York](#)
- Apr. 15, 2021: [Candid Comments Shared on Choosing COVID-19 Vaccine](#)

 

- Mar. 16, 2021: [From Sea to Shining Sea: Combating the Pandemic One Mile at a Time](#)
- Mar. 12, 2021: [U.S. Navy Accelerates Progress in Providing Vaccinations for Sailors](#)
- Mar. 11, 2021: [USS Dwight D. Eisenhower Receives Second COVID-19 Vaccination Shot](#)
- Mar. 11, 2021: [Naval Medical Research Center continues Research in Fight Against COVID-19](#)
- Mar. 10, 2021: [Suicide and COVID-19: How Navy Region Southeast is fighting back](#)
- Mar. 09, 2021: [Nursing the COVID Vaccine Forward](#)
- Mar. 09, 2021: [Porter Receives First Dose of COVID-19 Vaccine](#)
- Mar. 05, 2021: [USS Lake Champlain Sailors Receive COVID-19 Vaccine](#)
- Mar. 01, 2021: [Fleet Readiness Center Southeast supports COVID-19 containment efforts through 3D printing](#)
- Feb. 26, 2021: [U.S. 5th Fleet Responds to COVID-19 Aboard USS San Diego and USS Philippine Sea](#)
- Feb. 24, 2021: [Navy Identifies Assault Craft Unit 4 Sailor Who Died of COVID-Related Complications](#)
- Feb. 15, 2021: [Sailors Embarked on a U.S. Pacific Fleet Ship Test Positive for COVID-19](#)
- Feb 13, 2021: [Navy Identifies USS Wasp Sailor Who Died of COVID-Related Complications](#)
- Feb. 5, 2021: [Navy Identifies USS Tennessee Sailor Who Died of Coronavirus-related Complications](#)
- Feb. 5, 2021: [Navy Identifies Recruit Training Command Sailor Who Died from COVID-19](#)
- Feb. 4, 2021: [USS Ronald Reagan Begins Second Round of COVID-19 Vaccinations](#)
- Feb. 4, 2021: [Sailor Assigned to Kings Bay Unit Dies of COVID-Related Complications](#)
- Feb. 4, 2021: [TRF Kings Bay Provides Superior Support to Submarine Force](#)
- Jan. 28, 2021: [Navy Shifts 2021 Fitness Cycle to July](#)
- Jan. 28, 2021: [Navy Medical Personnel to Join in Texas COVID-19 Response](#)
- Jan. 28, 2021: [Initiation Innovation: Navigating Chief Season in the Midst of COVID](#)
- Jan. 26, 2021: [Navy, DoD Respond to COVID-19 in Navajo Nation](#)
- Jan. 23, 2021: [Fleet Forces Establishes Vaccination Cell to Expedite Delivery to Fleet](#)
- Jan. 22, 2021: [NSA Souda Bay Receives COVID Vaccine](#)
- Jan. 22, 2021: [Frontline Workers at Naval Station Rota, Spain Begin Receiving COVID-19 Vaccine](#)
- Jan. 13, 2021: [USS Ronald Reagan Begins COVID-19 Vaccinations](#)
- Jan. 12, 2021: [Navy Expeditionary Combat Command Leadership Receives COVID-19 Vaccine](#)
- Jan. 12, 2021: [Navy Exchange Great Lakes Buoys A-School Students Placed on Restriction of Movement After Holiday Break](#)
- Jan. 9, 2021: [NAS Sigonella Receives First Shipment of COVID-19 Vaccine](#)
- Jan. 7, 2021: [Service Members Transferring Overseas Must Test Negative for COVID-19 Before Flying](#)
- Jan. 6, 2021: [CDC Explains Benefits of COVID-19 Vaccine](#)
- Jan. 5, 2021: [U.S. 7th Fleet Sailors Receive COVID Vaccine](#)
- Jan. 5, 2021: [Additional Naval Military Treatment Facilities Receiving COVID-19 Vaccine](#)
- Jan. 4, 2021: [Commander of Military Sealift Command Receives COVID-19 Vaccine](#)
- Dec. 22, 2020: [Navy Announces Expanded Operational Stress Control Program: Here Are the Details](#)
- Dec. 21, 2020: [Southwest Regional Maintenance Center Hosts Blood Drives Benefitting Service Members](#)
- Dec. 17, 2020: [FLU SEASON 2020: Protect Yourself Against Two Viruses](#)
- Dec. 16, 2020: [U.S. Navy Issues Vaccine Guidance to Combat COVID-19](#)
- Dec. 15, 2020: [NMCSD Receives First Shipment of COVID-19 Vaccines](#)
- Dec. 15, 2020: [Naval Medical Forces Atlantic Hospitals to Be Among First to Receive COVID-19 Vaccine](#)
- Dec. 14, 2020: [COVID-19 Vaccine Headed to Naval Medical Center San Diego, Naval Hospital Camp Pendleton](#)
- Nov. 12, 2020: [Navy Publishes Scientific Paper on USS Theodore Roosevelt COVID-19 Outbreak](#)
- Nov. 12, 2020: [Navy/Marine Corps COVID-19 Study Findings Published in New England Journal of Medicine](#)
- Nov. 6, 2020: [Navy: ROM Is Official Duty Status](#)
- Nov. 4, 2020: [U.S. Navy Updates Guidance to Combat COVID-19](#)

Skip to main content (Press Enter).

- Oct. 28, 2020: Navy Junior ROTC Units Contend With New Normal in New School Year; Naval Science Instructors Meet New Challenge
- Oct. 22, 2020: Navy Researchers Evaluate UV Light Sources to Combat COVID-19

    

- Oct 16, 2020: Clothing, Textile Research Facility Pivots 3D Knitting Research to Face Covering Development
- Sept. 30, 2020: U.S. Navy Issues Standardized Operational Guidance 3.0
- Sept. 3, 2020: NAVCENT Medical Personnel Embed with Bahrain Ministry of Health to Manage Pandemic Response
- Sept. 3, 2020: Yokosuka Fleet Logistics Center Supports Incoming Personnel During Pandemic
- Aug. 19, 2020: Naval Safety Training Keeps Momentum with Virtual Learning
- Aug. 12, 2020: Recruit Training Command and Partners Work Together to Transform Drill Halls Into Barracks
- Aug. 10, 2020: USS Germantown's COVID-19 Rapid Response Team: Fighting Pandemic From The Deckplate
- Aug. 4, 2020: Lebanese Armed Forces, U.S. Navy Conduct Resolute Union Virtually Amid COVID-19 Pandemic
- Aug. 4, 2020: Staying the Course during COVID-19: Losing Weight and Feeling Great!
- July 31, 2020: Naval Laboratory Researcher's Invention Allows to Study Nanoparticle Gases
- July 31, 2020: MARMC SST Advances OSD Grasp of COVID Risk
- July 29, 2020: NHC Annapolis' Operational Approach to COVID-19 Prevention puts U.S. Naval Academy on Track for Fall 2020 Semester
- July 24, 2020: Navy Care Virtual Visits: Real-Time Access to Care, From Anywhere
- July 23, 2020: NMCB-3 Completes Turnover, Assumes Execution of Indo-Pacific Region NCF Operations
- July 23, 2020: Nimitz Receives COVID-19 Convalescent Plasma Administration Certification
- July 23, 2020: 4th Fleet Commander Hosts Maritime Staff Talks with Armada de Chile
- July 22, 2020: Sailors Needed to Move; NPC Innovated to put Them in Motion
- July 22, 2020: NAVWAR Trident Warrior Team Assesses New Tracking Technology for COVID-19 Mitigation
- July 21, 2020: Sailors Support COVID Response in Texas
- July 17, 2020: Change of Command in the Era of a Global Pandemic: Commander, Maritime Prepositioning Ships Squadron Two Changes the Helm
- July 15, 2020: Adaptability and Resilience: EMF-M's Historic Stateside Deployment Supporting COVID-19
- July 14, 2020: A SPRINT to Guam: Psychological First Aid in the COVID-19 Pandemic
- July 14, 2020: Navy Childcare Center Supports Sailors Through COVID-19
- June 25, 2020: Navy Establishes COVID-19 Surveillance Testing Program
- June 10, 2020: Navy Mobilizing Reservists Under SurgeMain Program to Support Ship Maintenance
- June 10, 2020: Addressing Mental Health Key to NDW Fleet and Family Support Center During Pandemic
- June 10, 2020: USS Kidd Commanding Officer Sends Thank You Letter to San Diego
- June 9, 2020: Findings From USS Theodore Roosevelt Public Health Investigation Support Force Health Protection
- June 9, 2020: U.S. Navy Navigates to 'New Normal'
- June 9, 2020: High School on U.S. Navy Base in Japan Holds Socially Distanced Graduation Ceremony
- June 9, 2020: Navy Emergency Liaisons Deploy in Record Numbers for Pandemic
- June 8, 2020: Mission Essential Training Continues During COVID-19 at Great Lakes Schools
- June 5, 2020: Center for Seabees Learning Sites Adjust Courses in Response to COVID-19
- June 5, 2020: Safety, Standards Uncompromised as Naval Special Warfare Center Restarts Paused Training Phases
- June 4, 2020: I Am Navy Medicine: Hospital Corpsman 3rd Class Marc Gasbarri
- June 4, 2020: Navy Pharmacy Adjusts Procedures in Response to COVID-19
- May 29, 2020: Navy Approves Interim Retirement Ceremony Rules
- May 29, 2020: Base Port Operations: 'Commitment and Ability to Protect America has Not Changed'
- May 27, 2020: Mental Health During the Pandemic: Understanding How Your Mind Responds to Disasters
- May 27, 2020: Navy Issues COVID-19 Standardized Operational Guidance
- May 27, 2020: Naval District Washington Recovery Working Group Plans for Post COVID-19 'New Normal'
- May 27, 2020: Virtual Fleet Week NY Concludes; City Thanks Servicemembers for Help in COVID-19 Fight
- May 26, 2020: Officer Training Command Uses Remote Learning to Train Leaders During Pandemic

2/13/23, 4:21 PM

Case: 22-10077    Document: 284    Pages: 225    Date Filed: 02/13/2023
Case 4:21-cv-01236-O    Document 225    Filed 02/13/23    Page 66 of 162    PageID 7507

- May 22, 2020: [Navy Releases Commander Guidance on Adjusting Health Protection Conditions (HPCON)](#)
- ~~May 21, 2020: Navy Reserve Extends Drill Postponement thru ... to Provide Additional Guidance for COVID-19~~
- ~~May 21, 2020: Supply Corps Reservists Apply Data, Logistics Expertise to COVID-19 Pandemic~~

  

- May 19, 2020: [Naval District Washington Personnel Adapt to Teleworking During COVID-19 Pandemic](#)
- May 17, 2020: [NEPLOs Coordinate Cross-Country Move of Navy Medical Personnel in COVID-19 Fight](#)
- May 15, 2020: [USNS Mercy Departs Los Angeles; Military Relief Efforts Continue](#)
- May 14, 2020: [Navy Exchange Service Command Provides Over Half Million Cloth Face Masks](#)
- May 14, 2020: [Senior Enlisted Academy Achieves Mission Success through Virtual Training during COVID-19](#)
- May 14, 2020: [Individual Ready Reserve Sailors Serve at Navy Medical Center Portsmouth](#)
- May 14, 2020: [NAVWAR Launches Data Fusion Tool, Maintains Fleet Readiness in Wake of Worldwide Pandemic](#)
- May 13, 2020: [Blue Angels to Salute Tennessee and Arkansas COVID-19 Responders](#)
- May 13, 2020: [U.S. Navy Ceremonial Guard Marches Forward During COVID-19 Pandemic](#)
- May 13, 2020: [The NEX Has You "Covered"](#)
- May 12, 2020: [Naval War College Faculty Steps Up to Assist U.S. Northern Command Planning Effort During COVID-19](#)
- May 12, 2020: [Crew Endurance Team Emphasizes Role of Sleep in Immunity](#)
- May 12, 2020: [Puget Sound Teams Fast-Track Biocontainment Prototype for Covid-19 Testing](#)
- May 11, 2020: [Blue Angels to Salute Michigan, Illinois, Indiana COVID-19 Responders](#)
- May 8, 2020: [U.S. Pacific Fleet Reaffirms Confidence in USS Theodore Roosevelt](#)
- May 8, 2020: [Fleet Activities Yokosuka Rolls Out Family Partner Program](#)
- May 8, 2020: [NEX, Navy Lodges Install Sneeze Shields to Help Stop Spread of COVID-19](#)
- May 7, 2020: [Southwest Regional Maintenance Center Prints Face Shields for Medical Personnel](#)
- May 7, 2020: [National Capital Region Military Treatment Facilities Continue Providing Quality Care During COVID-19 Pandemic](#)
- May 6, 2020: [Blue Angels to Salute Florida COVID-19 Responders](#)
- May 6, 2020: [Navy Exchange Service Command Associates Screened for COVID-19 Symptoms](#)
- May 4, 2020: [Naval Special Warfare Center Resumes Portions of Paused SEAL and SWCC Training](#)
- May 4, 2020: [NAVSUP Leading Way in 100% Safety Checks for HHG Moves](#)
- May 4, 2020: [Manning Initiatives Announced to Mitigate Fleet Gaps](#)
- May 4, 2020: [Blue Angels to Salute Texas, Louisiana COVID-19 Responders](#)
- May 4, 2020: [NMCP Staff Members Build a Ventilator In Wake of COVID-19](#)
- May 4, 2020: [HSC-26 Maintains Mission Readiness during COVID-19 Pandemic](#)
- May 2, 2020: [USS Constitution Hosting Daily Virtual Tours on Facebook Live](#)
- May 2, 2020: [NEX San Diego, Sustainable Support System Supplying Ships and Sailors](#)
- May 1, 2020: [Fleet Activities Yokosuka Call Center Serves Thousands](#)
- April 30, 2020: [NEXConnect Keeps Internet 'Light' On for Navy Community](#)
- April 30, 2020: [Undersea Warfare Center Partners With University of Alaska for COVID-19 Preparation](#)
- April 30, 2020: [Blue Angels, Thunderbirds to Salute Maryland, Washington D.C., Virginia, Georgia COVID-19 Responders](#)
- April 29, 2020: [Human Resources Comprehensive FAQ](#)
- April 29, 2020: [Truman Sailors Join Forces to Protect Against COVID-19](#)
- April 29, 2020: [Online Tutoring Now Available for Military and Civilian Families](#)
- April 29, 2020: [Barracks at Naval Base Guam Ordnance Annex Refurbished for Warfighter Support](#)
- April 29, 2020: [Naval Sea Systems Command Continues Fleet Support Despite COVID-19 Restrictions](#)
- April 29, 2020: [Navy MWR Digital Library Always Open](#)
- April 28, 2020: [Navy Provides Medical Care to Sailors of USS Kidd, Disinfects Ship](#)
- April 28, 2020: [Information Warfare Training Command Virginia Beach Employs Virtual Training to Help Keep Sailors, America Safe](#)
- April 28, 2020: [Sailors on Isolated Facility Use Radio to Keep Shipmates Informed, Connected](#)
- April 27, 2020: [USS Nimitz Departs for Training](#)
- April 27, 2020: [Navy Cancels Active/FTS E4 Exam, Sets Schedule for Finishing Advancement Cycles](#)
- ~~April 27, 2020: Florida Team Trains Culinary Specialists Virtually During Pandemic~~





- April 26, 2020: Thunderbirds, Blue Angels to Salute New York, New Jersey, Pennsylvania COVID-19 Responders
- April 24, 2020: USS Kidd Evacuates Sailor, Embarks COVID-19 Medical Response Team

- April 23, 2020: Fleet Readiness Center East Manufacturing Face Shields to Support Local Health Care Workers
- April 22, 2020: Sea Duty Incentive Pay Expands During Time of COVID-19 Crisis
- April 22, 2020: NEX Customers Can Support NMCRS During COVID-19 Crisis
- April 22, 2020: Combating Coronavirus: Navy Provides Protective Gear to First Responders
- April 22, 2020: Navy Reserve Unit Shows Agility in Crisis With First Virtual Drill
- April 22, 2020: Navy Civil Servants' Support to COVID-19 Response Earns Meritorious Civilian Service Awards
- April 21, 2020: Navy Extends Travel and PCS Restrictions, Authorizes Leave Accrual
- April 21, 2020: Navy Updates ID Card Guidance
- April 20, 2020: Staff Work to Continue Strong Support for Navy Wounded Warriors' Pay, Benefits Needs
- April 20, 2020: Military Resale Unites to Support Servicemembers During COVID-19 Pandemic
- April 20, 2020: Surface Warfare Center Designs Portable Oxygen Manifolds for Camp Pendleton COVID-19 Response
- April 20, 2020: Overseas Navy Personnel Fight COVID-19 One Stitch at a Time
- April 20, 2020: USS George Washington Preventive Maintenance Team Makes Masks to Combat COVID-19
- April 20, 2020: Bahrain Fleet Mail Center Steps Up to Support 6th Fleet With Mail Operations
- April 17, 2020: Update to Restriction of Movement Guidance
- April 17, 2020: Navy Conducting Public Health Outbreak Investigation on USS Theodore Roosevelt
- April 17, 2020: NAVFAC Southwest Battles COVID-19 with $2.6 Million for Disinfecting Services
- April 17, 2020: Navy Reserve Extends Drill Postponement Until May 31, Consolidates COVID-19 Guidance
- April 17, 2020: Navy Hospital's Car-Based Triage Assists Emergency Dept in Wake of COVID-19
- April 17, 2020: Air Warfare Center Works to Keep Americans Safe In, Out of the Fleet
- April 17, 2020: Reserve Component Command Fort Worth Mobilizes Second Wave of Reservists to Assist in Global COVID-19 Combat Support
- April 17, 2020: Undersea Warfare Center Launches 'Operation Sewcial Distancing' to Craft Face Masks
- April 17, 2020: Don't Let COVID-19 Keep You From the Emergency Department
- April 16, 2020: Navy Identifies USS Theodore Roosevelt Sailor Who Died of COVID-19
- April 16, 2020: Surface Warfare Center Designs Face Shields for Staff at State Prison
- April 16, 2020: Norfolk Team Tackles Unique COVID-19 Contracting Challenges
- April 16, 2020: USS Theodore Roosevelt's Clean Fight
- April 16, 2020: Supervisor of Shipbuilding, Conversion, Repairs Turns to Fusion for Face Masks
- April 15, 2020: Engineering/Expeditionary Warfare Center 3-D Prints Masks to Aid Pandemic Response
- April 15, 2020: NAVFAC Partners with USACE for FEMA "Whole-of-Nation" Effort Combating COVID-19
- April 15, 2020: Navy MWR at Home Helps Sailors, Families 'Stay Active, Stay Informed, Stay Connected'
- April 15, 2020: Navy Reserve App to Deliver Real-Time Access to Business Processes
- April 14, 2020: Fleet and Family Services Still Open for Business Over Phone, Web
- April 14, 2020: Navy Museums Donate PPE to Local Clinics
- April 14, 2020: Chaplains Prove Essential to COVID-19 Response
- April 14, 2020: Navy Exchange Service Command Hosts Virtual "We Stand Together" Concert Series
- April 14, 2020: Humanitarian Response Program Offers Expertise For COVID-19 Response
- April 13, 2020: Emergency Physician of 44 Years Postpones Retirement to Fight COVID-19
- April 13, 2020: Navy Authorizes Retiring Officers to Stay Until December
- April 13, 2020: Leadership Tips in Challenging Times
- April 13, 2020: NEX Creates New Program to Bring the Store to a Sailor's Door
- April 13, 2020: Navy Sailor Assigned to USS Theodore Roosevelt Dies of COVID-Related Complications
- April 10, 2020: Naval Academy Cancels All Public Commissioning Week 2020 Events; USNA and NROTC Ceremonies Go Virtual
- April 10, 2020: 3rd Marine Logistics Group Supports USS Theodore Roosevelt

- April 10, 2020: [Commander, Fleet Activities Yokosuka Hosts a "Camp In" to Support Physical Distancing](#)

April 11, 2020: Chief of Naval Research Releases a Message to the Force

April 10, 2020: 3rd Marine Logistics Group Supports USS Theodore Roosevelt

  

- April 8, 2020: [Meal Allowance Rules Modified for Sailors Restricted to Government Quarters](#)
- April 8, 2020: [NCIS: Sailors, Marines, Civilians Beware of Card-Cracking Scams](#)
- April 7, 2020: [NAVWAR Enterprise Delivers Innovative Solutions for Increased Readiness in Support of COVID-19 Relief Efforts](#)
- April 7, 2020: [Navy Lodge Program Supports Those on Restriction of Movement Status Due to COVID-19](#)
- April 7, 2020: [Navy Mandates Face Covering: What You Need to Know](#)
- April 6, 2020: [NAVCO Launching SHIP2SHORE Virtual Outreach Program](#)
- April 6, 2020: [Navy Exchange Service Command Donates 240 N-95 Masks to Naval Air Station Pensacola Fire Department](#)
- April 6, 2020: [Info Warfare Training Detachment Entertains Base-Bound Sailors While Social Distancing](#)
- April 5, 2020: [7th Fleet Commander Arrives in Guam During COVID-19 Recovery](#)
- April 4, 2020: [Rapid Mobilization Process Established for Reservists Supporting COVID-19 Response](#)
- April 3, 2020: [Navy Deploys Expeditionary Medical Facility Personnel to Support Federal COVID-19 Response](#)
- April 3, 2020: [Navy College Program Continues During COVID-19 Pandemic](#)
- April 3, 2020: [NAVSUP FLC Norfolk Helps Comfort Get Underway for New York](#)
- April 3, 2020: [Team at Naval Personnel Command Works 24/7 to Help Sailors, Families With PCS Questions](#)
- April 3, 2020: [Navy Initiates Temporary Changes for ID Card Offices](#)
- April 2, 2020: [Navy, Marine Corps Partner With Industry, FEMA to 3-D Print Face Shields](#)
- April 2, 2020: [Hospital Ships Arrive Safely With Help From Meterologists, Oceanographers](#)
- April 2, 2020: [Navy COVID-19 Efforts Link to Joint Acquisition Task Force](#)
- April 2, 2020: [Before COVID-19, U.S. Naval War College War Game Examined Epidemic Response](#)
- April 1, 2020: [Comfort Treats First Patients in New York](#)
- April 1, 2020: [U.S. Navy Support Facility Diego Garcia Ramps Up Social Distancing](#)
- April 1, 2020: [Undersea Warfare Center Builds Face Shields for Local Medical Community](#)
- April 1, 2020: [DC-Area Fleet/Family Support Center Offers Webinars to Help Navigate COVID-19](#)
- March 31, 2020: [24/7 Chaplain Hotline for Reserve Sailors Starts April 1](#)
- March 30, 2020: [Comfort Arrives in New York](#)
- March 29, 2020: [Comfort Underway to Support City of New York](#)
- March 27, 2020: [Navy Exchange Service Command Closes Tailor/Embroidery, Laundry, Dry Cleaning Shops Due To COVID-19](#)
- March 27, 2020: [USNS Mercy Arrives in Los Angeles](#)
- March 27, 2020: [Amid COVID-19 Restrictions SkillBridge Internships Continue](#)
- March 27, 2020: [St Louis Native Supports Nation's COVID-19 Response Efforts Aboard USNS Mercy](#)
- March 27, 2020: [Navy Strengthens Supply Chain During COVID-19 Pandemic](#)
- March 26, 2020: [Navy Authorizes Enlistment Extensions, Re-Entry Opportunities](#)
- March 26, 2020: [Navy Base in Japan Works to Keep COVID-19 at Bay](#)
- March 25, 2020: [U.S. Navy Reports Updated Positive COVID-19 Cases](#)
- March 25, 2020: [Navy Consolidates COVID-19 Prevention Policies in NAVADMIN 080/20](#)
- March 25, 2020: [Naval Postgraduate School Continues Prep for Spring Classes Online](#)
- March 24, 2020: [Navy Reserve Arrives to Support USNS Mercy](#)
- March 24, 2020: [Containing COVID-19: Why the Boss Sent Me Home](#)
- March 24, 2020: [TAP Available Online for Transitioning Sailors](#)
- March 23, 2020: [USNS Mercy Departs San Diego](#)
- March 23, 2020: [U.S. Naval War College Turns to Virtual Town Hall, All-Hands Call in Response to COVID-19](#)
- March 22, 2020: [Navy Exchange Service Command Closes Barber and Beauty Shops in Response to COVID-19](#)
- March 22, 2020: [Navy Preventive Medicine Teams Embark Ships in 7th Fleet](#)
- March 21, 2020: [Naval War College Moves Lectures, Seminars Online, Postpones Events to Fight COVID-19](#)
- March 20, 2020: Navy Exchange Suspends All In-Store Vendor and Sales Events

Skip to main content (Press Enter).

- March 20, 2020: [Navy Increasing Health Protection Measures on Installations to Fight COVID-19](#)

- March 19, 2020: [Navy Postpones Selection Boards](#)

  

- March 18, 2020: [Navy Cancels Spring 2020 Fitness Cycle, Delays Advancement Exam](#)
- March 18, 2020: [Navy School Closed After Third COVID-19 Case](#)
- March 17, 2020: [Updated Training Track Guidance Issued](#)
- March 16, 2020: [Navy Museums Temporarily Close](#)
- March 15, 2020: [COVID-19: Important Information for U.S. Navy Reservists](#)
- March 15, 2020: [Navy Sets Coronavirus Transfer and Travel Rules: What You Need to Know (March 15, 2020)](#)

## Navy.mil Strategic Library

- July 31, 2020: [Department of the Navy Return to the Workplace](#)

## Navy Times

- July 31, 2020: ['A small number' of carrier George HW Bush sailors test positive for COVID-19](#)

Back to links

## Supporting Video

- Jan. 11, 2021: [Coronavirus Vaccines on USS San Antonio](#)
- Dec. 16, 2020: [Lieutenant Emily Micciolo talks about receiving COVID-19 vaccine](#)
- Dec. 16, 2020: [Captain Shelley Perkins talks about the first round of COVID-19 vaccination at Naval Hospital Camp Pendleton](#)
- Dec. 16, 2020: [U.S. Navy Lieutenant Commander Devon Czarzasty talks about the COVID-19 Vaccination](#)
- Dec. 16, 2020: [NMCSD's Coronavirus Vaccine MAO](#)
- Dec. 15, 2020: [NMCSD COVID-19 Vaccine Interview](#)
- Dec. 15, 2020: [NMCSD COVID-19 Vaccine Transfer to NHCP](#)
- Dec. 15, 2020: [COVID-19 vaccine arrives at Naval Hospital Camp Pendleton](#)
- Dec. 15, 2020: [NMCSD Distributes COVID-19 Vaccine](#)
- Dec. 15, 2020: [Naval Medical Center San Diego COVID-19 Vaccine Teleconference](#)
- Dec. 15, 2020: [COVID-19 Vaccine Arrives at Naval Hospital Pensacola](#)
- June 3, 2020: [Basic Information on COVID19 Contact Tracing Process in the U.S. Navy](#)
- April 25, 2020: [America Strong](#)
- April 3, 2020: [Secretary Modly appearance on Hugh Hewitt Show to discuss Navy response to COVID-19](#)
- March 24, 2020 (Facebook Live Press Conference): [Secretary of the Navy, Chief of Naval Operations, Navy Surgeon General, Master Chief Petty Officer of the Navy](#)
- March 24, 2020: [Acting Secretary of the Navy Thomas B. Modly – Message to the Fleet](#)
- March 23, 2020: [USNS Mercy (T-AH 19) Deploys in COVID-19 Response Support](#)
- March 23, 2020 (Facebook Video): [Press Availability on USNS Mercy Deployment](#)
- March 21, 2020: [Chief of Naval Personnel Virtual Town Hall](#)
- March 19, 2020: [CNO's Message to the Fleet on Coronavirus](#)
- March 18, 2020: [Coronavirus Terms to Know](#)
- March, 14, 2020: [Message From Chief of Naval Operations ADM Mike Gilday and Master Chief Petty Officer of the Navy Russell Smith](#)

Skip to main content (Press Enter).

- Feb. 26, 2020: Navy Surgeon General's Message

  

## DoD, Navy Leadership Statements

- Oct.4, 2021: Mandatory Coronavirus Disease 2019 Vaccination of DoD Civilian Employees
- Aug. 24, 2021: Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members
- Dec. 15, 2020: CNO Gilday Issues a Message to the Fleet on the COVID Vaccine
- April 14, 2020: U.S. Naval Forces Europe-Africa and U.S. 6th Fleet Resiliency Letter
- April 11, 2020: Chief of Navy Reserve Releases Message to the Force
- March 31, 2020: Vice Chief of Naval Operations Message to Navy Leadership
- March 30, 2020: COVID-19 Navy Update: CNO and MCPON Message to the Fleet
- March 27, 2020: Memo from Secretary of Defense to all DoD Personnel
- March 26, 2020: Chief of Naval Operations Statement on USS Theodore Roosevelt
- March 25, 2020 (DoD Statement): Overseas Stop Movement Order in Response to COVID-19
- March 18, 2020: Hospital Ships, Other DOD Assets Prepare for Coronavirus Response
- March 14, 2020: Statement by the Department of Defense on COVID-19 Response Measures on the Pentagon Reservation
- March 13, 2020: Department of Defense Statement on Enhanced Protection Measures at Pentagon

Back to links

## TRANSCOM Release

- March 17, 2020: Most Defense Personal Property Pick-ups and Pack-outs Paused; Deliveries Continue

Back to links

## More Resources

- 30 Days to Slow the Spread (President's Coronavirus Guidelines for America – PDF)
- MWR At Home Website
- White House/CDC/FEMA COVID-19 Page
- Navy Remote Work Information & Guidance (CAC Required) Published by the DON Deputy Chief Information Officer for the Navy
- Military Health System Nurse Advice Line
- MyNavy Career Center
- Navy Chaplain Care
- Psychological Health Resource Center
- Navy Marine Corps Public Health Center

Skip to main content (Press Enter) onavirus Update Site

https://web.archive.org/web/20220526022338/https://www.navy.mil/US-Navy-COVID-19-Updates/

- Centers for Disease Control and Prevention COVID-19 Website
- Navy-Marine Corps Relief Society: Coronavirus Response (video)

  







Get plenty of sleep



Try to eat healthy, well-balanced meals



Stretch, meditate and exercise regularly



MAINTAINING MENTAL A...





  

Google Translation Disclaimer

LEGAL & ADMINISTRATIVE LINKS



     





**U.S. Navy Office of Information**

Chief of Information
Attn: US Navy
1200 Navy Pentagon
Washington DC 20350-1200

# Tab 8

UNCLASSIFIED

ROUTINE

R 111536Z APR 22 MID200001660830U

FM CNO WASHINGTON DC

TO NAVADMIN

INFO SECNAV WASHINGTON DC
CNO WASHINGTON DC

BT
UNCLAS
NAVADMIN 093/22

MSGID/NAVADMIN/CNO WASHINGTON DC/CNO/APR//

SUBJ/U.S. NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE 6.0(CORRECTED
COPY)//

REF/A/MSG/CNO/152351ZJAN22//
REF/B/MSG/CNO/292217ZJUL21//
REF/C/MSG/CNO/301952ZAPR21//
REF/D/DOC/USD(PR)/04APR2022//
REF/E/ASN(MRA)/03MAR2022//
REF/F/MSG/CNO/221712ZDEC21//
REF/G/MSG/CNO/241805ZNOV21//
REF/H/DOC/NMCPHC/27DEC2021//
REF/I/DOC/NMCPHC/14MAY2021//
REF/J/DOC/NMCPHC/19MAR2021//
REF/K/MSG/CNO/041827ZAUG21//
REF/L/MSG/CNO/231718ZAUG21//

NARR/REF A IS NAVADMIN 007/22, U.S. NAVY COVID-19 STANDARDIZED OPERATIONAL
GUIDANCE 5.0.
REF B IS NAVADMIN 161/21, UPDATED MASK GUIDANCE FOR ALL DOD INSTALLATIONS AND
OTHER FACILITIES.
REF C IS NAVADMIN 086/21, UPDATED GUIDANCE TO COMMANDERS ON ADJUSTING HEALTH
PROTECTION CONDITIONS AND BASE SERVICES DURING
COVID-19 PANDEMIC (CORRECTED COPY).
REF D IS USD P&R CONSOLIDATED DEPARTMENT OF DEFENSE CORONAVIRUS DISEASE 2019
FORCE HEALTH PROTECTION GUIDANCE AVAILABLE AT
https://www.defense.gov/Explore/Spotlight/Coronavirus/Latest-DOD-Guidance/.
REF E IS ASN M&RA MEMORANDUM ON DEPARTMENT OF THE NAVY GUIDANCE ON COVID-19
COMMUNITY LEVELS AND WORKPLACE SAFETY PROTOCOLS.
REF F IS NAVADMIN 289/21, GUIDANCE ENCOURAGING COVID-19 VACCINE BOOSTER.
REF G IS NAVADMIN 268/21, REQUIRED COVID-19 TESTING FOR UNVACCINATED SERVICE
MEMBERS.
REF H IS NAVY AND MARINE CORPS PUBLIC HEALTH CENTER COVID-19 OMICRON VARIANT
AND BOOSTER EFFECTIVENESS.
REF I IS NAVY AND MARINE CORPS PUBLIC HEALTH CENTER U.S. NAVY FORCE HEALTH
PROTECTION WITH CONSIDERATIONS FOR VACCINE EFFICACY.
REF J IS NAVY AND MARINE CORPS PUBLIC HEALTH CENTER DOCUMENT ASSESSING REAL
COVID-19 RISK.
REF K IS NAVADMIN 165/21, SOVEREIGN IMMUNITY POLICY.
REF L IS NAVADMIN 180/21, UPDATE TO COVID-19 REPORTING REQUIREMENTS.

POC/OPNAV/CAPT SHARIF CALFEE, (703) 571-2822//EMAIL:
SHARIF.H.CALFEE.MIL(AT)US.NAVY.MIL

RMKS/ 1.  Purpose.  This NAVADMIN provides updated COVID-19 Standing
Operational Guidance (SOG 6.0), replaces reference (A) and cancels references

(B) and (E).

2.  SUMMARY:  SOG 6.0 should be read in its entirety.  Notable updates
include guidance for unvaccinated personnel, actions taken for COVID-19
infected personnel and close contacts, and guidance for mask wearing
underway.  All units shall refer to references
(D) and (E) for Health Protection Condition and masking guidance not
contained in this NAVADMIN.  Personnel safety of our sailors and civilians
remains our driving focus.  Vaccinations, vaccine boosters, command
engagement, and personal accountability continue to form the foundation of
our success.  Every member of every command must take personal ownership and
responsibility of the promulgated measures required to keep COVID-19 in
check.

3.  Applicability.  This guidance applies to all service members (active duty
and ready reserve) assigned to, or supporting, operational units as defined
in paragraph 5.e below.  Additionally, paragraph 7 (COVID-19 Testing) applies
to all commands and paragraph 8 (Operating in a COVID-19
Environment) applies to all personnel onboard operational platforms.  Non-
operational forces, civilian employees and contractor personnel should follow
the latest Department of Defense (DOD) Force Health Protection, Centers for
Disease Control and Prevention (CDC), and state/local area guidance.
Additionally, higher echelon Commanders guidance may apply.

4.  Evolving Guidance.  The CDC is the authority for COVID-19 measures on
behalf of the general public.  The Navy Surgeon General remains as the
authority for Navy COVID-19 measures and advises the CNO on how best to apply
CDC guidance across the spectrum of unique Navy operating environments, and
may include additional measures not required by the general public.
Accordingly, and except as noted below in this NAVADMIN, evolving CDC
guidance related to virus behavior shall first be evaluated by the Navy
Surgeon General prior to Fleet implementation.
Questions regarding applicable COVID-19 measures may be directed to the point
of contact (POC) listed above.

5.  Definitions.  All CDC definitions regarding COVID-19 apply and are kept
current on the CDC website (https://www.cdc.gov).
The following additional Navy definitions are provided:

5.a.  Fully Vaccinated:  Term for an individual who has completed a primary
COVID-19 vaccine series as defined in reference (F).  Term applies two weeks
after the final dose is received.  During the time period from initial dose
until two weeks after the final dose, an individual is considered partially
vaccinated.

5.b.  Up-to-Date (UTD) COVID-19 Vaccination:  Term for an individual who has
received all CDC recommended COVID-19 vaccines, including booster dose(s)
when eligible.  UTD
COVID-19 Vaccine and booster guidance is subject to change and is available
on the CDC website.

5.c.  High-Risk Personnel:  Those individuals designated by a medical
provider who meet CDC criteria for increased risk of severe illness.
Qualifying conditions are included on the CDC website.

5.d.  Commander:  For the purposes of this NAVADMIN, the term Commander
includes Commanding Officers, Officers-in-Charge, Masters, and Aircraft
Commanders.

5.e.  Operational and Non-Operational Forces:  For the purposes of this
NAVADMIN, operational forces and non-operational forces are defined by the
applicable NCC.  For operational forces, this might include deployed forces,
forces in sustainment, or other operational elements that the NCC determines
to fall within the intent and context of this NAVADMIN.

Pls.' Opp. to Assertion of Mootness App. 0072

5.f.  Restriction of Movement (ROM):  Used term for limiting personal
interaction to reduce risk to a broader population.
Personnel executing directed ROM remain in a duty status and will not be
charged leave.  ROM-sequester, when directed, is the Navy term for preemptive
ROM in order to reduce risk of infection in advance of movement.

5.g.  Health Protection Measures (HPM):  Comprehensive term for mitigation
measures that reduce the spread of COVID-19.
This includes physical distancing, wearing of masks, and enhanced
environmental cleaning and disinfection.  Recommended HPMs are included on
the CDC website.

5.h.  Viral Test:  For the purposes of this NAVADMIN, unless specifically
stated otherwise, viral test may refer to either a test that measures the
antigens (antigen test) or a test that measures viral RNA (Polymerase Chain
Reaction (PCR) test).

5.i.  Close Contact:  A person who was less than 6 feet away from an infected
person (laboratory-confirmed or a clinical
diagnosis) for a cumulative total of 15 minutes or more over a 24-hour period
(for example, three individual 5-minute exposures for a total of 15 minutes).

6.  COVID-19 Infected Personnel and Close Contacts.

6.a.  Actions for Personnel Suspected of Being Infected.

6.a.1.  Symptomatic.  Test immediately those individuals exhibiting COVID-19
symptoms.  If symptomatic and positive, isolate the individual per paragraph
6.a.3 and identify close contacts per reference (D).

6.a.2.  Close Contacts.  Asymptomatic close contacts who have not received a
vaccine booster should be tested 5 days after exposure, if testing is
available (see paragraph 6).
If COVID-19 positive, refer to paragraph 6.a.3.  If the asymptomatic close
contact has received a vaccine booster, testing is not required.  Close
contacts who do not test positive for COVID-19 may remain on duty but must
wear a mask for 10 days.  If symptoms develop, test per paragraph

6.a.1.

6.a.3.  Isolation.  Isolate individuals who test positive for 5 days or until
symptoms are clearing, whichever is longer, including 24 hours with no fever
and without fever-reducing medication (day 0 is date of positive test or
symptom onset, whichever occurred first).  Isolation may be conducted either
ashore or afloat.  Once released, individuals will wear a mask for an
additional 5 days (minimum 10 days total).  No exit testing is required and,
absent symptoms, prior positives should not be PCR-tested again for 90 days
(per paragraph 7.c).

6.b.  Actions for Unvaccinated Personnel.

6.b.1.  To maintain Fleet readiness, all personnel assigned to operational
Navy units shall be fully vaccinated.  Unvaccinated personnel shall not
execute orders to operational Navy units.
Unvaccinated personnel shall not embark underway Navy vessels or aircraft;
commanders of operational units shall temporarily reassign unvaccinated
personnel from their commands with the concurrence of the first flag officer
in the chain of command.
Exceptions, if any, will be managed case-by-case by the applicable NCC and
reported to the POC of this instruction.

6.b.2.  Refer to medical providers unvaccinated individuals exhibiting COVID-
19 symptoms for follow-on care.  Identify close contacts per reference (D).
Similarly, refer unvaccinated close contacts to medical providers.  Treat
vaccinated close contacts per paragraphs 6.a.2 above.

7.   COVID-19 Testing.

7.a.   Test Procurement.  To ensure uninterrupted operations, and as feasible,
commands will coordinate with their supporting supply activities to obtain
testing supplies 60 days in advance of need.  This should include additional
tests required for U.S. testing of personnel during any anticipated port
calls.

7.b.   Testing of Unvaccinated Personnel.  Unvaccinated personnel shall follow
the testing requirements of reference (G), as amended in reference (D) and
below in paragraph 7.c.

7.c.   Testing of Individuals Previously Infected with COVID-19.
Individuals previously infected with COVID-19 may be asymptomatic and
continue to test positive by PCR test for up to 90 days from date of initial
diagnosis due to the presence of persistent non-infectious viral fragments.
Therefore, prior COVID-19 positives are exempt from testing protocols for 90
days from the earlier of symptom onset or first positive test (90-day rule).
Individuals who exhibit new or persistent symptoms during that three-month
period should be evaluated by a medical provider.

7.d.   Surveillance / Ship-Wide Testing.  Surveillance or ship-wide testing is
not required or recommended and has previously identified large numbers of
asymptomatic persistent positives.

7.e.   Testing Priority.  Personnel exhibiting COVID-19 like symptoms are the
highest priority for testing.  If testing asymptomatic close contacts per
paragraph 6.a.2 or 8.g.2 will stress testing supplies, or if operations
preclude testing
(e.g., small, remote teams or depleted  testing supplies),
Commanders are authorized to forego testing asymptomatic close contacts.
This prioritization is consistent with CDC guidance
(https://www.cdc.gov/coronavirus/2019-ncov/php/
contact-tracing/contact-tracing-plan/prioritization.html).

8.   Operating in a COVID-19 Environment.

8.a.   Up-to-date (UTD) COVID-19 Vaccination.  Commanders should encourage UTD
COVID-19 Vaccination of personnel at least 30-days prior to DEPORD movements
or inter-fleet transfers.

8.b.   Medical Screening.  Medical screening will include newly reporting
personnel and a command-wide monthly data review and assessment, as directed
by the NCC.  An additional pre- deployment screening will be completed 7 days
prior to deployment.
Medical screening shall be conducted by medical providers and reported to the
unit Commander to assist in assessing risk and mitigations.  Screening will
include, at a minimum, vaccination and vaccine booster status, review and
assessment of COVID-19 exposure history (those under the 90-day rule), and
underlying risk factors.

8.c.   Military Sealift Command (MSC).  MSC shall medically screen Civil
Service Mariners (CIVMARs) and contract personnel for deployment on MSC
vessels in accordance with existing MSC Quality Management System processes
and procedures.  Unvaccinated CIVMARs and contract personnel should not be
assigned to operational units. Exceptions and associated mitigations will be
approved by Commander, MSC.

8.d.   Fully vaccinated High-Risk Personnel.  The decision to operate and
deploy with fully vaccinated high-risk personnel rests with the Commander, as
advised by medical providers, who must report intentions to their immediate
superior in command.  High-risk personnel shall be PCR viral tested within 3
days prior to embarking.

Pls.' Opp. to Assertion of Mootness App. 0074

Case 4:21-cv-01236-O   Document 225   Filed 02/13/23   Page 79 of 162   PageID 7580

8.e.  Predeploying ROM-sequester.  Fully vaccinated personnel should not
normally be required to ROM-sequester ahead of planned operations.  ROM-
sequester may be directed by the applicable NCC based upon Geographic
Combatant Commander guidance and applicable host nation requirements.

8.f.  Underway HPM.  As a result of demonstrated vaccine effectiveness, a
100% fully vaccinated operational force and a healthy demographic, serious
illness or death resulting from COVID-19 for fully vaccinated individuals is
statistically very unlikely, and modeling contained in references (H), (I),
and (J) indicates this will continue in the context of current variants.  UTD
COVID-19 Vaccination reduces the risk even further.  However, the increasing
contagious nature of evolving variants can result in unmanageable numbers of
even mild symptomatic positives and may impose general health and operational
unit risk, i.e. risk to force or risk to mission, regardless of symptom
severity.  The following HPM, at a minimum, are required:

8.f.1.  Medical screening as outlined above in paragraph 8.b.

8.f.2.  Masks.  Following all inport periods, if less than 75% of the crew is
UTD COVID-19 Vaccination Commanders should consult with medical professionals
and consider mask wear for the first 10-days at sea.  Similarly, Commanders
should consider mask wear in response to the onset of onboard COVID-19.

8.f.3.  Educate and reinforce the importance of self-monitoring for symptoms
and prompt reporting.

8.f.4.  Educate and reinforce the importance of frequent handwashing and
social distancing, when possible.

8.f.5.  Aggressively isolate COVID-19 positive individuals per paragraph 6
above.

8.f.6.  Ensure adequate ventilation in spaces routinely manned.

8.f.7.  Educate and reinforce focused cleaning efforts on high-touch
surfaces, at least daily or more frequently, depending upon usage (e.g.,
tables, hatch latches, ladderwells, phones, watch console keyboards and
buttons, toilets, faucets, sinks, etc.).  Although remote, there is evidence
of surface spread of COVID-19 and other viruses with similar symptoms.

8.g.  Considerations for Adding or Relaxing HPM.  NCCs and Commanders should
consider for any unit the operational impact resulting from the number of
sailors in isolation, either ashore or afloat, regardless of percentage of
immunized personnel, UTD COVID-19 Vaccinations, or severity of symptoms.
Commanders may elevate or relax HPM at any time, and retain the latitude to
temporarily apply alternate HPM in lieu of isolation to support safe
operations.  An example might be a rapid spread that compels a Commander to
employ asymptomatic or mildly symptomatic positives to manage watch-bill
impact while recovering others in isolation, applying additional alternate
measures as needed to minimize spread.  The following should be considered
before adjusting HPM:

8.g.1.  Overall number of individuals in isolation and trend.  The general
rule of thumb for a COVID-19 outbreak trending in a favorable direction is
that the number of those exiting isolation matches (flattening curve) or
exceeds (lowering curve) those entering isolation, combined with the
assessment that the total number of symptomatic individuals is manageable and
improving, and watch-bill (operational) impact is manageable and improving.

8.g.2.  If less than 75% of the total eligible crew is UTD COVID-19
Vaccinations, implement the requirements of 8.f.2. and consider a 5 day viral
test for all close contacts per paragraph 6.a.2., regardless of vaccination
status.

8.g.3.  Proximity of a units access to shore and afloat Medical Treatment

Facilities (MTF) within a medically important timeframe, balanced with
paragraph 7.e HPM and onboard trend.  Rule of thumb is within 1-week of an
MTF for 100 percent fully vaccinated crew with manageable case load, moving
to a more restrictive 72 hours or less if a growing or concerning caseload,
and moving to a less restrictive beyond 1-week, if small or no caseload.

8.h.  Port Visits.  Liberty is an important mission and should be pursued
within the context of this NAVADMIN.
Geographic NCCs (GNCC) will set conditions for foreign port off-base liberty
in coordination with country teams and local authorities, taking into account
host country requirements, vaccination and booster status, sovereign immunity
per paragraph 9 below, COVID-19 prevalence and mission requirements.

8.i.  Aircraft Operations.  On a case-by-case basis, aircrews and aircraft
maintainers may be exempt from this guidance in order to meet emergent
operational or NATOPS currency requirements.  Exemptions and mitigation plans
must be approved by the Squadron Commander.  For aviation units embarked on
surface ships, mitigation plans will be coordinated with the ships health
protection plan and approved by the ships Commanding Officer.

8.j.  Post-Deployment.  Personnel returning to homeports from deployment
shall follow CDC and U.S. Department of State travel and testing
requirements.  If return travel includes foreign countries, personnel shall
follow the travel and testing requirements for those individual nations,
subject to sovereign immunity concerns (see below).
Updated travel information is on the following website:
https://travel.state.gov.

9.  Sovereign Immunity.

9.a.  It is U.S. Government policy to protect the sovereign immunity of
warships, naval auxiliaries, and aircraft, including protecting crew
information to the maximum extent possible.  Within the context of COVID-19,
host nations may request or require crew or ship information that exceeds
that authorized by U.S. policy or international law.  NCCs will ensure
appropriate training and guidance on protecting U.S.
sovereign immunity and on the protection of health information as part of
OPSEC/personal security.

9.b.  GNCCs should endeavor to determine in advance those host nations that
may challenge U.S. sovereign immunity and, as able, avoid them.  See
reference (K) for additional guidance.  In all cases, GNCCs shall authorize
the minimum information necessary in order to meet operational requirements.
The Navy Declaration of Health (NAVMED 6210/3) is the only authorized form
for providing health information to foreign officials.  If required by the
host nation, and with GNCC concurrence, Commanders, at their discretion, may
include on the NAVMED 6210/3 that their unit is 100% vaccinated, those
disembarking have tested negative within the required timeframe, and/or that
those disembarking have received a vaccine booster.

9.c.  Exceptions to Policy (ETP).  On a case-by-case basis, and to support
operations, OPNAV N3N5 may grant an ETP to mitigate the operational impact of
host nation COVID-19 requirements.  Any action that may constitute or require
a waiver of sovereign immunity must be coordinated by the applicable GNCC
with OPNAV N3N5 for ETP approval no later than 5 days ahead of need.  To
avoid precedence beyond COVID-19, any ETP will be messaged to the host nation
as explicitly linked to the pandemic.  Requests shall include justification
for port selection; host nation mitigation and testing requirements;
alternate port options; impact to mission if the request is denied; medical,
legal, collection and privacy risk; and feedback from country team
coordination.
Notifications and requests may be sent via record message traffic, email to
the POC provided above, or both.

9.d.  Guidance for Commanders.  Per the direction of their GNCCs, Commanders

shall comply with domestic and foreign quarantine regulations upon port entry and document compliance on NAVMED 6210/3.  Absent GNCC approval in advance, Commanders will not submit to host nation COVID-19 testing nor provide individual or collective medical data, copies of health records, nor any supplementary or locally-demanded health forms, and shall not grant access to ship or crew health records or allow the same to be searched or inspected by host nations.  If compelling circumstances require a Commander to acquiesce to additional host nation requirements without obtaining an ETP or GNCC concurrence (e.g., personnel emergency, weather avoidance), report the event and circumstances as soon as practicable to OPNAV N3N5 via the chain of command.


10.  Reporting Procedures.  Reporting procedures are amended as follows and will be incorporated in the next revision of reference (L).  OPREP-3 Navy Blue messages for COVID-19 cases that do not result in death, request for assistance, or operational impact may instead be reported via SharePoint.  If unable to report via SharePoint, a single daily OPREP-3 Navy Unit SITREP summarizing all COVID-19 cases onboard is required.  SharePoint information is used to produce daily reports to Senior Navy Leadership.

11.  Released by VADM W. R. Merz, Deputy Chief of Naval Operations for Operations, Plans, and Strategy, OPNAV N3/N5.//

BT
#0001
NNNN
UNCLASSIFIED//

Tab 9

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>                    Plaintiffs,<br><br>       v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>                    Defendants. | Case No. 4:21-cv-01236-O |

<u>**DECLARATION OF U.S. NAVY SEAL 3**</u>

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 3, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I serve as a Class Representative in this class action litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

4.   Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5.   I am currently serving in a non-operational billet. I came to this position shortly after I was removed from a lead position as a SEAL instructor because my command presumed that I was going to be kicked out of the Navy, even with a pending religious accommodation.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 11, 2023.

_/s/ U.S. Navy SEAL 3_
U.S. Navy SEAL 3

# Tab 10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>    Plaintiffs,<br><br> v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>    Defendants. | Case No. 4:21-cv-01236-O |

<u>**DECLARATION OF U.S. NAVY SEAL 7**</u>

 Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 7, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am one of the original Plaintiffs in this litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. From January 3, 2022, until my End of Active Obligated Service, I was protected from separation because of the preliminary injunction.

Pls.' Opp. to Assertion of Mootness App. 0083

4.  I separated from the Navy in November of 2022. In doing so, I did not knowingly withdraw my religious accommodation request. During the separation process, my religious accommodation request was never mentioned.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and

correct. Executed on February 12, 2023.

*/s/ U.S. Navy SEAL 7*
U.S. Navy SEAL 7

# Tab 11

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, | |
| *Plaintiffs,* | Case No. 4:21-cv-01236-O |
| v. | |
| **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, | |
| *Defendants.* | |

## DECLARATION OF U.S. NAVY SEAL 9

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 9, under penalty of perjury declare as follows:

1.  I am over the age of eighteen and am competent to make this declaration.

2.  I am one of the original Plaintiffs in this litigation.

3.  I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

Pls.' Opp. to Assertion of Mootness App. 0087

4.  Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5.  I am currently non-operational. I rank as an E-8 and serve at an advanced training command. After my last deployment, I screened for the milestone position of Troop Chief. However, I was not picked up by any SEAL teams and instead went to the advanced training command I am now serving at.

6.  I previously aspired to fill the Troop Chief role so I could promote and continue progressing in my career, but now, my progression has stalled so long as I am unvaccinated. Without being a Troop Chief, I cannot promote to an E-9.

7.  Retiring as an E-8, instead of an E-9, reduces my military retirement and bonuses.

8.  I am an experienced SEAL of almost 20 years and will soon be faced with a decision regarding reenlistment. One of the factors I am considering for reenlistment is whether I will be able to continue serving my country in meaningful ways while remaining unvaccinated.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 12, 2023.

/s/ U.S. Navy SEAL 9
U.S. Navy SEAL 9

# Tab 12

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, <br><br> Plaintiffs, <br><br> v. <br><br> **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, <br><br> Defendants. | Case No. 4:21-cv-01236-O |

<u>**DECLARATION OF U.S. NAVY SEAL 13**</u>

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 13, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am one of the original Plaintiffs in this litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

1

4. Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5. I am currently a member of a non-operational command. So long as I remain here, I am unable to fulfill the milestone of deployed Leading Petty Officer to advance in rank. Because I cannot deploy as an unvaccinated SEAL, I will not be able to complete this milestone or promote. My career progression has ended, as there is no way for me to advance to the next rank as an unvaccinated SEAL if I cannot deploy.

6. I was removed from my position as a Leading Petty Officer when I filed my religious accommodation request.

7. I have served for eighteen years. Not being allowed to promote again before retirement will have a significant impact on what I can receive in retirement.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 10, 2023.

/s/ U.S. Navy SEAL 13
U.S. Navy SEAL 13

Pls.' Opp. to Assertion of Mootness App. 0093

# Tab 13

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, <br><br><br>           Plaintiffs, <br><br>    v. <br><br> **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, <br><br>           Defendants. | <br><br><br><br><br><br><br> Case No. 4:21-cv-01236-O |

## DECLARATION OF U.S. NAVY SEAL 15

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 15, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am one of the original Plaintiffs in this litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

4. Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

1

5.    I am currently in a training detachment working as an instructor in a non-operational command.

6.    Before the mandate, I intended to screen for a SEAL delivery vehicle (SDV) command. I was very excited about serving in this position, and it would have been an important role for my career. I am now unsure if I could ever serve in this position if I remain unvaccinated.

7.    If I was not able to serve in a SDV command, the other option would be attaching to a SEAL team and doing a deployment as an Assistant Lead Petty Officer (ALPO). Serving as an ALPO is required to become a platoon's Lead Petty Officer (LPO). The LPO role is a milestone for enlisted SEALs as an E-6. As long as I am non-operational, I cannot serve in either the ALPO or LPO position.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and

correct. Executed on February 11, 2023.

_/s/ U.S. Navy SEAL 15_
U.S. Navy SEAL 15

Tab 14

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, | |
| Plaintiffs, | Case No. 4:21-cv-01236-O |
| v. | |
| **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, | |
| Defendants. | |

**DECLARATION OF U.S. NAVY SEAL 19**

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 19, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am one of the original Plaintiffs in this litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. From January 3, 2022, until my End of Active Obligated Service, I was protected from separation because of the preliminary injunction.

1

4.   I separated from the Navy in January of 2023. In doing so, I did not knowingly withdraw my religious accommodation request. During the separation process, my religious accommodation request was never mentioned.

Pls.' Opp. to Assertion of Mootness App. 0100

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 13, 2023.

*/s/ U.S. Navy SEAL 19*
U.S. Navy SEAL 19

# Tab 15

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>     Plaintiffs,<br><br>  v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>     Defendants. | Case No. 4:21-cv-01236-O |

## <u>DECLARATION OF U.S. NAVY SEAL 22</u>

Pursuant to 28 U.S.C. §1746, I, U.S. Navy SEAL 22, declare under penalty of perjury as follows:

1.   I am over the age of eighteen and competent to make this declaration.

2.   I am one of the original Plaintiffs in this litigation.

3.   I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

Pls.' Opp. to Assertion of Mootness App. 0103

4.      Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5.      Since September 2019, I have ranked as an E-7. In November 2021, I was officially serving in a milestone position as Platoon Chief of SEAL Team 7. A milestone position is a leadership position that must be successfully completed before promoting to the next rank. To be eligible for a milestone, one must screen positive through interviews with Team Master Chiefs, have a good reputation, and successfully complete prior leadership positions. This position was incredibly meaningful to me, as I just deployed with these same men and began my career as a Navy SEAL in the same Platoon and Team I was now leading. Serving as one of the Platoon Chiefs of SEAL Team 7 was an honor.

6.      To promote from an E-7 to an E-8, I must fulfill a series of requirements, including service in a milestone position. Until the imposition of the COVID-19 requirements I was on track to fulfill those requirements and complete my milestone, therefore becoming eligible to promote to an E-8.

7.      When I submitted my Religious Accommodation Request (RAR) in October of 2021, I was removed from that SEAL team and milestone position and sent back to a training command. I was told by my Command Master Chief in December that regardless of whether my religious accommodation request was granted, I could not serve on a SEAL team.

8.      Transferring out of that position and back to a training command ended my potential to promote from an E-7 to an E-8. If I remain non-operational because I am unvaccinated, I will be unable to ever attain this promotion.

9.      Prior to the COVID-19 vaccine mandate, I consistently received excellent evaluations and awards, including Sailor of the Year for SEAL Team Seven. Therefore, I was

Pls.' Opp. to Assertion of Mootness App. 0104

being solicited by a Chief Warrant Officer 4 (W-4) to transition from being an enlisted member of the Navy to an officer for a warrant package through the Warrant Officer Program. I was eligible for this program as an E-7 with fourteen years of dedicated, exemplary service to the Navy and excellent physical qualifications.

10.     In support of my warrant package, I received recommendations from Officers, Warrant Officers, and my Commanding Officer. I received this recommendation because I demonstrated outstanding performance as a SEAL, excellent leadership abilities, and the capacity to serve as an Officer of the United States Navy. True and correct copies of my recommendations are attached to this declaration as Exhibit A. After this recommendation, my warrant package was sent to a selection board at Naval Personnel Command.

11.     Among those of us seeking warrant packages before the selection board, I screened second in the group for a position, meaning it was incredibly likely that I would be selected. Ultimately, I did not receive a warrant package, even though people that screened below me did. I was told by a CWO3 that my name was removed from consideration because they assumed that I was soon going to be separated from the military because of my RAR. I then received a phone call from a CWO4 explaining how I had frustrated a lot of people that supported my package and that my Commander would not be recommending me any longer. I reached out to the selection board for further clarification about why I was not selected for appointment as a Warrant Officer, but I did not receive a response.

12.     There is a prime time for an enlisted sailor to seek appointment as a Warrant Officer, of which I was in. Once an enlisted sailor is appointed as a Warrant Officer, promotion and rank are based on time alone and not on merit or performance. Had I been selected to be a

Warrant Officer, I would likely have retired as a W-4, which would have provided me and my family with substantially higher retirement pay than my current position as an enlisted member.

13.     Because I am unvaccinated and non-operational, it would be a near impossibility for me to pursue the Warrant Officer program again or even to promote from an E-7 to an E-8. Since submitting my RAR, I lost time necessary for promotion eligibility, regressed in my skills as a SEAL, and have experienced personal hostility within my command that would make it impossible to prepare another warrant package. Within my community, my reputation is so negatively tarnished for being unvaccinated that I feel as if I have transitioned from an exemplary SEAL to a problem that my leadership and command have no desire to deal with. Therefore, I don't believe I will be able to promote again in my career. There is nothing that I have the power to do that can remedy this loss. Further, there is nothing in my personnel file that the Navy can simply remove to remedy this loss of opportunity.

14.     The stigma surrounding my unvaccinated status extends beyond my command and my ability to promote. In March of 2022, I was in need of medical treatment and contacted my hospital corpsman (HMC) to schedule an appointment. A HMC serves as a first step in the process for seeking any sort of medical treatment and is able to approve certain treatments based on his or her initial assessment. I was told by my HMC that he would not approve my requested appointment because I was not vaccinated. I offered to test in advance of any medical appointments, yet my treatment was still not approved. Eventually, I went around the HMC to seek medical care. Although I eventually received the requested appointment, I have lost trust in my ability to receive fair medical treatment because of the stigma surrounding my vaccination status.

15.     I am in the process of officially transferring from Temporary Assigned Duty orders at Training Detachment-One (Tradet-1) to Naval Special Warfare Group-One (NSWG-1). NSWG-

Pls.' Opp. to Assertion of Mootness App. 0106

1 is historically where the Navy sends SEALs with family, character, or performance issues and otherwise is seen as an assignment for those that cause trouble for other commands. I am one of three unvaccinated NSW personnel transferring from Tradet-1 to NSWG-1. Currently, our role in NSWG-1 is complete random tasks assigned to us within the command. I am currently working for a Trident cell that, during the week of February 6, 2023, traveled to a cold weather training trip to Montana that I was not allowed to attend. Instead, I remained at my command and was tasked to move from our old building to a new one a few miles away.

16.    I am specifically concerned about my inability to train as a SEAL during the mandate. Because of the highly-specialized nature of Navy SEAL skills, it is nearly impossible to lose two or more years of training opportunities and still maintain the skill level required of a Navy SEAL. Not training prevents me from keeping my skills sharp and at the level my rank and job duties would require.

17.    Before the COVID-19 vaccine mandate, my skills were the sharpest they had ever been, and I was teaching skydiving to west coast SEAL Teams and joining other blocks of tactical training. Because I lost so much training time, I do not feel confident that my skills would be sharp enough to lead a SEAL platoon right now, even if I were operational. In a position where I would need to gain the trust and confidence of the men I would lead, I would need to be the tactical subject matter expert. This is the main responsibility of a Platoon Chief. I would need to be refreshed on my skills and new weapon systems before leading junior members of a platoon that are current and up to date. A leader cannot be the weakest link in a platoon. Loss of leadership and skills are quick ways to be fired from a position. These issues and concerns have not changed since the Secretary of Defense rescinded the COVID-19 vaccination mandate on January 10, 2023.

18.    I have numerous NSW qualifications which are considered "critical qualifications," including Master Training Specialist, NSW Sniper, NSW Explosive Breacher, NSW Dive Supervisor, Air Ops Trainer Examiner, Military Freefall Jumpmaster, among others. Each SEAL team and SEAL platoon needs to have a certain number of members with these qualifications to be considered fully mission capable. If I remain non-operational because I am not vaccinated, I am jeopardizing the ability of my team to complete missions.

19.    Because I remain unvaccinated, the leadership surrounding me is looking for me to mess up or make a mistake so I can be reprimanded. The repeal of the mandate does not change that.

20.    My current status is uncertain to both my command and me. Despite the new Force Health Protection Guidance regarding travel, my command still believes that I cannot travel. When I asked my Senior Chief about travel, he sent me to a website that was last updated on November 30, 2022, and stated that this was the policies that Navy was working off of.

21.    One of my most recent tasks assigned is moving laptops from one building to another – a job that my command publicly demeaned. I have also been told that I will be heavy task saturated and closely watched. I believe these tasks will be equally menial to those such as moving buildings and transporting laptops.

22.    While I was once a committed naval service member with excellent evaluations, several service awards, and a progressing career, that has been lost because of the mandate. This has caused me and my family many sleepless nights, anxiety, and loss of purpose. My career is suffering and will continue to suffer if my leadership continues to make operational, assignment, and deployment decisions while considering my unvaccinated status. These are the decisions that have already damaged my career, and I expect they will continue based on the Secretary's January

Pls.' Opp. to Assertion of Mootness App. 0108

10, 2023, memo rescinding the mandate but allowing vaccination status to continue to be considered.

Pls.' Opp. to Assertion of Mootness App. 0109

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true

and correct. Executed on February 12, 2023.

*/s/ U.S. Navy SEAL 22*
U.S. NAVY SEAL 22

# Exhibit A

**DEPARTMENT OF THE NAVY**
NAVAL SPECIAL WARFARE GROUP ONE
3632 GUADALCANAL ROAD
SAN DIEGO CA 92155-5583

1420
Ser 00/452
22 Sep 21

FIRST ENDORSEMENT on SOC(SEAL) ███SEAL 22███ ltr of 24 Aug 21

From:   Commander, Naval Special Warfare Group ONE
To:     Commander, Navy Personnel Command (PERS-803)

Subj:   APPLICATION FOR CONSIDERATION BY THE FY-23 ACTIVE LIMITED DUTY
        OFFICER/CHIEF WARRANT OFFICER IN-SERVICE PROCUREMENT
        SELECTION BOARD

Ref:    (a) CNO WASHINGTON DC 032039Z JUN 21 (NAVADMIN 116/21)
        (b) OPNAVINST 1420.1 (Series)
        (c) OPNAVINST 6110.1 (Series)

1.  Forwarded.  SOC ███SEAL 22███ meets all requirements outlined in references (a) through (c), and is
worldwide assignable.

2.  I have verified that SOC ███SEAL 22███ meets Personnel Security Information/Clearance Requirements.

   a.  Type of investigation:  T3R

   b.  Date of Investigation:  15 May 2019

3.  Commanding Officer's Recommendation:

   a.  SOC ███SEAL 22███ 's performance, leadership, and technical expertise, exemplify the traits desired in a
SEAL Chief Warrant Officer.  He is intelligent, motivated, and demonstrates the highest degree of
professionalism.  As a member at my Training Detachment his subject matter expertise and dedication as
a SEAL instructor has made a positive and lasting impact in my command's operational readiness.  The
U.S. Navy needs qualified leaders in influential and demanding assignments, and I am sure that SOC
███SEAL 22███ 's experience and drive will make him an asset to any Wardroom in the future.  SOC ███SEAL 22███ has
my endorsement for the Chief Warrant Officer Program.

4.  I certify that the applicant has been provided copies of all enclosures to this application as well as a
copy of this endorsement.  My command point of contact for this matter is CWO5 Troy Wilson
████████ @socom.mil.

D. A. ABERNATHY

Copy to:
SOC ███SEAL 22███

3

# INTERVIEWER'S APPRAISAL SHEET

**NAVCRUIT 1131/5 (Rev 3-2021)**     **Supporting Directive: COMNAVCRUITCOMINST 1131.2**

(See information on reverse before completing)     **TYPE OR PRINT LEGIBLY**

| Name: SEAL 22 | Program for Which Applying: 7151, Chief Warrant Officer | Date: 01 SEP 2021 |
| --- | --- | --- |

## PERSONAL QUALITIES

DESCRIPTIVE: Observe the applicant and write 6 adjectives or phrases that you believe to be most descriptive of the applicant:

| 1. Impressive | 2. Relaxed | 3. Clear |
| --- | --- | --- |
| 4. Confident | 5. Articulate | 6. Combat Proven |

INTERVIEWED VIA:  Telephone [ ]   In-Person [X]   Other Type of Electronic Media [ ]   List Type _____

EVALUATIVE: Consider the applicant as a potential Naval Officer and evaluate them on the following:

| | *OUTSTANDING | EXCELLENT | GOOD | ADEQUATE | *UNSATISFACTORY |
| --- | --- | --- | --- | --- | --- |
| **APPEARANCE AND POISE** | X | | | | |

| | *OUTSTANDING | EXCELLENT | GOOD | ADEQUATE | *UNSATISFACTORY |
| --- | --- | --- | --- | --- | --- |
| **ORAL COMMUNICATION AND EXPRESSION OF IDEAS** | X | | | | |

| | *OUTSTANDING | EXCELLENT | GOOD | ADEQUATE | *UNSATISFACTORY |
| --- | --- | --- | --- | --- | --- |
| **LEADERSHIP POTENTIAL** | X | | | | |

| | PARTICULARLY LIKE TO HAVE | | PREFER TO MOST | | BE PLEASED TO HAVE | | BE SATISFIED WITH | | PREFER NOT TO HAVE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **YOUR WILLINGNESS TO HAVE INDIVIDUAL SERVE UNDER YOUR COMMAND WHEN COMMISSIONED** | *10 | 9 | 8 | 7   6 | 5   4   3 | 2 | 1 | 0* |
| | X | | | | | | | |

**COMMENTS:** A summary statement evaluating the applicant is required. All extreme ratings marked by an asterisk (*) should be further commented upon.

**\*\*THE NUMBER TWO CWO CANDIDATE THAT I HAVE INTERVIEWED THIS YEAR!\*\***

SOC SEAL 22 is an ideal candidate for the NSW CWO program. During his interview he showed confidence and enthusiasm for the CWO program and the challenges of being a NSW CWO. He was very articulate in expressing his knowledge of the NSW CWO community and the commissioning program. He demonstrates all the leadership traits of a veteran SEAL within NSW. I have personally served with him at SEAL Team SEVEN and have observed him in both a training environment and combat deployment. At all times he represented the U.S. and NSW with the highest possible standards.

## MOTIVATION

| | VERY HIGHLY MOTIVATED FOR PROGRAM | DEFINITELY MOTIVATED FOR PROGRAM | MOTIVATED FOR NAVY - PROGRAM NOT IMPORTANT | MOTIVATED FOR COMMISSION - PROGRAM AND SERVICE NOT IMPORTANT | UNABLE TO DETERMINE |
| --- | --- | --- | --- | --- | --- |
| **PROGRAM MOTIVATION** (Indicate the applicant's motivation for the program for which applying) | X | | | | |

## POTENTIAL

| | OUTSTANDING (1) | EXCELLENT (2) | GOOD (3) | AVERAGE (4) | LESS THAN AVERAGE (5) |
| --- | --- | --- | --- | --- | --- |
| **TECHNICAL KNOWLEDGE** (For LDO/CWO Applicants Only) Refer to Discrete Requirements | X | | | | |
| **POTENTIAL AS A CAREER NAVAL OFFICER** | X | | | | |

**COMMENTS:** Supplement or qualify the motivation rating and potential as a career Naval Officer, as appropriate.

SOC SEAL 22 is truly motivated for the NSW CWO program. He is very motivated to serve in a greater leadership capacity.

SOC SEAL 22 is a dedicated Navy professional with unbounded motivation to lead troops and further the successes of his Naval special warfare community.

SOC SEAL 22 will immediately increase the effectiveness of any wardroom, I would be honored to serve with this individual at any command when he receives his commission.

**\*\*\*I found my replacement, Press 100 NOW!!\*\*\***

| SIGNATURE OF INTERVIEWER | TYPE OR PRINT NAME OF INTERVIEWER Ramon Betancourt | GRADE, DESIGNATOR (IF ANY) BRANCH OF SERVICE CWO4/7151/USN |
| --- | --- | --- |

[ Reset Form ]  [ Print Form ]

Pls.' Opp. to Assertion of Mootness App. 0413

CUI
**When Filled In**

## INTERVIEWER'S APPRAISAL SHEET

| NAVCRUIT 1131/5 (Rev 3-2021) | Supporting Directive: COMNAVCRUITCOMINST 1131.2 |
|---|---|

| (See information on reverse before completing) | TYPE OR PRINT LEGIBLY |

| Name: SEAL 22 | Program for Which Applying: CWO / Special Warfare Technician (715X) | Date: Sep 2, 2021 |
|---|---|---|

### PERSONAL QUALITIES

DESCRIPTIVE: Observe the applicant and write 6 adjectives or phrases that you believe to be most descriptive of the applicant:

| 1. SPEAKS CLEARLY | 2. CONFIDENT | 3. IMPRESSIVE |
|---|---|---|
| 4. WELL-DRESSED | 5. POISED | 6. ARTICULATE |

INTERVIEWED VIA:  Telephone [ ]   In-Person [X]   Other Type of Electronic Media [ ]   List Type ____

EVALUATIVE: Consider the applicant as a potential Naval Officer and evaluate them on the following:

| | *OUTSTANDING | EXCELLENT | GOOD | ADEQUATE | *UNSATISFACTORY |
|---|---|---|---|---|---|
| APPEARANCE AND POISE | | X | | | |
| ORAL COMMUNICATION AND EXPRESSION OF IDEAS | X | | | | |
| LEADERSHIP POTENTIAL | | X | | | |

| YOUR WILLINGNESS TO HAVE INDIVIDUAL SERVE UNDER YOUR COMMAND WHEN COMMISSIONED | PARTICULARLY LIKE TO HAVE | | PREFER TO MOST | | | BE PLEASED TO HAVE | | | BE SATISFIED WITH | | PREFER NOT TO HAVE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0* |
| | | | X | | | | | | | | |

COMMENTS: A summary statement evaluating the applicant is required. All extreme ratings marked by an asterisk (*) should be further commented upon.

SOC SEAL 22 possesses the leadership qualities and the technical expertise that the Navy and NSW community desires within their Chief Warrant Officer ranks. His writing ability and communication skills paired with his appearance and poise in uniform make this candidate stand out. His leadership and performance as an enlisted sailor are trademarks and qualities that NSW CWO's must possess. I have no doubt that SOC SEAL 22 will be an outstanding SEAL CWO in the future if selected.

### MOTIVATION

| PROGRAM MOTIVATION (Indicate the applicant's motivation for the program for which applying) | VERY HIGHLY MOTIVATED FOR PROGRAM | DEFINITELY MOTIVATED FOR PROGRAM | MOTIVATED FOR NAVY - PROGRAM NOT IMPORTANT | MOTIVATED FOR COMMISSION - PROGRAM AND SERVICE NOT IMPORTANT | UNABLE TO DETERMINE |
|---|---|---|---|---|---|
| | X | | | | |

### POTENTIAL

| | OUTSTANDING (1) | EXCELLENT (2) | GOOD (3) | AVERAGE (4) | LESS THAN AVERAGE (5) |
|---|---|---|---|---|---|
| TECHNICAL KNOWLEDGE (For LDO/CWO Applicants Only) Refer to Discrete Requirements | | X | | | |
| POTENTIAL AS A CAREER NAVAL OFFICER | | X | | | |

COMMENTS: Supplement or qualify the motivation rating and potential as a career Naval Officer, as appropriate.

SOC SEAL 22 motivation and commitment for the CWO program were clearly articulated throughout the interview. He has a dynamic understanding of the challenges that the Navy and NSW face in the future. His experience, leadership and performance to date make him an excellent CWO candidate that the Navy and NSW should consider.

| SIGNATURE OF INTERVIEWER | TYPE OR PRINT NAME OF INTERVIEWER | GRADE, DESIGNATOR (IF ANY) BRANCH OF SERVICE |
|---|---|---|
| WILSON.TROY.EDWARD.116 8869089  Digitally signed by WILSON.TROY.EDWARD.1168869089 Date: 2021.09.15 14:09:16 -07'00' | Troy E. Wilson | CWO5, 7151, USN |

Page 1 of 2

cut
When Filled In

## INFORMATION FOR COMPLETING INTERVIEWER'S APPRAISAL SHEET

1.  The purpose of the interview is to evaluate accurately and impartially the characteristics of the candidate to determine potential as a commissioned officer and motivation toward service in the Navy.

2.  The interview should take a minimum of 15 minutes. A period of 15-30 minutes is usually adequate, although more time may be necessary on occasion.

3.  Discussion topics should draw out the applicant. Suggested topics include: Navy programs, service life, school experiences, personal interests, goals in life, current events, sports, family attitude toward application, and any others suggested by a review of the application file.

4.  Marking is difficult. Your judgments form an important part of each applicant's file, and usually represent the only personal contact with the applicant reported by an official of the Navy. Be fair and impartial, neither too easy nor too hard on the applicant. Mark only on what you have observed personally, not on the opinions or comments of others.

5.  No marks should be put on this form until the interview has been completed.

6.  If it appears that the space for comments will not be sufficient, phrases may be used rather than complete sentences.

7.  Professional interviews are coordinated with the Region Chaplain Field Recruiter and the respective NAVTALACOGRU. _N312_ will monitor compliance with the following, before application kits are forwarded to the Chaplain Appointment and Retention Eligibility (CARE) Advisory Group. Cooperation will minimize unnecessary delays in processing applications.

8.  General guidance for ALL NAVCRUIT 1131/5, Chaplain Corps (CHC) Professional Interview Appraisals:

    a. Should be conducted in-person or using VTC, Facetime, Skype, or similar type technology.

    b. May only be conducted by an active duty CHC officer in the following rank:

      (1) CAPT or CAPT(s)
      (2) CDR (milestone screened only)

    c. Comment Section Guidance for NAVCRUIT 1131/5:  The interviewer will need to address the following areas in the narrative section (additional pages are accepted; typed preferred, legible for fax/photo copies)

      (1) How has the applicant's previous experience prepared him or her for Navy Chaplaincy?
      (2) Describe the applicant's understanding of institutional ministry?
      (3) Comment on the applicant's willingness to facilitate ministry to faith groups other than his or her own?
      (4) Describe the applicant's disposition toward working with chaplains of faith groups, gender, race other than his or her own?
      (5) Elaborate on applicant's perception of commission oath and obligations (i.e. extended separations, overseas assignments, shipboard and Fleet Marine Force tours, etc.)
      (6) Give applicant's response to the fact that some chaplains may only serve three years (Career Status Board) on active duty and may then be release to the inactive reserves.  Would the applicant still request appointment in the Navy?
      (7) Any summary remarks regarding the interviewer's recommendations are also welcome.

Note: Chaplain Candidate Program Officer (CCPO/1945) applicants may not be well informed regarding the finer nuances of these questions CCPO Orientation addresses these matters, it is not too soon to bring these matters to their attention. CCPO applicant responses will be reviewed in this context, and are not expected to be at the same level as 4100 (active) or 4105 (reserve) applicants.

9.  In-person interviews before a CARE Advisory Group is required for all 4100 and 4105 applicants, in addition to the NAVCRUIT 1131/5.

10.  Below is a checklist of characteristics which interviewing officers can observe and adjectives that can be used to describe these characteristics in applicants.  This list is meant only to assist the interviewer in preparing the interview and in making a written evaluation afterward.  It is not intended to be all-inclusive.

Characteristic/Descriptive-Example Adjectives:

BEARING:  Good posture, Stouch, Forceful, Apathetic, Casual, Formal

GROOMING:  Careless, Neat, Clean, Unclean, Well-Dressed, Inappropriately dressed

COMPOSURE:  Poised, Awkward, Relaxed, Nervous, Confident, Insecure

ATTITUDE:  Sincere, Flippant, Enthusiastic, Indifferent, Contentious, Pleasant, Forthright, Secretive, Arrogant, Modest

ORAL EXPRESSION:  Articulate, Inarticulate, Responsive, Unresponsive, Taciturn, Loquacious

VOICE QUALITY:  Strident, Soft, Spoken, Speaks clearly, Inaudible

GENERAL IMPRESSION:  Impressive, Unimpressive, Dull, Interesting, Mature, Immature

Pls.' Opp. to Assertion of Mootness App. 0115

cut
**When Filled In**

## INTERVIEWER'S APPRAISAL SHEET

**NAVCRUIT 1131/5 (Rev 3-2021)**      **Supporting Directive: COMNAVCRUITCOMINST 1131.2**

*(See information on reverse before completing)*      **TYPE OR PRINT LEGIBLY**

| Name: SOC SEAL 22 | Program for Which Applying: Warrant Officer | Date: Sep 10, 2021 |
|---|---|---|

### PERSONAL QUALITIES

DESCRIPTIVE: Observe the applicant and write 6 adjectives or phrases that you believe to be most descriptive of the applicant:

| 1. Forceful | 2. Confident | 3. Enthusiastic |
|---|---|---|
| 4. Speaks clearly | 5. Impressive | 6. Forthright |

INTERVIEWED VIA:  Telephone ☐   In-Person ☒   Other Type of Electronic Media ☐   List Type

EVALUATIVE: Consider the applicant as a potential Naval Officer and evaluate them on the following:

| | *OUTSTANDING | EXCELLENT | GOOD | ADEQUATE | *UNSATISFACTORY |
|---|---|---|---|---|---|
| APPEARANCE AND POISE | ✕ | | | | |
| ORAL COMMUNICATION AND EXPRESSION OF IDEAS | | ✕ | | | |
| LEADERSHIP POTENTIAL | | ✕ | | | |

| | PARTICULARLY LIKE TO HAVE | | PREFER TO MOST | | | BE PLEASED TO HAVE | | | BE SATISFIED WITH | | PREFER NOT TO HAVE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| YOUR WILLINGNESS TO HAVE INDIVIDUAL SERVE UNDER YOUR COMMAND WHEN COMMISSIONED | *10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0* |
| | | ✕ | | | | | | | | | |

COMMENTS: A summary statement evaluating the applicant is required. All extreme ratings marked by an asterisk (*) should be further commented upon.

SOC SEAL 22 is an accomplished SEAL SOC.

### MOTIVATION

| | VERY HIGHLY MOTIVATED FOR PROGRAM | DEFINITELY MOTIVATED FOR PROGRAM | MOTIVATED FOR NAVY - PROGRAM NOT IMPORTANT | MOTIVATED FOR COMMISSION - PROGRAM AND SERVICE NOT IMPORTANT | UNABLE TO DETERMINE |
|---|---|---|---|---|---|
| PROGRAM MOTIVATION (Indicate the applicant's motivation for the program for which applying) | ✕ | | | | |

### POTENTIAL

| | OUTSTANDING (1) | EXCELLENT (2) | GOOD (3) | AVERAGE (4) | LESS THAN AVERAGE (5) |
|---|---|---|---|---|---|
| TECHNICAL KNOWLEDGE (For LDO/CWO Applicants Only) Refer to Discrete Requirements | ✕ | | | | |
| POTENTIAL AS A CAREER NAVAL OFFICER | | ✕ | | | |

COMMENTS. Supplement or qualify the motivation rating and potential as a career Naval Officer, as appropriate.

SOC SEAL 22 has demonstrated high performance in NSW.

| SIGNATURE OF INTERVIEWER RATCLIFFE.ALEXANDER.ED WIN.1171627148  *Digitally signed by RATCLIFFE.ALEXANDER.EDWIN.1171627148  Date: 2021.09.20 18:29:19 -07'00'* | TYPE OR PRINT NAME OF INTERVIEWER Ratcliffe, Alexander | GRADE, DESIGNATOR (IF ANY) BRANCH OF SERVICE CDR, SEAL, USN |
|---|---|---|

Page 1 of 2

cut

When Filled In

## INFORMATION FOR COMPLETING INTERVIEWER'S APPRAISAL SHEET

1. The purpose of the interview is to evaluate accurately and impartially the characteristics of the candidate to determine potential as a commissioned officer and motivation toward service in the Navy.

2. The interview should take a minimum of 15 minutes. A period of 15-30 minutes is usually adequate, although more time may be necessary on occasion.

3. Discussion topics should draw out the applicant. Suggested topics include: Navy programs, service life, school experiences, personal interests, goals in life, current events, sports, family attitude toward application, and any others suggested by a review of the application file.

4. Marking is difficult. Your judgments form an important part of each applicant's file, and usually represent the only personal contact with the applicant reported by an official of the Navy. Be fair and impartial, neither too easy nor too hard on the applicant. Mark only on what you have observed personally, not on the opinions or comments of others.

5. No marks should be put on this form until the interview has been completed.

6. If it appears that the space for comments will not be sufficient, phrases may be used rather than complete sentences.

7. Professional interviews are coordinated with the Region Chaplain Field Recruiter and the respective NAVTALACQGRU. _N312_ will monitor compliance with the following, before application kits are forwarded to the Chaplain Appointment and Retention Eligibility (CARE) Advisory Group. Cooperation will minimize unnecessary delays in processing applications.

8. General guidance for _ALL_ NAVCRUIT 1131/5, Chaplain Corps (CHC) Professional Interview Appraisals:

   a. Should be conducted in-person or using VTC, Facetime, Skype, or similar type technology.

   b. May only be conducted by an active duty CHC officer in the following rank:

     (1) CAPT or CAPT(s)
     (2) CDR (milestone screened only)

   c. Comment Section Guidance for NAVCRUIT 1131/5: The interviewer will need to address the following areas in the narrative section (additional pages are accepted; typed preferred, legible for fax/photo copies)

     (1) How has the applicant's previous experience prepared him or her for Navy Chaplaincy?
     (2) Describe the applicant's understanding of institutional ministry?
     (3) Comment on the applicant's willingness to facilitate ministry to faith groups other than his or her own?
     (4) Describe the applicant's disposition toward working with chaplains of faith groups, gender, race other than his or her own?
     (5) Elaborate on applicant's perception of commission oath and obligations (i.e. extended separations, overseas assignments, shipboard and Fleet Marine Force tours, etc.)
     (6) Give applicant's response to the fact that some chaplains may only serve three years (Career Status Board) on active duty and may then be release to the inactive reserves. Would the applicant still request appointment in the Navy?
     (7) Any summary remarks regarding the interviewer's recommendations are also welcome.

Note: Chaplain Candidate Program Officer (CCPO/1945) applicants may not be well informed regarding the finer nuances of these questions CCPO Orientation addresses these matters, it is not too soon to bring these matters to their attention. CCPO applicant responses will be reviewed in this context, and are not expected to be at the same level as 4100 (active) or 4105 (reserve) applicants.

9. In-person interviews before a CARE Advisory Group is required for all 4100 and 4105 applicants, in addition to the NAVCRUIT 1131/5.

10. Below is a checklist of characteristics which interviewing officers can observe and adjectives that can be used to describe these characteristics in applicants. This list is meant only to assist the interviewer in preparing the interview and in making a written evaluation afterward. It is not intended to be all-inclusive.

---

Characteristic/Descriptive-Example Adjectives:

BEARING: Good posture, Slouch, Forceful, Apathetic, Casual, Formal

GROOMING: Careless, Neat, Clean, Unclean, Well-Dressed, Inappropriately dressed

COMPOSURE: Poised, Awkward, Relaxed, Nervous, Confident, Insecure

ATTITUDE: Sincere, Flippant, Enthusiastic, Indifferent, Contentious, Pleasant, Forthright, Secretive, Arrogant, Modest

ORAL EXPRESSION: Articulate, Inarticulate, Responsive, Unresponsive, Taciturn, Loquacious

VOICE QUALITY: Strident, Soft, Spoken, Speaks clearly, Inaudible

GENERAL IMPRESSION: Impressive, Unimpressive, Dull, Interesting, Mature, Immature

Pls.' Opp. to Assertion of Mootness App. 0117

Tab 16

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, <br><br> Plaintiffs, <br><br> v. <br><br> **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, <br><br> Defendants. | Case No. 4:21-cv-01236-O |

## <u>DECLARATION OF U.S. NAVY SEAL 26</u>

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 26, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am one of the original Plaintiffs in this litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

1

4.   I am currently attached to a training command, that is by definition non-operational, meaning I likely will not deploy or attach to a deployable SEAL team in this billet.

5.   Because I am non-operational, I am unable to complete a Leading Petty Officer (LPO) position, which is a milestone position that must be completed if I want to promote from an E-6 to an E-7.

6.   When I access NSIPS, the Navy Standard Integrated Personnel System, there is no information about my religious accommodation request (RA). I did not take any action to withdraw my request. I was not contacted by anyone in the Navy about this change, nor did anyone request approval to remove my RA from my account. A true and correct copy of my NSIPS religious accommodation window in attached as Exhibit A.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 12, 2023.

/s/ U.S. Navy SEAL 26
U.S. Navy SEAL 26

# Exhibit A



FOUO - Privacy Sensitive:             Last login: 02-08-2023 10:13   Home   Add to Favorites   **Sign Out**

## Religious Accommodations

Name: SEAL 26          Rank/Rate: SO1          Current DSC: 100



| **Religious Accommodation** | Find | View All | First  1 of 1  Last |
| --- | --- | --- |

**Member Info**

UIC:

Pay Grade:

Requested Date:

Request Category:

Sub Category:

Request Comments:

**Approval Authority Info**

UIC:

Date Determination:

Approved/Denied:

Approved/Denied Comments:

**Go to:**   ESR Home

ESR Personal Information Home

Return to Search    |    Notify    |

Pls.' Opp. to Assertion of Mootness App. 0123

Tab 17

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

**U.S. NAVY SEALs 1-3;** on behalf of
themselves and all others similarly situated;
**U.S. NAVY EXPLOSIVE ORDNANCE**
**DISPOSAL TECHNICIAN 1**, on behalf of
himself and all others similarly situated; U.S.
**NAVY SEALS 4-26**; **U.S. NAVY SPECIAL**
**WARFARE COMBATANT CRAFT**
**CREWMEN 1-5**; and **U.S. NAVY DIVERS**
**1-3**,

                     Plaintiffs,

     v.

**LLOYD J. AUSTIN, III**, in his official
capacity as United States Secretary of
Defense; **UNITED STATES**
**DEPARTMENT OF DEFENSE**; **CARLOS**
**DEL TORO**, in his official capacity as
United States Secretary of the Navy,

                   Defendants.

Case No. 4:21-cv-01236-O

## DECLARATION OF U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMAN 1

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy Special Warfare Combatant Craft Crewman

(SWCC) 1, under penalty of perjury declare as follows:

1.  I am over the age of eighteen and am competent to make this declaration.

2.  I am one of the original Plaintiffs in this litigation.

3.  I submitted several declarations in this matter that outline my religious objections to the

COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022,

I have been protected from separation because of the preliminary injunction.

4.   Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5.   I am currently non-operational. When I contacted the SWCC detailer regarding potential reenlistment, I was told that so long as I am non-vaccinated, I will be non-operational. The detailer is NSW specific, but he works for a Navy-wide command. A true and correct copy of this email is included as Exhibit A.

6.   I want to reenlist and continue serving my country but having to serve in a non-operational capacity will be detrimental to my career in a way that I am powerless to remedy myself.

7.   If I reenlist and am placed at an operational command while I am non-operational, I will be limited to strictly administrative tasks, which will lead to a loss of special duty pay. Retention at my current command, where I serve as an instructor, also limits my opportunities for advancement. Both options equally stall my career and advancement in the military, which exerts a coercive pressure on me to take the vaccine.

8.   I know that I am non-operational because during my five-year physical in May 2022, I was marked as "Not Physically Qualified" for SO/NSW/MFF/JUMP because I am unvaccinated. To my knowledge, this has not been amended since the repeal of the mandate or change to the MANMED. As long as I stay in my capacity as an instructor, I am non-operational. Further, multiple members of my chain of command have reiterated to me that unvaccinated service members are non-operational.

9.   I am approaching the eleven-year mark as an E-6, which means that it is time for me to assume the role of Lead Petty Officer (LPO). In a non-operational status, I am unlikely to be able to complete this milestone at an operational Special Boat Team. The LPO milestone is also a key

Pls.' Opp. to Assertion of Mootness App. 0126

element necessary to advance to E-7 under normal circumstances. To promote any further to an E-8, I must fulfill a role as a post-deployed Team Chief as an E-7.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 11, 2023.

/s/ U.S. Navy SWCC 1
U.S. Navy SWCC 1

Pls.' Opp. to Assertion of Mootness App. 0128

Exhibit A



RE: PRD Rotation Options

To   Casebolt, Justin M SCPO USN (USA) < @us.navy.mil>
Cc   [redacted] USN USN NSWCOM NSW (USA)

Signed By   [redacted]@navy.mil

**SWCC 1**

Your PRD has been adjusted to reflect the 12mo extension. Currently, non-vaccinated personnel are not being detailed to operational commands. I don't know what that will look like in a year. As it stands right now, your options are CONUS based instructor billets (BTC, TRADET, SCIATTS, Det Stennis, etc.). As policies change (if they change), we can readdress your options. Until then, you are quite limited. I am good with your current extension at Det Stennis to fill the need there and wait for policy updates. Upton your new PRD, we will have to look at other options. Let me know if you have any further questions.

Respectfully,

SBCS Justin Casebolt
SWCC Detailer PERS 401
Office:
Cell:
Email:                    @us.navy.mil

Tell us what you think! This short, 3-minute survey would help us improve our performance.
https://surveys.max.gov/index.php/454228
FOR OFFICIAL USE ONLY – PRIVACY SENSITIVE . Any misuse or unauthorized disclosure may result in both civil and criminal penalties".

From: **SWCC 1**
Sent: Friday, February 10, 2023 12:32 PM
To:                    @navy.mil
Cc: Beebe, Justin W SCPO USN (USA)                    @socom.mil>
Subject: PRD Rotation Options

# Tab 18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, | |
| Plaintiffs, | Case No. 4:21-cv-01236-O |
| v. | |
| **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, | |
| Defendants. | |

## DECLARATION OF U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMAN 5

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy Special Warfare Combatant Craft Crewman

(SWCC) 5, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am one of the original Plaintiffs in this litigation.

3. I submitted several declarations in this matter that outline my religious objections to the

COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022,

I have been protected from separation because of the preliminary injunction.

Pls.' Opp. to Assertion of Mootness App. 0132

4. Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5. I serve with SWCC 1. Our SWCC detailer, who authorizes orders for SWCCs to attach and detach from units, has stated that he is unable to provide me and the other unvaccinated members with orders to operational units. My billet is a training command, so I am classified as non-operational.

6. My career is at a standstill, and I have no ability to correct it myself. My leadership has told me that I can only be transferred to another non-operational unit, which halts my ability to continue to promote through the Navy. I am now significantly behind my peers within my group of enlistment.

7. Typically, SWCCs and other service members alternate between "sea duty" at deployable commands and "shore duty" at training commands. My command has told me that I can possibly extend my "shore duty" again, despite it already being extended once before, instead of switching to "sea duty." This is not a normal career progression. I have also been told that I could transfer from my current training command to another training command. Going from "shore duty" to "shore duty" is normally disapproved, since it's acknowledged by leadership as career stunting. It is now becoming my reality, and my only alternative. To continue progressing in my career and in my skill, I need to work "sea duty."

8. The longer I continue to serve in the capacity I am in now, the more that I fear I am growing detached from evolving tactics, techniques, procedures, and technologies in operational billets. This detachment makes my experience as a SWCC outdated and decreases my relevancy among my operational peers.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 11, 2023.

*/s/ U.S. Navy SWCC 5*
U.S. Navy SWCC 5

Pls.' Opp. to Assertion of Mootness App. 0134

# Tab 19

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>                    Plaintiffs,<br><br>        v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>                    Defendants. | Case No. 4:21-cv-01236-O |

<u>**DECLARATION OF U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**</u>

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy Explosive Ordnance Disposal Technician (EOD) 1, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I serve as a Class Representative in this class action litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

Pls.' Opp. to Assertion of Mootness App. 0136

4.  Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5.  I am currently stationed in a Leading Chief Petty Officer (LCPO) billet at a non-operational command. My executive officer made a comment that I am not deployable if I am unvaccinated.

6.  I am a Senior Chief Petty Officer (E-8). Without deploying, I will be unable to hit the career milestone of Platoon Senior Enlisted Advisor, which would make me less competitive than my peers for promotion to Master Chief Petty Officer (E-9).

Pls.' Opp. to Assertion of Mootness App. 0137

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 11, 2023.

/s/ U.S. Navy EOD 1
U.S. Navy EOD 1

# Tab 20

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, <br><br> Plaintiffs, <br><br> v. <br><br> **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, <br><br> Defendants. | Case No. 4:21-cv-01236-O |

**DECLARATION OF U.S. NAVY SEAL 5**

Pursuant to 28 U.S.C. § 1746, I, U.S. Navy SEAL 5, under penalty of perjury declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am one of the original Plaintiffs in this litigation.

3. I submitted several declarations in this matter that outline my religious objections to the COVID-19 vaccine and the adverse actions the Navy has taken against me. Since January 3, 2022, I have been protected from separation because of the preliminary injunction.

1

4.   Even though the COVID-19 mandate has now been repealed, consequences of the mandate still exist and personally impact my career in the Navy.

5.   I am currently a First-Class Petty Officer serving in an advanced training command. Because I am serving "shore duty" in a school house command, I am considered non-operational.

6.   Being non-operational means that I will not be able to meet certain criteria for advancement nor will I be able to gain the experience necessary through deployment to carry out the proper duties of a SEAL. Both the lack of experience and the lack of advancement have stalled my career. I have no assurance that I will be acceptable to a deployable command again without taking the vaccine.

7.   I feel like my career as a SEAL is being cut short and that the Navy would rather have me out of the service than remain as an unvaccinated SEAL.

Pls.' Opp. to Assertion of Mootness App. 0141

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 13, 2023.

/s/ U.S. Navy SEAL 5
U.S. Navy SEAL 5

# Tab 21

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **U.S. NAVY SEALs 1-3**; on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; **U.S. NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, <br><br> Plaintiffs, <br><br> v. <br><br> **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, <br><br> Defendants. | Case No. 4:21-cv-01236-O |

## <u>DECLARATION OF LEVI BEAIRD, LIEUTENANT COMMANDER (SEL), USN</u>

Pursuant to 28 U.S.C. §1746, I, Levi Beaird, declare under penalty of perjury as follows:

1.      I am over the age of eighteen and competent to make this declaration.

2.      I am a Lieutenant Commander (select) in the United States Navy presently assigned to Surface Warfare Schools Command, a non-operational command, performing the duties of Engineering Instructor.

3.      I first joined the Navy in April of 2009 as a pilot select. During Officer Candidate School ("OCS"), I fractured my right tibia and was medically separated in September of 2009.

4.      On or about January 2013, I was again selected for Navy OCS and commissioned in October of 2013.

1

5.      After commissioning, I began as a Surface Warfare Officer ("SWO") working on the *USS Roosevelt*, a guided missile destroyer. Onboard, I was the Electrical Officer and collaterally the Religious Lay Leader. This was my first deployment, which lasted nine months. As the Religious Lay Leader, I was leading five services per week in the absence of chaplains.

6.      During my second tour from February 2016 to February 2018, I served as Navigator, Administrative Officer, Electrical Officer, and Training Officer onboard the *USS Devastator*, a mine sweeper out of Manama, Bahrain. I also served as the command's Religious Lay Leader; however, due to being mostly pier-side, our Sailors had access to base chaplains on a continual basis.

7.      In 2017, I committed to serving in the Navy until on or about 2026. As part of that commitment, I screened for Department Head on my first look and was accepted, which is very difficult to accomplish because it is a highly competitive process. I also applied for a Talent Management Selection Board and was selected to attend the Naval Postgraduate School.

8.      As part of accepting my offer to attend Naval Postgraduate School, I obligated myself to fulfill the role of a Department Head at sea for three years after graduation from Department Head school and accepted a retention bonus of $105,000, that would be dispersed incrementally, to do so. The NAVADMIN that applies to my Department Head Retention Bonus is from 2016 and is entirely unrelated to any COVID-19 vaccination guidance.

9.      The retention bonus I was awarded has been paid in installments since 2017. To date, I have received six of eight total installments. The last installment I received was in November of 2021. I expected to receive a $15,000 payment in November of 2022; however, it was withheld for reasons explained below. No one in my chain of command has discussed with me the fact that my bonus payments stopped. The total amount I have received so far is $75,000.

Pls.' Opp. to Assertion of Mootness App. 0145

10.     From March 2018 until 2019, I attended the Naval Postgraduate School, Monterey where I received a degree in National Security Studies writing a thesis paper comparing contemporary Russian and Soviet Naval strategy and completed my Joint Professional Military Education at the Navy War College. During my time in postgraduate school, I was the President of the Surface Navy Association, Monterey Bay. In the Surface Warfare community, that's a non-governmental entity that meets for fellowship with a mission of promoting coordination and communication between military professionals with a specific interest in Naval Surface Warfare.

11.     After postgraduate school, in October 2019, I was assigned to Commander Amphibious Squadron Eight out of Norfolk, Virginia as the Future Operations Officer. During my deployment with that command from December 2019 through June of 2020, I was primarily responsible for mission and exercise planning.

12.     From the time COVID-19 began in March 2020 through May 2020, I was still deployed and located in Bahrain, functioning as a naval liaison officer between Task Force 51.5 and Commander Amphibious Squadron Eight, and moved over 400 personnel to and from ships back to the United States across multiple theaters of operations. My additional duties included delivering meals to personnel who were quarantining coming to and from the United States to our ships and from our ships to the United States, getting care for injured and mentally ill Sailors and Marines, and finding ways to get service members home to their dying loved ones when commercial air routes were non-existent.

13.     In May through June of 2020, I traveled to Greece from Bahrain to intercept 21 passengers coming from the United States who needed quarantining before they were taken to their respective ships.

Pls.' Opp. to Assertion of Mootness App. 0146

14.     I also moved approximately 200 Marines from their ships and quarantined them on base in Greece before sending them to the United States.

15.     Although I was constantly exposed, I did not catch COVID-19 until July 2022 and had a very mild case, with symptoms lasting only three days. I have not had COVID-19 since.

16.     After my deployment, in June 2020 until August of 2021, the same month the Department of Defense COVID-19 vaccination mandate went into effect, I returned to Norfolk, Virginia and assumed duties as the Staff Administrative Officer, Senior Watch Officer, and Anti-Terrorism Officer. The Senior Watch Officer position is a highly regarded position that is normally reserved for a higher-ranking officer, specifically a post-Department Head O-4, Lieutenant Commander, at the Staff level, but was given to me in my current position as an O-3, Lieutenant.

17.     In August of 2021, as part of my commitment to serve in the Navy until 2026, I was transitioned to Department Head School in Newport, Rhode Island where I began my studies in October of that year. I graduated in April of 2022. However, because my Religious Accommodation Request ("RAR") to not receive the COVID-19 vaccines was denied, my orders to be Chief Engineer, which is a Department Head position, onboard LCS 11 were canceled, **Exhibit A**, and I have since been stashed at the Surface Warfare School Command's engineering department (N74) as an instructor without a definitive set of orders or an end date in sight.

18.     My orders for sea duty onboard LCS 11 were set to begin in December 2022. When I am on sea duty, I receive special duty pay. But since I am presently stashed at a "shore command," I am not receiving special duty pay.

19.     During my time at Department Head School, in November 2021, I submitted my RAR.

Pls.' Opp. to Assertion of Mootness App. 0147

20.     My RAR was denied in December of 2021, and I submitted my appeal that same month.

21.     I received the final denial of my RAR in February of 2022.

22.     After receiving my final denial, later in February 2022, I received a Page 13 counseling, a Report of Misconduct, and was given a Notice to Show Cause.

23.     After receiving those documents, on March 4, 2022, I attempted to leave my responsive statement package to my Notice to Show Cause with the Director of the Department Head School, as required. The Director was expecting me to hand deliver papers that morning, so, I knocked on the Director's door to his office, said, "Sir . . . hello," and received no response. Then another officer walked into the Director's office and he and the Director had a conversation. I waited outside the Director's office for him and the officer to complete their conversation. When the Director finally walked out, he looked at me and then continued walking past me without saying a word. This is typical of the treatment I have received from senior leadership throughout the course of this litigation.

24.     The Notice to Show Cause initiated my Board of Inquiry, which is the Navy's process for discharging Sailors. I had the option to be administratively separated in exchange for an Honorable discharge (for Commission of a Serious Offense) but declined.

25.     Thankfully, the Board of Inquiry process was suspended as a result of this Court's issuance of the class-wide preliminary injunction on March 29, 2022. It is only because of this Court's intervention that I have been able to maintain my career in the Navy. However, the injunctive relief does not cure the fact that I could be forced to pay the Navy the bonus monies I already received along with the costs of my post-graduate and Naval War College education.

26.     Because I am not vaccinated, I have not been able to become a Department Head, as originally expected when I signed my commitment in 2017, which triggers the Recoupment and Repayment Policy referenced at paragraph 9 of NAVADMIN 206/16.

27.     Pursuant to paragraph 5.j. of NAVADMIN 206/16, "Officers who fail to complete DH [(Department Head)] and/or fail to report to their first DH tour will have all payments received recouped as unearned."

28.     Subsequent guidance in NAVADMIN 102/22, which has not been canceled or suspended, states that because I am unvaccinated, my bonus installment payments would end and "become unearned." This guidance was implemented after class-wide injunctive relief was granted on March 29, 2022.

29.     The relevant sections of NAVADMIN 102/22 that apply to me are as follows: "RMKS/1. Purpose. To provide additional guidance regarding the actions directed in references (a) through (h) for Navy service members who requested religious accommodation from the COVID-19 vaccination requirement. These service members were certified by the U.S. District Court order in reference (i) as members of a class action in the case of U.S. Navy SEALS 1-26, et al., versus Secretary of Defense Lloyd J. Austin, III, et al.  This message supersedes and replaces guidance previously provided in reference (j)."

30.     "2. Policy. To ensure compliance with the court order in reference (i), this NAVADMIN continues to suspend separation processing and certain adverse administrative consequences of COVID-19 vaccine refusal for Navy service members who submitted requests for religious accommodation from the COVID-19 vaccine requirement. In line with a recent decision of the U.S. Supreme Court, the Navy may continue to consider the unvaccinated status of Navy service members when making deployment, assignment, and other operational decisions."

Pls.' Opp. to Assertion of Mootness App. 0149

31.    "3. Applicability. This NAVADMIN applies only to Navy service members who have submitted requests for religious accommodation from the COVID-19 vaccine requirement in line with references (k) and (l)."

32.    "4.b.3. Bonus, Special Pays, and Incentive Pays. Bonuses, special pays and incentive pays are considered unearned for personnel who have been removed from assignment based on deployment and other operational decisions. Reference (c) [NAVADMIN 256/21, which has not been canceled] provides guidance on required actions for members with unearned bonuses, special pays and incentives."

33.    NAVADMIN 256/21 states at paragraph "8. [that] Bonuses, Special Pays and Incentive Pays. Navy service members refusing the vaccine may not enter into any new agreements for bonuses, special pays, or incentive pays and any unearned portion of current bonuses, special pays and incentive pays will be recouped in accordance with references (r) through (u). Examples include, but are not limited to, the following: career retention bonuses, enlistment bonuses and incentive pays (such as flight pay). Bonuses, special pays and incentive pays become unearned when a Navy service member refusing the vaccine is no longer performing duties for which they are receiving such a bonus, special pay, or incentive pay (i.e. removed from assignment)."

34.    NAVADMIN 256/21 further states at paragraph "9.a. [that] Institutional Education. Navy service members refusing the vaccine who incurred a service obligation for an education benefit (e.g. USNA, ROTC, Naval Postgraduate School, Health Professional Scholarship Program or in-residence Professional Military Education), will have any unearned portion of that education benefit recouped if separated before completing the service obligation. Navy service members refusing the vaccine (as defined in para. 3) currently enrolled in such an education program will be dis-enrolled from their program as soon as feasible and held at their institution or command

Pls.' Opp. to Assertion of Mootness App. 0150

pending administrative separation. Note: Current USNA and ROTC Midshipmen will be adjudicated by governing instructions as discussed in para. 3.a."

35. Because vaccination status is still being considered, current Navy policies indicate that I will be required to reimburse the cost of the education received, plus my retention bonus, which amounts to $75,000 and whatever the Navy determines I owe for studies at Naval Postgraduate School and the Naval War College for Joint Professional Military Education.

36. I have ranked ahead of my peers since I commissioned in 2013 until submission of my RAR.

37. While I was selected in May of 2022 for Lieutenant Commander, O-4, my understanding is that my promotion will be withheld. I have reason to believe that it will be withheld because I have firsthand knowledge of another Lieutenant, selected for Lieutenant Commander, whose promotion is still being withheld as a result of submitting a RAR, despite the mandate being rescinded. Further, I have not received any additional information or guidance from my command or my detailer to suggest otherwise. My command had no idea that I was even selected for Lieutenant Commander and did not celebrate that achievement with me, which is the normal course of action when officers are selected to promote to the next grade.

38. Until the implementation of the August 24, 2021, vaccine mandate, throughout my career, I have been very well-respected and held in high regard among my peers and those in leadership positions.

39. The fact that I will be required to repay my bonus and cost of my postgraduate education is discriminatory, will be damaging to my career and personally financially crippling, and has caused me significant and officially documented anxiety and depression with PTSD-like

Pls.' Opp. to Assertion of Mootness App. 0151

symptoms. The cost of repayment will completely wipe out all of my investment accounts and savings, which could further hamper my ability to provide for my wife and four children.

40.    As indicated in Secretary of the Navy Carlos Del Toro's speech on December 6, 2022 to the Navy League, the Navy will not allow me and others who are unvaccinated for COVID-19 to return to full operational duty, despite the 2023 National Defense Authorization Act rescinding the COVID-19 vaccination mandate. (https://news.usni.org/2022/12/07/pentagon-unclear-how-military-would-handle-end-of-mandatory-covid-19-vaccines).    I have done everything in my own power to complete the necessary schools and prepare myself for the job that the Navy will not let me do, which is Department Head.

41.    The fact that I cannot become a Department Head is discriminatory and is having a detrimental impact on my entire career, my family's financial security, and our mental wellbeing. If my career continues down this path, I may be forced out of the military and may not promote. I have spent the entirety of my career, up to this point, preparing to become a Department Head. As Navigator, I was a non-billeted Department Head, i.e., a Department Head in practice but not official title. I had all the rights and duties onboard the ship, which my second tour Division Officer counterparts did not. As the Future Operations Officer (N5) and Administrative Officer (N1) at Commander Amphibious Squadron Eight, I was treated as and functioned as a staff Department Head, but like being a Navigator, I was not a billeted Department Head. I had the same duties and responsibilities as my billeted staff Department Head counterparts; however, my time in those positions did not count for me like it did for them.

42.    What brings me sufficient anxiety and depression is that I know that if I am unable to ever fulfill the role of Department Head, I will not be able to achieve my next career milestones or take command of a warship, and I will have a heavy financial burden to pay back to the Navy,

Pls.' Opp. to Assertion of Mootness App. 0152

plus interest and as to the untaxed amount. When I received my bonuses, I paid taxes on those bonuses. When the Navy claws back those bonuses, my understanding is that they will do so based on the original amount – meaning I will be out even more than what I was paid. I will essentially pay taxes on those sums of money, twice.

43.    Like my career initially ended in 2009 due to an injury, I'm afraid that my career has essentially ended again. It is my understanding that if I cannot promote by 2025, I may be faced with meeting a career continuation board. My understanding is that this board convenes to decide whether or not I can stay in the Navy and may eventually lead to my early separation from the Navy because I have not been performing the job that I was trained to do. Because I have 10 more years before retirement, this means that I could lose out on all of my retirement benefits, which includes retirement pay, medical benefits for me and my family, loss of my GI bill education benefits if I receive a general discharge. A general discharge characterization could also have negative collateral impacts beyond the military context.

44.    Further, the treatment I have sustained as an unvaccinated member of the Navy has given me enough anxiety and depression that it is now documented in my record, with PTSD-like symptoms. I have been consistently sought after to update Page 13s, be counseled on my RAR, RAR appeal, Report of Misconduct, Notice to Show Cause, and Board of Inquiry. The manner in which I was discriminated against led to my peers constantly questioning what was going on, why I was being targeted, etc.

45.    Due to the small size of my family's base housing, which was supposed to be temporary, half of our belongings are required to be kept in Non-Temporary Storage ("NTS"). For context, my wife and I are currently living in a 1,400 square foot home with four boys. Our NTS has almost converted to be entirely our expense (not the Navy's) on two occasions because the

Navy will not issue me necessary orders because I am unvaccinated. I have asked my detailer, who is my correspondent with personnel command and is the person who assists with managing my career, a number of times about this and every time he claims it is impossible for me to be issued orders. This has placed further stress on me and my family.

46.     Finally, throughout this entire ordeal, neither the Commanding Officer nor Executive Officer of Surface Warfare Schools Command have personally sat down with me to discuss my RAR, my RAR denials, or my RAR appeal. With the exception of signing Page 13s given to me by an O-5 Commander, as a result of the RAR denials, all conversations were delegated to an O-4, Lieutenant Commander, who has no real positional significance in my command. My upper-level leadership continuously demonstrates that I mean nothing to them as a person or a SWO, despite the fact that I have continued to successfully perform my duties, albeit with a tremendously heavy and anxious heart, but while also receiving high remarks from students, peers, and my immediate leadership.

47.     At one point during the mandate, I was required to wear stickers on my badge that signified that I was unvaccinated and that I was allowed to enter the building.

48.     Although the Secretary of Defense rescinded the COVID-19 vaccination mandate on January 10, 2023, nothing about my above-referenced circumstances has changed. In light of the fact that the Navy will continue to consider my vaccination status for deployment, assignment, and operational decisions, I think that, without court intervention, all of the negative consequences for being unvaccinated, as listed above, will persist.

Pls.' Opp. to Assertion of Mootness App. 0154

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on February 13, 2023.

/s/ *Levi Beaird*
LEVI BEAIRD

Pls.' Opp. to Assertion of Mootness App. 0155

# Exhibit A

(1) - ORDXXXXX5139.0122.pdf - processed

ROUTINE

R 180207Z  MAR  22

FM COMNAVPERSCOM MILLINGTON TN//PERS4128 //

TO    SWOSCOLCOM NEWPORT RI//JJJ//

      USS SIOUX CITY GOLD//JJJ//

      CENNAVAVNTECHTRAU JACKSONVILLE FL//JJJ//

      SURFCOMSYSTRNCMD DET SOUTHEAST MAYPORT FL//JJJ//

      COMLCSRON TWO MAYPORT FL//JJJ//

      PERSUPP DET NAVSTA NORFOLK VA//JJJ//

      PERSUPP DET MAYPORT FL//JJJ//

      COMLCSRON ONE//JJJ//

      COMSURFACEDIV TWO ONE//JJJ//


UNCLAS //N01321//

MSGID/GENADMIN/CHNAVPERS//

SUBJ/BUPERS ORDER//

RMKS/

   BUPERS ORDER: 0122 (01)    XXX-XX-████████    (PERS-4128)

      OFFICIAL CANCELLATION OF ORDERS FOR

      LT LEVI WAYNE BEAIRD,  USN

- ORDERS AND ANY MODIFICATIONS(S) THERE TO CANCELLED.

CONTINUE PRESENT DUTY.

                              (SIGNED)

                              A. HOLSEY

                              REAR ADMIRAL, U.S. NAVY

                              COMMANDER NAVY PERSONNEL COMMAND

PERS413E PERS413  PERS412

NNNN